UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
MICHAEL MULGREW, *et al.*,

                                Plaintiffs,

                  - against -

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                          Defendants.

:
:
:
:   Civil Case No. 1:24-cv-01644-LJL
:
:
:
:
:
:
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION TO AMEND

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 8

      A.    Congestion Pricing in New York ..................................................... 8

      B.    The National Environmental Policy Act ............................................ 9

      C.    Defendants' "Fast-Track" Approval of Congestion Pricing ................. 10

      D.    Defendants Issue the EA Without Knowing the Toll Structure ............ 11

      E.    The TMRB Issues Its Recommended Toll Price and Structure ............ 13

      F.    MTA Adopts the TMRB Recommendation ........................................ 16

STANDARD OF REVIEW ..................................................................................... 16

ARGUMENT ....................................................................................................... 17

II.    Plaintiffs' NEPA Claims Are Not Barred Under § 139(l) ................................ 17

III.   Plaintiffs' NEPA Claim Is Timely Even Under The 150-day Period .............. 20

      A.    The EA and FONSI are not final agency actions ................................ 20

      B.    The EA and FONSI did not create legal consequences or directly affect the parties ................................................................................. 24

      C.    Equitable tolling principles bar dismissal of Plaintiffs' NEPA claims ................. 27

IV.   Plaintiffs' Failure To Supplement Claim Is Ripe ........................................... 28

V.    Plaintiffs Should Be Granted Leave To Amend The Amended Complaint To Substitute NYSDOT For Its Chief Engineer Acting In His Official Capacity ................................. 34

      A.    Leave to amend should be "freely given" .......................................... 35

      B.    Amendment would not be futile under the Eleventh Amendment ...................... 36

CONCLUSION ................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                        **Page(s)**

*Abbott Lab'ys v. Gardner*,
    387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430
    U.S. 99 (1977)..................................................................................................................2, 33

*In re AIG Advisor Grp. Sec. Litig.*,
    309 F. App'x 495 (2d Cir. 2009) ...............................................................................16

*Alicea v. City of New York*,
    No. 1:16-CV-07347 (JLR), 2023 WL 3724131 (S.D.N.Y. May 30, 2023)...........35

*Am. Airlines, Inc., v. Herman*,
    176 F.3d 283 (5th Cir. 1999) ....................................................................................25

*Aquavella v. Richardson*,
    437 F.2d 397 (2d Cir. 1971).....................................................................................21

*Bennett. Sw. Airlines Co. v. U.S. Dep't of Transp.*,
    832 F.3d 270 (D.C. Cir. 2016)..................................................................................24

*Bennett v. Spear*,
    520 U.S. 154 (1997)..................................................................................................21

*Byrd v. Goord*,
    No. 00 CV 2135 (GBD), 2007 WL 2789505 (S.D.N.Y. Sept. 26, 2007) ...............35

*California v. Block*,
    690 F.2d 753 (9th Cir. 1982) ............................................................................19,29

*Carvel v. Cuomo*,
    357 F. Appx. 382 (2d Cir. 2009)..............................................................................39

*Chamblee v. Espy*,
    100 F.3d 15 (4th Cir. 1996) ........................................................................................5

*Chan v. U.S. Dep't of Transp.*,
    No. 23-cv-10365-LJL (S.D.N.Y.), ECF 1.........................................................36, 39

*In re Charter Oak Assocs.*,
    361 F.3d 760 (2d Cir. 2004)....................................................................................36

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
    669 F.3d 1203 (11th Cir. 2012) ...............................................................................39

*Collins v. City Univ. of N.Y.*,
    21 Civ. 9544 (NRB), 2023 WL 1818547 (S.D.N.Y. Feb. 8, 2023) ........................40

*Cure Land, LLC v. U.S. Dep't of Agric.*,
  833 F.3d 1223 (10th Cir. 2016) ...................................................................26

*In re Dairy Mart Convenience Stores, Inc.*,
  411 F.3d 367 (2d Cir. 2005)........................................................................37

*Darby v. Cisneros*,
  409 U.S. 137 (1993).....................................................................................21

*Dine Citizens Against Ruining Our Env't v. Klein*,
  676 F. Supp. 2d 1198 (D. Colo. 2009).........................................................30

*Dubois v. U.S. Dep't of Agric.*,
  102 F.2d 1273 (1st Cir. 1996)......................................................................29

*Ecology Ctr., Inc. v. U.S. Forest Serv.*,
  192 F.3d 922 (9th Cir. 1999) .......................................................................23

*Est. of Amaro v. City of Oakland*,
  653 F.3d 808 (9th Cir. 2011) .......................................................................28

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992).....................................................................................21

*Friedman Bros. Inv. Co. v. Lewis*,
  676 F.2d 1317 (9th Cir. 1982) .......................................................................3

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
  No. CV 17-1811 (RJL), 2019 WL 1046889 (D.D.C. Mar. 5, 2019) ...........23

*FTC v. Standard Oil Co. of Cal.*,
  449 U.S. 232 (1980).....................................................................................25

*Fund for Animals, Inc. v. Lujan*,
  962 F.2d 1391 (9th Cir. 1992) .....................................................................39

*Hecla Mining Co. v. EPA*,
  12 F.3d 164 (9th Cir. 1993) ...........................................................................4

*Holistic Candlers & Consumers Ass'n v. FDA*,
  664 F.3d 940 (D.C. Cir. 2012).....................................................................22

*Iavorski v. U.S. I.N.S.*,
  232 F.3d 124 (2d Cir. 2000).........................................................................27

*Indep. Equip. Dealers Assoc. v. EPA*,
  372 F.3d 420 (D.C. Cir. 2004)......................................................................26

*Jurist v. Long Island Power Auth.*,
  538 F. Supp. 3d 254 (E.D.N.Y. 2021), *aff'd in part, vacated in part, remanded
  sub nom. Powers v. Long Island Power Auth.*, 21-1755-CV, 2022 WL
  3147780 (2d Cir. Aug. 8, 2022) .......................................................................................34

*Kostok v. Thomas*,
  105 F.3d 65 (2d Cir. 1997).............................................................................................37

*Los Alamos Study Grp. v. U.S. Dep't of Energy*,
  692 F.3d 1057 (10th Cir. 2012) .....................................................................................25

*Manahan v. New York City Dep't of Corr.*,
  214 F.3d 275 (2d Cir. 2000)...........................................................................................25

*McKethan v. N.Y.S. Dep't of Corr. Servs.*,
  No. 10 CIV. 3826 (PAE), 2012 WL 2367033 (S.D.N.Y. June 21, 2012) .............................37

*Moore v. PaineWebber, Inc.*,
  189 F.3d 165 (2d Cir. 1999)...........................................................................................16

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*,
  397 F. Supp. 3d 430 (S.D.N.Y. 2019).............................................................................24

*Nat'l Audubon Soc'y v. Hoffman*,
  132 F.3d 7 (2d Cir. 1997)...............................................................................................10

*Native Songbird Care & Conservation v. LaHood*,
  No. 13-CV-02265-JST, 2013 WL 3355657 (N.D. Cal. July 2, 2013) ...................................19

*Norton v. Fed. Highway Admin.*,
  No. 01-CV-0891E(SC), 2002 WL 31017416 (W.D.N.Y. Aug. 8, 2002) ...............................34

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998).......................................................................................................29

*Ouachita Watch League v. Jacobs*,
  463 F.3d 1163 (11th Cir. 2006) .....................................................................................29

*Pac. Coast Fed'n v. Gutierrez*,
  No. 06-CV-00245, 2007 WL 1752289 (E.D. Cal. June 25, 2007) .........................................23

*Papazoni v. Shumlin*,
  No. 5:15-cv-00056, 2015 WL 7281634 (D. Vt. Nov. 17, 2015), *appeal
  dismissed*, 2016 WL 11848846 (Sept. 7, 2016) .............................................................40

*Pugh v. Goord*,
  571 F. Supp. 2d 477 (S.D.N.Y. 2008).............................................................................38

*Rachman Bag Co. v. Liberty Mut. Ins. Co.*,
  46 F.3d 230 (2d Cir. 1995)..................................................................................35

*N.M. ex rel. Richardson v. Land Mgm't*,
  565 F.3d 683 (10th Cir. 2009) .............................................................................6

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)............................................................................................10

*Saba v. Cuomo*,
  535 F. Supp. 3d 282 (S.D.N.Y. 2021)..................................................................37

*Seneca Nation v. Hochul*,
  58 F.4th 664 (2d Cir. 2023) ................................................................................37

*Sierra Club North Star Chapter v. Peters*,
  Civil No. 07-2593, 2008 WL 2152199 (D. Minn. May 15, 2008) ........................27

*Simmonds v. I.N.S.*,
  326 F.3d 351 (2d Cir. 2003).................................................................................32

*South Carolina Wildlife Federation v. South Carolina Dept. of Transportation*,
  485 F. Supp. 2d 661 (D.S.C. 2007)......................................................................30

*Taxpayers Opposed to Oz, Inc. v. Barram*,
  No. CIV. A. 00-2136-CM, 2000 WL 1595754 (D. Kan. Oct. 16, 2000)................26

*Thompson Metal Fab, Inc. v. U.S. Dep't of Transp.*,
  289 F.R.D. 637 (D. Or. 2013)..............................................................................23

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016).............................................................................................21

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
  5 F.4th 997 (9th Cir. 2021) .................................................................................20

*Wild Va. Comm. v. Council on Env't Quality*,
  56 F.4th 281 (4th Cir. 2022) .................................................................................7

*Williams v. Citigroup Inc.*,
  659 F.3d 208 (2d Cir. 2011).................................................................................35

*Yorkshire Towers Co., L.P. v. U.S. Dep't of Transp.*,
  No. 11 CIV. 1058 TPG, 2011 WL 6003959 (S.D.N.Y. Dec. 1, 2011)...................18

*Ex parte Young*,
  209 U.S. 123 (1908)..................................................................................36, 38, 39

**Statutes**

U.S.C. § 139(l)(1) ...............................................................................17, 23, 27, 28

23 U.S.C. § 139(l)(2) ...........................................................................17, 18, 19, 20

42 U.S.C. § 4332(2)(C) ................................................................................................10

The Traffic Mobility Act ...............................................................................8, 9, 37

Migratory Bird Treaty Act ..............................................................................24

N.Y. Tax L. § 606(jjj) (2021) ..............................................................................9

N.Y. Veh. & Traf. L. § 1704(2) ..............................................................................9

N.Y. Veh. & Traf. L. § 1704-a(1) (2021) ....................................................8

N.Y. Veh. & Traf. L. § 1704-a(1), (2) ..........................................................8

National Environmental Policy Act ..................................................... *passim*

