UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
MICHAEL MULGREW, *et al.*,

                                        Plaintiffs,

                v.                                          Case No. 24-cv-01644-LJL

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                                        Defendants.
------------------------------------------------------------------------X


**BRIEF OF *AMICUS CURIAE*
NEW YORK CITY MUNICIPAL LABOR COMMITTEE
IN SUPPORT OF PLAINTIFFS**

You got a fast car
I got a plan to get us out of here
I been working at the convenience store
Managed to save just a little bit of money
Won't have to drive too far
Just 'cross the border and into the city
You and I can both get jobs
And finally see what it means to be living
> \- Tracy Chapman, Fast Car (Elektra 1988)

That's going to cost $15.
> \- Defendants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

INTEREST OF *AMICUS CURIAE* .................................................................................. 3

ARGUMENT ....................................................................................................................... 5

    I.     Congestion Pricing Will Negatively Affect the Health and Quality of Life of Public Employees Who Live on the Periphery of the CBD .......................................... 5

    II.    Congestion Pricing Will Adversely Impact Public Sector Employees Who Must Commute into the CBD with Their Personal Vehicles. ............................................. 7

    III.   Defendants' Failure to Improve Public Transit Before Implementing Congestion Pricing Harms Public Employees Without Adequate Access to Public Transit. .................................................................................................. 11

CONCLUSION ................................................................................................................... 14

# TABLE OF AUTHORITIES

## Other Authorities

Christopher Maag, *Man Killed by No. 4 Train After Being Pushed Onto Subway Tracks*, N.Y. Times (Mar. 25, 2024), https://www.nytimes.com/2024/03/25/nyregion/subway-shoving-manhattan.html ........................................................................................... 8

Claire Fahy, *Man Is Critically Wounded in a Shooting on a Subway Train in Brooklyn*, N.Y. Times (Mar. 14, 2024), https://www.nytimes.com/2024/03/14/nyregion/subway-shooting-brooklyn.html............................................................................................ 8

District Council 37, AFSCME, AFL-CIO, *Economic Contract* (May 19, 2023), https://www.dc37.net/dc37contracts/economic ......................................... 4

Eric Jaffe, *Where the New York City Subway Doesn't Go*, Bloomberg (Aug. 5, 2015), https://www.bloomberg.com/news/articles/2015-08-05/mapping-new-york-city-s-subway-deserts ........................................................................ 9

Ian Kumamoto, *These two old subway stations are getting a $100 million refresh*, TimeOut (Mar. 19, 2024), https://www.timeout.com/newyork/news/these-two-old-subway-stations-are-getting-a-100-million-refresh-031924 ............................................. 14

Jonathan Allen, *New York to deploy 750 National Guard soldiers to check bags on subway*, Reuters (Mar. 8, 2024), https://www.reuters.com/world/us/new-york-deploy-750-national-guard-soldiers-check-bags-subway-2024-03-06 ........................... 13

Marcia Kramer, Lisa Rozner, *School buses, city-owned cars granted exemptions from NYC congestion pricing, MTA says*, CBS News (Mar. 25, 2024), https://www.cbsnews.com/newyork/news/nyc-congestion-pricing-exemptions-for-government-vehicles-and-school-buses ............................................ 10

Metropolitan Transportation Authority, *Central Business District Tolling Program*, https://new.mta.info/project/CBDTP .......................................... 1

National Institute of Environmental Health Sciences, *Air Pollution and Your Health*, https://www.niehs.nih.gov/health/topics/agents/air-pollution (last reviewed Apr. 2, 2024) ................................................................................ 6

Natlie Duddridge, *FDNY members against congestion pricing speak at MTA's 2nd public hearing on new tolls*, CBS News (Mar. 2, 2024), https://www.cbsnews.com/newyork/news/fdny-members-against-congestion-pricing-tolls-mta-second-public-hearing ................................................ 7

New York City Department of Citywide Administrative Services, *Fiscal Year 2019 New York City Government Workforce Profile Report*,

https://www.nyc.gov/assets/dcas/downloads/pdf/reports/workforce_profile_report_fy_2019.pdf (last visited Apr. 5, 2024) .................................................................. 8

New York City Department of Citywide Administrative Services, *Fiscal Year 2021 New York City Government Workforce Profile Report*, https://www.nyc.gov/assets/dcas/downloads/pdf/reports/nyc-government-workforce-profile-report-fy-2021.pdf (last visited Apr. 5, 2024).............................. 8

