**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL MULGREW, as President of the UNITED FEDERATION OF TEACHERS, Local 2, American Federation of Teachers, AFL-CIO, VITO J. FOSSELLA, individually and as Staten Island Borough President, THE A. PHILIP RANDOLPH INSTITUTE, THE COALITION OF BLACK TRADE UNIONISTS, THE LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, JESSICA SCARCELLA-SPANTON, individually and as New York State Senator, DAVID WEPRIN, individually and as New York State Assemblyman, DAVID CARR, individually and as New York City Council Member, NICOLE MALLIOTAKIS, individually and as United States Congresswoman, JOSEPH BORELLI, individually and as New York City Council Member, JAMES SKOUFIS, individually and as New York State Senator, ROB ROLISON, individually and as New York State Senator, AILEEN GUNTHER, individually and as New York State Assemblywoman, CHRISTOPHER EACHUS, individually and as New York State Assemblyman, KARL BRABENEC, individually and as New York State Assemblyman, BRIAN MAHER, individually and as New York State Assemblyman, MICHAEL REILLY, individually and as New York State Assemblyman, MICHAEL TANNOUSIS, individually and as New York State Assemblyman, KAMILLAH HANKS, individually and as New York City Councilmember, JAIME WILLIAMS, individually and as New York State Assemblywoman, ANDREW J. LANZA, individually and as New York State Senator, IWEN CHU, individually and as New York State Senator, MONICA MARTINEZ, individually and as New York State Senator, CLIFF HAGEN, TROY McGHIE, MARTHA MAZIER, PAUL CAMINITI, CARLY BIANCHINI, HANNAH CHOI, FRANK GARCIA, LINDSEY LAMPF,

Plaintiffs,

- against -

Civil Case No. 1:24-cv-00081-DG-JAM

**(PROPOSED) SECOND AMENDED COMPLAINT**

UNITED STATES DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION, SHAILEN BHATT, in his official capacity as Administrator of the Federal Highway Administration, RICHARD J. MARQUIS, in his official capacity as Division Administrator of the New York Division of the Federal Highway Administration, the METROPOLITAN TRANSIT AUTHORITY, the TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, STEPHANIE WINKELHAKE, P.E. in her official capacity as Chief Engineer of the New York State Department of Transportation, the NEW YORK CITY DEPARTMENT OF TRANSPORTATION

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiffs Michael Mulgrew, as President of the United Federation of Teachers, Local 2, American Federation of Teachers ("UFT"), Vito J. Fossella, individually and in his capacity as Staten Island Borough President, The A. Philip Randolph Institute ("APRI"), The Coalition of Black Trade Unionists ("CBTU"), the Labor Council for Latin American Advancement ("LCLAA"), Jessica Scarcella-Spanton, individually and in her capacity as New York State Senator for the 23rd Senate District, David Weprin, individually and in his capacity as New York State Assemblyman for the 24th Assembly District, David Carr, individually and in his capacity as New York City Council Member for the 50th Council District, Nicole Malliotakis, individually and in her capacity as United States Congresswoman for the 11th Congressional District, Joseph Borelli, individually and in his capacity as New York City Council Member for the 51st Council District, James Skoufis, individually and in his capacity as New York State Senator for the 42nd Senate District, Rob Rolison, individually and in his capacity as New York State Senator for the 39th Senate District, Aileen Gunther, individually and in her capacity as New York State Assemblywoman for the 100th Assembly District, Christopher Eachus,

individually and in his capacity as New York State Assemblyman for the 99th Assembly District, Karl Brabenec, individually and in his capacity as New York State Assemblyman for the 98th Assembly District, Brian Maher, individually and in his capacity as New York State Assemblyman for the 101st Assembly District, Michael Reilly, individually and in his capacity as New York State Assemblyman for the 62nd Assembly District, Michael Tannousis, individually and in his capacity as New York State Assemblyman for the 64th Assembly District, Kamillah Hanks, individually and in her capacity as New York City Councilmember for the 49th Council District, Jaime Williams, individually and in her capacity as New York State Assemblywoman for the 59th Assembly District, Andrew J. Lanza, individually and in his capacity as New York State Senator for the 24th Senate District, Iwen Chu, individually and in her capacity as New York State Senator for the 17th Senate District, Monica Martinez, individually and in her capacity as New York State Senator for the 4th Senate District, Cliff Hagen, Troy McGhie, Martha Mazier, Paul Caminiti, Carly Bianchini, Hannah Choi, Frank Garcia, and Lindsey Lampf, by and through their undersigned counsel, hereby file this Second Amended Complaint against Defendants the United States Department of Transportation ("USDOT"), the Federal Highway Administration ("FHWA"), Shailen Bhatt, in his official capacity as Administrator of the FHWA, Richard Marquis, in his official capacity as Division Administrator of the New York Division of the FHWA, the Metropolitan Transit Authority ("MTA"), the Triborough Bridge and Tunnel Authority ("TBTA"), the New York State Department of Transportation ("NYSDOT"), and the New York City Department of Transportation ("NYCDOT"), and allege as follows:

## NATURE OF THE CASE

1. This is an action to protect New York and New Jersey residents from the decision to implement congestion pricing in New York City, a decision that would inflict environmental and economic damage on already challenged neighborhoods and one reached only after a rushed and hurried process that violated the comprehensive review requirements that agencies must take under federal law and state constitutional environmental protections and which further results in a regressive and discriminatory pricing scheme that violates Plaintiffs' constitutional rights.

2. The fast-tracked tolling program – the main component of which was only determined after the process had purportedly concluded – would have a significant and long-term impact not only on the 1,856,000 drivers who enter Manhattan by car each day – many working and middle-class residents of the outer-boroughs and suburbs – but also on the millions of New York and New Jersey residents living and working in surrounding communities that would be exposed to increased dangerous, atmospheric pollutants resulting from the increased spillover and diverted traffic. Reducing congestion may be a laudable goal, but the process must be carefully vetted and considered, given its sprawling environmental and financial impact. The opposite occurred here, where Defendants' intent focus on raising revenue ignored the cacophony of voices, including its sister federal agencies such as the Environmental Protection Agency ("EPA"), cautioning the FHWA on the adverse environmental impacts of congestion pricing and suggesting further review. Indeed, Defendants purported to conclude their analysis and find "no significant impact" of the program while acknowledging that the main elements of the proposal influencing driving behavior (and thus, environmental impact) – prices, exemptions, credits, and discounts – remained to be determined. Instead, Defendants relegated analysis of the details of the tolling program to a later perfunctory process shielded from public scrutiny.

3. Under the proposal from the Traffic Mobility Review Board ("TMRB"), issued at the end of November 2023, New York's Central Business District Tolling Program ("Congestion Pricing") would cost those traveling into the congestion zone $15 as a base toll, with other classes of vehicles, including large trucks, paying up to $36 per day to drive into Manhattan. This fee is on top of the already sizable amounts charged for virtually all of the river crossings into Manhattan and creates certain off-sets and discounts depending on crossing, driver, and time.

4. Yet, at the time the FHWA found that Congestion Pricing in New York City would have "no significant impact on the human or natural environment," the ultimate structure of the tolls was unknown.

5. The MTA presented a series of different possible pricing scenarios for the Congestion Pricing plan to the FHWA, and the FHWA issued of a "Finding of No Significant Impact" ("FONSI") for *any* of the scenarios to proceed. The scenarios varied as to the toll rate, the timing of different rates, who would be entitled to exemptions and under what circumstances, which river crossings would receive a credit towards the toll, how much that credit would be, and even the number of times per day vehicles would be charged.

6. It is hard to imagine how the FHWA could have conducted an accurate or comprehensive review of the environmental impact, burden on other transportation systems, likely change in traffic patterns, necessary mitigation measures, or potential harm to outer-borough and out-of-State residents, without knowing the actual "price" and structure of the Congestion Pricing program and its impact on driving behavior. Indeed, *none of the scenarios* in the EA modeled the impact of the recently issued structure.

7. While there is much to consider when evaluating a congestion pricing program, this ill-conceived plan essentially consists of three components: (i) a geographic zone, (ii) a tolling scheme, and (iii) the technology to charge the tolls. Of these, the most consequential component, of course, is the tolling scheme, for that will motivate driver behavior and the resultant environmental impact.

8. That is also the component that the FHWA acknowledged in its FONSI would only be known well after its finding. The FHWA further admitted that the actual tolling structure and attended mitigation measures would, ultimately, need be re-evaluated after the TMRB recommendation. But that re-evaluation will be relegated to a less rigorous and less public process, depriving impacted communities of a meaningful right to participate in the administrative process and failing to take the required hard look at the actual program.

9. This blind drive to the desired result was driven by the only stated goal of Congestion Pricing that seemed to matter: to "at minimum, ensure annual revenues and fees collected . . . to fund [$15 billion dollars]" for the 2020 to 2024 MTA Capital Program. N.Y. Veh. & Traf. Law § 1704-a(1) (MTA Reform and Traffic Mobility Act or "Traffic Mobility Act").

10. In March 2021, now MTA Chair and CEO Janno Lieber confirmed this emphasis on revenue, stating that the FHWA would be "fast tracking the MTA's environmental process, which will certainly get the MTA moving forward toward being able to realize this source of funds."[1]

11. Congestion Pricing, in theory, is designed to reduce traffic, improve air quality, and raise revenue. Yet, raising revenue and the financial needs of the MTA have been thrust as

[1] MTA Board Meeting on March 17, 2021 Minutes, *in* MTA Board Action Items 15 (Mar. 2021), http://new.mta.info/document/33901.

paramount over the needs of New York and New Jersey commuters as well as collateral adverse environmental impacts in enacting the Congestion Pricing program, without concomitant benefit to those most burdened.

12. Congestion Pricing is projected to raise $1 billion of revenue annually to the MTA, in addition to the $15 billion to its Capital Plan for unspecified projects. To achieve this massive influx of cash, New York and New Jersey residents would be expected to foot the bill monetarily as well as by sacrificing quality of life. The average commuting cost for a Staten Island resident, for example, would increase $15 to $89 each day; the average Bronx commuter's daily expense would rise to $76, amounts that many cannot afford. (Final EA, at 4A-28). Many, including those who do not (and cannot) use public transit, would see no benefit from the purported goal of bolstering the MTA's Capital Plan. Plainly put, the toll is excessive and imposes a disproportionate burden on residents as compared with the local benefits expected to be conferred.

13. Teachers, firefighters, police officers, EMS workers, sanitation workers, and other public sector workers who are essential to the fabric of New York City would be forced to shoulder the burden of the MTA's latest fundraising gambit; some are already considering changing jobs because of the proposed tolls. Many essential employees have the added burden of traveling to or from the various "transit deserts" in New York City and have no choice but to pay the toll rather than change behavior. Still others earning lower incomes, like public school paraprofessionals represented by Plaintiff UFT, would be significantly burdened (despite being afforded a so-called "discount"). As Defendants begrudgingly admit, under Congestion Pricing "*a disproportionately high and adverse effect would potentially occur for low-income drivers to*

*the Manhattan CBD who do not have a reasonable alternative transportation mode for reaching the Manhattan CBD.*" (Final EA, at ES-15) (emphasis added).

14. The requirements of the National Environmental Policy Act ("NEPA") mandate that a federal agency must extend beyond an Environmental Assessment ("EA") and conduct a comprehensive review and prepare a complete environmental impact statement ("EIS") whenever a proposed action is of such consequence, as here, that it will "significantly affect [] the quality of the human environment." 42 U.S.C. § 4332(2)(C). Congestion Pricing would significantly affect the quality of the human environment of Plaintiffs and many New York and New Jersey residents. Yet, Defendants seem to have worked backwards to achieve a predetermined outcome, issuing a FONSI that disregarded the significant impacts even before the primary component to the plan – the tolling structure – was determined.

15. Even in its superficial environmental review, the FHWA admits that under Congestion Pricing, the Bronx, Staten Island, and Nassau and Bergen County will see increases in every category of pollutant, including volatile organic compounds, nitrogen oxides, carbon monoxides, particulate matter, and carbon dioxide equivalents, in some cases for the next 20 years. (Final EA, at 10-21, 10-23). The program would have particular adverse impacts on communities with environmental justice concerns, communities that have some of the highest preexisting pollution and chronic disease burdens. New York residents, for example, who live and work near the Staten Island Expressway and Cross Bronx Expressway, will suffer from increased air pollution. Congestion Pricing will add six pollutants to Staten Island, including the North Shore of Staten Island where air quality is some of the worst in the City and is already a threat to area residents. These harms to the air quality will have detrimental impacts on human health, including premature mortality, increased hospital admissions for heart or lung causes,

acute and chronic bronchitis, asthma attacks, emergency room visits, respiratory systems, and restricted everyday activities. The extent of such impact could not even be fully assessed without knowing the structure of the program and the associated, anticipated changes in traffic patterns. Yet this very analysis, by the FHWA's admission subject to "re-evaluation," remains to be conducted in an even less rigorous manner than the initial analysis.

16. Congestion Pricing may not reduce traffic congestion; it may just shift it. The FHWA described significant shifts in traffic patterns, affecting New York and New Jersey drivers and communities, recognizing that Congestion Pricing would increase traffic diversions to the Robert F. Kennedy Bridge in Queens, across the South Bronx and the George Washington Bridge, and into New Jersey and across the Verrazzano-Narrows Bridge and into Staten Island. These assessments, too, were made prior to a tolling scheme being finalized. It is unclear to what extent it should be anticipated that those travelling and working outside Manhattan would see higher traffic volumes in many parts of Brooklyn, Queens, Staten Island, the Bronx, Hudson Valley, Long Island, New Jersey, and Connecticut.