**Other Authorities**

23 C.F.R. 771.130 ...............................................................................................29

23 C.F.R. § 771.109 (2023) ..............................................................................9

23 C.F.R. § 771.115 ...........................................................................................11

23 C.F.R. § 771.119 ...........................................................................................10

23 C.F.R. § 771.129 ...........................................................................................30

23 C.F.R. § 771.130 .................................................................................6, 19, 30

40 C.F.R. § 1500.1(a) (2023) ..............................................................................9

40 C.F.R. § 1501.6 ...........................................................................................10

## PRELIMINARY STATEMENT

Despite the reality of a public transit system increasingly mired in delays, financial mismanagement[1] and in recent months increasing violence, Defendants remain largely focused on ensuring that Congestion Pricing – and the billions of dollars in toll revenue expected to be received by MTA – stays in the "express" lane.  Defendants' attempt to have the *Mulgrew* Plaintiffs' National Environmental Policy Act ("NEPA") claims quickly dismissed on procedural grounds is consistent with the entire environmental review process challenged here, one purposefully designed to evade meaningful public scrutiny despite its profound impact on millions of New Yorkers.  Defendants' Congestion Pricing program is not principally aimed at reducing congestion in the City.  If it were, Defendants would have considered alternatives that would not redistribute traffic and pollution to already suffering environmental (in)justice communities; rather, it is, as MTA again recently acknowledged, a hurried "means" to get to the funding "end" for the fiscally-mismanaged agency, no matter the consequences.[2]

Congestion Pricing will dramatically shift the everyday experience of living and working in New York City.  Teachers, first responders, and other public sector workers essential to the fabric of New York City will be forced to shoulder a daily $15 burden and live with lasting negative environmental impacts.  Many, including Plaintiffs, live in "transit deserts" in New York City and will have little choice but to suffer the toll for there is no realistic travel option.  Teachers, for example, typically need to be at their schools by 7:30 am.  It would take many teachers up to three

---

[1] Last year, MTA found that a "staggering" $690 million of its losses were caused by fare and toll evasion.  The agency should start with collecting what it is already owed than on burdening millions of hardworking New Yorkers with a regressive and environmentally unjust toll.

[2] Desheania Andrews and Chris Nesi, *Staten Island Politicians, Unions Heads Welcome Local NAACP Chapter to Congestion Pricing Opposition*, N.Y. POST (Mar. 22, 2024, 6:18 PM), https://nypost.com/2024/03/22/us-news/nyc-pols-welcome-local-naacp-chapter-to-congestion-pricing-opposition/ (Demetrius Crichlow, chief of MTA's subway operations, acknowledges that "[c]ongestion pricing is a means" to fund improvements to public transportation).

hours to commute from their homes in Staten Island or South Brooklyn to their schools requiring assorted combinations of public transit.  (FAC ¶¶ 56-59).  Many also reside in environmentally vulnerable communities and will see increased traffic congestion in their neighborhoods; and many, including Plaintiffs, will suffer considerably from the environmental damage wrought from diverted traffic.  Indeed, as acknowledged by Defendant Federal Highway Administration ("FHWA"), diverted traffic will increase dangerous air pollutants in Staten Island, the Bronx, Nassau and Bergen counties in some cases for the next 20 years.  The harm to air quality will have detrimental impacts on human health in communities that Plaintiffs live and work in, bringing with it increased hospital admissions for heart or lung conditions, acute and chronic bronchitis, asthma attacks, and even premature death.  Yet, rather than engage in the necessary Environmental Impact Statement ("EIS") process or meaningfully consider the growing chorus of voices raising concerns with the finally spelled out Congestion Pricing plan, Defendants remain fixated on rushing recklessly to June, when the toll scanners already installed are currently scheduled to begin filling the coffers of MTA.  The instant motions before the Court reflect a further attempt to clear all hurdles that dare to question the validity of the result-driven review of Congestion Pricing. Because Plaintiffs' NEPA claims are neither untimely nor unripe, the motions should be denied.

First, Plaintiffs' NEPA claims are not time-barred because they fall within the "de facto exception" to the § 139(l) 150-day limitations period for claims based on "new information" received after the close of a NEPA comment period.  Here, Plaintiffs' claims are timely because they are predicated on the actual Congestion Pricing tolling structure, indisputably "new information" directly bearing on the project and determined only after FHWA had issued its "Finding of No Significant Impact" ("FONSI").

Second, even if the 150-day period did apply, Defendants' motions to dismiss rest on a faulty premise, namely, that the FONSI for Congestion Pricing was a final agency decision, triggering the 150-day limitations period.  The FONSI issued by FHWA was anything but "final." Rather, at that time, MTA had put out assorted pricing scenarios for the Congestion Pricing plan to FHWA, which varied as to the toll rate, the timing of rates, who would be entitled to exemptions and under what circumstances, which river crossings would receive a credit, how much that credit would be, and even the number of times per day vehicles would be charged.  Recognizing that the ultimate structure of the tolls, including the most rudimentary element of the program – the toll price – was still unknown, FHWA acknowledged in the FONSI that Congestion Pricing *would* – not might – "need to be re-evaluated" after the Traffic Mobility Review Board ("TMRB") issued its recommendation "to determine if the decision made in the FONSI is still valid."  Thus, FHWA reserved final judgment on whether Congestion Pricing will have a significant impact for a later-in-time (and potentially less scrutinized) review.

The decision whether an agency decision is "final" for purposes of triggering the NEPA statute of limitations claim turns on whether the agency has consummated its decision-making process; whether it has actually rendered its "last word" on the environmental impact of a proposed project as a whole.  *E.g.*, *Friedman Bros. Inv. Co. v. Lewis*, 676 F.2d 1317, 1319 (9th Cir. 1982). Here, by the terms of the FONSI itself, FHWA had not yet rendered its "last word" when issued, on June 28, 2023.  The FONSI was in reality a tentative assessment of alternatives before final confirmation and did not mark the "consummation" of FHWA's decision-making.  Indeed, Federal Defendants argue in their motion to dismiss that FHWA's final agency decision on tolling structure "has not yet occurred," yet claim finality of the FONSI and EA in an attempt to bar Plaintiffs' claims.  Defendants cannot have it both ways.

The other prong of the finality analysis asks whether the agency decision has "determined the rights or obligations" of plaintiffs.  An agency action is "final" once the result of the process has a "direct and immediate effect" on a complaining party.  *Hecla Mining Co. v. EPA*, 12 F.3d 164, 165 (9th Cir. 1993).  The FONSI did nothing to determine the rights or obligations of the parties and did not directly affect Plaintiffs.  The finding left nearly all the required determinations that would drive and directly impact human behavior – including prices, exemptions, credits and discounts – undecided.  The basic structure of the TMRB recommendation, which *did* ultimately determine the rights or obligations of the parties, was not released to the public until November 30, 2023 (notably three days *after* Defendants contend the limitations period expired).  Indeed, up until March 27th, key features of the Congestion Pricing tolling structure still remained unknown. For Plaintiff Staten Island and New Jersey commuters, the direct and immediate effect of Congestion Pricing, depends on whether and the extent of any mitigation measures committed to environmental justice communities, such as the northern part of Staten Island and the South Bronx, and whether the George Washington and Verrazano Bridges receive crossing credits.  These questions were unresolved by the FONSI.  Nor was the expanding number of exemptions from the tolling requirement known or, more importantly, analyzed.  Now, in the adopted tolling structure, school buses and an unknown number[3] of government vehicles (typically driven by higher salaried supervisors) join the already-qualifying authorized emergency vehicles as exempt from the toll (although cars driven by typically lower-level employees still bear the burden of the $15 charge).

Ultimately, the question of "finality" for purposes of the statute of limitations is interpreted in a "pragmatic" and "flexible" manner and courts consider the "practical effect" of the agency determination, not any self-serving label.  *Chamblee v. Espy*, 100 F.3d 15, 17 (4th Cir. 1996).  The

---

[3] The exemption adopted by the MTA permits an unknown quantum of "specialized government vehicles" to be identified and agreed to by the TBTA and the City of York.

FONSI had no "practical effect" and it was not until, at earliest, December 6, 2023 when the MTA Board voted to proceed with the administrative procedure required to adopt the TMRB Recommendation, that any legal consequences flowed.  Pragmatically, it defies logic to require Plaintiffs to bring a lawsuit within 150-days of the issuance of the FONSI, before any of the material components of the Congestion Pricing program were established with the recognition that details of the plan would only be determined afterwards.  Defendants themselves recognize the purpose of NEPA is "to insure a fully informed and well-considered decision" in examining potential environmental impacts of proposed agency action.  ECF 48 at 2 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978)).  Yet these dual goals utterly failed in the Congestion Pricing process, for both the public-at-large and FHWA were deprived of key aspects of the program's terms, resulting in an ill-conceived decision.

In fact, the entire timeline of the NEPA process has been designed to ensnarl Plaintiffs in the "too late, yet too early" posture that Defendants now claim argues for dismissal.  By analyzing a tentative menu of hypothetical tolling alternatives (rather than the actual project) and deferring a final decision on Congestion Pricing until after the TMRB final recommendation and *after* the supposed 150-day statute of limitations had expired, Defendants' process ensured that any challenge to the FONSI would either not meaningfully address the actual tolling structure imposed and likely harm to Plaintiffs or fall outside the statute of limitations.  If allowed, Defendants' "tentative" FONSI process provides a roadmap to any agency wishing to avoid an informed challenge.  Therefore, to the extent the Court considers the 150-day limitations period starting from the date of the FONSI, the doctrine of equitable tolling should apply.

Third, Federal Defendants expressly assert that Plaintiffs are both too late *and* too early, insisting that Plaintiffs' claim based on the failure to supplement the Congestion Pricing

Environmental Assessment ("EA") is unripe and must await the final FHWA "re-evaluation."  The

argument – which inherently concedes the non-final nature of the FONSI – misconstrues the claim.

The "forthcoming re-evaluation" by FHWA is a short-hand, discretionary analysis outside public

view (one widely expected simply to confirm the FONSI).  That cannot substitute for the full

reopening of the NEPA process that occurs with a supplemental EA.  The Amended Complaint

thus does not challenge the adequacy of FHWA's re-evaluation of its environmental review, as

Federal Defendants suggest.  Instead, the pleading seeks a declaration that Defendants *must*

prepare a supplemental EA now under NEPA based on the new circumstances provided in the

actual tolling structure, the subsequent changes to those circumstances and the new information

relevant to environmental concerns.  Nothing more need occur for that claim to be ripe. The

moment Defendants received the significant new circumstances of the actual Congestion Pricing

scheme – unreviewed changes that impact the environmental analysis – and failed to conduct a

supplemental review, NEPA was violated.  *See N.M. ex rel. Richardson v. Land Mgm't,* 565 F.3d

683, 707 (10th Cir. 2009) (supplemental review required because the initial review did not evaluate

changed elements and there was "no direct reliable way to compare the [environmental] effects"

to what was previously analyzed).  Plaintiffs' request for declaratory judgment is therefore fit for

judicial review now and need not await any further action.