New York City Office of Labor Relations, *Recent Agreements & Prevailing Rate Consent Determinations, 2021-2026 Agreements*, https://www.nyc.gov/site/olr/labor/labor-recent-agreements.page (last visited Apr. 5, 2024)............................................................................................................ 4

Samantha Liebman, *MTA clarifies congestion pricing exemptions ahead of Wednesday vote*, Spectrum News NY1 (Mar. 25, 2024), https://ny1.com/nyc/all-boroughs/traffic_and_transit/2024/03/25/mta-clarifies-congestion-pricing-exemptions-ahead-of-wednesday-vote ...................................... 11

Sarah Maslin Nir, *Left Behind by the Nation's Largest Subway System*, N.Y. Times (Dec. 27, 2017), https://www.nytimes.com/2017/12/27/nyregion/new-york-subway-deserts.html............................................................................ 10

Stephen Dubner, *This Is Your Brain on Pollution*, Freakonomics (Aug. 11, 2021), https://freakonomics.com/podcast/this-is-your-brain-on-pollution/ .......................................... 6

Traffic Mobility Review Board, *Congestion Pricing in New York* (Nov. 2023), https://new.mta.info/document/127761 ...................................................... 11

U.S. Department of Transportation Federal Highway Administration, *Central Business District (CBD) Tolling Program Final Environmental Assessment* (Apr. 2023), https://new.mta.info/document/111101 ...................................... 1, 4, 5, 6

U.S. Environmental Protection Agency, *National Environmental Policy Act Review Process*, https://www.epa.gov/nepa/national-environmental-policy-act-review-process (last updated Oct. 3, 2023)............................................................ 11

## PRELIMINARY STATEMENT

The New York City Municipal Labor Committee ("MLC") respectfully submits this *amicus curiae* brief in support of Plaintiffs' opposition to Defendants' motions to dismiss and in support of their demand that an Environmental Impact Statement ("EIS") be performed before congestion pricing is implemented in New York City's Central Business District ("CBD"). Defendants' congestion pricing scheme will have a disproportionate impact on the health and well-being of New York City's ("City") municipal employees, particularly those who live or work in communities surrounding the CBD and those who must commute into the CBD for their work.  Only an EIS will ensure that these public sector employees – the backbone of the City – are protected from congestion pricing's deleterious effects.

As mentioned by Plaintiffs in their opposition to Defendants' motions to dismiss, Defendants are attempting to preclude meaningful review of their environmental analysis of congestion pricing in the CBD before tolling commences.[1]  Approximately one year ago, they published a purportedly "final" Environmental Assessment even though it was subject to review and amendment once a final tolling schedule was determined.[2]  That tolling schedule was not finalized until a few weeks ago, on March 27, 2024.[3]   By the time Defendants' alleged supplemental review of their Environmental Assessment is completed, tolling in the CBD will commence, as Defendants have declared that it will begin in June 2024.[4]  Public sector employees who will be detrimentally affected by congestion pricing deserve the opportunity to be heard before incurring the scheme's costly toll and negative consequences on their commutes

---

1.  Pls.' Opp'n to Defs.' Mot. to Dismiss 5, ECF No. 62.
2.  U.S. Department of Transportation Federal Highway Administration, *Central Business District (CBD) Tolling Program Final Environmental Assessment,* 4D-11 (Apr. 2023), https://new.mta.info/document/111101.
3.  Metropolitan Transportation Authority, *Central Business District Tolling Program*, https://new.mta.info/project/CBDTP (last visited Apr. 12, 2024).
4.  *Id.*

1

and communities.[5]  The MLC therefore submits this brief at this stage to prevent Defendants

from silencing them, and respectfully requests that the Court consider the gravity of the

following issues facing the City's municipal workforce when determining Defendants' motions.

Like Plaintiffs, many municipal employees live or work in the communities surrounding

the CBD, where traffic will be diverted once congestion pricing commences.  These employees

and their families will suffer increased exposure to elevated levels of pollution caused by this

traffic, as the abbreviated environmental review conducted by Defendants recognizes.  Their

neighborhoods may also experience increased noise pollution, or negative effects to the natural

resources in them, but the Environmental Assessment does not satisfactorily address these issues

for these communities, even though they will have to absorb increased traffic.