17. The FHWA's truncated and incomplete federal review process ignored and failed to mitigate a litany of "significant impacts" that the hypothetical Congestion Pricing proposals would likely create for the New York metropolitan area (let alone what the actual impact will be of the current proposal), as hundreds of thousands of vehicles driving in and out of New York are affected by the new toll and forced to adapt to the ill-conceived program.

18. Flaws in the proposal include:

(i) the toll would not eliminate air and noise pollution and traffic, but would instead simply shift pollution and traffic to Staten Island, the Bronx, Upper Manhattan, and Northern New Jersey;

(ii) the toll regressively and disproportionately impacts low income New York and New Jersey residents; even the exemption for residents earning under

$60,000 (a delayed tax-refund for those who qualify) and a discount for those earning less than $50,000 after ten trips in a calendar month still requires large, daily out-of-pocket payments;

(iii) there is no exemption for drivers with disabilities who drive, and the City transit system is ill-equipped to accommodate such riders;

(iv) there is no exemption for school buses, hospital workers, or electric vehicles;

(v) the toll would increase parking demand outside of the Central Business District, without any corresponding plans to increase parking capacity or address these newly created congestion areas;

(vi) the toll has not accounted for drivers, such as those living in "transit deserts" who do not have a reasonable option to take public transit and those who have no choice but to drive to work, and whose behavior will not be impacted by the toll; and

(vii) the toll program inexplicably awards a discount to drivers using the Hudson and East River Tunnels, but excludes drivers crossing into Manhattan via the George Washington Bridge.

19. One of the ironies of the Congestion Pricing program is that the toll's prohibitive cost would force daily commuters to ride the very same inadequate and ill-equipped public transit system that needs the billions of dollars in contemplated repairs and improvements necessitating the funding of the MTA Capital Program in the first place.

20. The failure to properly account for or adequately mitigate these impacts of Congestion Pricing is unsurprising, given the hurried process that led to its premature approval. The EA prepared by the FHWA in coordination with the NYSDOT, NYCDOT, and the MTA (together, the "Project Sponsors") – an 838-page document (with 3,044 pages in appendices) – was announced and placed on the MTA's website and the public was then provided a 30-day review and comment period, all without the benefit of a notice published in the Federal Registrar or docket to facilitate the review of material. The comment period was extended by a mere 14

days, despite requests for substantially longer extensions, only to be further hindered by a compressed series of public hearings scheduled right before the 2022 Labor Day holiday.

21. Moreover, the public was not provided the most relevant information for their comment and analysis: what the actual tolling program would be. One of the guiding principles and purposes of NEPA is for an agency to disclose sufficient information for the public to have an opportunity to meaningfully comment on the basis for a decision. The TMRB's later-in-time adoption of a toll structure that was unreviewed by the FHWA means the public was given insufficient information and forced to comment on an entirely hypothetical set of scenarios and impacts.[2]

22. Among the comments received was the EPA's review of the Draft EA, which concluded that there was "insufficient data" surrounding disproportionate air quality impacts. The EPA "remained concerned" about the potential for adverse air quality impacts in the Bronx, Staten Island, and Bergen County, where traffic congestion will likely worsen due to Congestion Pricing. The EPA also had significant environmental justice concerns and recommended that the MTA and NYCDOT perform additional analysis and "engage in more robust community outreach to consider mitigation." (EPA Comment Letter).

23. During even the limited 44-day comment period, the FHWA and the Project Sponsors received more than 69,000 submissions, most outlining significant opposition to the proposed program. Representatives from each of the affected communities, in addition to unions, non-profits, teachers, businesses, and individuals, voiced their serious concerns regarding the unknown and possible impacts Congestion Pricing would have on their communities.

[2] Even among the hypothetical scenarios, the FHWA's framework lacked certain necessary information. As just one example, the FHWA's analysis was conducted during the COVID pandemic, an outlier period of time that does not accurately reflect typical working and commuting patterns. In a post-pandemic New York City, congestion and traffic may have already shifted in ways that affect the analysis of how traffic patterns will be impacted by a toll.

24. Despite the outpouring of concern, protest, and request for further analysis from the EPA and others, few material changes were made from the Draft EA to the Final EA.

25. By the time the decision reached New York's TBTA and TMRB, Congestion Pricing was a forgone conclusion. The agency provided no material environmental analysis of the impact of Congestion Pricing; nor did the TBTA or its appointed TMRB suggest any additional mitigation efforts for economic justice communities, despite the significant environmental impact concerns raised by the EPA and others. This disregard for the EPA's (and others') environmental concerns violates state constitutional law.

26. In fact, less than a month after the FHWA issued the FONSI, in July 2023 – months before the TBTA and TMRB issued its recommendation and months before the agency is scheduled to conduct a supposed substantive and deliberative public comment period – the MTA began installing toll readers outside of the Central Business District for use in the Congestion Pricing program.

27. At the time the FHWA found that the Congestion Pricing Plan in New York City would have "no significant impact on the human or natural environment," the ultimate structure of the tolls was unknown. The MTA presented a series of different possible pricing scenarios for the Congestion Pricing Plan to the FHWA, and the FONSI issued a "finding of no significant impact" for any of the scenarios to proceed. The scenarios varied as to the toll rate, the timing of different rates, who would be entitled to exemptions and under what circumstances, which river crossings would receive a credit towards the toll, how much that credit would be, and even the number of times per day vehicles would be charged.

28. It is hard to imagine how the FHWA could have conducted an accurate or comprehensive review of the environmental impact, burden on other transportation systems,

likely change in traffic patterns, necessary mitigation measures, or potential harm to outer-borough and out-of-State residents, without knowing the actual "price" and structure of the Congestion Pricing Plan and its impact on driving behavior. Indeed, none of the scenarios in the EA modeled the impact of the recommended toll structure. At the very least, the FHWA must take a "hard look" at the Congestion Pricing Plan in a supplemental NEPA environmental review process that closely analyzes the actual tolling scheme recommended by the MTA and the TBTA.

29. Because of the anticipated changes to the tolling structure evaluated in the EA from the one ultimately adopted, the FHWA committed in its initial review to conducting a "re-evaluation" of the Congestion Pricing Plan to determine whether the original FONSI remained valid. For months after the March 27th adoption of the tolling scheme by the MTA and the TBTA, the FHWA and MTA remained silent on the progress of the re-evaluation – a process conducted entirely outside of public view.

30. Then, on June 5, 2024, Governor Kathy Hochul issued a statement indefinitely halting the implementation of Congestion Pricing, explaining that "circumstances have changed" in New York City for a program that was "enacted in a pre-pandemic period" and that Congestion Pricing "risked too many unintended consequences." The Governor stopped short of canceling the program altogether, but suggested in subsequent remarks that "to assume that the only funding source [for improvements to mass transit] has to be congestion pricing shows a lack of imagination" and that there are "other ways to deal with this."

31. In the days after the Governor's statement, the Legislature and the Governor began looking for alternatives that would raise revenue for the MTA (alternatives that could have

been explored prior to adopting the Congestion Pricing Plan). The process to identify additional sources of revenue for the MTA and other strategies for reducing congestion remains ongoing.

32. Shortly after the Governor's statement (and months after the MTA and the TBTA arrived at the actual tolling construct), the MTA, on June 13, 2024, requested that the FHWA complete its re-evaluation in an effort to push the Congestion Pricing Plan forward, despite the cancellation of the planned June 30th implementation date.

33. One day later, on June 14, 2024, the FHWA released a 175-page re-evaluation, concluding that no additional NEPA review was warranted because, it asserted, the additional effects associated with the adopted toll structure fell within the scope of the analysis presented in the EA. The re-evaluation ignored the changed circumstances cited by the Governor in support of her action halting the program.

34. The Court's June 20, 2024 Opinion and Order approved Defendants' multi-step review, at least in part, because the EA and FONSI would be followed by a "more granular assessment of whether specific aspects of a project fit within the prior analysis or require additional study." (Dkt. No. 86, at 68).

35. The FHWA's released "re-evaluation" – the only environmental assessment of the actual tolling structure adopted—does not provide a "granular assessment." With the die already cast, the FHWA's re-evaluation analysis amounts to, in essence, a re-running of the New York Best Practice Model ("BPM") outside of public review. The re-run BPM data on the actual toll predicts even more pollutants to areas such as Richmond County and Bergen County and still forecasts increased traffic to the Lower East Side, along the FDR Drive (predominantly south of 10th Street), a primarily residential and environmental justice community that would be significantly burdened both economically and environmentally by Congestion Pricing.

36. With respect to the analysis, despite its length, the "re-evaluation" failed to adequately consider the full environmental impact of (i) the changes to the toll on taxis and FHVs; (ii) the changes to the structure of peak, off peak and overnight pricing for the toll, including adding two additional peak hours; (iii) the changes to crossing credits; (iv) mitigation to respond to those adverse conditions identified in the re-evaluation (economic discounts do not lessen the environmental impact and are not truly "mitigation"); and (iv) any additional alternatives to Congestion Pricing, despite the actions of the Governor and Legislature exploring such alternatives.

37. The purposefully rushed agency process and implementation of the tolling program has allowed the agencies to elide the soon-to-be released City environmental justice plan and regulations, which will require, among other things, agencies to promote greater public participation and transparency in decision-making, like Congestion Pricing, that raises environmental justice concerns.

38. For 20 years, despite no other City in the United States attempting it, congestion pricing has been heralded and promised to New York and New Jersey residents as a long-term policy solution to alleviate traffic gridlock and to decrease pollution. After all this time, it is hard to imagine that this current half-baked Congestion Pricing iteration, which would impose crippling daily fees on commuting New York and New Jersey residents and would increase pollution to New York and New Jersey's most economically vulnerable communities, failed to fully evaluate the supposed premise of the program: reducing congestion. Instead, the analysis focused more on the revenue to be raised for the MTA's budget troubles as its primary goal.

**JURISDICTION AND VENUE**

39. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action presents a federal question under the laws of the United States, including NEPA, the APA, and the dormant Commerce Clause of the United States Constitution. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a). This Court also has jurisdiction because the United States is a defendant.

40. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1)(B), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Additionally, venue is proper under 28 U.S.C. § 1391(e)(1)(C), because no real property is involved in the action and several Plaintiffs reside in the District.

**PARTIES**

41. Plaintiff Michael Mulgrew is a resident of the State of New York and City of New York, County of Richmond, and is the President of the UFT, Local No. 2 American Federation of Teachers, AFL-CIO. The UFT is an unincorporated association with its principal place of business in the City and County of New York and is the recognized bargaining agent for all nonsupervisory pedagogical personnel and classroom paraprofessionals employed by the Board of Education of the City School District of the City of New York (the "BOE"), as well as various other workforces in the public and private sector. Part of the UFT's mission is to ensure that its members are able to work and travel in a healthy and safe environment. Thousands of UFT members would be impacted by Congestion Pricing. Many work in public schools, where increased pollution and traffic is likely to be diverted from Congestion Pricing. Thousands reside in the impacted communities: 11,515 UFT members reside in Richmond County, 13,385 reside in the Bronx, and 5,571 reside in New Jersey (1,568 in Bergen County). The UFT also

represents 5,000 nurses employed at two private hospitals and three home healthcare agencies as well as 700 nurses at NYU Langone Hospital, and 300 nurses at Staten Island University Hospital's South Site. These nurses often have to travel late at night and cannot simply switch to public transit to avoid increased tolls. Further, the UFT represents thousands of DOE and non-DOE professionals – including residential workers in ADAPT facilities, Lorge employees and LREI maintenance workers – many of whom earn under $60,000, cannot afford the substantial increase in tolls and cannot outlay such money and wait months until a tax refund is issued.

42. Plaintiff Vito J. Fossella is a resident of Staten Island and is the Staten Island Borough President, as well as a former member of Congress and the New York City Council. Mr. Fossella and his constituents in Staten Island will be directly impacted by Congestion Pricing. Staten Island, and the North Shore of Staten Island in particular, already suffer from poor air quality, a condition that would be exacerbated by the current proposal. In fact, much of the North Shore of Staten Island has been designated as an Environmental Justice Area by the City of New York. Health metrics related to air quality – asthma (including ozone and PM2.5 asthma), emergency department visits, and respiratory hospitalizations – are all significantly higher in the North Shore of Staten Island than the greater New York City area, and Staten Island's North Shore would see increased pollutants under the proposed action. In fact, the Final EA acknowledged that Staten Island will receive by far the largest overall increases in the six dangerous pollutants identified both in 2023 and projected through 2045. (*See* Final EA at 10-23, 10-24). The Final EA also recognized that the Verrazzano-Narrows Bridge would see increases in peak-hour traffic volume under every tolling scenario. (Final EA, at 4B-6, 4B-8, 10-42). Residents of Staten Island already suffer from health issues relating to significant pollution. Specifically, 10.4% of Staten Island adults have asthma, 11.0% have diabetes, and 27.8% have

high blood pressure. (Appendix 17D-25). Mr. Fossella, like his constituents, will also be impacted by the economic burden of the tolling structure, bearing a disproportionate burden to the benefits it is purported to convey given the limited availability of mass transit, including unreliable and frequently disrupted ferry service, on Staten Island as compared to other boroughs. That limited availability is compounded by the fact that Staten Island is already the only borough that must pay an existing toll to access the remainder of the City by car. The new toll places further burden without countervailing benefit. Mr. Fossella will also be disenfranchised by the purposeful bifurcation of Defendants' submission and evaluation, allowing a finding of no impact without consideration of the actual tolling program and relegating the actual structure to a later, more limited review.