Moreover, FHWA's suggestion that a supplemental review may occur at some time in the

future is a red herring.  NEPA provides that supplementation may occur at any time, when changes

to the proposed action or new circumstances would result in significant environmental impacts not

analyzed in the EA.  23 C.F.R. § 771.130.  The agency's failure to engage in a supplemental study

of Congestion Pricing is not a contingent, future event or a "mere possibility"; they have failed to

commit to or commence supplemental review since the new tolling structure was announced in

December.  Despite knowing the new information, FHWA and MTA have repeatedly publicly affirmed the timeline of Congestion Pricing.  MTA has adopted the TMRB's tolling structure recommendation, FHWA's approval of the structure is scheduled to occur in mid-May, and implementation of the Congestion Pricing program is slated to take place in June.  FHWA cannot possibly perform the full supplemental environmental review required by NEPA, after its "re-evaluation," for which there is no public timetable, which requires public participation, extensive documentation, new environmental studies and inter-agency coordination, and stay on the MTA's committed schedule.

If there was any doubt as to the appropriateness of adjudicating these issues, consideration of the hardship to Plaintiffs, as is required in the "ripeness" analysis, decidedly tips the scales. Should Plaintiffs be unable to bring these claims to challenge FHWA's failure to supplement now, they will be deprived of the opportunity to bring such claims before incurring the daily experience of high tolls, traffic diversions, and adverse environmental consequences.  Delaying adjudication until Congestion Pricing has started also risks Federal Defendants arguing the inverse – that the claims have been rendered moot on account of the commencement of Congestion Pricing.  There is nothing untimely or unripe about deciding this action now.  *See, e.g.*, *Wild Va. Comm. v. Council on Env't Quality*, 56 F.4th 281 (4th Cir. 2022) (looking to NEPA factual developments occurring after the complaint on the question of ripeness).

Finally, alongside Defendants' motion to dismiss the NEPA claims on procedural grounds is the New York State Department of Transportation's ("NYSDOT") motion to dismiss based on the doctrine of sovereign immunity.  The motion should be denied as moot, since Plaintiffs have cross-moved to amend their pleading to substitute NYSDOT Chief Engineer Stephanie Winkelhake in her official capacity, having now succeeded Nicolas Choubah in that position, for

the NYSDOT.  Plaintiffs asked NYSDOT to stipulate to the substitution to obviate the need for this motion wherein there would be little prejudice or surprise since Mr. Choubah has already been named as a defendant in *Chan*.  Klinger Decl. ¶ 2.  NYSDOT declined, saying the timing of the motion schedule made it difficult to adjust its argument.  *Id.* ¶ 3.  In any event, leave to amend is freely given where, as here, there is no prejudice to Ms. Winkelhake, whose predecessor was the signatory to the relevant agency decisional documents challenged here and who herself will have a continued role in the action.  Under well-settled principles, sovereign immunity does not apply to the actions of Ms. Winkelhake in her official capacity because the Amended Complaint alleges an ongoing violation of federal law and seeks prospective relief.

## FACTUAL BACKGROUND

### A.    *Congestion Pricing in New York*

In April 2019, the New York State Legislature passed the Traffic Mobility Act.  *See* First Amended Complaint (hereinafter "FAC"), ECF 19 ¶ 78.  The Traffic Mobility Act authorized the Triborough Bridge and Tunnel Authority ("TBTA")[4] to charge vehicles entering or remaining in Manhattan's CBD a toll that "at minimum, ensure[s] annual revenues and fees collected under such program . . . fund fifteen billion dollars for . . . the 2020 to 2024 MTA capital program," as well as any successor programs, while reducing traffic congestion within the CBD.  N.Y. Veh. & Traf. L. § 1704-a(1) (2021).  The CBD generally includes the entirety of Manhattan south of and inclusive of 60th Street, excepting only the outer thoroughfares, including the FDR Drive, New York state route 9A otherwise known as the "West Side Highway," and the Battery Park Underpass.  N.Y. Veh. & Traf. L. § 1704(2).

---

[4] TBTA is an affiliate of MTA and does business as the MTA Bridges and Tunnels.  Accordingly, this brief includes TBTA as part of MTA.

The Traffic Mobility Act imposed just two requirements for the congestion pricing program,[5] leaving all remaining details of the program to MTA and its appointed Traffic Mobility Review Board ("TMRB"). *Id.* § 1704-a(3), (4). Based on the TMRB's recommendations, MTA would set the toll price for different types of vehicles, the time period when the toll would be operative, credits to cars that access the CBD through bridges and tunnels and already pay a toll, discounts to applicable vehicles and drivers, how to address for-hire vehicles (*i.e.*, taxis and ride-share vehicles), and exemptions from the toll. *See id.*; EA at 2-30 to 2-34. Following the Traffic Mobility Act's enactment, MTA, NYSDOT, and New York City Department of Transportation ("NYCDOT") (collectively, the "Project Sponsors") began developing proposals for Congestion Pricing and submitted an Expression of Interest to FHWA, seeking tolling authority under the federal Value Pricing Pilot Program ("VPPP") to implement the program. EA at 0-1; FAC ¶ 82. To approve the program under the VPPP, FHWA was required to perform an environmental review under NEPA.[6] 23 C.F.R. § 771.109 (2023).

### B. *The National Environmental Policy Act*

In 1970, Congress passed NEPA "to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a) (2023). NEPA fulfills this purpose by: (1) requiring agencies to take a hard look at the environmental impacts of an action before it occurs; and (2) providing the public with a "role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

---

[5] These requirements include: (1) an exemption for qualifying vehicles transporting persons with disabilities and authorized emergency vehicles; and (2) tolling passenger vehicles entering or remaining in the CBD no more than once per day. N.Y. Veh. & Traf. L. § 1704-a(1), (2). Additionally, the State would provide tax credits equal to the amount of tolls paid per year for residents of the CBD with an adjusted gross income of less than $60,000. N.Y. Tax L. § 606(jjj) (2021).

[6] To date, FHWA has not approved the congestion pricing scheme pursuant to the VPPP.

Under NEPA, the lead agency funding, authorizing, or implementing a proposed action –
here, FHWA – must conduct and prepare an Environmental Assessment ("EA") analyzing the
proposed action's direct, indirect, and cumulative impacts to determine whether or not the action
would "significantly affect[] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  If
the lead agency finds that the action is likely to significantly affect the quality of the human
environment, the agency must prepare an Environmental Impact Statement ("EIS").  40 C.F.R.
§ 1501.5(c)(1); 23 C.F.R. § 771.119(i).  Should the lead agency find that the proposed action will
have no significant impact on the environment, it may issue a Finding of No Significant Impact
("FONSI").  40 C.F.R. § 1501.6.  If the decision is a "close call," the agency should prepare an
EIS.  *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 13 (2d Cir. 1997).  Only after a determination
that none of a proposed action's direct, indirect, or cumulative effects has a substantial possibility
to significantly affect the quality of the human environment – accounting for planned mitigation –
may a federal agency be relieved of its duty to prepare an in-depth EIS and instead issue a FONSI.

## C.      Defendants' "Fast-Track" Approval of Congestion Pricing

Uncertainty over the scope of Congestion Pricing, the proper process for review, and
changes in political leadership defined a project characterized by fits and starts from 2019 to 2021.
Despite MTA participating in over a dozen meetings with FHWA under the previous
administration, FAC ¶ 83, the program's implementation was delayed because FHWA "repeatedly
failed to provide the MTA with guidance" whether an environmental assessment or an EIS was
required.[7]  *See* 23 C.F.R. § 771.115.  Nearly two years later, in February 2021, CEO Janno Lieber

---

[7] Erik Bascome, *NYC Congestion Pricing May Be Pushed Forward Under Biden*, Silive (Feb. 26, 2021, 1:09 PM),
https://www.silive.com/news/2021/02/nyc-congestion-pricing-may-be-pushed-forward-under-biden.html.

indicated that FHWA is "going to fast-track our environmental process."[8]  FAC ¶ 87.  The next month, Lieber again confirmed the "good news" that FHWA "will be fast tracking the MTA's environmental process, which will certainly get the MTA moving forward towards being able to realize this source of funds and instituting [congestion pricing]."[9]  FAC ¶ 10.  On March 30, 2021, FHWA authorized the Project Sponsors to proceed with a NEPA Class III action, which called for the creation of an EA to determine whether the congestion pricing plan was likely to have a significant environmental affect.[10]  FAC ¶ 88.  In its authorization letter, FHWA emphasized it would "expedite its efforts wherever possible."  FAC ¶ 88.

### D.    Defendants Issue the EA Without Knowing the Toll Structure

Defendants published the Draft EA in August 2022, which, after a constricted 44-day comment period, was finalized on May 5, 2023 with little change.  FAC ¶¶ 23-24, 93-94, 105; EA[11] at 0-2 to 0-4 ("[m]ost of the text in the Final EA remains unchanged from the August 2022 EA").  The EA's stated purpose was to "reduce traffic congestion in the Manhattan CBD *in a manner that will generate [$15 billion] for future transportation improvements*."  FAC ¶ 91; EA at 3 of 958 (emphasis added); *see also id.* at ES-7.  However, neither the Draft nor "Final" EA analyzed the environmental impact of any particular congestion pricing program with a specific price, credits, discounts, and exemptions.  FAC ¶ 2.  Instead, the EA purported to analyze the environmental effect of a number of tolling scenarios – which all differed in price, structure, and credits/exemptions – in comparison to a single "no-action" alternative (*i.e.*, not implementing the

---

[8] Alissa Walker, *Sec'y Pete Is Already Coming Through for New York City on Congestion Pricing Curbed* (Feb. 23, 2021), https://www.curbed.com/2021/02/congestion-pricing-nyc-approval-pete-buttigieg.html.

[9] MTA, MTA Board Meeting on March 17, 2021 Minutes, in MTA Board Action Items, at 15 (Mar. 17, 2021), http://new.mta.info/document/33901.

[10] If the FHWA concluded that the congestion pricing program significantly affected the environment, it would have to prepare a more in-depth EIS.  *See* 23 C.F.R. § 771.115(a).

[11] The EA is available at https://new.mta.info/document/111101.

program).  FAC ¶¶ 89-90; EA at ES-12.[12]  Based on the scenarios, Defendants determined that although Congestion Pricing would decrease harmful emissions as a whole in Manhattan, the redirected traffic from drivers attempting to avoid the toll would result in added congestion and increases in every category of pollutant in the Bronx, Staten Island, and Bergen County, in some cases for the next 20 years.  FAC ¶ 15; EA at 10-21 to 10-35.  Staten Island, and the North Shore of Staten Island in particular, already suffer from poor air quality, a condition that would be exacerbated by Congestion Pricing.  FAC ¶ 32.  In fact, much of the North Shore of Staten Island has been designated as an Environmental Justice Area by the City.  *Id.*  Health metrics related to air quality – asthma (including ozone and PM2.5 asthma), emergency department visits, and respiratory hospitalizations – are all significantly higher there than the greater New York City area.  *Id.*  The EA acknowledged that Staten Island will receive the largest overall increases in the six dangerous pollutants identified both in 2023 and projected through 2045.  *Id.*

On May 12, 2023, Defendants published a draft FONSI, providing again a severely limited period, here only 30 days, for public review[13] before finalizing the FONSI on June 23, 2023 without any notable changes.  FAC ¶¶ 110-11; FONSI at 25.[14]  While the FONSI acknowledged the "potential adverse effect[s]" for air quality, subway ridership, increased congestion due to traffic diversions on exempted thoroughfares, and that "some [environmental justice] communities that are already overburdened by pre-existing air pollution and chronic diseases could see an

---

[12] As Defendant acknowledge, not all of the hypothetical scenarios were analyzed throughout the EA with respect to the issues identified (*i.e.,* air quality, environmental justice, transportation impacts) and geographic areas.  Instead, Defendants self-selected certain tolling scenarios for certain issues and for certain geographic areas based on their view as to the negative impact of those scenarios.