Congestion pricing's effects will extend beyond the CBD's periphery as well.  It will

adversely impact public employees who live in more distant communities in the outer boroughs

and in neighboring counties in New Jersey, on Long Island, and north of the Bronx.  These

employees, particularly those who work in law enforcement, emergency services, sanitation

services, and maintenance, often require use of their personal vehicles to mitigate unreasonable

stresses of their commute, like transporting burdensome equipment or traveling during hours

when public transportation is limited, isolated, deserted, or just inaccessible.  Defendants'

congestion pricing scheme disregards these issues, and instead forces these employees to suffer

the CBD's $15 toll notwithstanding their duties and circumstances.

Indeed, Defendants' failure to improve public transit infrastructure before implementing

congestion pricing disregards successful precedents implemented in London, United Kingdom

and Stockholm, Sweden.  Unlike these models, which prioritized improving public transit

---

5.   *See* Pls.' Opp'n to Defs.' Mot. to Dismiss 7, ECF No. 62.

services to incentivize commuters to shift to them, Defendants have neglected necessary improvements to the City's transportation infrastructure. This short-sighted failure to enhance public transportation options ahead of imposing a toll in the CBD burdens public employees (and all workers) who lack adequate access to public transit.

Defendants' Environmental Assessment and Finding of No Significant Impact does not address or alleviate these various concerns. The EIS requested by Plaintiffs will provide the MLC and its member unions a better opportunity to address these issues with Defendants than was permitted under the hasty Environmental Assessment process Defendants performed. Therefore, the MLC respectfully requests that this Court deny Defendants' motions to dismiss.

## INTEREST OF *AMICUS CURIAE*

The MLC is a coalition of labor unions representing the interests of approximately 390,000 active municipal employees in the City. It was established pursuant to a memorandum dated March 31, 1966, and is codified at section 12-303(k) of the New York City Administrative Code. The MLC serves as a platform for communication and negotiation between the City government and its workforce and, among other responsibilities, plays a significant role in negotiating the healthcare benefits afforded to the City's employees. With approximately 102 member unions covering a wide range of professions and industries, the MLC plays a significant role in advocating for the rights, health, and welfare of the City's workforce.

The MLC and its member unions have a significant interest in the outcome of this proceeding because many municipal employees who are vital to the City's operations will be adversely affected by the imposition of congestion pricing in Manhattan's CBD. Numerous public employees and their families live in communities surrounding the CBD, where pollution is expected to increase because of diverted traffic. This increase in exposure to pollution will inevitably lead to increased demand for related medical services. As the MLC is responsible for

negotiating health care benefits for these employees (which have dramatically increased in cost over the years), it has a strong interest in protecting these communities from increased pollution.

Public sector employees who live farther afield from the CBD's periphery will also suffer.  Many must commute into the CBD because the services they provide, like law enforcement, fire protection, sanitation, and various trades related work (e.g., electrical, mechanical, etc.), among others, cannot be done remotely.  The $15 toll to enter the CBD, which will cost these employees approximately $3,500 annually, will effectively wipe out one year worth of raises (collectively bargained at 3%) for those earning under $120,000 per year, and two years of raises for those earning $60,000 per year.[6]  The disproportionate impact on lower-wage public sector employees (not to mention all low-wage workers), particularly those who lack adequate access to public transit, is significant.

Those employees who work outside the CBD but near it will also suffer increased stress and costs for their commute, even though they will not be subject to the toll.  Congestion pricing will divert traffic to these neighboring areas, which will increase traffic and demand for parking as commuters seek parking to take public transit into the CBD.  As the supply of parking in these areas is limited, congestion pricing will drive up the cost to park in them.[7]

---

6. On March 31, 2023, members of District Council 37, AFSCME, AFL-CIO ("DC 37"), the City's largest municipal employee union, ratified an economic agreement with the City that provided 3% general wage increases for 2021, 2022, 2023, and 2024, and a 3.25% increase for 2025.  *See* DC 37, *Economic Contract* (May 19, 2023), https://www.dc37.net/dc37contracts/economic.  Because the City engages in pattern bargaining, those wage increases have set the pattern for economic agreements with other non-uniformed unions as well.  *See* New York City Office of Labor Relations, *Recent Agreements & Prevailing Rate Consent Determinations, 2021-2026 Agreements,* https://www.nyc.gov/site/olr/labor/labor-recent-agreements.page (last visited Apr. 5, 2024).  The pattern for uniformed unions (Police, Fire, Corrections, and Sanitation) is slightly different, with a general wage increase of 3.25% for 2021, 3.5% for 2022 and 2023, and 4% for 2024.  *See id.* ("PBA MOU 2017-2025" and "Uniformed Coalition Economic Agreement 2022-2027").