43. Plaintiff A. Philip Randolph Institute ("APRI"), headquartered in Washington, DC, is an organization for African-American trade unionists and the senior constituency group of the AFL-CIO, representing workers of color in their fight for racial equality and economic justice. Congestion Pricing may improve traffic in Manhattan, but it will do so at the environmental and financial expense of those living outside Manhattan. Many of the workers represented by the APRI live in the outer-boroughs and have to commute to work on a daily basis. Some represented by the APRI make minimum wage and cannot afford the new $15 expense to drive to work.

44. Plaintiff Coalition of Black Trade Unionists ("CBTU"), headquartered in Washington, DC, is an AFL-CIO constituency group representing members from seventy-seven international and national unions with forty-two chapters across the country, whose mission is to achieve economic, political, and social justice for its members. CBTU is part of the growing environmental justice movement that empowers community-based organizations to identify

harmful or discriminatory conditions, mobilize their constituencies, and resolve local environmental health problems. Many low-income communities and people of color suffer a disproportionate burden of environmental hazards and health problems associated with poor quality air, water, and toxic exposure. Often, these communities are also victims of environmental racism and the discriminatory enforcement of environmental laws and regulations, resulting in high rates of disease, birth defects, and early death. Many of the members that CBTU represents are low wage workers and struggle every day to meet economic demands. Adding an additional Congestion Pricing toll to their current cost of living would do economic harm and create environmental injustice, producing a system of "haves and have nots" between those living in the outer-boroughs – where the majority of CBTU members reside – and those living in lower Manhattan. Traffic congestion, parking, and fuel emission issues and their long-term impact would be shouldered by the outer-borough communities.

45. Plaintiff Labor Council for Latin American Advancement ("LCLAA"), headquartered in Washington, D.C., is an organization dedicated to advancing the rights and well-being of Latino workers and their families. LCLAA aims to address issues of social and economic justice, advocating for fair working conditions and policies that benefit the Latino community. LCLAA has also consistently stood by communities facing environmental injustices. Congestion Pricing is likely to hurt members of LCLAA's New York chapter, particularly those living in disadvantaged communities in the outer-boroughs, with severe heath challenges and limited access to healthcare, who will see increased traffic, parking, and air pollution, which would exacerbate existing health issues. LCLAA firmly believes that the out-boroughs should be regarded with equal importance to Manhattan in environmental decision-

making and that an EIS and hearings in all outer-boroughs should be held to ensure that LCLAA members and their communities are fully considered and that their voices are heard.

46. Plaintiff Jessica Scarcella-Spanton is a resident of the State of New York and City of New York, County of Richmond and is a New York State Senator, representing New York's 23rd Senate District, which encompasses most of the North Shore of Staten Island and parts of southern Brooklyn. Congestion Pricing unfairly places an additional burden on the people of Senate District 23, including Senator Scarcella-Spanton, who already shoulder the weight of two tolls, and now face an extra $15 travel fee to enter Manhattan below 60th Street. In addition to the financial burden, Congestion Pricing also presents a significant health threat to Senator Scarcella-Spanton and her constituents, causing heightened traffic pollution and harming air quality in Staten Island.

47. Plaintiff David Weprin is a resident of the State of New York and City of New York, County of Queens and is a New York State Assembly Member, representing the 24th Assembly District in Queens, and formerly a member of the New York City Council. Assemblyman Weprin and his constituents are directly impacted by Congestion Pricing, as the district is a "transit desert." Senior citizens, the disabled, small business owners, and middle-class families in the district cannot afford the latest tax to fund the MTA. Congestion Pricing will also impact businesses across New York City, including in the 24th Assembly District, forcing them to shut down or pass on the costs to the consumer while New Yorkers are still recovering from the economic effects of COVID-19.

48. Plaintiff David Carr is a resident of the State of New York and City of New York, County of Richmond and is a New York City Council Member, representing the 50th Council District, which encompasses Staten Island's mid-island neighborhoods and a portion of

southwestern Brooklyn. Congestion Pricing will cause traffic to be rerouted through Staten Island, as commuters avoid lower Manhattan and drive and park in Staten Island. Air quality will worsen for Councilmember Carr and his constituents and Staten Island already ranks among the worst areas for health events and deaths attributable to fine particle (PM 2.5) and ozone exposure. The only areas of air quality where Staten Island does not find itself in the bottom third for air quality is in areas related to fuel emissions, traffic, and outdoor air pollutants and toxins. The rerouted traffic from Congestion Pricing will impair air quality in those areas as well. Certain areas of southern Brooklyn currently rate equal or near equal to lower Manhattan in every measured pollutant. Shifting lower Manhattan's traffic to a primarily residential borough creates the likelihood that there will be areas in Brooklyn with even worse air quality than the current air quality in Lower Manhattan.

49. Plaintiff Nicole Malliotakis is a resident of the State of New York and City of New York, County of Richmond and is a United States Congresswoman, representing the 11th Congressional District, which encompasses Staten Island and parts of southern Brooklyn. Congresswoman Malliotakis believes that the level of study conducted under the EA process to date has been insufficient and that further study, analysis, and mitigation proposals are necessary before Congestion Pricing should proceed. A full and thorough EIS needs to be conducted to meet the requirements of NEPA and study the impact on her and her constituents, as projects of far less consequence and less apparent environmental impact – such as the Federal Railroad Administration's recent EIS for the "Western Rail Yard" project in Manhattan – have been afforded a full and complete EIS analysis, while this program of tremendous consequence for an entire region has been pushed through at maximum speed with only an EA.

50. Plaintiff Joseph Borelli is a resident of the State of New York and City of New York, County of Richmond and is a New York City Council Member, representing the 51st Council District, which covers the South Shore of Staten Island. As the Council Member representing the southern most part of the State, Councilman Borelli and his constituents have some of the longest commutes in the country. Congestion Pricing will cost residents of the 51st District more money to travel to and from work daily and they will be forced to endure increased pollution caused by the influx of diverted traffic of drivers avoiding the Congestion Pricing toll.

51. Plaintiff James Skoufis is resident of the State of New York, Orange County and is a New York State Senator, representing New York's 42nd Senate District, which covers nearly all of Orange County, including all of the southern and western portions of the County. Senator Skoufis and his constituents live within the MTA region and pay similar, if not identical MTA fees and taxes as other, highly serviced areas, yet they only have one sporadically-run train line for the over 400,000 residents in the County. (The train does not terminate in New York City; it runs to Secaucus and Hoboken in New Jersey and a separate train must then be taken to arrive in Penn Station.) Supporters of Congestion Pricing state that the intent is to shift people's commuting behavior onto public transit; for Senator Skoufis and his constituents, this outcome is unrealistic and punitive, given the lack of viable transit options. Senator Skoufis and many of his constituents will need to continue to drive – and, under the proposed plan, pay an additional $15 toll on top of the nearly $15 toll at the George Washington Bridge – due to the lack of viable transit alternatives.

52. Plaintiff Rob Rolison is a resident of the State of New York, Duchess County and is a New York State Senator, representing New York's 39th Senate District, which is located in the Hudson Valley and includes much of Orange County and parts of Rockland and Ulster

Counties. Congestion Pricing will function as a tax on middle-class commuters, like Senator Rolison and his constituents, who travel to New York City from the Hudson Valley and have no other viable public transit options.

53. Plaintiff Aileen Gunther is a resident of the State of New York, Sullivan County and is a New York State Assemblywoman, representing the 100th Assembly District, which includes large parts of Orange and Sullivan Counties. Assemblywoman Gunther represents thousands of commuters, including many who relocated to Orange and Sullivan County during the COVID-19 pandemic, but still need to commute to New York City on a regular basis. The fact-tracked tolling program – the main component of which was only determined after the review process had purportedly concluded – would have a significant and long-term financial impact on the many working and middle-class residents of Orange and Sullivan Counties, including Assemblywoman Gunther, with no concomitant benefit to their quality of life.

54. Plaintiff Christopher Eachus is a resident of the State of New York, Orange County and is a New York State Assemblyman, representing the 99th Assembly District, which includes towns in Orange County and Stony Point. Assemblyman Eachus was also a former educator for 40 years in both public and private schools in New York. Congestion Pricing will directly and unjustly harm Assemblyman Eachus and his constituents needing to commute to work in the 99th District; teachers, nurses, and many of other of Assemblyman Eachus's constituents will be burdened with a large fee on top of already expensive tolls, making it hard to sustain jobs on their current salaries. There is a severe lack of public transportation to New York City in Assemblyman Eachus's region, making it difficult to find alternate transportation routes. All indications from the MTA suggest that the fees generated by Congestion Pricing will largely circulate into the New York City subway system, not towards highly needed upgrades to Metro

North and the Port Jervis Line, which Assembly Eachus and his constituents rely upon. Congestion Pricing adds an additional financial burden in the district, in a time of already difficult financial times.

55. Plaintiff Karl Brabenec is a resident of the State of New York, Orange County and is a New York State Assemblyman, representing the 98th Assembly District, which covers parts of Orange and Rockland Counties. Residents from the 98th District commute to New York City for work on a daily basis and the proposed Congestion Pricing will disproportionately burden them with additional commuting costs. The measure would place an undue strain on Assemblyman Brabenec and his hardworking constituents, who lack other public transit options, affecting their daily lives and economic well-being.

56. Plaintiff Brian Maher is a resident of the State of New York, Orange County and is a New York State Assemblyman, representing the 101st Assembly District, which covers parts of Delaware, Orange, Otsego, Ulster, and Sullivan Counties. The Hudson Valley is home to a large number of residents that commute to New York City, including police officers, firefighters, nurses, teachers, union workers, and countless other hard-working New Yorkers that make up the backbone of the State. These workers already find themselves on tight budgets, currently paying high tolls for the bridges and tunnels they use to get into the City. Congestion Pricing charges an additional cost and hurts many, including Assemblyman Maher and his constituents in his District.

57. Plaintiff Michael Reilly is a resident of the State of New York and the City of New York, County of Richmond and is a New York State Assemblyman, representing the 62nd Assembly District, which encompasses part of Staten Island's South Shore. Assemblyman Reilly represents some 150,000 constituents, including himself, who will be forced to pay a new

large toll on top of already significant amounts in tolls when traveling to the City, while seeing little to no benefit from the tax.

58. Plaintiff Michael Tannousis is a resident of the State of New York and the City of New York, County of Richmond and is a New York State Assemblyman, representing the 64th Assembly District, which covers the East Shore of Staten Island and Bay Ridge Brooklyn, including the Verrazano-Narrows Bridge. Congestion Pricing will add to the already high costs of transportation for Assemblyman Tannousis and his constituents, and increase traffic and pollution in Staten Island.

59. Plaintiff Kamillah Hanks is a resident of the State of New York and the City of New York, County of Richmond and is a New York City Councilmember, representing the 49th Council District, which covers the Northern Shore of Staten Island. The financial and environmental impact of Congestion Pricing, especially in Environmental Justice Areas like the North Shore of Staten Island, are injurious to Councilmember Hanks and her constituents. Staten Islanders lack viable public transportation alternatives to navigate the challenge of Congestion Pricing. Introducing an additional financial burden will disproportionately impact working families, who often have little choice but to drive into Manhattan for employment. Congestion Pricing will also contribute increased air pollution in Staten Island, exacerbating environmental concerns facing Staten Island residents.

60. Plaintiff Jaime Williams is a resident of the State of New York and City of New York, County of Kings and is a New York State Assemblywoman, representing the 59th Assembly District, which encompasses the neighborhoods of Canarsie, Flatlands, Georgetown, Mill Basin, Marine Park, Bergen Beach, and Gerrittsen Beach. Assemblywoman Williams and her constituents live in a "transit desert" community and Congestion Pricing will impose a

significant cost with few viable public transit alternatives. Congestion Pricing also offers few exemptions, for example failing to provide financial relief for residents in Brooklyn seeking medical treatment in Manhattan.

61. Plaintiff Andrew J. Lanza is a resident of the State of New York and City of New York, County of Richmond and is a New York State Senator, representing the 24th Senate District, which covers a significant portion of Staten Island, including the southern most point in all of New York State. Congestion pricing will force Assemblyman Lanza and his constituents to endure even more traffic on Staten Island and breathe even more polluted air.

62. Plaintiff Iwen Chu is a resident of the State of New York and City of New York, County of Kings and is a New York State Senator, representing the 17th Senate District, which includes the neighborhoods of Bath Beach, Bay Ridge, Sunset Park, Kensington, Dyker Heights, Bensonhurst, and Gravesend. Senator Chu and her constituents live in southern Brooklyn, which continues to be a transit desert for families and residents. Subway stops are nearly a mile away for many and, even then, unreliable service and lack of accessibility for residents with disabilities and strollers makes driving into the Central Business District by car the only viable option. Congestion Pricing does not offer sufficient protections or access for Senator Chu and her constituents.