[13] N.Y.S., *ICYMI: Governor Hochul Announces Central Business District Tolling Program Final Environmental Assessment and Draft 'Finding Of No Significant Impact' Now Available* (May 12, 2023), https://apps.cio.ny.gov/apps/mediacontact/public/view.cfm?parm=9CC5FE4F-F476-DBF9-8AE2F84FBB494C17_6F3DC552-A1CD-952B-56D6159AC4DA3367.

[14] The FONSI is available at https://new.mta.info/document/114186.

adverse effect as a result of increased traffic," FONSI at 4, 6-7, 12-14, it summarily concluded that Congestion Pricing would have "no significant impact on the human or natural environment," FONSI at 3 of 41.

As "Next Steps" in the agency process, the FONSI identified the need to "define the CBD Tolling Program," by which the TMRB "will recommend to the [MTA] Board the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for existing tolls paid on bridges and tunnels." FONSI at 25. It further left open how the "pricing structure could vary by time of day, day of week, and day of year and could be different for different types of vehicles." FONSI at 25; FAC ¶ 112. Because the EA did not commit to any particular tolling price or structure, FHWA indicated that it would still need to "re-evaluate" the chosen rates and tolling structure in the future to determine whether a FONSI is still appropriate. FONSI at 26; FAC ¶ 113. Re-evaluation, however, can amount to a mere administrative step, unlike a statutorily required supplemental EA, and will not satisfy the required hard look. On June 28, 2023, FHWA published a notice in the Federal Register stating that claims in opposition to congestion pricing filed after November 27, 2023 would be barred, 88 FR 41998.[15] FONSI at 26.

### E.    The TMRB Issues Its Recommended Toll Price and Structure

Just three days after the federal registrar notice expired (according to Defendants, the final date anyone could challenge the non-finalized congestion pricing program), on November 30, 2023, the TMRB published its recommended toll price and structure for the Congestion Pricing program ("TMRB Recommendation").[16] FAC ¶ 115. Notably, the recommended toll price and

---

[15] "Notice of Final Federal Agency Actions on the Central Business District Tolling Program, New York, New York," available at https://www.federalregister.gov/documents/2023/06/28/2023-13709/notice-of-final-federal-agency-actions-on-the-central-business-district-tolling-program-new-york-new.

[16] The TMRB Recommendation is available at https://new.mta.info/document/127761.

structure did not match any of the scenarios analyzed in the EA or FONSI, and had several considerable changes from any of the analyzed tolls.  FAC ¶ 147.

First, the recommended "peak" daytime toll rate applied for an extra two hours each day compared to the scenarios – from 5:00 AM to 9:00 PM on weekdays and 9:00 AM to 9:00 PM on weekends – capturing many more drivers and causing further diversion of traffic to surrounding areas.[17]  FAC ¶ 116; TMRB Recommendation at 8.  In fact, the proposed peak hours exceed the peak hour schedules of the transit systems, like the Long Island Railroad and Metro-North, meant to accommodate these drivers.  Second, TMRB applied a $15 toll for passenger vehicles and passenger-type vehicles, even though none of the scenarios analyzed that toll price.[18]  TMRB Recommendation at 8.  Third, the Recommendation provided a $5 crossing credit for those traveling through the Queens-Midtown, Hugh L. Carey, Lincoln, and Holland Tunnels, but declined to offer a similar credit to the George Washington and Verrazano Bridges.[19]  Id.  Fourth, the Recommendation charges for-hire-vehicles (e.g., taxis and Ubers) per ride,[20] even though the EA never contemplated a per-ride toll.  Id.  The amount, times, locations of the toll pricing, and structure doubtless would impact the volume, location of traffic and environmental impact of Congestion Pricing.  FAC ¶ 7; EA at ES-13.  Yet none of these scenarios were analyzed.

The TMRB recommendation was approved by MTA on December 6, 2023.  FAC ¶ 128. Though the State Administrative Procedure Act requires MTA to conduct a public hearing and

---

[17] All other hours are considered "off-peak" and are priced 75% lower than the peak toll.

[18] To put the $15 toll in context, an individual traveling five times per week into the CBD would face $75 per week, and over $3,000 per year in additional costs, a significant amount of after-tax dollars (on top of existing tolls and mileage costs).

[19] These crossing credits only apply during peak toll hours and several were reduced as part of the recent adoption of the final tolling scheme.

[20] Taxis will be charged $1.25 per ride, while Ubers will be charged $2.50 per ride.

comment process before implementation, the process was a formality.  FAC ¶ 128.  Hearings were limited to four days, including three consecutive business days, speakers were limited to two minutes of time to make their case, and MTA publicly stated that the recommendation will largely remain the same (despite widespread public opposition).  FAC ¶ 128-29.  MTA has said that it expects congestion pricing to "go[] live in late spring,"[21] giving little credence to the various litigations brought against the program.  FAC ¶ 130.  Ninety-five percent of the infrastructure for Congestion Pricing has been built as of February.[22]  MTA has also indicated – in a self-serving effort to deter requested exemptions – that the recommendation cannot materially change because "[i]f you change one aspect . . . the whole thing starts to unravel or fall apart."[23]  This assertion ended up contradicted by Defendants' actions, however, as MTA did change a number of components analyzed in the EA.  It is difficult to understand how MTA can believe that the Congestion Pricing structure is so delicately balanced that any one change could throw the entire program into jeopardy, yet the same changes (not to mention the entire tolling structure) do not warrant supplemental review.  While the MTA hearing process, much like the NEPA process, pays lip service to public input and participation, in reality, the process was focused on expeditious approval.  FAC ¶¶ 10, 87-88, 183.  Following the release and MTA adoption of the TMRB Recommendation, Plaintiffs brought suit on January 4, 2024.  *See* ECF 1.

---

[21] *See* MTA, MTA Board Meeting - 12/6/2023, YouTube (Dec. 6, 2023), https://www.youtube.com/live/0pfJ-S9myBk?si=4BnXippfzAml3OoC&t=6022 at, 1:40:22 (Allison C. de Cerreño (MTA Chief Operating Officer): "We're looking forward to going live in late spring.").

[22] Andrew Siff, *MTA Gives Congestion Pricing Update Ahead of First Public Hearing*, NBC (Feb. 28, 2024, 3:02 PM), https://www.nbcnewyork.com/traffic/transit-traffic/congestion-pricing-nyc-manhattan-how-it-works/5177568/.

[23] Stephen Nessen &Clayton Guse, *Don't Expect Changes to MTA's Congestion Pricing Even After Final Pub. Review*, Gothamist (Dec. 8, 2023), https://gothamist.com/news/changes-to-mtas-congestion-pricing-nyc-nj (quoting MTA Chair and CEO Janno Lieber).  In the middle of the 60-day comment period on the TMRB Recommendation, MTA announced a limited program for individuals with disabilities to apply for a toll exemption, indicating the inadequacy of the EA analysis.

### F.       *MTA Adopts the TMRB Recommendation*

On March 27, 2024, MTA voted 11-1 to finally approve the TMRB Recommendation at its monthly board meeting, with a few key changes.[24]   Although the prices, peak hours, and crossing credits generally aligned with the TMRB Recommendation, the Final Toll Structure added exemptions for school buses, certain commuter vans and buses, and additional  government vehicles (to be agreed to by TMRB and the City), and also changed the crossing credit on the Queens-Midtown and Hugh L. Carey Tunnel from $5 each entry to $2.50 each time the vehicle enters or exits the CBD (leaving credits for other crossing unchanged from December).[25]   As such, the toll structure strayed even further from those considered in the EA and FONSI.   Following MTA's adoption of the toll structure, MTA updated its website to state, "In June 2024, New York City will implement the nation's first congestion pricing program."[26]

<u>STANDARD OF REVIEW</u>

The standards for dismissal under Federal Rule 12(b)(6) and 12(b)(1) are substantively identical.  *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 (2d Cir. 1999).  In deciding both types of motions, the District Court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff."  *In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x 495, 497 (2d Cir. 2009) (quoting Jaghory v. N.Y. State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997)).

---

[24] Stephen Nessen, *MTA Gives Final Approval for Congestion Pricing in NYC*, Gothamist (Mar. 27, 2024), https://gothamist.com/news/mta-gives-final-approval-for-congestion-pricing-in-nyc.

[25] MTA, MTA Board Meeting on March 27, 2024 Minutes, in MTA Board Action Items, at 14-15 (Mar. 29, 2023), https://new.mta.info/document/135591.

[26] MTA, Central Business District Tolling Program, https://new.mta.info/project/CBDTP (last visited Mar. 28, 2024).  On March 27, 2024, after Defendants submitted their Motions to Dismiss, MTA finalized its tolling schedule based on the TMRB Recommendation.

## ARGUMENT

Federal Defendants argue that Count I of the *Mulgrew* Plaintiffs' Amended Complaint ("Violation of NEPA") is time-barred pursuant to the 150-day limitation set forth in U.S.C. § 139(l)(1), and that Count II of the Amended Complaint ("Failure to Supplement") is unripe. *See* ECF 48 ("Fed. Def. Mot."). MTA, NYCDOT, TMRB, and TBTA Defendants argue that Count I is time-barred by § 139(l)(1). *See* ECF 53 ("Proj. Sponsors Mot."). NYSDOT bases its motion solely on the doctrine of sovereign immunity. *See* ECF 50 ("NYSDOT Mot."). Plaintiffs address each of these arguments, in turn, below.

## II.   Plaintiffs' NEPA Claims Are Not Barred Under § 139(l)

Defendants' argument that Plaintiffs' first NEPA cause of action is time-barred under § 139(l)(1) lacks merit, and, in fact, is disproven by the cases cited by Federal Defendants.

Section 139(l)(1) provides the general 150-day limitation period that Defendants cite for claims seeking judicial review of a final approval issued by a federal agency for public transportation capital projects. 23 U.S.C. § 139(l)(1). However, that is not the only limitations period for FHWA capital projects. Subsection 2 of § 139(l) governs the limitations period when "new information" directly bearing on a transportation project is disclosed after the close of a NEPA comment period. In that case, the agency is *required* to consider such new information, and the "deadline" to file a claim arises 150-days after the preparation (or the agencies failure to prepare) a supplemental analysis. 23 U.S.C. § 139(l)(2). Courts within this district have labeled the "new information" subsection a "de facto exception" to the 150-day limitations period.