7. Pun intended.  Defendants' Environmental Assessment concludes that congestion pricing will "generate parking demand outside the Manhattan CBD, which could exceed supply if the area is currently at or over capacity," and that further study is required after congestion pricing commences.  U.S. Department of Transportation Federal Highway Administration, *Central Business District (CBD) Tolling Program Final Environmental Assessment,* 4D-11 (Apr. 2023), https://new.mta.info/document/111101.

Given these considerations, the MLC has a compelling interest in seeing that congestion pricing is implemented in a fair manner that does not disproportionately burden the very people who maintain the City's operations.  As Plaintiffs allege in their Amended Complaint, previous attempts to impose congestion pricing in Manhattan have failed before because inadequate public transit alternatives were offered in advance of imposing any tolls.[8]  An Environmental Assessment is simply insufficient to address the magnitude of issues Defendants' congestion pricing creates, especially considering far simpler projects in New York State have previously warranted an EIS.[9]  The MLC therefore supports Plaintiffs' demand that an EIS be conducted to ensure the health and welfare of all municipal employees.

## ARGUMENT

I.  **Congestion Pricing Will Negatively Affect the Health and Quality of Life of Public Employees Who Live on the Periphery of the CBD.**

While Defendants' congestion pricing scheme may reduce pollution in the CBD, it does not eliminate it.  Instead, it displaces pollution from Manhattan's CBD to neighboring communities, where public employees and their families live and work.  Defendants' Environmental Assessment recognizes as much, finding that over the next 20 years, many of the communities neighboring the CBD will see increases in various pollutants, including volatile organic compounds, nitrogen oxides, carbon monoxide, particulate matter, and carbon dioxide equivalents, after the implementation of congestion pricing due to traffic diverting around the CBD.[10]  Staten Island, where thousands of public employees and their families live, is expected to incur the largest increase in vehicle-miles traveled as a result of congestion pricing, followed

---

8.  Am. Compl. ¶¶ 73-76, ECF No. 19.
9.  *See, e.g., id.* ¶ 39.
10.  *See* U.S. Department of Transportation Federal Highway Administration, *Central Business District (CBD) Tolling Program Final Environmental Assessment,* 10-23 to 10-35 (Apr. 2023), https://new.mta.info/document/111101.

by Bergen, Morris, and Middlesex Counties in New Jersey, and the Bronx.[11]  Communities in these counties, along with Nassau and Suffolk Counties, will consequently see increases in mobile source air toxic emissions through at least 2045, with Staten Island seeing the most significant increase.[12]  This displaced pollution unfairly impacts the City's workforce that live or work in these neighborhoods, especially those who live in disadvantaged communities that will suffer negative environmental consequences.

The negative effects of this air pollution on residential communities are consequential. According to the National Institute of Environmental Health Sciences, increases in exposure to air pollution can increase the risks of cancer, cardiovascular disease, and respiratory disease.[13] Children who are exposed are more likely to develop bronchitis and asthma.[14]  Air pollution can also negatively affect cognitive functions.[15]  Congestion pricing's displacement of pollution to the communities surrounding the CBD will unfairly harm their residents.

In addition to air quality concerns, public sector employees who live in communities adjoining the CBD will also suffer other harms to their quality of life.  For example, increased traffic may lead to increased noise levels.  Even though Defendants' Environmental Assessment found that vehicle-miles traveled will increase in Staten Island, Bergen, Morris, and Middlesex Counties in New Jersey, and in the Bronx, no analysis of noise level changes for those areas was conducted.[16]  Nor did the Environmental Assessment analyze impacts to the natural resources in these areas, which will also be affected by the increased air pollution and traffic resulting from

---

11.  *Id.* at 10-12 to 10-13.
12.  *Id.* at 10-37 to 10-40.
13.  National Institute of Environmental Health Sciences, *Air Pollution and Your Health*, https://www.niehs.nih.gov/health/topics/agents/air-pollution (last reviewed Apr. 2, 2024).
14.  *Id.*
15.  *Id.*; *see also* Stephen Dubner, *This Is Your Brain on Pollution*, Freakonomics (Aug. 11, 2021), https://freakonomics.com/podcast/this-is-your-brain-on-pollution/ (podcast discussing effects of pollution on cognitive functioning).
16.  *See* U.S. Department of Transportation Federal Highway Administration, *supra* note 5, at 12-1 to 12-12.

congestion pricing.[17]  These areas, which will suffer the negative consequences of CBD, deserve more consideration to ensure their residents' health and well-being.  An EIS will require Defendants to consider these issues, and therefore should be ordered.