63. Plaintiff Monica Martinez is a resident of the State of New York, Suffolk County and is a New York State Senator, representing the 4th Senate District, which includes portions of Brentwood and Deer Park on Long Island. Congestion Pricing directly impacts Senator Martinez and her constituents who need to drive to work in Manhattan and do not have ready access to alternative modes of transportation. The $15 toll being charged places an undue burden on Long Island workers and business owners, including those in Senator Martinez’s district, who cannot

shoulder the extra cost of funding the MTA, particularly when they will not benefit from the MTA's capital program or balanced budget. The toll may also discourage customers from returning to businesses in the City, impacting the post-pandemic recovery.

64. Plaintiff Cliff Hagen is a resident of the State of New York, Richmond County, a Special Education and middle school science teacher at the Police Officer Rocco Laurie Intermediate School 72 on Staten Island, and a UFT member. Mr. Hagen, a teacher of 27 years, is also a leader in the environmental community on Staten Island. Congestion Pricing will impact the air quality and traffic congestion where Mr. Hagen lives and works. The increased traffic from diverted commuters will place increased stress on Staten Island, where a lack of parking infrastructure already significantly impacts Mr. Hagen. Additional road traffic will add to air pollution near Mr. Hagen's home and school, where air quality is already among the worst in New York City.

65. Plaintiff Troy McGhie is a resident of the State of New York and City of New York, County of Richmond, and works at Curtis High School as a 9th Grade Special Education teacher in an ICT science class and is a UFT member. He also serves as dean at the school. The traffic diversion around the Staten Island Ferry, close to Curtis High School, will significantly increase traffic and air pollution in the area, a City designated Environmental Justice Area, which does not have the infrastructure to accommodate a large increase in traffic. Mr. McGhie, who lives in North Staten Island, also drives his wife, a cancer survivor, and his elderly extended family into the City south of 60th Street for medical appointments. His relatives cannot take public transit and he would be forced to pay the toll whenever he takes them for medical treatments. Mr. McGhie will also be disenfranchised by the purposeful bifurcation of

Defendants' submission and evaluation, allowing a finding of no impact without consideration of the actual tolling program and relegating the actual structure to a later, more limited review.

66. Plaintiff Martha Mazier is a resident of the State of New York and City of New York, County of Richmond, and works at the Children's Workshop School as a Pre-K through 5 speech pathologist in the East Village and is a UFT member. Ms. Mazier commutes by driving from Staten Island every day. She already pays the toll at the Verrazzano bridge (and sometimes the Brooklyn-Battery Tunnel). Ms. Mazier does not use public transit because doing so would take close to two hours each day. Because of Congestion Pricing and the $15 cost (for approximately 20 days a month), Ms. Mazier is planning to apply for a transfer to a school in Brooklyn. Ms. Mazier also lives in North Staten Island (in the West Brighton neighborhood) where it is already congested and air pollution is already an issue. Ms. Mazier will also be disenfranchised by the purposeful bifurcation of Defendants' submission and evaluation, allowing a finding of no impact without consideration of the actual tolling program and relegating the actual structure to a later, more limited review.

67. Plaintiff Paul Caminiti is a resident of the State of New York and City of New York, County of Richmond, and is a special education teacher at a District 75 school in Manhattan in Alphabet City, on Houston Street and is a UFT member. District 75 schools serve City students with the most challenging disabilities and educational and other needs. Mr. Caminiti has worked at this school his whole career and drives to work every day from Staten Island. Like Ms. Mazier, traveling by public transit from his area in Staten Island would take Mr. Caminiti approximately two hours. He already pays the Verrazzano toll and lives right by the Verrazzano Bridge, where there is already congestion and air pollution. Congestion pricing would likely cost him an additional $3,000 or more per year, which he cannot afford to pay. No

mitigation actions have been presented by the program to alleviate his commuting burden. If Congestion Pricing is implemented, Mr. Caminiti would by economic necessity seek to transfer to a school in Brooklyn. Mr. Caminiti will also be disenfranchised by the purposeful bifurcation of Defendants' submission and evaluation, allowing a finding of no impact without consideration of the actual tolling program and relegating the actual structure to a later, more limited review.

68. Plaintiff Carly Bianchini is a resident of the State of New York and City of New York, County of Richmond, and works at Chelsea Prep, PS 33 as a special education teacher of a self-contained class and is a UFT member. Ms. Bianchini commutes by driving from Staten Island every day. She already pays the toll at the Verrazzano Bridge. Ms. Bianchini does not use public transit because doing so would take her over two hours each day. Given her work in the early morning hours before school providing a Mathlete program and after school providing intervention programs for students with the most needs, the duration of a commute by public transportation is prohibitive. Ms. Bianchini, together with other staff members, is working to begin a much-needed social emotional learning program to add to the after-school offerings. With the economic pressure of the impending toll, that program is at risk, with teachers expressing a concern about longer commute times later in the day. Because of Congestion Pricing and the $15 cost (for approximately 20 days a month), Ms. Bianchini is considering applying for a transfer to a school in Brooklyn or Staten Island. Ms. Bianchini also lives in North Staten Island (close to the expressway) where it is already congested and air pollution is already an issue. It often takes Ms. Bianchini 25 minutes of her commute to go from her local exit to her home less than a mile away. Added congestion in this area will negatively impact those living and commuting from her area. Ms. Bianchini will also be disenfranchised by the purposeful bifurcation of Defendants' submission and evaluation, allowing a finding of no

impact without consideration of the actual tolling program and relegating the actual structure to a later, more limited review.

69. Plaintiff Hannah Choi is a resident of the State of New York and City of New York, County of Richmond, and works at Chelsea Prep, PS 33 as a third grade gifted and talented classroom teacher and is a UFT member. Ms. Choi commutes by driving from Staten Island every day. She already pays the toll at the Verrazzano Bridge. Ms. Choi does not use public transit because doing so would take nearly three hours each day. Given her work in the early morning hours before school providing math and phonics intervention services, she already begins her day at 5:00 am. Ms. Choi also stays after school to provide additional programs and will be supporting the new social emotion program set to begin this year. Because of Congestion Pricing and the $15 cost (for approximately 20 days a month), Ms. Choi is considering applying for a transfer to a school in Brooklyn or Staten Island. Ms. Choi also lives in North Staten Island (close to the expressway), a City designated Environmental Justice Area, where it is already congested and air pollution is already an issue. Ms. Choi has observed that despite roadwork making the expressway wider, there continues to be intense congestion. Ms. Choi will also be disenfranchised by the purposeful bifurcation of Defendants' submission and evaluation, allowing a finding of no impact without consideration of the actual tolling program and relegating the actual structure to a later, more limited review.

70. Plaintiff Frank Garcia is a resident of the State of New York, Rockland County. He is a teacher at PS 179 in the Mott Haven area of the Bronx and is a UFT member. Mr. Garcia commutes by driving from Rockland County to the Bronx every day. Mr. Garcia does not use public transit because doing so would take some two hours each day, each way and is not readily accessible from where he lives. To avoid existing congestion and a severe shortage of available

parking spaces in the vicinity of his school, Mr. Garcia already begins his day at 5:00 am. He is concerned that congestion pricing will increase not just through traffic to the South Bronx, but will also increase the number of people driving to the area and competing for already scarce parking spaces, as an entry point to the transit system. The congestion pricing program does not provide for the creation of additional parking facilities in surrounding areas. Mr. Garcia, like many of his students, also suffers from asthma. The Bronx, and the South Bronx in particular, is a City-designated Environmental Justice Area, and likely to experience higher volumes of traffic and air pollution as a result of Congestion Pricing. The FHWA has acknowledged that diversion of truck traffic is likely to adversely impact the already congested Cross-Bronx Expressway, which would see a daily increase of thousands of diverted vehicles. This is a significant finding, especially when the U.S. Department of Health and Human Services detailed the need for additional health protective mitigation measures for the neighborhoods surrounding the Cross Bronx Expressway. Mr. Garcia's experience confirms these facts. The air quality where he works is compromised and negatively impacts him and his students, particularly in the warmer months. Mr. Garcia will also be impacted by the redirected congestion and pollution at home in Rockland County, where he resides near the Governor Mario M. Cuomo Bridge. Finally, Mr. Garcia will also be disenfranchised by the purposeful bifurcation of Defendants' submission and evaluation, allowing a finding of no impact without consideration of the actual tolling program and relegating the actual structure to a later, more limited review.

71. Plaintiff Lindsey Lampf is resident of the State of New Jersey, Morris County. She is a third-grade teacher at PS 11 in Manhattan, where she has worked since 2012, and is a UFT member. Ms. Lampf lives in Montville, New Jersey and commutes into Manhattan from her home in New Jersey by car each day, both because of cost and because childcare issues

require her and her husband to drive. Typically, Ms. Lampf takes the Lincoln Tunnel or the George Washington Bridge, which costs her approximately $15 in tolls per day (in addition to mileage costs). If implemented, Congestion Pricing would impose an additional $15 daily fee on top of those tolls. Ms. Lampf cannot switch to mass transit to avoid the toll. The only alternative way for her to get to the City to work would be to take a Lakeland Bus to Port Authority, which would cost her $12.50 each way (and still not get her to her destination in Chelsea). Congestion pricing will also increase congestion on the roads for Ms. Lampf, whether she continues to take the George Washington Bridge and Lincoln Tunnel or switches to the Lakeland Bus. Ms. Lampf, like many New Jersey residents, rarely uses MTA public transit. Thus, Congestion Pricing will impose a significant daily financial burden on her commute to work, and she will receive no benefit from the MTA's use of toll revenue for its capital projects.

72. Defendant USDOT is the executive department of the federal government responsible for oversight of the transportation planning process, including implementing the requirements of NEPA, and ensuring the conformity of federally-developed, funded, or approved transportation projects.

73. Defendant FHWA is a federal agency within the USDOT that supports state and local governments in the design, construction, and maintenance of the Nation's highway system. Among its management responsibilities, the FHWA must ensure that the activities it authorizes comply with governing federal environmental statutes, including NEPA. The FHWA authorizes States to toll on federal roads and highways under the Value Pricing Pilot Program ("VPPP"). 23 U.S.C. § 129. The FHWA issued the Final EA and FONSI for Congestion Pricing and must

approve it under the VPPP. The FHWA was required to perform a NEPA review pursuant to its regulations. 23 C.F.R. Part 771.

74. Defendant Shailen Bhatt is the Administrator of the FHWA and is responsible for the Final EA and FONSI. He is named herein in his official capacity.

75. Defendant Richard J. Marquis is the Division Administrator for the New York Division of the FHWA and is responsible for the Final EA and FONSI at issue and is a signatory to each document. He is named and mentioned here in his official capacity. Defendants FHWA, Administrators Bhatt and Marquis are collectively referred to in this Amended Complaint as the FHWA.

76. Defendant MTA is a public benefit corporation chartered by the New York State Legislature in 1968 under the Metropolitan Transportation Authority Act, N.Y. Pub. Auth. Law § 1260 *et seq.* Defendant is a program sponsor for Congestion Pricing.

77. Defendant Triborough Bridge and Tunnel Authority ("TBTA") is a public benefit corporation organized and existing under the Public Authorities Law of the State of New York, empowered to acquire, design, construct, maintain, operate and improve and reconstruct toll bridges and toll tunnels that connect the five boroughs of New York City. The Traffic Mobility Act provides that TBTA design, develop, build and run the Congestion Pricing program. The Act also authorizes the TBTA Board to establish the Traffic Mobility Review Board, which was tasked with issuing the final tolling structure for the Congestion Pricing program.

78. Defendant Stephanie Winkelhake, P.E. is the Chief Engineer at the New York State Department of Transportation. Named in her official capacity, Winkelhake is also responsible for the EA and FONSI at issue. Ms. Winkelhake, as Chief Engineer for the

Congestion Pricing Plan, is closely connected with the enforcement and implementation of the acts at issue.

79. Defendant New York City Department of Transportation ("NYCDOT") is the City agency charged with maintaining and enhancing the transportation infrastructure of New York City. NYCDOT is a co-project sponsor for Congestion Pricing and was charged, along with the MTA, with developing proposals for the scheme and releasing the Final EA for the program.

## FACTUAL ALLEGATIONS

i. Congestion Pricing in New York

80. In 1991, Congress established the Value Pricing Pilot Program ("VPPP") as a pilot program for Congestion Pricing. The VPPP, by supporting programs throughout the country, was intended to demonstrate whether, and to what extent, roadway congestion could be reduced through congestion pricing strategies.

81. While the VPPP no longer actively solicits projects or dispenses federal funds, the FHWA must still approve tolling schemes proposed by state and local governments that would toll existing federal-aid highway lanes before they can be implemented.[3] Upon information and belief, there is no other approved congestion pricing district in the United States.

82. When the FHWA reviews an application to the VPPP, it must evaluate the potential environmental effects of the proposed action in accordance with NEPA. (Final EA, at 0-1). NEPA requires federal agencies to take a hard look at environmental impacts and disclose its analysis in order to facilitate a meaningful public review and comment period.

[3] *Id.*; Fed. Highway Admin., U.S. Dep't of Transp., Value Pricing Program (Aug. 22, 2022), https://ops.fhwa.dot.gov/congestionpricing/value_pricing/index.htm; Fed. Highway Admin., U.S. Dep't of Transp., Frequently Asked Questions (Feb. 11, 2022), https://ops.fhwa.dot.gov/congestionpricing/faq/index.htm#faq_05_08.