Federal Defendants' misplaced reliance on *Yorkshire Towers Co., L.P. v. U.S. Dep't of Transp.* ("*Yorkshire Towers*"), No. 11 CIV. 1058 TPG, 2011 WL 6003959, at *5-6 (S.D.N.Y. Dec. 1, 2011), proves the applicability of the longer § 139(l)(2) period to Plaintiffs' claims here. In *Yorkshire Towers*, the MTA announced its decision to locate a new subway entrance in front of

Yorkshire Towers on 86th Street in a supplemental environmental assessment released to the public in May 2009.  The Federal Transportation Authority issued its FONSI on October 29, 2009, with a published notice of limitations in the Federal Register on December 9, 2009, limiting claims to those filed before June 7, 2010.  The plaintiffs filed suit in February 2011, arguing that "new information," in the form of a "proposed alternative" they provided to the MTA for the subway entrance, extended the statute of limitations.

The court analyzed the language of the longer § 139(l)(2) limitations period for claims brought based on "new information" received after the comment period and held that under NEPA regulations, the "de facto exception" applies to (1) changes to a proposed action that would result in significant environmental impacts not evaluated in the EIS; or (2) new information or circumstances relevant to environmental concerns bearing on the proposed action or its impacts. *Id*. at *6.  The plaintiffs in *Yorkshire Towers* offered their preferred alternative for the subway entrance, rather than a change to the project or new information not considered by the FTA as the basis of their claims.  The court reasoned that suing on this preferred alternative was not "new information," but instead the same attack on the underlying agency decision itself.  *Id.*

The distinguishing characteristics here make plain that this case falls within the "de facto exception" identified in *Yorkshire Towers*.  Rather than simply offering an alternative, Plaintiffs identify "new information" both as a change to the proposed action that would result in significant environmental impact and new information relevant to environmental concerns bearing on the project's impact.  We now have the actual tolling structure, unknown to FHWA at the time of the FONSI and hence absent from critical review, as the basis of Plaintiffs' claims.  The TMRB Recommendation made on November 30, 2023 and later approved by MTA on December 6, 2023 is "new information" within the meaning of 23 U.S.C. § 139(l)(2) and 23 C.F.R. § 771.130 and

the proffered 150-day time limit is inapplicable.  The TMRB Recommendation (and the additional March 27 modifications to the adopted structure) not only directly bear on the proposed Congestion Pricing scheme, it *is* the Congestion Pricing scheme.  The toll structure is the critical instrument which lays out all of the keys details of the plan that were not present – perhaps intentionally so – for the EA, such as the specific tolling rates for various vehicles, the peak tolling hours, and exemptions.  FAC ¶¶ 116, 118, 119, 122; *see also California v. Block*, 690 F.2d 753, 770 (9th Cir. 1982) (NEPA does not allow an agency to wait until after a final EIS to announce the proposed action it intends to adopt).  It was received after the comment period and thus never analyzed by FHWA in its initial review.  The "new information" exception to the 150-day limitations period rests on the non-finality of an agency's decision when material changes to a program are made after a FONSI is issued.  That is what occurred here.

Defendants rely on *Native Songbird Care & Conservation v. LaHood*, No. 13-CV-02265-JST, 2013 WL 3355657, at *5 (N.D. Cal. July 2, 2013), to argue that § 139(l)(2) "only allows parties to challenge an agency's failure to supplement an EIS, rather than reviving an untimely challenge to the original review."  Fed. Def. Mot. at 13.  First, Plaintiffs have brought a failure to supplement claim in addition to its underlying NEPA claim.  Second, *Native Songbird* is distinguishable.  There, the plaintiffs challenged a Final Environmental Impact Statement (FEIS) prepared by FHWA to analyze impacts of a series of improvements to a 16–mile portion of U.S. Route 101, when nearly *four years* after issuance of the FEIS, numerous cliff swallows became entangled in the netting and many died.  That occurrence was not a change to FHWA's "proposed action" that would have a significant environmental impact on the project.  It may have been a result of the netting, many years later, but it was not a proposed revision to the project.  The allegedly "new information" there occurred years after the FEIS and did not directly bear on the

project or the adequacy of the initial FEIS analysis.  It therefore could not be used to revive a claim regarding the FEIS.  Here, the tolling structure, occurring before and directly bearing on the "proposed action" and the adequacy of the FONSI, is precisely the type of new information contemplated by § 139(l)(2).  Accordingly, Plaintiffs' claims are timely.

III.   **Plaintiffs' NEPA Claim Is Timely Even Under The 150-day Period**

Even if the Court does not apply the new information exception, Defendants' limitation period argument also fails.  First, it ignores settled case law regarding when an agency action becomes final to trigger the statute of limitations; and second, it defies fundamental principles of equity, rewarding Defendants for purposefully failing to commit to a Congestion Pricing plan until *after* the 150-day period had run.

### A.   *The EA and FONSI are not final agency actions*

To seek judicial review of an agency's actions under the APA, a plaintiff must have suffered a legal wrong or been adversely affected by a "final agency action."  *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1007 (9th Cir. 2021) (citing 5 U.S.C. § 704).  Here, both Federal Defendants and MTA claim that the June 28, 2023 Federal Register publication stating that "the FHWA and other Federal agencies have taken final action," and that claims seeking judicial review "will be barred unless the claim is filed on or before November 27, 2023" precludes Plaintiffs' NEPA challenge.  Fed. Def. Mot. at 11; Proj. Sponsors Mot. at 7.  Defendants premise their argument on the Federal Register assertion, but critically omit any analysis of whether the EA and FONSI actually constitute a final determination.  *See* Fed. Def. Mot. at 11-12; Proj. Sponsors Mot. at 7-8.  This absence is telling, for Plaintiffs' Amended Complaint makes clear that no true "final agency action" took place.[27]  FAC ¶ 147.  At the earliest,

---

[27] *See* Fed. Def. Mot. at 9, which lists additional agency actions that needed to take place after issuance of the FONSI but before implementation of Congestion Pricing, such as the tolling structure adoption on December 6.

FHWA could not have taken its final action until after December 6, 2023 when the MTA approved the TMRB Recommendation regarding the Congestion Pricing tolling structure.  FAC ¶ 128. Plaintiffs' NEPA claims, filed on January 4, 2024, are therefore timely.

Two conditions must be satisfied for an agency action to be "final."  First, "the action must mark the 'consummation' of the agency's decision-making process," meaning it "must not be of a merely tentative or interlocutory nature."  Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (applying *Bennett*'s two-prong test for final agency action).  The "core question" is whether the agency has completed its decision-making and given its "last word," with "a definitive position on an issue that inflicts an actual, concrete injury."  *Darby v. Cisneros*, 409 U.S. 137, 144 (1993); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).  The Supreme Court has indicated that the finality requirement is properly interpreted by courts in "a pragmatic way."  *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  The Second Circuit has further instructed that "[w]hether an agency action is final for purposes of the APA should not depend on *semantic characterizations* but rather on a careful evaluation of the separate but coordinate functions of courts and administrative agencies and of the impact of the challenged action on the parties."  *Aquavella v. Richardson*, 437 F.2d 397, 404–05 (2d Cir. 1971) (emphasis added).

A careful evaluation of impact of the EA and FONSI on the parties here shows that the documents fail to satisfy the finality test from *Bennett* and Defendants' "semantic characterization" of the FONSI as a "final" action in the Federal Register does not change that result.  The FONSI did not reflect FHWA's definitive position or the rendering of its "last word" on Congestion

Pricing, nor did it mark the consummation of its decision-making that would inflict concrete injury on Plaintiffs.  Instead, it was one step of a longer, agency process, ending with the adoption of the actual tolling structure.  *See Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (holding that an agency's own treatment of the action can show that it is not the culmination of the agency's consideration of an issue).

In a section aptly entitled, "*What are the Next Steps*," the FONSI explained that after its issuance, TMRB would subsequently recommend "the toll amounts and toll structure, such as crossing credits, discounts, and/or exemptions for existing tolls paid on bridges and tunnels." FONSI at 25.  While the TMRB Recommendation "[would] be informed" by the results of the EA, the FONSI states that in this recommendation, "the variable pricing structure could vary by time of day, day of week, and day of year and could be different for different type of vehicles" and it outlined a process whereby the MTA Board would then approve and adopt a final toll structure. *Id.*  Once adopted, the FONSI clarifies that the adopted toll structure "will have to be re-evaluated [by the FHWA] to determine if the decision in the FONSI is still valid."  FONSI at 26.  The re-evaluation "requires that the [MTA] demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid." *Id.*

It is hard to see how the FONSI could be construed as the consummation of FHWA's decision-making, when the agency expressly preserved a later re-evaluation, promising a future "final word" on Congestion Pricing and indicates that MTA's next actions should be informed by the EA and FONSI.  While certain FONSIs may constitute final agency adjudication, this FONSI was not.  It was a tentative ruling on a host of tolling alternatives, with FHWA reserving its final determination for a later time depending on the actual tolling structure.  *See Ecology Ctr., Inc. v.*

*U.S. Forest Serv.*, 192 F.3d 922, 925 (9th Cir. 1999) (holding that monitoring and reporting were not final agency actions that consummated the Forest Service's decision-making process because they were "only steps leading to an agency decision, rather than the final action itself"); *see also Pac. Coast Fed'n v. Gutierrez,* No. 06-CV-00245, 2007 WL 1752289, at *10 (E.D. Cal. June 25, 2007) (agency's plan to federally manage two water projects was not a "final" decision because the actions were "not being implemented at present," and because the agency would be consulting with others on other actions before future action).

None of the cases cited by Defendants resemble the interlocutory nature of the FONSI issued by FHWA here.  In *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, No. CV 17-1811 (RJL), 2019 WL 1046889, at *8 (D.D.C. Mar. 5, 2019), the court found that the plaintiffs' claims challenging a proposed light rail's potential adverse effects on certain historic sites were time-barred by § 139(l)(1), as the agency's final, unchallenged determinations on potential impact on such historic sites were made in 2014, three years prior to the plaintiffs' lawsuit.  In *Thompson Metal Fab, Inc. v. U.S. Dep't of Transp.*, 289 F.R.D. 637, 643 (D. Or. 2013), the court denied a motion to intervene for the failure to timely file within the 150-day time period where the intervenor's claims challenged the adequacy of an agency's Final EIS.  These cases, all brought more than 150-days after clear, final agency determination, find no application here.  In none of the cases did the agency expressly reserve a future decision on key elements of the proposed action.

Moreover, courts also look to how the agency subsequently treats the challenged action in assessing whether an agency action qualifies as "final" for purposes of the first prong of *Bennett*. *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).  *Nat. Res. Def. Council, Inc. v. U.S. Dep't of the Interior*, 397 F. Supp. 3d 430, 447 (S.D.N.Y. 2019) is instructive. There, the court found that defendant FWS had treated the challenged action (an official opinion

issued by the Secretary of the Department of Interior interpreting the Migratory Bird Treaty Act) as the agency's "final word" on the subject based on its issuance of guidance several months later that was consistent with the definitive conclusions of the memorandum.  Here, by contrast, FHWA made no final conclusions in the FONSI, and, in fact, openly admitted that the actual tolling structure would only be determined *after* issuance of the FONSI.  FAC ¶ 112.  Even in this litigation, Defendants emphasize that the EA and FONSI were not the final word on Congestion Pricing.  *See* Fed. Def. Mot. at 14-15 (FHWA still needs to understand that the "effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid," and "the MTA has not yet adopted a final tolling schedule . . . [o]nce the schedule is finalized the FHWA must make a re-evaluation").