## II. Congestion Pricing Will Adversely Impact Public Sector Employees Who Must Commute into the CBD with Their Personal Vehicles.

Congestion pricing's effects will not just impact the quality of life of public employees who live on the CBD's periphery, but also those who live farther afield.  The daily commute is a defining feature of urban and suburban life in the New York metropolitan area.  While many public employees use public transportation to access the CBD, a significant number are unable to do so for various reasons.  These reasons include a need to transport equipment or materials, safety and security concerns, and a plain lack of geographic or temporal accessibility.  Public employees who must use their personal vehicles to access the CBD to mitigate these issues after congestion pricing goes into effect will unfairly suffer.

First, there are instances where public employees are required to transport equipment or materials as part of their job responsibilities.  This is especially relevant for individuals working in fields such as law enforcement, emergency services, sanitation services, or maintenance, where carrying specialized equipment or supplies is essential.  For example, firefighters are often reassigned to different firehouses based on staffing needs.  These firefighters must carry their gear which can weigh between 60 and 80 pounds and may be laced with carcinogens if that gear was used during a fire.[18]  The subways and buses in the CBD cannot accommodate the

---

17. *See id.* at 13-1 to 13-15.
18. *See* Natlie Duddridge, *FDNY members against congestion pricing speak at MTA's 2nd public hearing on new tolls*, CBS News (Mar. 2, 2024), https://www.cbsnews.com/newyork/news/fdny-members-against-congestion-pricing-tolls-mta-second-public-hearing.

transportation of such items, making personal vehicles a practical necessity for these employees. Defendants' congestion pricing scheme provides no accommodation for these concerns.

Second, there are considerations related to safety and security.  A recent spate of violent activity – including a man shot on a subway during a fight[19] and another man killed by a subway train after being pushed onto the tracks just in March alone[20] – has not helped the subway's safety image.  Public employees who work shifts that begin or end during off-peak late-night or early-morning hours, when public transportation options are limited and bus stops and subways stations may be deserted or isolated, mitigate these security risks by using their own personal vehicles.  Defendants' congestion pricing scheme does not allay any of these justified fears.

Finally, many public employees lack adequate access to public transit based on where they live or the schedule they work.  Numerous City employees live outside of the CBD, in the outer boroughs (which is unsurprising given the high cost of living in the City, particularly in Manhattan), as illustrated on the following map:[21]

---

19.  *See* Claire Fahy, *Man Is Critically Wounded in a Shooting on a Subway Train in Brooklyn*, N.Y. Times (Mar. 14, 2024), https://www.nytimes.com/2024/03/14/nyregion/subway-shooting-brooklyn.html.

20.  *See* Christopher Maag, *Man Killed by No. 4 Train After Being Pushed Onto Subway Tracks*, N.Y. Times (Mar. 25, 2024), https://www.nytimes.com/2024/03/25/nyregion/subway-shoving-manhattan.html.

21.  New York City Department of Citywide Administrative Services, *Fiscal Year 2019 New York City Government Workforce Profile Report*, 10-11, https://www.nyc.gov/assets/dcas/downloads/pdf/reports/workforce_profile_report_fy_2019.pdf (last visited Apr. 5, 2024).  Note that the last Workforce Profile Report for Fiscal Year 2021 published by DCAS does not include graphics depicting the home zip codes of City employees.  *See* New York City Department of Citywide Administrative Services, *Fiscal Year 2021 New York City Government Workforce Profile Report*, https://www.nyc.gov/assets/dcas/downloads/pdf/reports/nyc-government-workforce-profile-report-fy-2021.pdf (last visited Apr. 5, 2024).



Various neighborhoods in these outer boroughs lack convenient access to subway lines and are

known as "subway deserts," which are illustrated as white-grey areas on the following map: [22]



---

22.  Eric Jaffe, *Where the New York City Subway Doesn't Go*, Bloomberg (Aug. 5, 2015), https://www.bloomberg.com/news/articles/2015-08-05/mapping-new-york-city-s-subway-deserts.

Public employees residing in these neighborhoods, which predominantly exist in Staten Island, the Bronx, Queens, and Brooklyn, are underserved by public transportation options, especially when commuting to the CBD.[23]  Their commute times are longer and more stressful compared with those who live within walking distance of a subway station.