83. In recent years, New York City has attempted multiple times, without success, to implement congestion pricing.

84. In 2007, then-Mayor Bloomberg announced "PlaNYC: A Greener, Greater New York," a plan involving open space, energy improvements, improving water and air quality, addressing climate change, and, lastly, congestion pricing.

85. Mayor Bloomberg proposed an $8 toll for vehicles entering parts of Manhattan between 6 a.m. and 6 p.m. on weekdays. The project was expected to produce $491 million annually for transit improvements and propel a transit build-out for the MTA.[4] Due to a lack of public support, state assembly leaders blocked the project in 2008.[5]

86. In 2017, then-Governor Cuomo brought together community representatives, officials, and business leaders from across New York State and tasked the group with developing recommendations to address congestion in Manhattan and identify sources of revenue to fix the ailing subway system.[6] The panel issued a report recommending that "the MTA must first invest in public transportation alternatives and make improvements in the subway system before implementing a zone pricing plan to reduce congestion."[7] Pertinent here, the report explicitly mentioned that this type of zoning congestion plan would require "completion of an Environmental Impact Statement (EIS)."[8]

---

[4] Laura Bliss, *Congestion Pricing: Here's How the Governor-backed Plan Could Win This Time Around*, Bloomberg (Aug. 16, 2017, 7:00 AM EDT), https://www.bloomberg.com/news/articles/2017-08-16/new-york-city-has-a-new-congestion-pricing- plan.

[5] Nicholas Confessore, *$8 Traffic Fee for Manhattan Gets Nowhere,* New York Times (Apr. 8, 2008), https://www.nytimes.com/2008/04/08/nyregion/08congest.html.

[6] Fix NYC Report, HNTB (Jan. 19, 2023), https://www.hntb.com/fix-nyc-report/.

[7] *Id.* at 3 (emphasis added).

[8] *Id.*

ii. The Central Business District (CBD) Tolling Program – Congestion Pricing

87. In 2019, the New York State Legislature revived its efforts to pursue a congestion pricing program.

88. In April of that year, the Legislature passed the Traffic Mobility Act. The stated goal of the Traffic Mobility Act was to create a dedicated revenue stream that "at minimum, ensure[s] annual revenues and fees collected under such program . . . *fund fifteen billion dollars* [] for . . . the 2020 to 2024 *MTA capital program*" while reducing traffic congestion.[9] N.Y. Veh. & Traf. Law § 1704-a(1) (emphasis added).

89. The Traffic Mobility Act authorized the TBTA, an affiliate of the MTA, to "establish and charge variable tolls and fees." *Id.* It also directed the TBTA to establish a plan to toll vehicles entering or remaining in the Manhattan CBD, an area including the entirety of Manhattan south of 60th Street, with a few key exceptions, including the FDR Drive and the West Side Highway. *Id.* §§ 1704-a(3)(a), 1705.

90. The Traffic Mobility Act required three basic components of any pricing scheme: (1) an exemption for qualifying vehicles transporting persons with disabilities and authorized emergency vehicles; (2) tolling only once a day; (3) tax credits equal to the amount of tolls paid per year for residents within the Manhattan CBD with adjusted gross income less than $60,000; and (4) a requirement that passenger vehicles that enter or "remain" in the Manhattan CBD, *i.e*, vehicles detected when leaving the City, but not entering, would be tolled. *See id.* § 1704-a(2);

[9] The Manhattan CBD is defined as "the geographic area in the borough of Manhattan south of and inclusive of sixtieth street to the extent practicable but shall not include the FDR Drive, and New York state route 9A otherwise known as the 'West Side Highway' including the Battery Park underpass and any surface roadway portion of the Hugh L. Carey Tunnel connecting West St. The boundaries of the central business district shall not be modified, expanded, or reduced and shall incorporate the outer bounds of the aforementioned district to the extent practicable." N.Y. Veh. & Traf. Law § 1704(2).

N.Y. Tax Law § 606 (jjj)(1); (FONSI, at 1).[10] The remaining details of Congestion Pricing were completely left up to the TBTA and its appointed TMRB.

91. Shortly after the Traffic Mobility Act's enactment, the New York State Legislature passed the 2019-20 budget authorizing the congestion pricing scheme and mandating that it be implemented no earlier than December 31, 2020.[11] Thereafter, the Project Sponsors began developing proposals for the congestion pricing plan.

92. As required, following enactment of the Traffic Mobility Act, the Project Sponsors submitted an Expression of Interest to the FHWA, seeking tolling authority under the VPPP to implement its congestion pricing scheme. (Final EA, at 1).

93. Between April 2019 and early 2020, the Project Sponsors met with the prior federal administration more than a dozen times to discuss its assessment and approval of congestion pricing in the Manhattan CBD, including whether an EA or EIS was needed.[12] With little progress made, New York officials accused the federal government of delaying congestion pricing and making the EA process more strenuous than was necessary. By July 2020, the government had not yet informed the MTA as to whether it needed to undertake an EA or EIS.[13]

94. The COVID-19 pandemic caused massive shifts in commuting patterns, including causing ridership on the New York City subway and buses to plummet and the MTA lost billions of dollars. As with many state and federal agencies, the MTA received significant federal

---

[10] The TMRB recommended only tolling vehicles entering the Manhattan CBD. (TMRB Report, at 17).

[11] Dana Rubinstein, *Why Congestion Pricing Might Be Delayed*, Politico (Feb. 18, 2020), https://www.politico.com/states/new-york/city-hall/story/2020/02/18/why-congestion-pricing-might- be-delayed-1261628; S. 1509-C, 2019-2020 Leg., Senate Assemb. (N.Y. 2020), https://www.nysenate.gov/node/7059296.

[12] Christopher Robbins, *Congestion Pricing's Failure A "Shining Example" of Government Dysfunction*, Gothamist (July 15, 2020), https://gothamist.com/news/congestion-pricings-failure- shining-example-government-dysfunction.

[13] *Id.*

emergency funding. In May 2020, the MTA received $500 million in transit funding under the Coronavirus Aid, Relief, and Economic Security Act.[14] Then, between May 2020 and March 2022, the MTA received *over $15 billion* in pandemic relief funding – conveniently the same amount it stands to gain from its congestion pricing scheme.[15]

95. The MTA has been heavily criticized for mismanaging these funds. Congresswoman Nicole Malliotakis (NY-11) and Congressman Josh Gottheimer (NJ-05) called for a congressional oversight hearing and investigation which would examine "how $15 billion of COVID-19 relief taxpayer dollars were spent," particularly since despite receiving this enormous sum of federal funds, the MTA is expected to hit a "fiscal cliff," with a $2.5 billion deficit in 2025 and a $4.6 billion operating deficit by 2026.[16]

96. Following the November 2020 election, New York and the MTA saw a renewed opportunity for congestion pricing. Indeed, the FHWA signaled that it intended to move as quickly as possible to produce an EA well before beginning its requisite formal assessment under NEPA.

97. In March 2021, MTA officials stated that the MTA had "heard from the Federal Highway Administration that they are going to fast-track our environmental process."[17]

---

[14] Stephanie Pagones, *MTA to Get $3.9B in Coronavirus Aid, Cuomo Says Trump 'cut red tape' to Send NY Expedited Funding, Fox Business* (May 14, 2020, 2:58 PM EDT), https://www.foxbusiness.com/lifestyle/trump-cuomo-new-york-city-subway-funding.

[15] N.Y. State, Statement from Governor Kathy Hochul on the MTA Receiving 769 Million in Additional COVID Relief Funding from the Federal Transit Administration (Mar. 7, 2022), https://www.governor.ny.gov/news/statement-governor-kathy-hochul-mta-receiving-769-million- additional-covid-relief-funding.

[16] *Id.*

[17] Eric Bascome, *NYC Congestion Pricing May Be Pushed Forward Under Biden*, silive.com (Feb. 26, 2021, 1:09 PM EST), https://www.silive.com/news/2021/02/nyc-congestion-pricing-may-be-pushed- forward-under-biden.html.; Alissa Walker, Secretary Pete Is Already Coming Through for New York City on Congestion Pricing, Curbed (Feb. 23, 2021), https://www.curbed.com/2021/02/congestion- pricing-nyc-approval-pete-buttigieg.html.

98. Shortly thereafter, the FHWA authorized the MTA and New York transportation agencies to proceed with a NEPA Class III EA action pursuant to 23 C.F.R. § 771. (Final EA, at 1). In its authorization letter, the FHWA emphasized that it would "expedite its efforts wherever possible," and that the EA would require "enhanced coordination and public involvement that engages stakeholders from throughout all three States." (FHWA Letter, at 2).

99. Starting in May 2021 and continuing through August 2022, the Project Sponsors prepared the Draft EA for Congestion Pricing. At the time of its preparation, neither the FHWA or the Project Sponsors had any idea how much the toll would be, when the toll would be in effect, and what the structures and exemptions to the tolls would be.

100. Moreover, the FHWA considered only one alternative to Congestion Pricing – the "No Action Alternative." All other potential revenue raising alternatives were rejected at the outset in large part because they would not achieve the $15 billion revenue goal set forth by the Traffic Mobility Act – notwithstanding the fact that they would have reduced traffic congestion. The FHWA also did not consider whether a combination of these alternatives could meet its goals.

101. Congestion Pricing has always set its sights on the $15 billion figure targeted for the MTA capital plan. The stated purpose of the project in the Draft EA was to "reduce congestion in the Manhattan CBD *in a manner that will generate revenue for future transportation improvements*." (Draft EA, at ES-6) (emphasis added). The Executive Summary of the EA sets as its goals reducing VMT within the Manhattan CBD by at least 5%; reducing the number of vehicles entering Manhattan daily by at least 10%; and "*creating a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program.*" (*Id.* at ES-7) (emphasis added).

102. On August 10, 2022, the completed Draft EA was made available to the public. The Draft EA reflected the determination that an EIS was not required for Congestion Pricing, which meant that the Project Sponsors believed that if there were any significant adverse environmental impacts, they could (and would) be mitigated.

103. The publication of the Draft EA initiated a 30-day formal comment period, which was subsequently extended by only 14 days despite requests for substantially longer extensions.

104. Despite the tight timeframe, during the comment period, the FHWA and the Project Sponsors received more 69,000 submissions.

105. Among them was the EPA's written comment, which raised significant concerns about the environmental impact of Congestion Pricing, particularly in Bronx, Bergen, and Richmond counties, "where the analysis in the Draft EA project[ed] that traffic congestion will likely worsen due to Project implementation." (EPA Comment Letter).

106. Due to the "insufficiency of data in the Draft EA around localized and disproportionate air quality impacts in the surrounding area," the EPA was "unable to confirm" that the environmental impacts would be "less than significant without appropriate mitigation." (*Id.*) The EPA recommended that the analysis of Bergen, Bronx, and Richmond counties "be improved" and "appropriate mitigation be identified to ensure adverse impacts are less than significant, especially given the historical environmental justice (EJ) concerns and cumulative impacts to the affected communities." (*Id.*)

107. With respect to air quality, the EPA recognized that "[t]raffic diversion may result in continued or increased air pollution in many residential neighborhoods along the East River," including the South Bronx and Washington Heights. (*Id.*) The agency saw that "all tolling scenarios suggest a potential increase in vehicle and truck traffic" with some scenarios seeing

"an additional 700 trucks per day" in the South Bronx and understood that the "[p]rojected benefits for the CBD are not expected to offset" the increased traffic to Bronx, Richmond, and Bergen counties. (*Id.*)

108. The EPA urged the inclusion of a "more expansive microscale screening analysis of intersections" (beyond the 102 hot-spot intersections already included), including in Staten Island and Bergen County where residents will see increased traffic and air pollutants from 2023 to 2045 as a result of the Congestion Pricing plan. (*Id.*). The EPA encouraged the FHWA to consider *"[a]ll potential adverse impacts* . . . irrespective of benefits to other areas," and prepare a "comprehensive mitigation package" accordingly. (*Id.*) (emphasis added).