FHWA's actions are more similar to the challenged action in *Whitewater*, where the Ninth Circuit found that a manual which described "how DHS will implement NEPA," but did not "prescribe any action in any particular matter" was not final for purposes of the APA.  The court emphasized there that the *Whitewater* manual contained only "very general instructions and has not bound DHS to any particular decision" which demonstrated that it was not the "'consummation' of the agency's decision-making process."  *Whitewater*, 5 F.4th at 1009 (citing *Bennett*, 520 U.S. at 177-78).  The same can be said of the FONSI.  It was not a final agency action as it did not bind FHWA to its decision; it explicitly reserved decision and, as such, did not trigger the statute of limitations.

### B.     The EA and FONSI did not create legal consequences or directly affect the parties

The second prong in determining whether an agency action is final is whether the action "is one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 530 U.S. at 178.  Under this prong, courts consider whether the agency action

is advisory or whether it will have a "direct and immediate . . . effect on the day-to-day business of the subject party" and "whether immediate compliance with its terms is expected." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239-40 (1980).  A nonfinal agency action is one that "does not adversely affect complainant, but only affects his rights adversely on the contingency of future administrative action." *Am. Airlines, Inc., v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999).

The FONSI at issue is contingent on future agency action and did not "give[] rise to 'direct and appreciable legal consequences,'" *U.S. Army Corps of Eng'rs*, 578 U.S. at 598 (quoting *Bennett*, 520 U.S. at 178).  No legal consequences flow from the issuance of the EA and FONSI; they neither granted nor denied rights, they imposed no legal obligations, exposed no individual to penalties, and in no way tied the government's hands.  After the issuance of the FONSI on June 28, 2023, the Project Sponsors retained wide discretion to enact a Congestion Pricing program of their choosing.  Plaintiffs could not anticipate how they would ultimately be impacted by the FONSI or the EA based on FHWA's advisory review of hypothetical tolling scenarios.  Nor did the FONSI bind FHWA in any meaningful way to take any particular action.  *See Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1066 (10th Cir. 2012) (committing an action that is a "binding commitment" for an agency is a final action for NEPA purposes).  Even with the FONSI, FHWA remained free to reverse itself on the environmental impact of Congestion Pricing after a tolling structure was adopted.  At bottom, because the EA and FONSI "[c]ompelled no one to do anything" and had "no binding effect whatsoever," they do not constitute final agency action. *Indep. Equip. Dealers Assoc. v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

Ironically, in *Cure Land, LLC v. U.S. Dep't of Agric.*, 833 F.3d 1223, 1231 (10th Cir. 2016), the federal government asserted precisely the argument advanced here, namely, that a FONSI did not constitute final agency action by the Farm Service Agency (FSA) because the agency retained

the ability to revisit the FONSI if the terms of a water conservation program underwent a "significant expansion or increase."  Because of this reservation of rights, the government argued that FONSI did not reflect the agency's binding commitment and posited that "although a FONSI can serve as a final decision (where it expressly provides that a decision has been finalized), this one does not."  *Cure Land, LLC v. U.S. Dep't of Agric.*, Appellees' Supplemental Brief Addressing Jurisdiction, No. 14-1415, 2016 WL 420647 (10th Cir. Feb. 1, 2016).  The Tenth Circuit ultimately held that the FONSI was final because it was not "tentative or interlocutory in nature," but *Cure Land's facts* are readily distinguishable. There, a supplemental environmental analysis *was* performed studying the changes to the water conservation program (expanding acreage, adding counties and increasing project funding).  While exact details of the program to be agreed upon by the agencies had yet to be finalized, the FONSI issued after supplemental review determined the parties' respective rights and obligations and was an action from which legal consequences flowed. Here, of course, no supplemental analysis has been conducted and the core elements of the entire Congestion Pricing program remained to be determined.

The facts here are more akin to *Taxpayers Opposed to Oz, Inc. v. Barram*, No. CIV. A. 00-2136-CM, 2000 WL 1595754, at *4 (D. Kan. Oct. 16, 2000), where the court found that that defendant U.S. General Services Agency's (GSA) issuance of a FONSI after evaluating the environmental effects of transferring an ammunition plant did not constitute a "direct and immediate" action "that determined the rights or obligations or from which legal consequences may flow."  There, similar to here, because GSA was still required to perform critical steps in the regulatory process for the proposed action to occur, the FONSI did not constitute final action.[28]

---

[28] Defendants may argue that FHWA satisfied the procedural obligations of NEPA.  However, the court in *Taxpayers Opposed to Oz* recognized that "although the defendant has arguably completed the steps under the NEPA regulatory review process," that did not necessarily make the FONSI "final" agency action from which legal consequences flow.  In so holding, the court weighed the "practical considerations" of the situation, noting that it

### C.     *Equitable tolling principles bar dismissal of Plaintiffs' NEPA claims*

Should the Court nonetheless be inclined to apply the 150-day statute of limitations to Plaintiffs' first claim and run the period starting on the issuance of the FONSI, the statute should be equitably tolled.  Courts have wide discretion to equitably toll statutes of limitations "to avoid inequitable circumstances."  *See, e.g.*, *Iavorski v. U.S. I.N.S.*, 232 F.3d 124, 129 (2d Cir. 2000).  In exercising this discretion under § 139(l)(1), courts have relied on a number of different tests, any of which provides sufficient justification for this Court to toll the limitations period.  Courts have held that the plaintiff must demonstrate, "(1) timely notice, (2) lack of prejudice to the defendant, and (3) reasonable, good faith conduct by the plaintiffs."  *Sierra Club North Star Chapter v. Peters*, Civil No. 07-2593, 2008 WL 2152199, at *9 (D. Minn. May 15, 2008) (quoting *Pecoraro v. Diocese of Rapid City*, 435 F.3d 870, 875 (8th Cir. 2006).  Relevant here, equitable tolling may apply in circumstances where lateness to file a NEPA claim is beyond the control of the plaintiff.  *Sierra Club North Star Chapter*, 2008 WL 2152199, at *9.

The fast-tracked NEPA review process appears set up to shield the Congestion Pricing program from meaningful legal challenge.  *See* FAC ¶¶ 2, 8, 10, 183.  The timeline of the NEPA process was beyond Plaintiffs' control and the lack of any identifiable tolling structure stood in the way of mounting a meaningful challenge to the adequacy of the FONSI.  FHWA labeled the June 28, 2023 FONSI publication as the statute of limitations starting point while intentionally leaving out critical details of the tolling structure to be filled in at some unspecified later date, which "deprived the plaintiff of a full understanding of the true facts."  *Est. of Amaro v. City of Oakland*, 653 F.3d 808, 813 (9th Cir. 2011); FAC ¶ 111.  Curiously, that critical information issued but three days after the asserted limitations period expired.  If Plaintiffs had filed the NEPA

---

was "not logical to consider the regulatory review processes under NEPA . . . in isolation."  *Taxpayers Opposed to Oz, Inc. v. Barram*, 2000 WL 1595754, at *4.

challenge before the TMRB Recommendation was made on November 30, 2023, they would have been forced to challenge a hypothetical set of scenarios and impacts.  FAC ¶ 21.  Defendants' insistence that the TMRB's Recommendation and even the adoption of the tolling structure by MTA *is not* final (for ripeness), *infra* at 29, but that the FONSI *was* final is an attempt to slice the agency process into pieces to avoid any meaningful review.

Viewing the circumstances as a whole, including Defendants' actions, Plaintiffs satisfy the elements required to establish equitable tolling.  Equitably tolling § 139(l)(1) is not prejudicial to Defendants, as they are currently litigating NEPA challenges to the EA and FONSI on the merits with multiple other parties, and, based on the present motion, anticipate the possibility of additional litigation on their failure to conduct a supplemental analysis.  It would be more efficient for Defendants to bring these suits to conclusion on the merits rather than addressing the same claims later.  Plaintiffs have engaged in reasonable, good faith conduct.  When the actual tolling structure was recommended by TMRB on November 30th, and later approved on December 6th, Plaintiffs worked diligently to analyze the details of the tolling structure and how it would environmentally impact their communities in comparison to the hypothetical scenarios presented in the EA and FONSI and filed their lawsuit within a matter of weeks.  Allowing Defendants to assert a statute of limitations defense in this context violates fundamental principles of equity.

IV.   **Plaintiffs' Failure To Supplement Claim Is Ripe**

While MTA, TBTA, and NYCDOT move to dismiss only Plaintiffs' first claim, Federal Defendants contend that Plaintiffs' failure to supplement claim should be dismissed on ripeness grounds.  Fed. Def. Mot. at 13-16.[29]   Specifically, Federal Defendants argue that because

---

[29] Federal Defendants also halfheartedly assert that certain City Council member Plaintiffs should be dismissed because they are named in their official capacity.  Fed. Def. Mot. at 1 n.1.  The argument, raised solely in a footnote, is unavailing because the Council members also assert claims in their individual capacity and are personally

"FHWA's re-evaluation . . . has not yet occurred, and indeed cannot occur until the TBTA finalizes

a tolling schedule," Count II of Plaintiffs' Amended Complaint should be dismissed.  Fed. Def.

Mot. at 12-14, 9 (listing remaining events in Project).  Defendants' suggestion that the claim is

"speculative" misconstrues the import of the claim.  A failure to supplement claim under NEPA is

ripe for review "at the time the failure takes place."  *Ouachita Watch League v. Jacobs*, 463 F.3d

1163, 1174 (11th Cir. 2006) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737

(1998)).  NEPA requires supplementation of an EA, which can occur at any time, when "new

information" or "new circumstances" make substantial changes to a project not evaluated in an EA

that are relevant to environmental concerns, even when the full environmental impact is unknown.

23 C.F.R. 771.130.  Supplemental review is required when changes in the final project not analyzed

in the initial review pose new environmental issues that "could not be fairly anticipated" and

"serious dilute[]" the relevance of the public comment period.  *Cal v. Block*, 690 F.2d 753, 772

(9th Cir. 1982); *Dubois v. U.S. Dep't of Agric.*, 102 F.2d 1273 (1st Cir. 1996).  That is precisely

what occurred here, as the moment a tolling structure was adopted by MTA that differed materially

from its hypothetical scenarios, new circumstances required FHWA to supplement the EA to fully

consider the scope of the environmental impact of Congestion Pricing.