Numerous public employees also work schedules that commence or end in the early morning or late night when public transit frequency is reduced.  For example, automobile mechanics employed by the City who work in the CBD begin their day shifts at 6 am, while those working night shifts work from 10 pm to 6:30 am.  Most of these mechanics have long commutes as they live in the outer boroughs or in counties north of the Bronx, in New Jersey, or on Long Island.  They must leave their homes at off-peak times when public transit, like commuter rails and the subway, operates infrequently.  Moreover, many of them work in garages along the edges of Manhattan, which lack adequate access to public transit.  They will not be able to avoid the congestion pricing toll and will have to endure the increased traffic that diverts to the CBD's periphery due to the toll.

The MLC sought an exemption for public employees to resolve these issues but received none.[24]  While vehicles operated by the City will be exempt,[25] those vehicles are either operated by supervisors who may be permitted to commute in them or are only available for use once an

---

23.  *See, e.g.*, Sarah Maslin Nir, *Left Behind by the Nation's Largest Subway System*, N.Y. Times (Dec. 27, 2017), https://www.nytimes.com/2017/12/27/nyregion/new-york-subway-deserts.html.

24.  A copy of the MLC's letter to Defendant Triborough Bridge and Tunnel Authority commenting on congestion pricing's proposed toll schedule, dated March 11, 2024, is appended to this brief as Exhibit A.

25.  *See* Marcia Kramer, Lisa Rozner, *School buses, city-owned cars granted exemptions from NYC congestion pricing, MTA says*, CBS News (Mar. 25, 2024), https://www.cbsnews.com/newyork/news/nyc-congestion-pricing-exemptions-for-government-vehicles-and-school-buses.

employee reports to work.  Frontline municipal employees who must commute into the CBD will not benefit.  (Meanwhile, affluent riders of the Hampton Jitney will enjoy an exemption.[26])

In sum, many public employees will be at a considerable disadvantage when commuting to the CBD once congestion pricing commences.  No exemptions are made for them, even though they will be required to carry burdensome and potentially unsafe equipment into the CBD, or work schedules that make public transit either an unsafe or far too arduous option. Personal vehicles mitigate these hazardous or stressful conditions, but Defendants' congestion pricing scheme dismisses them, cavalierly noting that these employees are already subject to tolls and should just be tolled further.[27]  An EIS will provide the MLC an opportunity to address these issues with Defendants during the scoping process.[28]

## III. Defendants' Failure to Improve Public Transit Before Implementing Congestion Pricing Harms Public Employees Without Adequate Access to Public Transit.

Defendants' congestion pricing scheme seeks to create a revenue stream for public transit improvements without first making improvements to public transit.  This logic contradicts successful congestion pricing programs implemented internationally, like in London and Stockholm.  In both of those congestion pricing plans, the municipalities improved public transport first to support the programs.  Defendants' congestion pricing program lacks this feature and consequently unfairly burdens public employees and workers who do not live near public transit with inadequate alternatives to the CBD toll.

---

26.  *See* Samantha Liebman, *MTA clarifies congestion pricing exemptions ahead of Wednesday vote*, Spectrum News NY1 (Mar. 25, 2024), https://ny1.com/nyc/all-boroughs/traffic_and_transit/2024/03/25/mta-clarifies-congestion-pricing-exemptions-ahead-of-wednesday-vote.

27.  Traffic Mobility Review Board, *Congestion Pricing in New York*, 28 (Nov. 2023), https://new.mta.info/document/127761.

28.  *See* U.S. Environmental Protection Agency, *National Environmental Policy Act Review Process*, https://www.epa.gov/nepa/national-environmental-policy-act-review-process (last updated Oct. 3, 2023).

Defendant Federal Highway Administration of the US Department of Transportation ("FHWA") provides a Congestion Pricing Primer Series on its website that offers guidance and lessons learned about congestion pricing and its implementation.[29]  As part of this Primer Series, the FHWA assessed the significant relationship between public transit and zone-based congestion pricing, like Defendants' scheme for the CBD, by examining "[t]wo of the most comprehensive and successful international examples of zone-based pricing . . . London, U.K., and Stockholm, Sweden."[30]

London implemented its congestion pricing program on February 17, 2003, but enhanced its public transportation services well in advance of charging vehicles.  300 additional buses were put into service months before the program went into effect, and routes were created or modified to accommodate the expected increase in ridership.  These improvements coincided with other concurrent efforts to improve bus service, including improving traveler information, and enforcing bus lanes and parking restrictions.  This increased bus capacity helped mitigate the increased load on inbound morning buses caused by London's congestion pricing.[31]