109. This more expansive screening analysis was not conducted and no comprehensive mitigation package has been prepared.

110. The EPA recommended that the Project Sponsors provide more detailed analysis of the "cumulative effects" on economic justice communities in accordance with NEPA Implementing Procedures, particularly because the numerous groups in the three counties identified "may already be heavily overburdened from the types of impacts relevant to the project" including cancer risk, respiratory hazards, particulate matter, and diesel particulate matter. As the EPA noted, the pediatric rates of asthma emergency department visits and hospitalization in the Bronx and East Harlem are already exceedingly high; Richmond County also bears disproportionate asthma disparities for both adults and children. (*Id.*)

111. No such further analysis of cumulative effects on these communities has been conducted.

112. Overall, the EPA concluded that "additional analysis should be conducted to identify mitigation measures to reduce disproportionate, significant impacts to communities with

EJ concerns" and stated that the Project Sponsors should include "concrete mitigation requirements as commitments in its decision document." (*Id.*)

113. Meaningful and concrete mitigation requirements were not included in the Defendants' decision document.

114. Besides the EPA, a wide spectrum of local and national politicians, community groups, public and private sector associations, government agencies, and individuals wrote in strong opposition to Congestion Pricing and the Draft EA. Among them:

a. The U.S. Department of Health and Human Services recommended additional health protective mitigation measures for the neighborhoods surrounding the Cross-Bronx Expressway. (Appendix 18C-480).

b. The New York Civil Liberties Union pointed out that disabled people will be unable to simply switch to public transit in response to Congestion Pricing because, of the 493 transit system stations in New York City, only 123 are accessible under the Americans with Disabilities Act. (*Id.* 18C-23046).

c. The American Bus Association, an organization representing the nearly 11,000 buses operating in the tri-state area, indicated that it would be imprudent for the FHWA to make a finding of "no significant impact" without knowing which pricing model would be implemented. "Coach USA," one of the largest transportation operators in the United States, also argued that the public comment period was "rushed and inadequate" and did not comply with the NEPA process. (*Id.* 18C-3596).

d. City Council Speaker Adrienne Adams expressed her concern that the Draft EA did not sufficiently account for the impact on environmental justice communities and communities in the outer-boroughs who cannot rely on mass transit to reach Manhattan. She questioned the Draft EA's conclusion that Congestion Pricing would result in "small changes" in parking demand (in neighborhoods where there is already easy subway access) and urged the FHWA to re-examine the impacts to parking demand and quality of life. Like the EPA, Speaker Adams highlighted the EA's projection of increased air pollutants in the Bronx and in Staten Island and emphasized that simply monitoring the particulate in these areas would not be sufficient without more appropriate mitigation efforts. (*Id.* 18C-3).

e. Politicians and individuals from Connecticut, New Jersey, Rockland, Queens, and Westchester argued that their constituents – many of whom live in "transit deserts" and cannot switch to public transit – are paying an unfair portion of the

commuter tax and do not realize its benefits, which inure primarily to New York City residents. (*Id.* 18C-415, 18C-440, 18C-485).

f. Staten Island President, Plaintiff Vito Fossella and Council Members from Staten Island, including six plaintiffs in this action[18] lamented the traffic diversion that will occur in Staten Island from Congestion Pricing, citing the increased incidence and severity of health problems associated with close proximity to traffic. They pointed out that trucks are already frequently illegally parked overnight in residential neighborhoods in Staten Island due to the cost of transportation. Even more traffic forced onto Staten Island's oversaturated roadways – "for just a theoretical 10% decrease in Manhattan traffic" – would be salt in an ever more painful wound. (*Id.* 18C-137).

115. In early May 2023, the FHWA published its Final EA. Despite the litany of concerns identified, the Final EA remained largely unchanged from the initial draft. Although a few mitigation measures were added, they failed to address the identified issues, often providing that the issues would be studied and analyzed over the next 18 months, after the proposed action went into effect.

116. Aside from the promise to study the issues further, to "mitigate the traffic diversions, related air pollutants and associated health effects," the Final EA included "regional and place-based mitigation" for communities adversely impacted by Congestion Pricing. As contrasted with the $1 billon in annual revenue and estimated $15 billion revenue to the MTA capital program, the Program Sponsors committed a mere $155 million over 5 years to mitigation, for initiatives such as "install[ing] roadside vegetation to improve near-road air-quality." (Final EA, at ES-22). None of the air pollution or traffic mitigation efforts that the EPA and others recommended or further studies were included.

117. The mitigation is wholly inadequate both in scope and in value to ameliorate the severely deleterious likely impact of Congestion Pricing.

[18] Plaintiffs who signed onto Mr. Fossella's comment letter include David Carr, Nicole Malliotakis, Michael Reilly, Michael Tannousis, Kamillah Hanks, and Andrew J. Lanza.

118. Alongside the Final EA, the FHWA published a Draft FONSI. In the Draft FONSI, the FHWA claimed that it had "independently evaluated the Final EA and determined it to adequately and accurately document the purpose and need, environmental issues, and impact of the Proposed Action and appropriate mitigation measures." (Draft FONSI). The FHWA thus summarily found that the Final EA "provide[d] sufficient evidence and analysis" to determine that an EIS was "not required." (*Id.*)

119. Without having before it the ultimate toll structure that it was supposed to be reviewing, the FHWA determined there was "no mitigation needed" and "no adverse effects" of Congestion Pricing, but did recommend that the TBTA work with New York City Department of Health and Mental Hygiene, as well as the New York State Department of Environmental Conservation, to monitor particulate matter to determine whether changes in air pollution occur as a result of the changes in traffic patterns in New York.

120. The Draft FONSI was made available for public review for 30 days.

121. In June 2023, the FHWA published its Final FONSI without notable changes.[19] The Final EA and FONSI reflected a deficient and inadequate assessment of the tolling scenarios and their possible effects on neighboring districts, a failure to require necessary mitigation measures, particularly in all communities with environmental justice concerns, and a failure to consider alternatives – all culminating in an unjustified finding of no significant impact that provided for minimal mitigation measures while simultaneously acknowledging that the FONSI did not review the actual toll structure to be implemented, as that structure was not yet determined.

[19] The FONSI, Final EA, comment letters, and other agency documents can be found at: https://new.mta.info/project/CBDTP/environmental-assessment.

122. Instead, the FONSI considered a number of hypothetical tolling scenarios, with no requirement that the ultimate tolling structure resemble those scenarios. The scenarios contemplated peak toll rates ranging from $9 to $23, applicable from 6:00 AM to 8:00 PM weekdays and 10:00 AM to 10:00 PM weekends. (Final EA, at ES-12). The Final EA committed to a nighttime (12:00 AM to 4:00 AM) discount of at least 50%. Several of the scenarios included credit toward the CBD toll for tolls paid at the Queens-Midtown, Hugh L. Carey, Lincoln, and Holland Tunnels. (*Id.*) One included credit for tolls paid at the Robert F. Kennedy, Henry Hudson, and George Washington bridges. As for exemptions, the Final EA considered three types of exemptions or limitations for taxis, for-hire vehicles, and certain buses (city and inter-city). Tolls for trucks also spanned a very wide range. In approving these disparate components, the FHWA admitted that the actual tolling structure would only be determined after issuance of the FONSI, leaving open that the "pricing structure could vary by time of day, day of week, and day of year and could be different for different types of vehicles," among other differences. (FONSI, at 25).

123. Accordingly, the FONSI provides that FHWA will re-evaluate the actual toll structure and related mitigation at a later time. Such "re-evaluation," despite there never being an initial evaluation of the actual tolling structure, shifts the agency's legal obligation under NEPA to take a hard look at the impacts of Congestion Pricing to the TBTA, requiring only that it demonstrate such changes are "consistent with the effects disclosed in the Final EA." This later look leaves the process unfinished and fails to guarantee the analysis and public process that should have occurred when evaluating the central component of the proposed plan.

124. No EIS was ever conducted for the Congestion Pricing program.

iii. The TMRB's Recommendation

125. On November 30, 2023, well after the FHWA published its "final" finding of "no significant impact," the TMRB released its recommended toll structure.[20]

126. The recommended daytime toll rate applies from 5:00 AM to 9:00 PM on weekdays and 9:00 AM to 9:00 PM on weekends (longer periods capturing many more drivers and causing diversion of traffic from an earlier hour to surrounding areas). (TMRB Report, at 19). It includes the following tolls for vehicles entering the CBD, no more than once per day:

a. $15 for passenger vehicles and passenger-type vehicles
b. $24 for small trucks and intercity buses
c. $36 for large trucks and tour buses
d. $7.50 for motorcycles

(*Id.* at 8).

127. To put the $15 passenger toll in context, an individual traveling five times per week into the Manhattan CBD would face $75 per week, and over $3,000 per year in additional commuting costs, a significant amount of after-tax dollars (on top of existing tolls and mileage costs).

128. Nighttime tolls are 75% lower than during the above peak hours. The Report also recommended that low-income vehicle owners who qualify and register with the TBTA receive a 50% discount on daytime tolls after the first 10 trips made by that vehicle in a calendar month. (*Id.*)

---

[20] *Congestion Pricing in New York: A toll structure recommendation from the Traffic Mobility Review Board* (Nov. 2023), https://new.mta.info/document/127761.

129. According to the MTA's own statistics, the two new additional peak hours included in the adopted toll (from 5:00 AM to 6:00 AM and from 8:00PM to 9:00PM) would impact approximately 60,000 cars entering the CBD per day during those hours.

130. The peak period exceeds the peak hour schedules of the City's transportation systems, like the Long Island Railroad and Metro-North. The toll periods also changed from a three time-period structure (peak, off-peak, and overnight) to a two time-period structure (peak and overnight).

131. In addition, the Report recommended that passengers of taxis be charged $1.25 per ride and FHV (*e.g.*, Uber and Lyft) be charged $2.50 per-ride.[21] A per-ride charge was not considered or studied in the EA or FONSI. Further, the EA and FONSI did not study the deterring effects (or lack of deterring effects) of the adopted toll on taxi and for-hire-vehicles, given that the charge is passed to passengers and not incurred by the drivers themselves.

132. The TMRB Recommendation estimates that taxis and FHV "carry[] more than one million passengers a day pre-pandemic," are a "significant cause of congestion" in the City and comprise "more than half of all vehicles in the CBD." TMRB Recommendation at 22.

133. Because of the change to a minimal per ride pass-through charge to the consumer, (likely to be less impactful on congestion), the TMRB also stated that the "TBTA should monitor the effect of the per-ride taxi and FHV toll on congestion. If it finds that additional measures are needed, the TBTA should consider an additional surcharge for daytime trips that take place entirely within the CBD in light of the numerous public transit options available in the CBD." *Id.* The re-evaluation did not pursue this issue further; pushing the analysis – or an additional

[21] Unlike for other tolls in the proposed action that only apply up to once per day, these tolls are charged per ride.

surcharge – to some undetermined point in the future, particularly on such a key contributor to congestion, does not evince the "granular assessment" required for such a material change.

134. Finally, the Report recommended that a credit against the daytime CBD toll rate be provided only to vehicles entering through the four tolled entries that lead directly into the CBD:

a. The Queens-Midtown,
b. Hugh L. Carey,
c. Holland,
d. Lincoln

135. The recommended credit against daytime tolls was:

a. $5 for passenger vehicles and passenger-type vehicles,
b. $2.50 for motorcycles,
c. $12 for small trucks and intercity buses,
d. $20 for large trucks and tour buses

These toll credits would not apply at night. The $5 discount differed from the $6.55 to $13.10 discount contemplated in the EA.

136. The TMRB Report provided no credit to drivers already paying tolls on the Verrazzano-Narrows Bridge (Staten Island) or the George Washington Bridge (New Jersey), altering the diversion of traffic.

137. In a section entitled "*Exemptions considered, but ultimately not recommended*," the TMRB Report indicated that it would not recommend exemptions for schoolteachers, police officers, judges, transit workers, firefighters, and other public sector employees, nor would it provide exemptions for employees who must drive to work. The singular reason given for failing to provide any discount to such drivers was that "public-sector employees are not exempt from existing tolls on bridges, tunnels and highways." (TMRB Report, at 28). No consideration

was given to the indisputable fact that these employees, many of whom already struggle to pay the cost to drive to work, will now be forced to pay these expensive tolls *twice.*

138. The TMRB also considered but rejected calls to exempt electric vehicles and to exempt individuals with serious medical conditions who cannot take public transportation. For disabled individuals, the TMRB stated in conclusory fashion that London, a City that reimburses disabled commuters for Congestion Pricing tolls, has a national health insurance program, and the United States does not have a comparable entity. (*Id.* at 29). This is despite the fact that approximately one out of 15 New Yorkers has an ambulatory disability, and only 27% of the MTA's 472 subway stations are considered accessible under the Americans with Disabilities Act.[22]

139. In a telling response to one of the EPA's suggestions regarding low-income exemptions, the Project Sponsors stated: "One of the four objectives of the Project is to create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects…the more vehicles that are given cross credits, exemptions, etc., the higher the toll must be to ensure sufficient revenues are generated." (Appendix 18C-475).

140. The Project Sponsors and the TMRB have maintained a myopic focus – a focus now called into question by the Governor – on Manhattan traffic and MTA revenue to the detriment of all else, including the environmental impact and individual financial burden on surrounding communities and their residents.

141. That focus is contrary to the stated environmental goals of New York State and City. The City Council passed Local Laws 60 and 64, which mandate that a City interagency working group produce an Environmental Justice Plan for New York that will, among other

[22] Asmaa Elkeurti and Ana Ley, *Elevators at Most Subway Stations? 'I'll Believe It When I See It.'*, N.Y. Times (Aug. 31, 2023), https://www.nytimes.com/2023/08/31/nyregion/nyc-subway-accessible-disabled.html.

things, mandate that City agencies incorporate environmental justice concerns into agency decision-making and promote public participation and transparency in decisions that raise environmental justice issues. The Environmental Justice Plan is scheduled to be issued in 2024, and the TBTA and the TMRB's fast-tracked process ensures that the agency can elide these important new requirements.

142. While the TMRB's recommendation summarily states that the Board has "paid particular attention to the impact of the program on environmental justice communities," the only evidence of any analysis is a conclusory statement that it relied upon a "Best Practice Model" of travel forecasting "and the analysis methodology approved by federal authorities for this Project." The recommendation acknowledges that the "environmental impact of Congestion Pricing . . . is not uniform across the region" and that "traffic diversions can be a concern, particularly when they occur in communities already burdened by comparatively high pre-existing air pollution and/or chronic diseases." Besides this acknowledgment, the TMRB took no further action beyond rubber-stamping the EA and FONSI limited mitigation measures.