Putting aside that Federal Defendants believe that the FONSI is both sufficiently final to

trigger the statute of limitations, yet insufficiently definitive to be ripe for review, Defendants

reliance on a "re-evaluation" misunderstands the claim.  In short order (and likely before the Court

hears argument on this matter), Defendants will go through a "re-evaluation" to determine whether

the adopted Congestion Pricing tolling program changes FHWA's determination of "no significant

impact."  A "re-evaluation" however, is not a supplementation.  A "re-evaluation," as the FHWA's

---

impacted by Congestion Pricing, just like their constituents.  FAC at 1 (caption providing that each council member
is suing "individually and as New York City Council Member"), ¶¶ 31-61.

own guidance makes clear, is a non-public, abbreviated process entirely within the discretion of the agency in which affirming a FONSI may take the form of a simple "checklist, an email exchange between the agency and project sponsor" or even a verbal confirmation.[30] Plaintiffs are not here asking that the Court rule on the adequacy of any re-evaluation (Fed. Def. Mot. At 14), which outcome is easy to predict.  Rather, Plaintiffs seek a declaration from this Court that FHWA must reopen the NEPA process and conduct a full supplemental EA of the environmental impacts of the actual Congestion Pricing tolling structure, replete with another public notice and comment period, as is required by NEPA.  23 C.F.R. § 771.130(d); *see Dine Citizens Against Ruining Our Env't v. Klein*, 676 F. Supp. 2d 1198 (D. Colo. 2009) (claim seeking declaration that federal defendants violated NEPA and the APA by failing to supplement was ripe for review in light of new information and circumstances).  Federal Defendants conveniently assert that there "is no agency decision that Plaintiffs may claim is contrary to 23 C.F.R. § 771.129 (NEPA re-evaluation)," but Plaintiffs' claim is that FHWA has acted contrary to 23 C.F.R. § 771.130 (NEPA supplemental review).

*South Carolina Wildlife Federation v. South Carolina Dept. of Transportation*, 485 F. Supp. 2d 661 (D.S.C. 2007), is on all fours.  There, the plaintiffs challenged the planned construction of a bridge after the issuance of an EIS, arguing that an inadequate environmental analysis was performed.  The defendants there, like Federal Defendants here, argued that the challenge was premature and not ripe for review because the defendants had still planned to conduct a "re-evaluation" of the already-completed EIS.  The court ruled that the claim was ripe, explaining that FHWA NEPA regulations on re-evaluations do not require defendants to develop a new EIS, but only to consider the environmental impacts caused by any incremental changes to

---

[30] "NEPA Re-Evaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA) & Federal Transit Administration," August 14, 2019.

the project that have occurred since the EIS was issued.  Because the *South Carolina Wildlife Federation* plaintiffs' claim asked for a full supplemental review, the claim was ripe.  Notably, the court observed that there was no other stage in the agency process for the plaintiffs to bring their claims because defendants "have already chosen the site, millions of dollars have already been appropriated, and an FEIS and record of decision have already been completed." *Id.* at 672.

The similarities here are self-evident.  Federal Defendants argue that Plaintiffs' claims are unripe because they must await FHWA's "re-evaluation."  Fed. Def. Mot. at 14.  Not so.  A "re-evaluation" is not a supplemental environmental analysis and it does not reopen the NEPA process; it is a confirmation of an already reached agency decision.  The Court can determine now whether the adoption of the Congestion Pricing tolling structure requires full supplementation and issue a declaratory judgment mandating it.  And like the plaintiffs in *South Caroline Wildlife Federation*, there are no more relevant steps in the agency process to await; defendants have already chosen the program, millions of dollars have been appropriated, and Congestion Pricing is scheduled to begin.  A determination need happen now.

Moreover, to determine whether a claim challenging administrative action is ripe for judicial review, courts look to (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.  *Ohio Forestry*, 523 U.S. at 733.

Plaintiffs satisfy all elements necessary to establish ripeness as set forth by the Supreme Court.  First, Plaintiffs will face significant hardship if the failure to supplement claim is not heard.  If Plaintiffs are unable to bring these claims, they will be deprived of the opportunity to challenge the tolling scheme before experiencing "a direct and immediate dilemma" in the form of high daily

31

tolls, traffic diversions, and adverse environmental consequences, including pollution and diminished air quality. *Simmonds v. I.N.S.*, 326 F.3d 351, 359 (2d Cir. 2003); *see* FAC ¶¶ 31-61.

Second, judicial intervention at this stage would not interfere with any substantive administrative action by FHWA. MTA's last public hearing was held on March 4th, and the public written comment period ended on March 11th. On March 27th, the TMRB Recommendation was formally adopted by MTA. Federal Defendants state in their Motion that the "FHWA re-evaluation of Final EA and FONSI" and the "VPPP agreement between the FHWA and Project Sponsors" have yet to occur, Fed. Def. Mot. at 9; however, given MTA's consistent refrain that Congestion Pricing will go forward in June despite ongoing litigation, both of these actions will be little more than formalities to solidify an administrative action already set in motion.

Finally, at this point, there is no factual development that could benefit this Court in its analysis of Plaintiffs' NEPA claims. The tolling structure recommendation adopted by MTA is now final. Indeed, with the added exemptions, the scheme is even further away from the scenarios initially analyzed in the EA.[31] The facts are ripe for analysis by the Court now.

To the extent Defendants claim that a failure to supplement has yet to take place, their own authority emphasizes that "[i]f an agency has had time to respond to new information, and declines to make any expert determination, it foregoes any claim of deference and must submit to a court's de novo determination of whether a Supplemental EIS is required." *Native Songbird*, 2013 WL 3355657, at *7. Here, Defendants have been aware of new information requiring a supplemental review since December and have made no action or commitment to such review. Even now, they fail to acknowledge the need for supplementation and, in all likelihood, will continue to do so absent direction of this Court.

---

[31] Nessen & Guse, *supra*, note 23.

Moreover, prudential ripeness requires a consideration whether the issues are adequately presented to enable the court to conduct a review of agency action or whether the court would have to engage in analysis of uncertain potentialities with "abstract disagreements over administrative policies." *Abbott Laboratories,* 387 U.S. at 148. Ripeness "is concerned with whether the issues sought to be adjudicated are contingent on future events or may never occur." *Simmonds*, 326 F.3d at 359.

There is nothing contingent about Plaintiffs' failure to supplement claim. The Court can determine on the current administrative record that a full supplemental environmental analysis is required to comport with mandated NEPA procedures. Nor is there any real doubt that Defendants will fail to conduct a supplemental environmental review. By MTA's own admission, the congestion pricing program will be implemented by ***late Spring 2024***.[32] FAC ¶ 130. Indeed, 95% of the infrastructure for the program had already been built as of February.[33] MTA publicly stated that it intends to ensure that its "re-evaluation" remains consistent with FHWA's finding of "No Significant Impact." FAC ¶ 159. Under these circumstances, FHWA cannot possibly prepare a supplemental analysis of the program's environmental impact adequate to meet its burden under NEPA and comply with MTA's schedule. Upholding the FONSI is a foregone conclusion. With the late Spring 2024 implementation fast-approaching, this issue is fit for judicial review.

The facts of Defendants' cases in support of their ripeness argument differ considerably from the situation presented here. *See, e.g.*, *Jurist v. Long Island Power Auth.*, 538 F. Supp. 3d 254, 267 (E.D.N.Y. 2021), *aff'd in part, vacated in part, remanded sub nom. Powers v. Long Island*

---

[32] *See* MTA, *MTA Board Meeting - 12/6/2023*, YOUTUBE (Dec. 6, 2023), https://www.youtube.com/live/0pfJ-S9myBk?si=4BnXippfzAml3OoC&t=6022 at 1:40:22 (Allison C. de Cerreño (MTA Chief Operating Officer): "We're looking forward to going live in late Spring.").

[33] Andrew Siff, *MTA Gives Congestion Pricing Update Ahead of First Public Hearing*, NBC (Feb. 28, 2024, 3:02 PM), https://www.nbcnewyork.com/traffic/transit-traffic/congestion-pricing-nyc-manhattan-how-it-works/5177568/.

*Power Auth.*, 21-1755-CV, 2022 WL 3147780 (2d Cir. Aug. 8, 2022) (holding that plaintiffs' challenges were too speculative for the court's review, as they were based on the occurrence of a future event they may never happen); *Norton v. Fed. Highway Admin.*, No. 01-CV-0891E(SC), 2002 WL 31017416, at *2 (W.D.N.Y. Aug. 8, 2002) ("this action is not yet ripe for judicial review because there presently is no violation of NEPA or of its related regulations").  Here, there is no future event that needs to occur.  The failure to supplement the EA and fully evaluate the environmental consequences in light of the adopted tolling structure is a present violation of NEPA.  Plaintiffs need not wait until FHWA's rubber-stamped decision confirming the FONSI to bring a claim for failure to supplement.

**V.    Plaintiffs Should Be Granted Leave To Amend The Amended Complaint To Substitute NYSDOT For Its Chief Engineer Acting In His Official Capacity**

Separate from Defendants' motions to dismiss on the issues of timeliness and ripeness, Defendant NYSDOT has moved to dismiss on the grounds of sovereign immunity.  The motion should be denied as moot, for Plaintiffs have sought leave to amend the Complaint to substitute NYSDOT Chief Engineer Stephanie Winkelhake (a position formerly held by Nicolas A. Choubah) in her official capacity for the NYSDOT.[34]  On March 11, 2024, prior to Defendant's making this motion, Plaintiffs requested that NYSDOT consent to amending the Amended Complaint in this manner.  Klinger Decl. ¶ 2.  NYSDOT declined given where the parties were in motion practice.  *Id.* ¶ 3.

---

[34] On information and belief, Choubah has since retired as Chief Engineer and was replaced by Stephanie Winkelhake.  See NYSDOT, Engineering Division, https://www.dot.ny.gov/divisions/engineering (last visited Mar. 22, 2024).  Under Federal Rule of Civil Procedure 25(d), when a public officer ceases to hold office, the "officer's successor is automatically substituted as a party." *Id.*; *Byrd v. Goord*, No. 00 CV 2135 (GBD), 2007 WL 2789505, at *1 (S.D.N.Y. Sept. 26, 2007).  Accordingly, any references to Choubah apply with equal force to Winkelhake.

### A.     Leave to amend should be "freely given"

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, a party may amend its complaint with "the court's leave," and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see Alicea v. City of New York*, No. 1:16-CV-07347 (JLR), 2023 WL 3724131, at *2 (S.D.N.Y. May 30, 2023).

As the Second Circuit has explained, "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-13 (2d Cir. 2011) (cleaned up). Accordingly, "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility, Rule 15's mandate must be obeyed." *Manahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234 (2d Cir. 1995) ("The Supreme Court has emphasized that amendment should normally be permitted, and has stated that refusal to grant leave without justification is 'inconsistent with the spirit of the Federal Rules.'") (quoting *Foman*, 371 U.S. at 182).

There is no evidence or indication that substituting NYSDOT with its Chief Engineer would result in undue delay or prejudice, or that Plaintiffs assert this claim in bad faith or with a dilatory motive. Defendants named NYSDOT as a co-project sponsor for Congestion Pricing. In this role, NYSDOT was charged, along with the FHWA, MTA, and NYCDOT, with developing proposals for the Program and releasing the EA and FONSI. *See* EA at 0-1. NYSDOT is also listed as the "Implementation Lead" for certain mitigation measures identified in the EA, including to implement electric truck charging infrastructure using funds raised in the Congestion Pricing Program, EA at ES-22 to ES-23, and has control over certain roadways subject to the toll, *id*. at ES-28, ES-39. NYSDOT has been a part of all the proceedings in this action since the commencement, and would suffer no prejudice from the amendment.