Like London, Stockholm also enhanced its public transportation services in advance of implementing congestion pricing.  Five months before implementation, Stockholm increased its bus service by adding 197 new buses and 16 new bus routes, as well as increasing the frequency of buses on already established routes and adding off-peak capacity to train lines.  The FHWA notes that the trial results for Stockholm's congestion pricing "were very favorable, with public acceptance climbing throughout the trial, from under 30-percent approval before the trial to over 55 percent toward the end.  There was an immediate 22-percent drop in vehicle trips into the

---

29.  *See* FHWA, *Congestion Pricing Primer Series*,
     https://ops.fhwa.dot.gov/congestionpricing/resources/primers_briefs.htm (last modified July 10, 2023).
30.  *Id.*
31.  *Id.*

zone, a decrease in travel times, and a large shift to public transportation – ridership on inner-city bus routes rose 9 percent.  Buses, taxis, and distribution vehicles reported reductions in travel times.  Traffic accidents involving injuries fell by 5-10 percent.  Exhaust emissions decreased by 14 percent in the inner city and by 2-3 percent in Stockholm County."[32]

Ultimately, the FHWA concludes that enhancing public transportation is an essential component of a zone-based congestion pricing program:

> International zone-based pricing experiments could not have been successful without involvement from public transportation.  **Enhanced public transportation services are an essential component of a zone-based pricing system and must be comprehensively planned and deployed well in advance of zone-based charging.**  In London, planning for the zone-based charge began in the mid-1990s and included a series of progressively more detailed analyses.  Much of the additional public transportation service was rolled out as early as one year before the advent of charging.  Congestion pricing had been under discussion in Sweden since the early 1990s, and once the decision was made to begin zone-based charging, a year was spent comprehensively planning service modifications and their related impacts.  New and enhanced public transportation service was launched 5 months in advance of the imposition of the congestion tax, which provided time to iron out problems and publicize the service.[33]

Unlike London and Stockholm, Defendants are attempting to implement zone-based congestion pricing without first enhancing public transit.  Bus services or other alternate public transit options to subway deserts have not been improved.  Off-peak schedules have not been adjusted to accommodate those whose shifts begin or end in the early morning or late night.  Security enhancements to the subway system have been reactionary and ad hoc, like the recent addition of National Guard soldiers and New York State Police to help New York City police check commuters' bags.[34]  Two long neglected, run-down historic subway stations – one of

---

32. *Id.*
33. *Id.* (emphasis added).
34. Jonathan Allen, *New York to deploy 750 National Guard soldiers to check bags on subway*, Reuters (Mar. 8, 2024), https://www.reuters.com/world/us/new-york-deploy-750-national-guard-soldiers-check-bags-subway-2024-03-06.

which, Chambers, is in the CBD – are only now finally slated to be renovated.[35]  And no pilot program to test the efficacy of public transit in light of congestion pricing has been or will be performed.  Once again, an EIS will provide the MLC an opportunity to address these issues with Defendants during the scoping process.

## CONCLUSION

Defendants' hasty Environmental Assessment did not provide an adequate opportunity for the MLC or its member unions to discuss the concerns of the City's workforce with Defendants.  Plaintiffs' demand for an EIS will not only provide that needed opportunity but will also offer a better accounting of the social and environmental effects congestion pricing will cause, particularly to the municipal employees who are vital to the City's operations.  A project of this magnitude requires no less.  To ensure that these critical issues are addressed before congestion pricing's imminent start, the Court should deny Defendants' motions to dismiss.

Dated:   Lake Success, New York
         April 17, 2024


_____
Harry Greenberg
Daniel Doeschner
Greenberg Burzichelli Greenberg P.C.
3000 Marcus Avenue, Suite 1W7
Lake Success, NY 11042
(516) 570-4343
hgreenberg@gbglawoffice.com
ddoeschner@gbglawoffice.com

---

35. Ian Kumamoto, *These two old subway stations are getting a $100 million refresh*, TimeOut (Mar. 19, 2024), https://www.timeout.com/newyork/news/these-two-old-subway-stations-are-getting-a-100-million-refresh-031924.