143. On December 6, 2023, the TBTA approved the TMRB's recommendation to go forward with its tolling program.[23] MTA Chair and CEO Janno Lieber lauded the TMRB's recommendation in how it supposedly provided "discounts and exemptions for the folks who really need to drive," despite not offering a single discount or exemption to those who live in transit deserts and those with disabilities who are compelled to drive, among others.[24]

[23] Press Release, *MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule*, MTA (Dec. 6, 2023, 9:30 PM), https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate.

[24] Press Release, *MTA Board Votes to Begin Public Review Process for Central Business District Tolling Rate Schedule*, MTA (Dec. 6, 2023, 9:30 PM), https://new.mta.info/press-release/mta-board-votes-begin-public-review-process-central-business-district-tolling-rate; *see also* MTA, *MTA Board Meeting - 12/6/2023*, YOUTUBE (Dec. 6, 2023), https://www.youtube.com/live/0pfJ-S9myBk?si=4BnXippfzAml3OoC&t=6022 at 1:54:15 (Midori Valdivia

144. On December 26, 2023, the TBTA also announced that it would have but four hearings, on February 29, 2024, March 1, 2024, and two on March 4, 2024,[25] before the vote on the TMRB's recommendation takes place in the Spring of 2024.

145. The expectation of the MTA was that the tolling scheme would "go[] live in late Spring."[26]

146. To achieve this expedited and preordained result, MTA Chief Operating Officer, Allison C. de Cerreño, stated that concurrently with the public comment period and hearings, her team is performing "the final analysis and re-evaluation to ensure that the effects of the actual toll schedule remain consistent with the [FHWA's] finding of no significant impact."[27]

---

(MTA Board Member): "I'm very impressed that the TMRB has no exemptions really or very, very tiny exemptions in the report.").

[25] Press Release, *MTA Announces Details of Congestion Pricing Public Comment Period*, MTA (Dec. 26, 2023, 9:30 PM), https://new.mta.info/press-release/mta-announces-details-of-congestion-pricing-publiccomment-period.

[26] *See* MTA, *MTA Board Meeting - 12/6/2023*, YOUTUBE (Dec. 6, 2023), https://www.youtube.com/live/0pfJ-S9myBk?si=4BnXippfzAml3OoC&t=6022 at 1:40:22 (Allison C. de Cerreño (MTA Chief Operating Officer): "We're looking forward to going live in late Spring.").

[27] *Id.* at 1:39:42.

iv. The MTA Adopts the Final Toll Structure

147. On March 27, 2024, the MTA board voted 11-1 to approve the TMRB Recommendation at its monthly board meeting, with minimal changes.

148. The toll structure added exemptions for school buses, certain commuter vans and buses, and an unspecified number of additional government vehicles (to be agreed to by the TMRB and the City).

149. The toll structure changed the discount on the Queens-Midtown and Hugh L. Carey tunnels from $5 to $2.50 each time a vehicle enters or exits the CBD (leaving discounts for other crossings unchanged from December), without further explanation.

150. As such, the toll structure strayed even further from those considered in the EA and FONSI.

151. Following adoption of the toll, and before Defendants' re-evaluation, the MTA updated its website to state, "In June 2024, New York City will implement the nation's first congestion pricing program." During the pendency of this litigation, Defendants announced a June 30th implementation date for Congestion Pricing.

v. New York Governor Kathy Hochul Indefinitely Pauses Congestion Pricing

152. On June 5, 2024, Governor Hochul indefinitely halted the implementation of Congestion Pricing (hereinafter, the "Pause").

153. In her statement, Governor Hochul explained that "circumstances have changed" for a program that "was enacted in a pre-pandemic period where workers were in the office five days a week. . . ." The Governor stated that implementing Congestion Pricing "risks too many unintended consequences," particularly to working and middle-class New Yorkers.[28]

---

[28] *Video, Audio & Rush Transcript: Governor Hochul Addresses New Yorkers on Affordability and the Cost of Living*, NYS (June 5, 2024), https://www.governor.ny.gov/news/video-audio-rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost.

154. The Governor stopped short of canceling the program altogether, but suggested in subsequent remarks that "to assume that the only funding source [for improvements to mass transit] has to be congestion pricing shows a lack of imagination" and that there are "other ways to deal with this."[29]

155. Following this statement, the Legislature and Governor began seeking alternatives that would raise revenue for the MTA in place of funds expected to be raised by Congestion Pricing.

156. These alternative funding measures would contribute to the MTA capital program, and alleviate the need to raise the full $15 billion figure from Congestion Pricing alone.

vi. Defendants' Re-evaluation Concludes No Supplemental Analysis Is Necessary

157. Despite the Pause and with the status of the tolling program (including the contours of any tolling scheme) very in flux, on June 14, 2024, the FHWA issued its re-evaluation finding that the conclusions in the Final EA remain valid in light of the final tolling schedule adopted by the MTA.[30] Accordingly, Defendants concluded that no further environmental review is warranted.

158. The re-evaluation, excluding appendices (and including the Executive Summary), is 175 pages, reflecting significant change to the tolling program.

159. Under NEPA, supplementation of an EA is required when (i) changes to a proposed action would result in significant environmental impacts that were not evaluated or (ii) new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts. 23 C.F.R.

[29] *Hochul Still 'Committed' to MTA Improvements Despite Congestion Pricing Pause*, ABC7 NY (June 10, 2024), https://abc7ny.com/post/congestion-pricing-pause-hochul-committed-mta-improvements/14932184/.
[30] The re-evaluation is available on the MTA's website at: https://new.mta.info/project/CBDTP/reevaluation.

§771.130. Both the changes to the tolling structure and the changed circumstances – the Pause and commitment to other sources of funding – significantly changed the propose action and its environmental impacts, requiring supplementation.

160. The re-evaluation found that there will be adverse environmental impacts from Congestion Pricing in 20% of the areas analyzed, including, as the EA found, to environmental justice communities, but unsurprisingly concluded that the "package of regional and place-based investments" – still not developed with any specificity – will sufficient mitigate any adverse consequences.

161. Several areas were not sufficiently analyzed to allow the FHWA to draw the conclusion. that no further analysis is warranted. Among other deficiencies, the re-evaluation did not analyze the impact of the toll on taxis and for-hire-vehicles, given that the toll is charged to passengers, not drivers, it is charged per ride instead of one $15 toll, and drivers of taxis and FHV have no reason to be deterred from continuing to drive throughout the CBD.

162. Under the adopted program, taxis and FHV may drive as many miles as desired throughout the CBD – and create a great deal of congestion – without being charged any toll. Passengers will be charged a negligible fee ($1.25 and $2.50). The deterring effect of this negligible fee has not been studied. Much of the analysis centered on addressing the business impact on minority and low-income taxi drivers rather than the impact on congestion in the CBD. *See, e.g.*, Re-evaluation at 163. In fact, the re-evaluation predicts a decrease of only .3% in vehicle miles traveled by taxis and FHV, which account for approximately half the congestion in Manhattan.

163. The re-evaluation failed to properly analyze the impact of the change in peak and overnight hours, as well as the three time-period (peak, off-peak and overnight) structure

evaluated in the EA as compared to the adopted two time-period structure (only peak and overnight). The re-evaluation failed to properly analyze the discounted toll for the overnight period of $3.75, which falls outside the range of both overnight and off-peak tolls analyzed in the EA and FONSI.

164. The sole treatment of the changed structure in the re-evaluation is a footnote, which states: "The transportation modeling conducted for the adopted toll structure accounts for this change in the peak and off-peak periods and thus the model results reflect this change." Re-evaluation at ES-4. Defendants have not demonstrated the effects of this change.

165. While one cannot evaluate changes that have yet to be determined, the re-evaluation, coming after the Pause, failed to address issues raised by the Governor in her assessment, but less provide for possible further re-assessment should a future structure be proposed with still more material changes. Indeed, no recognition was given to the Governor's and Legislature's plan to explore new funding alternatives that would alleviate burdens on the human and natural environment and the need to raise the full $15 billion solely through Congestion Pricing. There is no additional re-evaluation of any additional alternatives. In fact, there is no mention at all of the Pause in the re-evaluation.

166. Attempting to artificially increase mitigation provided to counteract Congestion Pricing's otherwise significant adverse effects, the re-evaluation considers the difference between the peak toll and overnight toll as "mitigation." See Re-evaluation at ES-5 ("With those

additions, the total mitigation commitment made by the Project increased, from $207.5M to $330M.").

167. The increased discounts are not properly considered environmental mitigation. In the No Action Alternative (i.e. not implementing Congestion Pricing), there would be no overnight toll and no need to provide a low-income discount because no toll would exist.

168. The re-evaluation confirms that diverted traffic under Congestion Pricing will cause significant impacts to environmental justice communities. Neither a longer overnight period nor additional discounts to the overnight charge mitigates these polluting effects.

169. While the re-evaluation seeks to end the NEPA review of Congestion Pricing, nonetheless the fate of the program remains uncertain. There have been changed conditions that will likely impact the environmental analysis. New information and circumstancing will inevitably change the shape of any Congestion Pricing program. Like the EA, the re-evaluation effectively studied a hypothetical scenario.[31] Rather than wait for a final Congestion Pricing scheme that may be implemented or await details on potential assistance that may emerge from Governor Hochul's efforts to find alternative sources of funding for the MTA, the FHWA re-evaluated the adopted tolling program even before the MTA weighed in on the Pause.

170. Thirteen days later, on June 27, 2024 the MTA Board affirmed the Pause, extending the implementation date indefinitely from June 2024 until such time as the Project Sponsors execute the VPPP.

171. At the Board Meeting, MTA Board Member and New York City Deputy Mayor for Operations Meera Joshi recommended a phased-in roll-out for Congestion Pricing, an

---

[31] The FHWA issued the re-evaluation at the behest of the MTA, a day after receiving a letter from the MTA requesting its issuance. There was no explanation as to the curious timing, though there is speculation as to the motivation.

alternative raised by Plaintiffs. Deputy Mayor Joshi explained that exploring a "period of transition" would be "prudent work" and could allow stakeholders to gauge Congestion Pricing's true impact on New York City "at a pace that works for working people."

vii. The Legal Framework

172. NEPA is "intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process." 40 C.F.R. § 1500.1(a). As such, NEPA requires agencies to: (1) to closely examine the environmental impacts of an action before it occurs; and (2) provide the public with a role in both the decision-making and the implementation of that decision.

173. Decisions of federal transportation agencies, such as the FHWA, must comply with NEPA. NEPA requires federal agencies to study the potential environmental impacts of the proposed agency actions through an EA prior to commencing the action. That includes an analysis of the direct, indirect, cumulative, and potentially adverse effects of the action that are reasonably foreseeable.

174. If the agency determines through the EA that the action would "significantly affect[] the quality of the human environment," it must prepare a detailed EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.5(c)(1); 23 C.F.R. § 771.119(i). Otherwise, the agency must submit a FONSI detailing the reasons why the project will not have any significant environmental effect. 23 C.F.R. § 771.121.

175. An EIS, as contrasted with the EA, is a more extensive review of the proposed action. It must provide a full and fair discussion of significant environmental impacts, inform decisionmakers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment, assess all reasonable alternatives that

are consistent with the identified purpose and need, and evaluate a no-action alternative and all reasonably available measures to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.1, 1502.13, 1502.14(a), 1502.14(c).

176. Pursuant to the APA, 5 U.S.C. §§ 701–706, courts will set aside a FONSI and require preparation of an EIS if the FONSI is determined to be arbitrary and capricious.

177. In addition to the requirements of NEPA and its implementing regulations, Executive Order 12898, Executive Order 14008, and the Council on Environmental Quality ("CEQ")'s NEPA Environmental Justice guidance require federal agencies to study and address environmental justice issues when conducing a NEPA review. Executive Order 12898 directs agencies to "make achieving environmental justice part of [their] mission by identifying and addressing, as appropriate, disproportionately high, and adverse human health or environmental effects of [their] programs, policies, and activities." Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994).

178. The Order also requires agencies to develop and implement an "environmental justice strategy" that "promote[s] enforcement of all health and environmental statutes," "ensure[s] greater public participation," and "improve[s] research and data collection relating to the health of and environment of minority and low-income populations." *Id.* at 7,630.

179. The CEQ provides NEPA Environmental Justice Guidance "to further assist Federal agencies with their NEPA procedures so that environmental justice concerns are effectively identified and addressed."[32] CEQ highlights that "[m]itigation measures identified as part of an environmental assessment (EA), a finding of no significant impact (FONSI), an

[32] Council on Env't Quality, Environmental Justice: Guidance Under the National Environmental Policy Act 1 (1997), https://www.epa.gov/sites/default/files/2015- 02/documents/ej_guidance_nepa_ceq1297.pdf [hereinafter "CEQ NEPA Guidance"].

environmental impact statement (EIS), or a record of decision (ROD), should, whenever feasible, address significant and adverse environmental effects of proposed federal actions on minority populations, low income populations, and Indian tribes."[33] The guidance states that "[e]nvironmental justice issues may arise at any step of the NEPA process and agencies should consider these issues *at each and every step of the process*, as appropriate."[34]

180. Agencies should specifically consider at least: "the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on [them]";[35] "relevant public health data and industry data concerning the potential for multiple or cumulative exposure to human health or environmental hazards in the affected population";[36] "the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the [action, including the communities'] physical sensitivity [and] the effect of any disruption on the community structure associated with the proposed action."[37] Finally, to comply with NEPA, agencies "should seek input from [environmental justice communities] as early in the process as information becomes available."[38]

181. A final EA or a FONSI is not always the final agency decision. After the FHWA issues a FONSI it may re-evaluate any changes in a proposed action, anticipated impact, or

---

[33] *Id.* at 4.