35

Nor would there be any prejudice to Choubah (or, by operation of law, his successor). NYSDOT appointed Choubah in July 2020 as its Chief Engineer.[35]   Defendants identified Choubah in the EA as one of four Project representatives, and someone who helped prepare the EA and FONSI, both of which he signed.  EA at 1-19, 955 of 958; FONSI at 3 of 41.  In fact, Choubah has been on notice of the Congestion Pricing lawsuits since at least November 22, 2023, when the plaintiffs in a related case named him as a defendant for his role in Congestion Pricing. *See Chan v. U.S. Dep't of Transp.*, No. 23-cv-10365-LJL (S.D.N.Y.), ECF 1 ¶ 30; ECF 34 ¶ 44 n.4 (listing Choubah as defendant in his official capacity as Chief Engineer for NYSDOT). NYSDOT further explained that it would be responsible for implementing several mitigation measures, including "installing charging stations for electric trucks, monitoring traffic conditions on state highways, implementing traffic management measures such as installing signage to address changes in traffic patterns, and planting vegetation to reduce air pollution from changes in traffic patterns."  NYSDOT Mot. at 4.

### B.  *Amendment would not be futile under the Eleventh Amendment*

Nor would amending the Amended Complaint to add Ms. Winkelhake be futile.  The Eleventh Amendment bars suits against states and their agencies for claims of violating state or federal law.  *In re Charter Oak Assocs.*, 361 F.3d 760, 765 (2d Cir. 2004).  However, under the *Ex parte Young* exception, a party may sue state officials acting in an official capacity, and the "court need only conduct a 'straightforward inquiry' into whether the complaint alleges an ongoing violation of federal law and seeks prospective relief."  *Seneca Nation v. Hochul*, 58 F.4th 664, 670 (2d Cir. 2023); *Kostok v. Thomas*, 105 F.3d 65, 68 (2d Cir. 1997) ("If an act by a state violates the federal Constitution or federal law, . . . then the enforcing state actor loses official immunity.");

---

[35] Engineering News Record, Nicolas Choubah, https://www.enr.com/infrastructure-forum/speakers/nicolas-choubah (last visited Mar. 20, 2024).

*Saba v. Cuomo*, 535 F. Supp. 3d 282, 300 (S.D.N.Y. 2021) (this Court stating that declaratory and injunctive relief is considered prospective).  This is because "[t]he state has no power to impart to [an officer] any immunity from responsibility to the supreme authority of the United States."  *Ex parte Young*, 209 U.S. 123, 160 (1908).  The *Ex parte Young* exception requires only that the official "have a connection with the act, and nothing more."  *McKethan v. N.Y.S. Dep't of Corr. Servs.*, No. 10 CIV. 3826 (PAE), 2012 WL 2367033, at *2 (S.D.N.Y. June 21, 2012).

A straightforward inquiry clearly shows that Plaintiffs allege an ongoing violation of NEPA and the federal Dormant Commerce Clause and Privileges and Immunities Clause and seek prospective relief based on NYSDOT's (and other Defendants') connection and continued involvement with implementing Congestion Pricing.  *See generally* FAC at 58 (requesting injunctive and declaratory relief), ¶¶ 145-75.  NYSDOT admits that it, "as a Project Sponsor of the congestion pricing program, participated in preparation of the environmental assessment that the Federal Highway Administration issued and relied on in issuing its finding of no significant impact under NEPA."  NYSDOT Mot. at 13.  Yet, it improperly seeks to narrow *Ex parte Young's* applicability to those that the Traffic Mobility Act provides with explicit "authority to set or collect any congestion tolls."  *Id.* at 2, 6.

Contrary to NYSDOT's contention, the Second Circuit has held that a defendant's duties need not be noted in the act.  *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 373 (2d Cir. 2005) (citing *Ex parte Young*, 209 U.S. at 157).  Instead, *Ex parte Young* "require[s] only that a defendant have a 'connection' with the act, and not more."  *Pugh v. Goord*, 571 F. Supp. 2d 477, 517 (S.D.N.Y. 2008) (citing cases).  In *Pugh*, the district court found that an officer had a sufficient connection with the act at issue where the officer "was consulted" and "espoused views" that led to the creation of the allegedly unconstitutional policy.  *Id.* at 514–15.

Here, NYSDOT, as Project Sponsor, was consulted with and espoused views regarding the Congestion Pricing Plan throughout the period it helped develop the EA and FONSI. *See* NYSDOT Mot. at 13. Moreover, NYSDOT's role in the Project and violation of NEPA and Plaintiffs' constitutional rights remains ongoing. Once FHWA (inevitably) determines that the effects of the final tolling rates and structure are consistent with the decision to issue a FONSI, NYSDOT will work with the other Project Sponsors and FHWA to enter into a tolling agreement allowing the Project Sponsors to enter into the FHWA VPPP. FONSI at 26; *see also In re Dairy Mart*, 411 F.3d at 373 (rejecting argument that there was no continuing violation of law where wrongful acts occurred in the past because there were still more potential steps in the process). Once the Program is accepted into the VPPP, the Project Sponsors have continuing responsibilities, including collecting tolls and implementing mitigation and monitoring programs. *See, e.g.*, EA at ES-28.

Aside from the significant responsibilities shared among the Project Sponsors, NYSDOT, in particular, is charged with allocating millions of dollars raised through Congestion Pricing to implement electric truck charging infrastructure. EA at ES-22 to ES-23. Further, NYSDOT owns and maintains the relevant segments of the Long Island Expressway, I-95, and the FDR Drive, and will coordinate to implement certain transportation demand management measures as needed according to its own guidelines. EA at ES-28, ES-39. NYSDOT has also allowed and continues to allow the Program to utilize its roadways in the installation and collection of the tolls. Lastly, NYSDOT is tasked with using $10 million in toll funds to plant vegetation to reduce air pollution from changes in traffic patterns. *Chan*, No. 23-cv-10365-LJL, ECF 62 at 5. Mr. Choubah, through his role as Chief Engineer of NYSDOT, is the only NYSDOT official who signed and was referenced in the EA and FONSI. *See* EA at 1-19, 955 of 958; FONSI at 3 of 41. Accordingly,

Mr. Choubah (and his replacement, Ms. Winkelhake) maintains a sufficient "connection" to Congestion Pricing and can properly be named a defendant under the Eleventh Amendment.

Despite NYSDOT's clear and substantial involvement in the Project, NYSDOT argues that sovereign immunity bars Plaintiffs' NEPA claims because NEPA (and the APA) only applies to federal agencies.  NYSDOT Mot. at 12-14.  Notably, none of its cited cases actually discuss sovereign immunity, except for one non-NEPA case cited for the general proposition that "the *Ex parte Young* exception is available only if the law invoked "appl[ies] substantively to the agency." NYSDOT Mot. at 13 (citing *Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 88 (2d Cir. 2001)).

However, numerous courts have determined that sovereign immunity does not bar NEPA claims against state officials to enjoin the agency from continuing with a federally funded project. *See, e.g.*, NEPA Law and Litig. § 4:3 (2023-2024) (citing *Joseph v. Adams*, 467 F. Supp. 141, 148 (E.D. Mich. 1978)); *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1397 (9th Cir. 1992) ("Nonfederal defendants may be enjoined if 'federal and state projects are sufficiently interrelated to constitute a single 'federal action' for NEPA purposes.'"); *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (jurisdiction over state agency was proper in NEPA case because the agency had substantial role in project, worked in tandem with federal agencies, and plaintiffs only sought injunctive relief).

NYSDOT's cited cases are not to the contrary.  In *Carvel v. Cuomo*, 357 F. Appx. 382 (2d Cir. 2009), the plaintiff sued then-Attorney General Cuomo to dissolve a non-profit entity.  The plaintiff did not allege that the Attorney General himself violated any federal law or that he had any personal involvement in the alleged deprivation of her constitutional rights.  *Id.* at 383. Similarly, in *Papazoni v. Shumlin*, No. 5:15-cv-00056, 2015 WL 7281634 (D. Vt. Nov. 17, 2015), *appeal dismissed*, 2016 WL 11848846 (Sept. 7, 2016), the plaintiff's suit had already been thrown

out twice, and was dismissed a third time based on res judicata, failure to state a plausible claim, and sovereign immunity for "fail[ing] to articulate any connection between Governor Shumlin and this state proceeding, or any factual allegations specific to Governor Shumlin to suggest that he was personally involved or otherwise responsible for any alleged wrongdoing." *Id.* at *3.[36]

These cases where a plaintiff fails to assert any personal involvement of a state official are far different than the actions and authority of NYSDOT and its Chief Engineer, who worked with Defendants for years on developing and analyzing the Project, signed the EA and FONSI, and continue to help implement the Project.  It would belie reality to conclude that an official of one of three entities explicitly named as Project Sponsor who had and continues to have a significant role in implementation and mitigation could have no connection to the Project.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Defendants' Motions to Dismiss and grant Plaintiffs' Cross-Motion to Amend its Amended Complaint to substitute Defendant NYSDOT with NYSDOT's Chief Engineer (currently Stephanie Winkelhake) in her official capacity.

---

[36] NYSDOT's arguments against Plaintiffs' constitutional claims are also inapposite.  In *Collins v. City Univ. of N.Y.*, 21 Civ. 9544 (NRB), 2023 WL 1818547 (S.D.N.Y. Feb. 8, 2023), sovereign immunity barred claims against five individuals who no longer had any involvement in evaluating religious exemption requests to a school's COVID-19 vaccination requirements, and thus had no authority to grant any of plaintiff's requested relief.  *Id.* at *5. However, the court allowed suit against members of the committee who evaluate exemption requests.  *Id.*

Unlike the five individuals who have no role in evaluating religious exemptions or allowing individuals on campus, NYSDOT is involved in substantial aspects of Congestion Pricing's implementation and enforcement as a Project Sponsor.

Dated: New York, New York          **STEPTOE LLP**
       April 5, 2024

By:  /s/ *Alan M. Klinger*
     Alan M. Klinger
     Dina Kolker
     David Kahne
     1114 Avenue of the Americas
     New York, New York 10036
     (212) 506-3900
     aklinger@steptoe.com

*Co-Counsel for the United Federation of Teachers and Individual Plaintiffs*

              -and-

     BETH A. NORTON, Esq.
     United Federation of Teachers
     52 Broadway
     New York, NY 10004
     (212) 701-9420

*Co-Counsel for the United Federation of Teachers and Individual Plaintiffs*

              -and-

     THE OFFICE OF LOUIS GELORMINO, Esq. & FONTE & GELORMINO LEGAL GROUP
     2550 Victory Blvd.
     Suite 304
     Staten Island, NY 10314
     (917) 968-1619
     (718) 720-4949

*Co-Counsel for Vito J. Fossella*