# EXHIBIT A

# Municipal Labor Committee

55 Water Street, 23rd Floor / New York, NY 10041 / (212) 815-1474

**CHAIRPERSON**
HARRY NESPOLI
Local 831, I.B.T. Uniformed
Sanitationmen's Association, AFL-CIO

**CO-CHAIRPERSON**
HENRY A. GARRIDO
District Council 37, AFSCME, AFL-CIO

**EXECUTIVE VICE-CHAIR**
MICHAEL MULGREW
United Federation of Teachers, AFL-CIO

**SECRETARY**
GREGORY FLOYD
Local 237
City Employees Union, I.B.T., AFL-CIO

**TREASURER**
GLORIA MIDDLETON
Local 1180, NYC Administrative
Employees, CWA, AFL-CIO

**VICE CHAIRPERSONS**

ANDREW ANSBRO
Uniformed Firefighters Association

BENNY BOSCIO, JR.
Correction Officers' Benevolent Association

JOSPEH COLANGELO
S.E.I.U. New York City Local 246

ROBERT CROGHAN
Organization of Staff Analysts

JUDITH A. CUTCHIN
New York State Nurses Association

JAMES DAVIS
Professional Staff Congress
City University of New York

PAUL DIGIACOMO
Detectives' Endowment Association

MARTIN A. LYDON
District Council of Carpenters, AFL-CIO

WILLIAM M. LYNN
International Union of Operating Engineers
Local 30, AFL-CIO

JOSEPH MANNION
Sanitation Officers Association

JAMES MCCARTHY
Local 854, Uniformed Fire Officers
Association, AFL-CIO

FRANK PROSCIA, M.D.
Doctors Council

HENRY D. RUBIO
Council of School Supervisors
& Administrators

PETER STEIN
Local 508, NYC Lifeguard Supervisors,
AFSCME, AFL-CIO

LOUIS TURCO
Lieutenants Benevolent Association

MAF MISBAH UDDIN
Local 1407, NYC Accountants, Statisticians
& Actuaries, AFSCME, AFL-CIO

ANTHONY WELLS
Local 371, Social Service Employees,
AFSCME, AFL-CIO

*Executive Secretary*
ELLEN MEDWID

March 11, 2024

The Triborough Bridge and Tunnel Authority (TBTA)
Central Business District Tolling Program
2 Broadway, 23rd floor
New York, NY 10004
cbdtp.feedback@mtabt.org

**Re:  Comment on the Proposed CBDTP Tolling Schedule**

Dear Hearing Committee:

I write as Chair of the NYC Municipal Labor Committee ("MLC") to comment on the proposed Congestion Pricing District toll program.  The MLC is a statutorily created association of New York City municipal labor organizations comprised of some 102 bargaining units representing approximately 390,000 active City workers who keep the City clean, safe and running each day.  MLC member unions represent both civilian and uniformed workers providing essential services to City residents.  These workers not only serve the public, but they too largely reside in the City or surrounding downstate counties.  As such, MLC's constituents will be impacted professionally and personally by the proposed tolling structure.

Initially, the MLC supports efforts to reduce pollution and congestion, but recognizes that, as with all endeavors, the manner and wisdom of implementation matter and can transform lofty goals and intentions into unfortunate consequences.  Here, the MLC points to the short-sighted failure to exempt or otherwise accommodate public employees.

The City needs its public employees to function.  By creating a significant barrier for employees to work inside the congestion pricing zone, the tolling program will create significant burdens on the provision of services.  For those who need to enter the district, this amounts to more than a $3,000 pay cut as compared to City employees who work outside the District.  In the world of continuing inflation and especially for those earning lower salaries, that burden is prohibitive.  This is particularly true of public employees residing in known transit deserts, who lack viable alternative to incurring the toll.  Meanwhile, any planned improvements to the mass transit system will be years away, if at all applicable to transit deserts, while the full burden of the toll will be immediate.  Accordingly, the MLC urges the Committee to exempt public employees assigned to in-person work in the district.

The sole reason given for not exempting or providing a discount for public employees who are required to enter the district for work is that as public employees they are not exempt from existing tolls.  This fails to consider the collective burden on these employees and the impact it will have

on the City's ability to provide services that require employees to incur this new toll.

Further, the MLC generally opposes what seems to be a myopic focus on the revenue to be generated by the tolls at the expense of an approach that seeks to balance benefits and burdens in a common-sense manner.  The MLC recognizes that other groups and unions seek other adjustments, discounts and changes to lessen the burden on workers and the public.  Such requests should be meaningfully considered without the artificial limitation of requiring a specific revenue be achieved in year one of the program.  Without such reconsideration, the program will do more harm than good.

The MLC appreciates the opportunity to comment on the proposed tolling plan and urges the Committee to reconsider the magnitude of the burden being placed on public workers and others.

Harry Nespoli

*Harry Nespoli*

Chair