[34] *Id.* at 8 (emphasis added).

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.* at 11.

mitigation measures during the project development process to determine whether the FONSI remains valid and no formal documentation is necessary.

182. Where however, there are significant changes in the proposed action that are relevant to the environmental concerns or significant new circumstance or significant information relevant to the proposed action, a supplemental EA or EIS should be developed.

183. The actual tolling structure of Congestion Pricing is a significant piece of information never analyzed by the FHWA.

184. In additional to federal law protections, Article 1, Section 19 of the New York State Constitution guarantees every New Yorker's right to "clean air and water, and a healthful environment." Agencies within the State and City such as the MTA, the TBTA, and its TMRB, have an affirmative duty to all citizens of New York to protect the environment, avoid significant environmentally harmful actions, and consider vulnerable environmental justice communities in reaching agency decisions.

**FIRST CAUSE OF ACTION**[39]
(Violation of NEPA)

185. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 144 as if repeated in full.

186. The FHWA's Final EA and FONSI fail to analyze the actual proposed tolling structure under NEPA and the APA.

187. While presented as a final agency decision, the FHWA left the main tolling program structure to the TMRB (who did not recommend any of its proposed scenarios) and acknowledged that final consideration will occur at a later time.

---

[39] The Court dismissed Count I on June 20, 2024. ECF 86. Plaintiffs are not re-raising this claim here, but instead include the claim for preservation of appeal and for simplicity of numbering.

188. Accordingly, the FHWA has failed to prepare an adequate environmental review of Congestion Pricing that satisfies its duty to consider all environmental impacts of the proposed action, and to provide for public comment and participation in the public review process, in violation of NEPA and its implementing regulations. 42 US.C. § 4321 *et seq.;* 40 C.F.R. § 1500.1 e*t seq.*

189. Among other things, Defendants failed to (1) analyze the actual tolling proposal; (2) prepare an EIS, (3) consider the full extent of the direct, indirect, and cumulative effects of Congestion Pricing, (4) fully mitigate the air, noise, and traffic effects on New York and New Jersey residents, (5) fully consider Congestion Pricing's impact on and sufficiently consult with communities with environmental concerns, (6) consider a reasonable range of alternatives, and (7) provide adequate public participation in a process that failed to present the actual tolling structure and lasted but 44 days.

190. Defendants also failed to adequately analyze and address significant environmental justice concerns to surrounding New York City communities, including the failure to develop and implement a comprehensive environmental justice strategy to address the concerns.

191. The FHWA's Final EA and FONSI are arbitrary, capricious, and an abuse of discretion, and otherwise not in accordance with the law, in violation of NEPA and its implementing regulations, and are subject to judicial review under the APA. 5 U.S.C. §§ 701-706.

**SECOND CAUSE OF ACTION**

(Violation of NEPA – Failure to Supplement)

192. Plaintiffs repeat and reallege all preceding paragraphs and the paragraphs contained in Count III (re-evaluation) as set forth herein.

193. NEPA directs that if a statement, such as an EA, is "so inadequate as to preclude meaningful analysis," an agency "shall prepare and circulate a revised draft," or a supplement to the statement. 40 C.F.R. § 1502.9(a), (d).

194. Agencies are required to prepare supplements to either draft or final statements if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns," or there is "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Id.* § 1502.9(d)(1)(i), (ii).

195. On November 30, 2023, the TMRB issued its recommendation regarding the toll rates by vehicle, time of day, credits, discounts, and exemptions, which was adopted in large part by the MTA board on March 27, 2024.

196. Most of these changes – including the toll price recommended – were not adequately analyzed, modeled, or discussed in the Final EA or FONSI and require a hard look at the potential financial and environmental consequences.

197. The TMRB's final toll structure constitutes significant new circumstances or information relevant to environmental concerns and bears on the proposed action and its impact, rendering the FONSI inadequate and devoid of meaningful analysis.

198. Defendants acknowledged that a further analysis needed to be taken and, in light of the gross deficiencies in their prior examination, they should be directed to fully supplement their analysis.

199. Despite the acknowledgment of required further analysis, the MTA has already publicly stated that it intends to ensure that its "re-evaluation" remains consistent with the FHWA's finding of "No Significant Impact" and that it will "go-live" with Congestion Pricing in the Spring, after the four public hearings have just concluded in mid-March.

200. The MTA intended to have a quick "re-evaluation" process in a shortened timeframe, rather than a full analysis.

201. Defendants' use of a re-evaluation—performed in a non-public process— as the sole environmental review of the actual tolling structure was improper. A "re-evaluation" as contrasted with a supplementation avoids public scrutiny and sidesteps an open process that could test Defendants' assertions and conclusions. Defendants should have provided supplemental analysis, instead of or in addition to their re-evaluation.

202. On June 14, 2024, the FHWA issued a re-evaluation finding that the conclusions in the Final EA remain valid in light of the final tolling schedule adopted by the MTA. Defendants thus concluded that they would not provide any supplemental analysis.

203. The changes to the tolling structure coupled with Governor Hochul's indefinite Pause of Congestion Pricing and statement that they would find alternative funding measures constitute new circumstances that warrant supplemental analysis. New sources of funding plainly negate Defendants' rejection of alternatives that would undeniably reduce congestion but not promise the same level of funding as the challenged construct.

204. Accordingly, the FHWA's determination that it would re-evaluate rather than supplement the FONSI or Final EA to address this new information – without taking the hard look required by law – violates NEPA and its implementing regulations. *See, e.g.*, 40 C.F.R. §§ 1502.9(a) and (d)(1)(i), (ii).

**THIRD CLAIM FOR RELIEF**
(Violation of NEPA – Insufficient Re-evaluation)

205. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if set forth fully herein.

206. Federal regulations required Defendants to conduct a re-evaluation to determine whether the existing FONSI remained valid in light of the changes in the program. 23 C.F.R. § 771.129.

207. If Defendants' re-evaluation concluded that the adopted toll structure reflected "substantial changes to the proposed action that are relevant to environmental concerns," they would be required to conduct and publish a supplemental analysis. 40 CFR § 1502.9(d)(1).

208. On June 14, 2024, the FHWA issued a re-evaluation finding that the conclusions in the Final EA remained valid in light of the final tolling schedule adopted by the MTA and no further environmental review was required.

209. Defendants' re-evaluation was arbitrary and capricious and designed to achieve a pre-ordained result.

210. The amount, times, locations of the toll pricing significantly impact the volume, location of traffic, and environmental effects of Congestion Pricing.

211. The changes to the final tolling structure compared to the EA and FONSI are not immaterial. The difference between the tolling hypotheticals analyzed in the EA and the ones

reviewed in the non-public "re-evaluation" process cannot be characterized as a slight change or simple adjustment to the tolling price.

212. The re-evaluation failed to fully consider the significant changes from the studied hypothetical scenarios reflected in the adopted tolling program.

213. The re-evaluation failed to properly analyze the effects of the Pause and the Governor's and Legislature's plan to explore new funding alternatives that would alleviate burdens on the human and natural environment and the need to raise the full $15 billion solely through Congestion Pricing.

**FOURTH CAUSE OF ACTION**
(Violation of the Dormant Commerce Clause)

214. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 160 as if repeated in full.

215. The Commerce Clause empowers Congress to regulate commerce among the States, but also directly limits the power of the States to discriminate against interstate commerce.

216. State law or policy violates the dormant commerce clause when it "clearly discriminates against interstate commerce in favor of intrastate commerce" or "if it imposes a burden on interstate commerce incommensurate with the local benefits secured."

217. The dormant Commerce Clause's principles apply to the MTA and the TBTA given their status as public benefit corporations.

218. Defendants, under color of state law, deprived Plaintiffs of their constitutional rights, including their rights under the Commerce Clause by burdening them economically and environmentally in an unreasonable and excessive manner incommensurate with the identified benefits, imposing an impermissible burden on interstate commerce.

219. The significant burden on the 1.8 million outer-borough and out-of-state drivers and residents who enter Manhattan each day and will bear the burden of redirected congestion and pollution far outweighs the regional benefit to traffic in Manhattan. The toll also discriminates, among other ways, by excluding the George Washington Bridge and New Jersey commuters from the proposed discounts.

220. The discriminatory features of the tolling scheme do not serve a legitimate purpose that could not be served by nondiscriminatory alternatives.

221. The implementation of the toll (i) is not based on a fair approximation of the use of the facilities; (ii) is excessive in relation to the local benefits conferred; and (iii) discriminates against interstate commerce in violation of the United States Constitution.

**FIFTH CAUSE OF ACTION**
(Violation of the Right to Travel)

222. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 168 as if repeated in full.

223. The United States Constitution protects the fundamental right to travel within the United States.

224. State laws or policies implicate this fundamental constitutional right when impeding travel is its primary objective.

225. Impeding certain travel is the primary objective of Congestion Pricing.

226. The Congestion Pricing program includes tolls that were designed to, and will, deter the interstate and intrastate travel of Plaintiffs and/or the program penalizes their exercise of the right to travel.

227. The Congestion Pricing program is not narrowly tailored to meet a significant governmental interest.

228. The implementation of the toll (i) is not based on a fair approximation of the use of the facilities; (ii) is excessive in relation to the local benefits conferred; and (iii) discriminates against interstate commerce in violation of the United States Constitution.

**SIXTH CAUSE OF ACTION**
(Violation of the New York State Constitution – Green Amendment)

229. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 175 as if fully set forth herein.

230. Article 1, Section 19 of the New York State Constitution protects every New Yorker's right to "clean air and water, and a healthful environment."

231. These inherent and inalienable rights reflect the basic societal contract between citizens and the government of New York.

232. The State, and in particular, public benefit corporations such as the MTA, the TBTA, and its TMRB, have an affirmative duty to all citizens of New York to protect the environment.

233. The combined acts and omissions of the MTA, the TBTA, and the TMRB, including but not limited to, going forward with the Congestion Pricing plan without further study or mitigation, which will cause increases in air pollutants in the outer-boroughs and violate Plaintiffs' right to clean air and a healthful environment.

234. In issuing its toll recommendation, the TMRB and TBTA ignored the clear environmental concerns regarding air quality raised by the EPA regarding Congestion Pricing, particularly to the outer boroughs and environmental justice communities in Staten Island, the Bronx, and New Jersey.

235. Despite acknowledging that many New Yorkers will see an increase in traffic and air pollution under the Congestion Pricing program, including those living in environmental

justice communities already burdened by comparatively high pre-existing air pollution and/or chronic diseases, the TMRB and the TBTA nevertheless conducted no further analysis of the likely pollution and failed to provide any additional mitigation efforts beyond those already recommended by the FHWA in the FONSI.

236. The purposefully fast-tracked Congestion Pricing review ensures, among other things, that the relevant agencies will not have to comply with local laws, which mandate that agency programs, policies, and processes promote environmental justice, encourage public participation and transparency, and factor environmental justice and environmental justice community concerns in agency-decision making.

237. The TMRB recommendation and the TBTA adoption and plan to implement the Congestion Pricing program within a few months and without adequate environmental safeguards reflects a wholesale abrogation of their obligations to ensure a habitable climate and healthful environment for Plaintiffs.

**WHEREFORE**, Plaintiffs respectfully request that this Court grant the following relief:

i. Issue a permanent injunction vacating and setting aside Defendants' FONSI and Final EA and compelling Defendants to complete a full and proper EIS for Congestion Pricing;

ii. Declare that the FHWA's failure to prepare an EIS for Congestion Pricing, or to adequately explain why an EIS is unnecessary, violates NEPA, its implementing regulations, and the APA;

iii. Declare that Defendants' actions, including their FONSI and Final EA, are invalid as a matter of law;

iv. Declare that Defendants must conduct a full supplemental review and take the requisite hard look at Congestion Pricing's impact, as is required, and that the proposed action may not move forward absent such review;

v. Declare that Defendants' re-evaluation was arbitrary and capricious;

vi. Declare that Congestion Pricing violates Plaintiffs' constitutional rights under the United States Constitution;

vii. Declare that the Congestion Pricing tolling recommendation and adoption violates Plaintiffs' constitutional rights under the New York State Constitution;

viii. Order the FHWA to prepare a full and proper EIS for Congestion Pricing;

ix. Award Plaintiff its costs for the action, including reasonable attorneys' fees; and

x. Grant such other relief as this Court deems just and proper.

Dated: New York, New York
July 26, 2024

**STEPTOE LLP**

By:

*/s/ Alan M. Klinger*

Alan M. Klinger
Dina Kolker
David Kahne
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900
aklinger@steptoe.com

*Co-Counsel for the United Federation of Teachers and Individual Plaintiffs*

-and-

BETH A. NORTON, Esq.
United Federation of Teachers
52 Broadway
New York, NY 10004
(212) 701-9420

*Co-Counsel for the United Federation of Teachers and Individual Plaintiffs*

-and-

THE OFFICE OF LOUIS GELORMINO, Esq. &
FONTE & GELORMINO LEGAL GROUP
2550 Victory Blvd.
Suite 304
Staten Island, NY 10314
(917) 968-1619
(718) 720-4949

*Co-Counsel for Vito J. Fossella*