**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ELIZABETH CHAN, *et al.*,<br><br>                                   *Plaintiffs*,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>                                   *Defendants.* | Case No. 1:23-cv-10365 (LJL)<br>Case No. 1:24-cv-01644 (LJL)<br>Case No. 1:24-cv-00367 (LJL)<br>Case No. 1:24-cv-04111 (LJL)<br><br>**ORAL ARGUMENT REQUESTED** |
| MICHAEL MULGREW, *et al.*,<br><br>                                   *Plaintiffs*,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>                                   *Defendants.* | |
| NEW YORKERS AGAINST<br>CONGESTION PRICING TAX, *et al.*,<br><br>                                   *Plaintiffs*,<br><br>      v.<br><br>UNITED STATES DEPARTMENT OF<br>TRANSPORTATION, *et al.*,<br><br>                                   *Defendants.* | |

TRUCKING ASSOCIATION OF NEW
YORK,

                                        *Plaintiff*,

                v.

METROPOLITAN TRANSPORTATION
AUTHORITY, *et al.*,

                                        *Defendants*.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS THE METROPOLITAN
TRANSPORTATION AUTHORITY, THE TRIBOROUGH BRIDGE AND TUNNEL
AUTHORITY, THE TRAFFIC MOBILITY REVIEW BOARD, THE NEW YORK CITY
DEPARTMENT OF TRANSPORTATION, AND WILLIAM J. CARRY'S OMNIBUS
MOTION TO DISMISS THE CONSTITUTIONAL CLAIMS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ................................................................................................................... 2

      A.   The Program ................................................................................................ 2

      B.   The Adopted Toll Rate Schedule ................................................................ 3

      C.   The Pending Actions ................................................................................... 5

STANDARD OF REVIEW ................................................................................................... 6

ARGUMENT ......................................................................................................................... 7

   I.   Plaintiffs' Right to Travel and Dormant Commerce Clause Claims Are Meritless ......... 7

      A.   *Chan* and *Mulgrew* Misstate the Test Governing Their Right to Travel Claims ...... 7

      B.   The *Chan* and *Mulgrew* Plaintiffs Do Not Plausibly Allege a Violation of the Right to Travel or Dormant Commerce Clause Under *Northwest Airlines* ............ 11

      C.   TANY Does Not Plausibly Allege a Violation of the Right to Travel or Dormant Commerce Clause .................................................................................... 14

   II.   TANY's Preemption Claim Should Be Dismissed ......................................................... 18

      A.   The F4A Does Not Preempt Tolling Programs ...................................................... 19

      B.   Even If the F4A Applies, the Program Is a Permissible Size Limitation ................ 21

   III.   The Program Does Not Violate the Green Amendment ................................................. 22

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**CASES**                                                              **Page(s)**

*Abadi v. Am. Airlines, Inc.*,
No. 23 Civ. 4033, 2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024) ................................ 10, 10

*Angus Partners LLC v. Walder*,
52 F. Supp. 3d 546 (S.D.N.Y. 2014)....................................................................... 12, 13, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................... 6, 12

*Att'y Gen. of N.Y. v. Soto-Lopez*,
476 U.S. 898 (1986)................................................................................................................ 8

*Barker v. Bancorp, Inc.*,
No. 21 Civ. 869, 2022 WL 595954 (S.D.N.Y. Feb. 25, 2022) ............................................ 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................................... 6, 16

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*,
567 F.3d 79 (2d Cir. 2009)................................................................................................... 17

*Bruce Katz, M.D., P.C. v. Focus Forward, LLC*,
22 F.4th 368 (2d Cir. 2022) .................................................................................................. 6

*California Trucking Ass'n v. Bonta*,
996 F.3d 644 (9th Cir. 2021) .............................................................................................. 20

*City Club of N.Y. v. Hochul*,
Index No. 156696/2024 (Sup. Ct., N.Y. Cnty.) ............................................................. 6, 22

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*,
906 F.3d 41 (2d Cir. 2018).................................................................................................. 19

*Dan's City Used Cars, Inc. v. Pelkey*,
569 U.S. 251 (2013)............................................................................................... 19, 20, 22

*Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*,
405 U.S. 707 ( 1972)................................................................................................... 7, 8, 15

*George v. Starbucks Corp.*,
857 F. App'x 705 (2d Cir. 2021) ........................................................................................ 16

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020) ............................................................ 6

*Green Mountain R.R. Corp. v. Vermont*,
    404 F.3d 638 (2d Cir. 2005) ........................................................................... 19

*Jalbert Leasing, Inc. v. Massachusetts Port Auth.*,
    No. 04 Civ. 10486, 2005 WL 1288108 (D. Mass. May 18, 2005) ................... 19

*Jalbert Leasing, Inc. v. Massachusetts Port Auth.*,
    449 F.3d 1 (1st Cir. 2006) ............................................................................... 19

*Janes v. Triborough Bridge & Tunnel Auth.*,
    977 F. Supp. 2d 320 (S.D.N.Y. 2013) ......................................... 10, 13, 15, 17

*Janes v. Triborough Bridge and Tunnel Auth.*,
    774 F.3d 1052 (2d Cir. 2014) .................................................. 8, 11, 12, 14, 18

*Jiajia Luo v. Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020) ........................................................... 12

*Joseph v. Hyman*,
    No. 09 Civ. 7555, 2010 WL 3528854 (S.D.N.Y. Aug. 30, 2010) ..................... 9

*Kwong v. Bloomberg*,
    723 F.3d 160 (2d Cir. 2013) ............................................................................. 9

*Marte v. City of N.Y.*,
    2023 N.Y. Slip. Op. 31198(U), 2023 WL 2971394 (Sup. Ct., N.Y. Cnty.
    Apr. 17, 2023) ................................................................................... 23, 24, 25

*McBeth v. Porges*,
    171 F. Supp. 3d 216 (S.D.N.Y. 2016) ............................................................. 2

*Med. Soc. of State of N.Y. v. Cuomo*,
    976 F.2d 812 (2d Cir. 1992) ........................................................................... 20

*Miller v. Reed*,
    176 F.3d 1202 (9th Cir. 1999) ......................................................................... 9

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*,
    883 F.3d 45 (2d Cir. 2018) ............................................................................... 8

*Nat'l Elec. Mfrs. Ass'n v. Sorrell*,
    272 F.3d 104 (2d Cir. 2001) ........................................................................... 11

*Nw. Airlines, Inc. v. Cnty. of Kent*,
    510 U.S. 355 (1994) ........................................................................... 1, 7, 8, 11, 14

*Omya, Inc. v. Vermont*,
    33 F. App'x 581 (2d Cir. 2002) .................................................................... 20

*Pistolesi v. Calabrese*,
    No. 11 Civ. 5598, 2015 WL 1573364 (S.D.N.Y. Apr. 9, 2015) ........................................ 20

*Popovchak v. UnitedHealth Grp. Inc.*,
    692 F. Supp. 3d 392 (S.D.N.Y. 2023) .............................................................. 25

*Rest. Law Ctr. v. City of New York*,
    90 F.4th 101 (2d Cir. 2024) ...................................................................... 11

*Riders Alliance v. Hochul*,
    Index No. 156711/2024 (Sup. Ct., N.Y. Cnty.) ..................................................... 6, 22

*Rowe v. New Hampshire Motor Transp. Ass'n*,
    552 U.S. 364 (2008) ............................................................................ 20

*Selevan v. N.Y. Thruway Auth.*,
    584 F.3d 82 (2d Cir. 2009) ............................................................. 1, 7, 10, 11, 15

*Selevan v. N.Y. Thruway Auth.*,
    711 F.3d 253 (2d Cir. 2013) ............................................................... *passim*

*In re St. Johnsbury Trucking Co., Inc.*,
    199 B.R. 84 (S.D.N.Y. 1996) .................................................................... 20

*Streeter v. N.Y.C. Dep't of Env't Prot.*,
    83 Misc. 3d 417 (Sup. Ct., Kings Cnty. 2024) ...................................................... 23

*Sunwoo v. JPMorgan Chase & Co.*,
    No. 20 Civ. 5410, 2021 WL 2443814 (S.D.N.Y. June 15, 2021) ........................................ 6

*Torraco v. Port Auth. of N.Y & N.J.*,
    615 F.3d 129 (2d Cir. 2010) ...................................................................... 9

*Town of Southold v. Town of East Hampton*,
    477 F.3d 38 (2d Cir. 2007) ................................................................. 8, 9, 9, 10

*VIZIO, Inc. v. Klee*,
    886 F.3d 249 (2d Cir. 2018) ..................................................................... 11

*Weisshaus v. Port Authority of N.Y. & N.J.*,
    814 F. App'x 643 (2d Cir. 2020) ...................................................................... 18

**STATUTES**

23 U.S.C. § 129 .................................................................................................... 20

23 U.S.C. § 301 .................................................................................................... 20

49 U.S.C. § 14501(c)(1) .................................................................................. 1, 19

49 U.S.C. § 14501(c)(2)(A) .......................................................................... 21, 21

N.Y. Pub. Auth. Law § 553-j .............................................................................. 12

N.Y. Pub. Auth. Law § 553-k .......................................................................... 3, 25

N.Y. Tax Law § 606(jjj) ................................................................................... 5, 11

N.Y. Tax Law § 1299-A ...................................................................................... 15

N.Y. Veh. & Traf. Law § 1701 .......................................................................... 2, 9

N.Y. Veh. & Traf. Law § 1704 ........................................................... 2, 3, 23, 25

**RULE**

Federal Rule of Civil Procedure 12 .................................................................. 6, 12

**OTHER AUTHORITIES**

Amy E. Turner, *Legal Tools for Achieving Low Traffic Zones*, 50 Env't L. Rep. (ELI) 10329
    (2020) ................................................................................................................ 21

*Central Business District Tolling Program*,
    https://new.mta.info/project/CBDTP ................................................................ 23

*Congestion Pricing in New York: A toll structure recommendation from the Traffic Mobility
    Review Board* (November 2023), https://new.mta.info/document/127761 ................. *passim*

*Federal Highway Administration Value Pricing Pilot Program*,
    https://ops.fhwa.dot.gov/congestionpricing/value_pricing/ ................................... 3

H.R. Rep. No. 103-677, 1993 WL 440339 (1994) ........................................... 21

N.Y. Const. Art. I, § 19 ................................................................................. 22, 23

New York State Assembly Debate on Assembly Bill A1368, Feb. 8, 2021...........................23, 23

*Triborough Bridge and Tunnel Authority Central Business District (CBD) Charges*,
    https://new.mta.info/document/138931.........................................................................*passim*

## PRELIMINARY STATEMENT

These four lawsuits concern the congestion pricing program for the Manhattan Central Business District ("CBD"), officially titled the CBD Tolling Program (the "Program"). The New York State Legislature directed the Triborough Bridge and Tunnel Authority ("TBTA") to establish the Program to reduce traffic congestion, ensure a safe and efficient mass transit system, and protect public health and safety. To achieve these goals, which will benefit many groups, the Program will impose tolls upon entry into the CBD for most vehicles, and per trip occurring partially or wholly within the CBD for taxis and for-hire vehicles. The varying rates in the toll structure reflect a years-long effort to study and design the most effective program possible while balancing practical, financial, environmental, equity, and administrative concerns.

Plaintiffs assert that the Program offends federal and state constitutional law. In different configurations, and with very different arguments, they allege that it violates both the constitutional right to travel and the dormant commerce clause. These two claims are properly analyzed under the same legal standard. *See Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 367-69 (1994); *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 102 (2d Cir. 2009). Under that standard, Plaintiffs fail to state a claim as a matter of law: the Program's tolling structure is based on a fair approximation of use and reflects reasonable distinctions across types of motorists; is not excessive in relation to the benefits conferred on toll payers through improvements to regional mass transit and congestion reduction; and does not discriminate against interstate commerce.

This leaves only two further claims. *First*, the Plaintiff in *Truckers* argues that the Program is preempted by the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c)(1) (the "F4A"). But that Act does not cover tolling schemes like the Program and, even if it did, it includes a directly applicable statutory exception from its preemptive scope. *Second*, in an apparent attempt to relitigate claims under the National Environmental Policy Act ("NEPA")

1

that this Court already dismissed, *see Mulgrew v. U.S. Dep't of Transp.*, No. 23 Civ. 10365, 2024 WL 3251732, at *46 (S.D.N.Y. June 20, 2024), some Plaintiffs claim that the Program violates New York's Green Amendment. But this state constitutional provision does not provide a pathway to challenge an environmental review or impose additional affirmative obligations on Defendants.

Accordingly, the Court should dismiss all of these claims.

**BACKGROUND**[1]

**A.    The Program**

The Program emerged from a multi-year, state and federal effort to study and craft the most effective tolling program to reduce congestion in the CBD and generate funding to support the Metropolitan Transportation Authority's ("MTA's") capital needs. That process began when New York enacted the MTA Reform and Traffic Mobility Act (the "Act"), *see* N.Y. Veh. & Traf. Law § 1701; *Chan* ¶¶ 69-70; *Mulgrew* ¶¶ 87-88; *New Yorkers* ¶ 73, which directed the TBTA to establish and implement the Program, *see* N.Y. Veh. & Traf. Law § 1704-a; *Chan* ¶ 70; *Mulgrew* ¶ 89; *New Yorkers* ¶ 73.[2]

In June 2019, an Expression of Interest was submitted to the Federal Highway Administration ("FHWA") by the New York State Department of Transportation, New York City Department of Transportation, and the TBTA for tolling authority under the federal Value Pricing

---

[1] Citations to "*Chan* ¶ __" are to the Second Amended Complaint in *Chan v. U.S. Department of Transportation*, No. 23 Civ. 10365 (S.D.N.Y.) ("*Chan*"), ECF 106-2; to "*Mulgrew* ¶ __" are to the Second Amended Complaint in *Mulgrew v. U.S. Department of Transportation*, No. 24 Civ. 1644 (S.D.N.Y.) ("*Mulgrew*"), ECF 93-2; to "*New Yorkers* ¶ __" are to the Amended Complaint in *New Yorkers Against Congestion Pricing Tax v. U.S. Department of Transportation*, No. 24 Civ. 367 (S.D.N.Y.) ("*New Yorkers*"), ECF 54; to "*Truckers* ¶ __" are to the Complaint in *Trucking Association of New York v. Metropolitan Transportation Authority*, No. 24 Civ. 04111 (S.D.N.Y.) ("*Truckers*"), ECF 14; to "TMRB __" are to pages of the Traffic Mobility Review Board's Report, available at https://new.mta.info/document/127761, which is incorporated by reference in the *Chan*, *Mulgrew*, *New Yorkers*, and *Truckers* complaints; and to "TBTA __" are to pages of the adopted toll rate schedule, available at https://new.mta.info/document/138931, which is incorporated by reference in the *Truckers* complaint, *see, e.g.*, *Truckers* ¶¶ 5-8, 33, and is subject to judicial notice, *McBeth v. Porges*, 171 F. Supp. 3d 216, 221 (S.D.N.Y. 2016).

[2] As delineated by the Act, the CBD encompasses the geographic area of Manhattan south and inclusive of 60th Street, but not including the FDR Drive, the West Side Highway, the Battery Park Underpass, and any surface roadway portion of the Hugh L. Carey Tunnel connecting to West Street. N.Y. Veh. & Traf. Law § 1704(2).

2

Pilot Program ("VPPP").[3] *Mulgrew* ¶ 92; *New Yorkers* ¶ 126. This, in turn, initiated a four-year process of environmental analysis pursuant to NEPA. *See Mulgrew*, 2024 WL 3251732, at *4-6. That process culminated in the issuance of a Final Environmental Assessment ("EA") in May 2023, along with a Final Finding of No Significant Impact ("FONSI") in June 2023. *See Chan* ¶¶ 81-87; *Mulgrew* ¶¶ 115-121; *New Yorkers* ¶¶ 92-99.

### B.    The Adopted Toll Rate Schedule

After the issuance of the Final EA and the FONSI, the Traffic Mobility Review Board ("TMRB")—an independent advisory body established by the Act—recommended a toll rate schedule for the Program. *See Chan* ¶¶ 134-143; *Mulgrew* ¶¶ 125-135; *New Yorkers* ¶¶ 100-102; *Truckers* ¶¶ 32-33; N.Y. Veh. & Traf. Law § 1704-a; N.Y. Pub. Auth. Law § 553-k. The TMRB relied on the Final EA's findings and analyses (among other sources) in designing the toll rate schedule recommendations. TMRB 31. The recommended schedule sought to achieve the Program's congestion-reduction and revenue-raising aims, while "keeping the base toll as low as possible, avoiding unnecessary traffic diversions, supporting equity goals and environmental justice, and keeping the Program simple, easy to understand, and easy to administer." *Id.* at 7.

The TBTA Board adopted the toll rate schedule, based on the TMRB's recommendations, in March 2024. *See Chan* ¶ 154; *Mulgrew* ¶ 147. Under that schedule, all vehicles, apart from taxis and for-hire vehicles (and transit and commuter buses and specialized government vehicles), will be charged a toll upon entry into the CBD. For passenger vehicles, the peak-period entry charge is $15.00; for motorcycles, the charge is $7.50.[4] TBTA 1. Passenger vehicles and motorcycles are

---

[3] Through the VPPP, the FHWA can authorize state and local governments to implement congestion pricing programs on roads within the national highway system. *See* FHWA, Value Pricing Pilot Program, https://ops.fhwa.dot.gov/congestionpricing/value_pricing.

[4] For simplicity, we refer to the rates charged to E-ZPass customers. Although non-E-ZPass customers are charged higher rates, this distinction is immaterial to the claims before the Court.

also entitled to a once-per-day cap on tolls. *Id.* (setting "[d]aily toll cap of once per day"). In line with the Program's stated environmental equity goals, the Program provides a 50 percent discounted rate to low-income drivers after their first ten trips in a calendar month. TMRB 26.

As compared to passenger vehicles, larger vehicles face higher tolls. Single-unit trucks, vans with modified bodies, and non-transit buses will pay $24.00 per-entry, while multi-unit trucks and licensed sightseeing buses will pay $36.00 per-entry. TBTA 1. These rates reflect larger vehicles' "outsized" impact on congestion, stemming from "their large size and large turning radii, their parking patterns, and the noise and air pollution they cause." TMRB 20. The peak-period toll on multi-unit trucks and licensed sightseeing buses is roughly 2.4 times greater than the corresponding toll on passenger vehicles. This ratio is smaller than the ratio that exists under other major tolling programs in the New York metropolitan region (which often charge trucks even higher rates than those challenged here). The TMRB publicly explained its decision not to recommend even higher rates for trucks as follows:

> The recommended truck tolls balance the need to encourage the optimization of deliveries, thereby reducing trucks' contribution to congestion in the zone, with the equal need to minimize unnecessary diversions through communities that may already be burdened with comparatively high levels of air pollution and associated adverse health outcomes. Charging truck tolls at the rates they are typically charged at tolled facilities—often up to eight times the auto toll—could lead to unacceptable increases in truck diversions.

*Id.* The reduction in traffic congestion that the Program will bring will also provide benefits to truck drivers through reduced times to make deliveries and reduced parking demand.

The adopted toll rate schedule also addresses the unique impacts that for-hire vehicles and taxis have on congestion in the CBD. The TMRB explained that applying the standard passenger toll to taxis could have troubling and undesired effects. On the one hand, the NEPA review resulted in the TBTA's commitment to avoid overburdening taxi and for-hire vehicle drivers, "many of whom are considered an environmental justice population." *Id.* at 22. On the other hand, the

Program's baseline structure—charging tolls only upon entry to the CBD—could "encourage [taxis and for-hire vehicles] to stay within the CBD" to avoid tolls, thereby potentially "increas[ing] the number of miles they drive in the zone" and increasing congestion. *Id.* Ultimately, the Program addressed such concerns by subjecting taxis and for-hire vehicles to a different rate structure. These vehicles will be charged lower tolls ($1.25 for taxis; $2.50 for certain rideshare companies, like Lyft and Uber)—which, under longstanding New York City Taxi & Limousine Commission Rules, will be applied directly to passenger fares—but the tolls will apply to each trip wholly or partially within the CBD. TBTA 2. The per-trip amount is intended to equate to the Program's once-per-day toll for passenger vehicles: the $15 charge was divided by twelve for taxis and by six for specific for-hire vehicles, representing the daily average number of trips that each type of vehicle takes (whether partially or wholly) within the CBD. TMRB 23.

Finally, the Program has limited discounted rates consistent with its aim of reducing congestion. For example, toll rates are reduced by 75 percent during nighttime hours. TBTA 1. The Program also provides tunnel crossing credits against the daytime toll for vehicles directly entering the CBD from tunnels that are already tolled—the Lincoln and Holland tunnels across the Hudson, and the Midtown and Brooklyn-Battery tunnels across the East River. These credits include $5 for passenger vehicles, $2.50 for motorcycles, $12 for small trucks and buses, and $20 for large trucks and tour buses. TMRB 24. Low-income drivers who live within the CBD are also eligible for an end-of-year tax credit for the tolls they have paid. TBTA 1-2; TMRB 28; N.Y. Tax Law § 606(jjj).

### C.    The Pending Actions

Beginning in January 2023, Plaintiffs in these actions asserted federal and state constitutional claims against the Program. Those claims fall into three buckets. First, *Chan*, *Mulgrew*, and *Truckers* allege that the Program violates the federal dormant commerce clause and

right to travel. *See Chan* ¶¶ 231-247; *Mulgrew* ¶¶ 214-228; *Truckers* ¶¶ 76-92. Second, *Truckers* claims that the Program is preempted by the F4A. *Truckers* ¶¶ 93-99. Third, and finally, *Chan*, *Mulgrew*, and *New Yorkers* allege that the Program violates the Green Amendment under the New York Constitution. *See Chan*, ¶¶ 248-256; *Mulgrew* ¶¶ 229-237; *New Yorkers* ¶¶ 185-189. As explained below, these claims all fail as a matter of law and should be dismissed.[5]

## STANDARD OF REVIEW

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a court must "accept all factual allegations as true, and draw all reasonable inferences in the plaintiff's favor," *Bruce Katz, M.D., P.C. v. Focus Forward, LLC*, 22 F.4th 368, 370 (2d Cir. 2022), it need not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor must a court accept factual allegations contradicted by documents integral to the pleading, incorporated by reference, subject to judicial notice, or "fairly implicated" but selectively ignored by the pleading. *E.g.*, *Barker v. Bancorp, Inc.*, No. 21 Civ. 869, 2022 WL 595954, at *6 (S.D.N.Y. Feb. 25, 2022); *Sunwoo v. JPMorgan Chase & Co.*, No. 20 Civ. 5410, 2021 WL 2443814, at *6 (S.D.N.Y. June 15, 2021); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382-83 (S.D.N.Y. 2020) (Liman, J.).

---

[5] On June 5, 2024, Governor Hochul announced her decision to pause implementation of the Program. That decision has been challenged in two proceedings pursuant to Article 78 of the New York Civil Practice Law and Rules before Justice Engoron. *Riders Alliance v. Hochul*, Index No. 156711/2024 (Sup. Ct., N.Y. Cnty.); *City Club of N.Y. v. Hochul*, Index No. 156696/2024 (Sup. Ct., N.Y. Cnty.). On September 30, 2024, Justice Engoron issued a decision and order denying Governor Hochul's motions to dismiss the Article 78 proceedings. *See City Club*, Doc. No. 64; *Riders Alliance*, Doc. No. 57. Governor Hochul's answers are due October 15, 2024. *Id.*

## ARGUMENT

Plaintiffs' claims fail as a matter of law. *Chan* and *Mulgrew* contend that the Program is subject to strict scrutiny by virtue of its alleged burden on the right to travel. They are mistaken. Under the correct legal standard—which covers both their right to travel and dormant commerce clause claims—dismissal is required. That same legal standard also applies to (and forecloses) the right to travel and dormant commerce clause claims in *Truckers*. This leaves only the F4A preemption and Green Amendment claims, both of which also fail to state a claim for relief.

## I. Plaintiffs' Right to Travel and Dormant Commerce Clause Claims Are Meritless

*Chan*, *Mulgrew*, and *Truckers* allege claims under the right to travel and dormant commerce clause. Second Circuit precedent establishes that such claims, when challenging tolling programs, are all governed by a single standard. Under that standard, these claims fail.

### A. *Chan* and *Mulgrew* Misstate the Test Governing Their Right to Travel Claims

In *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, the Supreme Court established the standard for assessing a certain category of right to travel claims that are *not* subject to strict scrutiny by expressly looking to a long line of "decisions concerning highway tolls [as] instructive," dating back to 1915. 405 U.S. 707, 715 (1972). In doing so, the Supreme Court explained that "States are empowered to develop 'uniform, fair and practical' standards for tolls" and may charge fees "for the privilege of using [their] roads … so long as the fee[s] [are] not excessive." *Id.* at 715-16. The standard set forth in *Evansville-Vanderburgh* was subsequently adopted as the three-factor test in *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994).

Against that backdrop, when reviewing tolling programs of tolling authorities generally, the Second Circuit has rebuffed calls to subject tolling programs to strict scrutiny—reasoning, in one prominent case, that "minor restrictions" on travel, "such as toll roads, do not constitute a violation of the right to travel." *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 101 (2d Cir.

2009) ("*Selevan I*") (cleaned up); *accord Janes v. Triborough Bridge and Tunnel Auth.*, 774 F.3d 1052, 1054 (2d Cir. 2014); *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 257-58 (2d Cir. 2013) ("*Selevan II*"). In a similar vein, the Second Circuit has held that "travelers do not have a constitutional right to the most convenient form of travel," so "burdens on a single mode of transportation do not implicate the right to interstate travel." *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (citations omitted). Thus, tolling programs are evaluated under the distinct standard set forth by *Evansville-Vandeburgh* and *Northwest Airlines*, which asks whether tolls are (1) based on a fair approximation of use or privilege for use, (2) not excessive in relation to the benefits conferred, and (3) do not discriminate against interstate commerce. *See Northwest Airlines*, 510 U.S. at 369; *Selevan I*, 584 F.3d at 96; *Janes*, 774 F.3d at 1054. This test also applies to dormant commerce clause challenges to tolling programs. *See id.*

To be sure, the Second Circuit has not foreclosed the application of strict scrutiny to tolling programs in extreme and unusual circumstances. More specifically, in the right to travel context, strict scrutiny applies where (1) the challenged law's primary purpose is to impede travel, (2) the law actually deters travel, or (3) the law uses a classification that penalizes the exercise of the right. *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986); *Southold*, 477 F.3d at 53. However, Plaintiffs have failed to establish that the Program triggers strict scrutiny under that framework.

### 1. The Program's Primary Purpose Is Not to Impede Travel

A state law's primary purpose is not to impede travel when it was enacted for a different reason. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 883 F.3d 45, 66-67 (2d Cir. 2018) (finding gun regulation "was not designed to impede travel" but "to protect the welfare of city residents"), *vac'd on other grounds*, 590 U.S. 336 (2020); *Southold*, 477 F.3d at 54 (similar in a challenge to the Ferry Law). As the Program's enabling statute establishes, in a detailed statement of legislative findings, the Program is designed to "ensure a safe and efficient mass

transit system" and "protect the public health and safety" by providing critical funding to the metropolitan area's public transportation infrastructure and by reducing traffic congestion in the CBD. N.Y. Veh. & Traf. Law § 1701. In that respect, the Program is fundamentally concerned with the public welfare, mass transit, and environmental justice, which it seeks to achieve by facilitating and improving travel to, from, and within one of the nation's most congested metropolitan areas. Any burdens on vehicular travel that may result from the Program are simply means to the end of achieving these distinct purposes; in that respect, the Program's "primary purpose" is not to impede travel generally, but the opposite.

*Chan* and *Mulgrew* admit the Program's travel improvements and environmental objectives. *Chan* ¶ 69; *Mulgrew* ¶ 11. But they insist that the Program's "primary objective" is nevertheless to impede "certain travel." *Chan* ¶ 243; *Mulgrew* ¶ 225. The fundamental flaw in this argument is that the Program does not seek to impede *travel*. Rather, it seeks to affect the *mode of transportation* that some people use when they travel—both through the tolls that it imposes and the improvements to regional transportation infrastructure that it will ultimately support.

The Constitution does not enshrine a "fundamental right to drive" automobiles in particular geographies. *Miller v. Reed*, 176 F.3d 1202, 1206 (9th Cir. 1999). And federal courts have long recognized that "travelers do not have a constitutional right to the most convenient form of travel." *Southold*, 477 F.3d at 54; *see also Torraco v. Port Auth. of N.Y & N.J.*, 615 F.3d 129, 140-41 (2d Cir. 2010); *Joseph v. Hyman*, No. 09 Civ. 7555, 2010 WL 3528854, at *4 (S.D.N.Y. Aug. 30, 2010). Thus, under Second Circuit precedent, a state law does not infringe the right to travel (or trigger strict scrutiny) merely because it makes certain travel by a single mode of transportation more expensive. *Southold*, 477 F.3d at 54; *cf. Kwong v. Bloomberg*, 723 F.3d 160, 167-68 (2d Cir. 2013).

### 2.  The Program Will Not Actually Deter Travel

Nor is strict scrutiny applicable on a theory that the Program deters people from traveling.

*Chan* ¶ 244; *Mulgrew* ¶ 226. Here, the key consideration is whether the Program will "actually deter travel from one State to another or within a State." *Abadi v. Am. Airlines, Inc.*, No. 23 Civ. 4033, 2024 WL 1346437, at *55 (S.D.N.Y. Mar. 29, 2024) (Liman, J.). In *Abadi*, the plaintiff alleged that airlines' mask mandates violated his right to travel. *Id.* But because the mandates did "not prevent Plaintiff from other modes of transport"—such as "traveling on another airline"— this Court held that the policies did not actually deter travel. *See id.* ("A law does not 'actually deter' travel merely because it makes it somewhat less attractive for a person to travel interstate.").

In this case, Plaintiffs allege in a conclusory fashion that the Program actually deters travel. *Chan* ¶ 244; *Mulgrew* ¶ 226. But the Program does not foreclose any means of transportation or prevent any individuals from driving into the CBD. At most, like virtually every other tolling program, the Program might make it "somewhat less attractive" for a person to drive into the CBD, while making it more attractive for others to do so. That simply does not trigger strict scrutiny. *See, e.g.*, *Southold*, 477 F.3d at 54 (rejecting an actual deterrence argument where an "entire mode of interstate transport" was prohibited, since travelers retained numerous other options).

### 3. The Program Does Not Penalize the Exercise of the Right to Travel

Finally, strict scrutiny does not apply on a theory that the Program penalizes the exercise of the right to travel. For these purposes, strict scrutiny applies only where a state law uses "invidious distinctions," *Selevan I*, 584 F.3d at 102 (citation omitted), or "classifications" to penalize travel, *Abadi*, 2024 WL 1346437, at *55. Here, *Chan* and *Mulgrew* allege (again in a conclusory manner) that the Program imposes such a penalty. *Chan* ¶ 244; *Mulgrew* ¶ 226. But nowhere do they allege that the Program invidiously distinguishes between classes of motorists. Nor could they: the toll rates apply evenhandedly to all persons based on the form of transportation they use to enter the CBD, *Abadi*, 2024 WL 1346437, at *55, and do not distinguish based on geography, *see Southold*, 477 F.3d at 53; *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp.

2d 320, 334 (S.D.N.Y. 2013).[6]

\*    \*    \*

Because the Program imposes only a minor restriction on travel, the right to travel claims in *Chan* and *Mulgrew* must be assessed under *Northwest Airlines*, which is the same test used to assess dormant commerce clause claims in this context. *See Selevan I*, 584 F.3d at 102.[7]

### B.    The *Chan* and *Mulgrew* Plaintiffs Do Not Plausibly Allege a Violation of the Right to Travel or Dormant Commerce Clause Under *Northwest Airlines*

As set forth above, tolling programs are well established in our nation's history, and the Second Circuit has repeatedly upheld tolls against constitutional challenge under the *Northwest Airlines* standard. *Janes*, 774 F.3d at 1054; *Selevan II*, 711 F.3d at 258. Under this standard, the Court need only assess whether the tolls: (1) are based on a fair approximation of use or privilege for use; (2) are not excessive in relation to the benefits conferred; and (3) do not discriminate against interstate commerce. *See Nw. Airlines*, 510 U.S. at 369. Here, the application of that standard requires dismissal of Plaintiffs' claims in *Chan* and *Mulgrew*.

To start, although Plaintiffs generally assert that the Program's tolls are not based on a fair approximation of use or privilege for use, neither complaint alleges facts making that claim plausible. "[M]ere conclusory statements" and "[t]hreadbare recitals of the elements of a cause of

---

[6] To be sure, under state tax law, a limited low-income tax credit is available for eligible individuals who live within the CBD. *See* N.Y. Tax Law § 606(jjj). But tolling programs have long included residency-based discount plans and rebate programs for tolls and other usage-fee programs, especially for people facing particular geographic limitations that require them to incur more tolls than the average driver. *See Janes*, 977 F. Supp. 2d at 33-34 (collecting cases). In *Janes* and *Selevan II*, the Second Circuit rejected arguments that these kinds of discounts penalize the right to travel. *See Janes*, 774 F.3d at 1054-55; *Selevan II*, 711 F.3d at 259.

[7] The New York Attorney General takes the position that the Program's toll rates are subject to the Second Circuit's two-part framework for evaluating dormant commerce clause challenges in non-tolling cases, not the *Northwest Airlines* test. *Truckers*, ECF 54. That framework asks whether the challenged law: (1) discriminates against interstate commerce; or (2) imposes burdens on interstate commerce that are clearly excessive in relation to the local benefits conferred. *See Rest. Law Ctr. v. City of New York*, 90 F.4th 101, 118, 121 (2d Cir. 2024). But that two-part standard is satisfied here as well for similar reasons: the Program does not discriminate against interstate commerce and Plaintiffs do not plead facts supporting a plausible inference that the Program's purported burden on interstate commerce is "qualitatively or quantitatively different from that imposed on intrastate commerce." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 109 (2d Cir. 2001); *see, e.g.*, *VIZIO, Inc. v. Klee*, 886 F.3d 249, 259 (2d Cir. 2018).

action" cannot defeat a motion under Rule 12(b)(6). *Ashcroft*, 556 U.S. at 678; *Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 405 (S.D.N.Y. 2020) (Liman, J.). In all events, even this generalized allegation is itself implausible: the toll rates were determined after an exhaustive process that sought to "balance the needs of commuters" with those of businesses and residents, and that rationally "took into consideration how trucks, buses, passenger autos" and other vehicles "contribute … to congestion" (among other factors). TMRB 4, 31. That is not unlawful.

Plaintiffs' excessiveness allegations also fall short. At most, they suggest that certain motorists who commute to the CBD will not benefit from the Program because the toll revenues will be used to fund public transportation improvements that do not facilitate their own travel. *See, e.g.*, *Chan* ¶ 41; *Mulgrew* ¶ 12. They thus assert that the Program will fail to confer sufficient benefits on particular motorists who pay tolls. But courts have consistently and correctly held that using toll revenues to fund a metropolitan area's public transportation network materially benefits *all* motorists (including those who are subject to the toll) by diverting travelers to mass transit and reducing congestion for individuals who use the roads. That is a major purpose of the Program.

In *Janes*, the Second Circuit recognized that toll payers directly benefit from tolls used to fund public transportation improvements because such programs "divert[] numerous travelers in the region from the roadways" and "make[] it possible for users of the roadways to travel without excessive road congestion." 774 F.3d at 1055 & n.6. Courts have applied this same understanding to tolling programs more generally, at least where revenue is tied to improving an interconnected transportation system. *E.g., Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 569 (S.D.N.Y. 2014). Here, there is no question that Program revenues are tied to improving MTA's transportation network and will substantially reduce congestion within the CBD and on roadways leading into the CBD. *See* N.Y. Pub. Auth. Law § 553-j; *see also Mulgrew*, 2024 WL 3251732, at

*25. As a result, these actions will benefit all motorists, and Plaintiffs fail to plausibly allege that there are no such systemwide benefits to tolled motorists.

Finally, Plaintiffs' discrimination allegations fail for similar reasons. "A state regulation discriminates against interstate commerce only if it imposes commercial barriers or discriminates against an article of commerce by reason of its origin or destination out of State." *Angus Partners LLC*, 52 F. Supp. 3d at 561 (cleaned up). To establish that a regulation or fee is discriminatory, a plaintiff must "identify an[ ] in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors," as well as the "out-of-state competitor that is harmed by the toll policy." *Id.* In conducting this constitutional analysis, courts must ascertain "whether [the policy] is basically a protectionist measure, or whether it can fairly be viewed as a [policy] directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Id.*

Here, *Chan* and *Mulgrew* do not allege that in-state commercial interests, as a class, are advantaged relative to out-of-state competitors. *See, e.g.*, *Selevan II*, 711 F.3d at 260-61. At most, they suggest that the Program discriminates in two ways: by offering (1) discounted rates to motorists who pay a tunnel toll while crossing directly into the CBD, while failing to offer a discounted rate to motorists who pay the George Washington Bridge toll en route to the CBD; and (2) a low-income tax credit to motorists who reside within the CBD, while failing to offer the same credit to motorists who reside out-of-state. *Chan* ¶ 236; *Mulgrew* ¶ 219. Neither claim holds water.

For starters, and as a general matter, that a tolling program provides discounted rates to some motorists and not others is "insufficient to show disadvantage to an out-of-state interest." *Janes*, 977 F. Supp. 2d at 337 (collecting cases). Under the Program, both in-state and out-of-state motorists alike are entitled to a tunnel crossing credit if they enter the CBD directly through a

tolled entryway. TBTA 1. Out of four such entryways, two originate out of state. TMRB 24.

To be sure, drivers who use the George Washington Bridge, which does not enter the CBD directly, are not entitled to this credit. But failing to provide a crossing credit to motorists who pay a toll somewhere and sometime prior to entering the CBD does not plausibly discriminate against out-of-state motorists, much less discriminate against out-of-state commercial interests. New Yorkers who travel across the Triborough Bridge, for example, will pay the exact same rate to enter the CBD as New Jerseyans who travel across the George Washington Bridge.[8]

As for the low-income tax credit for CBD residents mandated by state tax law, it is perfectly lawful to provide a residence-based discount to alleviate the economic burden on a class of motorists who, because of where they live, would have to pay the toll every time they return home from outside the CBD. *See, e.g.*, *Janes*, 774 F.3d at 1054; *Selevan II*, 711 F.3d at 259. The evident purpose of such a discount is "benign"—addressing legitimate local concerns—not protectionist. *Janes*, 977 F. Supp. 2d at 339-40. Moreover, the tax credit applies only to a subset of CBD residents while not applying to most New York drivers.

### C.    TANY Does Not Plausibly Allege a Violation of the Right to Travel or Dormant Commerce Clause

Unlike *Chan* and *Mulgrew*, *Truckers* focuses solely on the Program's truck tolls, asserting that they violate the right to travel and dormant commerce clause because they fail the first two *Northwest Airlines* factors. *Truckers* ¶¶ 76-85. These arguments, too, are meritless.

#### 1.    The Truck Tolls Are Based on a Fair Approximation of Use or Privilege for Use

The Second Circuit has consistently held that tolls that charge different rates to different classes of motorists satisfy the fair-approximation requirement so long as the different rates reflect

---

[8] Of course, the George Washington Bridge is not used exclusively by New Jersey residents commuting between states; many New Yorkers, including some Plaintiffs, also use it to commute to the CBD. *See, e.g.*, *Mulgrew* ¶ 51.

"rational distinctions among different classes of motorists." *Selevan I*, 584 F.3d at 98. This principle encompasses rational distinctions tied to the use of a specific roadway by a class of motorists, as well as other common-sense justifications, such as concerns about a toll's burden on distinct populations. *Selevan I*, 584 F.3d at 98; *Selevan II*, 711 F.3d at 259. And although the Second Circuit has held that use may be one rational basis upon which to draw distinctions among different classes of motorists, "it need not be the only one." *Selevan II*, 711 F.3d at 259 n.5 (citing *Evansville*, 405 U.S. at 712). A tolling authority's core obligation in this context is merely to draw distinctions based on "reasonableness and broad proportionality." *Janes*, 977 F. Supp. 2d at 340.

Here, the Program's toll rates for trucks fall well within these parameters. In short, the truck toll rates reflect rational distinctions based on relative contributions to congestion and the effects of congestion upon the public welfare. A truck contributes more to congestion than a passenger vehicle, so the Program rationally charges trucks more than passenger vehicles to enter the CBD. The reasons why trucks contribute more to congestion are self-evident: trucks are larger, take up more space on the road, and engage in more disruptive parking patterns than passenger vehicles. TMRB 20. These factors rationally distinguish trucks from taxis and for-hire vehicles, which, like passenger vehicles, are smaller and emit fewer harmful pollutants. In addition, taxis and for-hire vehicles, unlike trucks, are already subject to a separate congestion-related tax for certain trips in Manhattan, TMRB 22; N.Y. Tax Law § 1299-A, and their tolls reflect further considerations, such as environmental justice equities and their driving patterns, *supra* at 4-5.

The Trucking Association of New York ("TANY") offers three arguments for why the Court should disregard these common-sense rationales. *First*, TANY asserts that the rationality of the Program's relevant distinctions cannot be determined on a motion to dismiss. *See Truckers*, ECF 56 at 3. For support, TANY cites *George v. Starbucks Corp.*, but that case (which involved a

15

state-law consumer-protection claim) resolved a question of reasonableness *against* the plaintiff on a motion to dismiss. *See* 857 F. App'x 705, 706-07 (2d Cir. 2021). Moreover, the mere fact that the applicable standard requires the Court to assess the rationality of differential tolling distinctions does not entitle TANY to discovery simply because it asserts that the tolls are unreasonable. As in every case, the Court's task is to determine whether TANY has pled sufficient facts to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570. TANY has not met that standard, since the facts alleged do not support a plausible inference that the tolling structure is irrational.

*Second*, TANY argues that because trucks make up a smaller percentage of vehicles within the CBD than taxis and for-hire vehicles, it is unreasonable for the toll's most expensive rates to fall on a minority of overall motorists. *Truckers* ¶ 9. This is really nothing more than a policy (or methodological) disagreement about different ways to measure contributions to congestion: by vehicle or in the aggregate. The Program's truck rates are based on fundamentally rational, well-studied conclusions about the average truck's contributions to traffic congestion and congestion's effects within the CBD, including pollution. Moreover, tolls are imposed on a per-vehicle basis, making a per-vehicle assessment of use more rational. And as the TMRB recognized, regional bridge and tunnel tolls charge trucks even greater proportional rates than those challenged here, presumably based on their outsized impact on bridge and tunnel structural conditions as compared to passenger vehicles, even though trucks may constitute a relatively small percentage of overall bridge and tunnel users. TMRB 20. In any event, courts permit tolling distinctions based on multiple factors, *see Selevan II*, 711 F.3d at 259 n.5 (distinctions need not be supported by one universal consideration), and the taxi and for-hire vehicle toll rates reflect considerations that do not apply to truckers, *see supra* at 15. TANY falls well short of proving that relying on considerations like these is unreasonable as a matter of law, or that it is inherently unreasonable to

impose higher toll rates on a minority of overall motorists despite the relevant distinguishing characteristics of that smaller group.

*Third*, TANY briefly alleges that the truck tolls do not reflect rational distinctions because taxis and for-hire vehicles are exempt from paying any toll. *Truckers* ¶ 6. This is flatly untrue and directly contradicted by the adopted toll rate schedule, which subjects taxis and for-hire vehicles to a $1.25 and $2.50 toll charge (respectively) per trip. TBTA 2. Moreover, although TANY complains that the taxi and for-hire vehicle tolls will be passed on to passengers, this objection is legally irrelevant, especially given TANY's allegation that truckers themselves will similarly "pass along the cost of the new toll to their customers." *Truckers* ¶ 69.

Ultimately, the fair-approximation requirement demands no more than "reasonableness and broad proportionality." *Janes*, 977 F. Supp. 2d at 340. TANY's allegations do not plausibly show that the truck toll rates, which reflect rational distinctions based on trucks' contributions to some of the worst congestion in the nation and associated pollution, are fundamentally irrational.

### 2.    The Truck Tolls Are Not Excessive in Relation to the Benefits Conferred

Turning to TANY's argument concerning excessiveness, the core question is whether the toll rates on trucks are excessive in relation to the benefits conferred. Here, too, the law merely requires "reasonableness." *Selevan II*, 711 F.3d at 260. As the Second Circuit has held, courts ask only whether the fee "confer[s] an actual or potential benefit" on those who pay. *Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009).

In support of its claim, TANY alleges that trucks will not see *any* benefits from the Program's operation, reasoning that trucks cannot take advantage of the public transportation options that will be funded by toll payments. *Truckers* ¶ 11. As discussed above, however, this argument is foreclosed under binding Second Circuit authority—which sensibly recognizes that *all motorists* materially benefit from a reduction in congestion where, as here, a toll is used to fund

a metropolitan area's public transportation network and divert travelers from roadways to mass transit. *Supra* at 12–13; *Janes*, 774 F.3d at 1055 & n.6; *Angus Partners*, 52 F. Supp. 3d at 569.

TANY does not (and cannot) plausibly allege that the Program confers no such benefit. By its terms, and as alleged by TANY, the Program will substantially reduce traffic congestion within the CBD and roads outside the CBD. Fewer vehicles on the road will inure to the benefit of truckers: less congestion will allow for faster delivery times, more curbside parking, fewer parking tickets, travel-time savings, travel-reliability improvements, quieter streets, and cleaner air. To the extent TANY asks this Court to reject those inferences, its position is implausible and conclusory.

The legal deficiency of TANY's position is only further confirmed by *Weisshaus v. Port Authority of N.Y. & N.J. See* 814 F. App'x 643, 647 (2d Cir. 2020). There, the plaintiff alleged that a challenged toll was excessive because it would fund "future [transportation] facilities, years in advance," and those projects may not "deliver a benefit to those paying the increased rate" now. *Id.* The Second Circuit rejected this argument, highlighting that the defendant tolling authority "plan[ned] to use the funds to 'maintain and modernize" the "transportation network." *Id.* at 648. So too here. Indeed, this case presents an even clearer application of that legal principle: the Program will directly benefit truck drivers by using tolling revenues to improve the MTA's public transportation network, thereby reducing congestion and facilitating travel for all motorists.

## II.    TANY's Preemption Claim Should Be Dismissed

TANY separately claims that the Program is preempted by the F4A because it is "intended to have" and its "implementation will have a significant effect on the prices, routes and/or services of TANY trucks." *Truckers* ¶¶ 94-97. This novel legal argument fails for two independent reasons: (1) the F4A was not intended to, and does not, apply to (let alone preempt) tolling programs like the Program; and (2) even if the F4A could theoretically apply to some form of tolling, the Program would not be preempted because it is permissible under the F4A's express statutory exceptions.

### A.    The F4A Does Not Preempt Tolling Programs

In evaluating the scope of a statute's pre-emptive effect, "the purpose of Congress is the ultimate touchstone." *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018). As the Supreme Court has explained, when Congress enacted the F4A, its purpose was to combat states' "direct substitution of [their] own governmental commands for competitive market forces in determining (to a significant degree) the services that motor carriers will provide." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 263 (2013). In this targeted respect, the F4A was designed to prevent only "certain aspects of the State regulatory process." *Id.*

To that end, the F4A provides that "a State [or] political subdivision of a State … may not enact or enforce a law … related to a price, route, or service of … any motor private carrier, broker, or freight forwarder with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). Accordingly, the F4A's preemptive scope "embraces state laws 'having a connection with or reference to' carrier 'rates, routes, or services,' whether directly or indirectly," *and* "concern[ing] a motor carrier's 'transportation of property.'" *Dan's City*, 569 U.S. at 260-61. This "focuse[s] the preemption on economic regulations and reflect[s] congressional intent to leave the state's historic police powers undisturbed where 'only incidental economic burdens can be discerned.'" *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 645 (2d Cir. 2005) (citation omitted).

As TANY recognizes, in the thirty years since the F4A was enacted, no one has ever claimed that a tolling program is preempted under the F4A. *See Truckers*, ECF 56 at 4.[9] Although TANY alleges that the Program is in fact preempted, that is wrong. The Program's purpose is far removed from Congress' fundamental concern in enacting the F4A. The Program's tolls seek to

---

[9] One court has refused to interpret a separate statutory provision, in the same chapter as the F4A, in such a way that would "preempt the imposition of state highway tolls on the motor carriers." *Jalbert Leasing, Inc. v. Massachusetts Port Auth.*, No. 04 Civ. 10486, 2005 WL 1288108, at *8 (D. Mass. May 18, 2005), *aff'd*, 449 F.3d 1 (1st Cir. 2006).

reduce congestion and promote public transportation. These purposes "bear no relationship to the regulation of competition," putting the Program far afield from the F4A's limited preemptive scope. *Omya, Inc. v. Vermont*, 33 F. App'x 581, 584 (2d Cir. 2002).

The F4A's inapplicability here is confirmed by the Program's details. The Program does not "relate to" prices, routes, or services with respect to the transportation of property within the meaning of the F4A. The Program's tolls apply across industries and to the general public, and do not "bind[] the carrier to a particular price, route or service" or "otherwise freeze[] them into place or determine[] them to a significant degree." *California Trucking Ass'n v. Bonta*, 996 F.3d 644, 658 (9th Cir. 2021). Indeed, even TANY concedes that its members' services and routes will be unaffected, as they will continue to make deliveries to the CBD along their usual routes and schedules. *See Truckers* ¶¶ 49, 54, 59. In these fundamental and material respects, the Program will "hardly constrain participation in interstate commerce" or "requir[e] a motor carrier to offer services not available in the market" so as to run afoul of the F4A. *Dan's City*, 569 U.S. at 263.

The Program stands in stark contrast to the types of state laws which the F4A does preempt. For example, courts have found F4A preemption with respect to "state trucking price regulations," *In re St. Johnsbury Trucking Co., Inc.*, 199 B.R. 84, 87 (S.D.N.Y. 1996); laws requiring delivery trucks to "follow[] particular delivery procedures" in order to serve tobacco retailers, *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371 (2008); and "local licensing requirements for tow companies," *Pistolesi v. Calabrese*, No. 11 Civ. 5598, 2015 WL 1573364, at *5 (S.D.N.Y. Apr. 9, 2015). By comparison, tolling programs (like the Program itself) do not set prices, require particular routes or procedures, impose licensing requirements, or control industry competition.[10]

---

[10] This conclusion is supported by the absence of any indication that Congress intended the F4A to preempt tolling programs. Congress has enacted several express restrictions on state tolling programs, including prior to its adoption of the F4A. *See, e.g.*, 23 U.S.C. §§ 129, 301. It knew how to preempt such programs and there is no evidence it meant to do so here. *Cf. Med. Soc. of State of N.Y. v. Cuomo*, 976 F.2d 812, 818 (2d Cir. 1992).

**B.      Even If the F4A Applies, the Program Is a Permissible Size Limitation**

Alternatively, even if the F4A preempted *some* tolling programs, it would not preempt this one. The F4A's preemptive scope is circumscribed by several explicit exceptions—one of which provides that the F4A "shall not restrict the safety regulatory authority of a State with respect to motor vehicles, [or] the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle …." 49 U.S.C. § 14501(c)(2)(A). The Program falls within this exception as its tolls are "limitations based on the size … of the motor vehicle." *Id.*

TANY recognizes that the Program's tolls turn on the vehicle size and charge "[t]rucks … a $24 or $36 toll (*depending on size*)." *Truckers* ¶ 33(b) (emphasis added). More precisely, higher tolls apply to larger vehicles *generally*. Small trucks, vans, and non-transit buses pay a $24 toll, and larger trucks and sightseeing buses pay $36. TBTA 1. Smaller vehicles, like passenger vehicles and motorcycles, pay lower tolls and are entitled to a daily cap on tolls. *Id.*

The Program thus falls within the F4A's express preservation of state regulatory powers. *See* 49 U.S.C. § 14501(c)(2)(A). Indeed, in enacting the F4A, Congress unambiguously reserved as "unchanged" a "State['s] authority to regulate … vehicle size" on its roadways. H.R. Rep. No. 103-677, at 85, 1993 WL 440339 (1994) (Conf. Rep.). States charging larger vehicles higher tolls is commonplace, *see* TMRB 20 (noting truck tolls are "often up to eight times the auto toll"), and their authority to do so is uncontroversial in the legal community, *see, e.g.*, Amy E. Turner, *Legal Tools for Achieving Low Traffic Zones*, 50 Env't L. Rep. (ELI) 10329, 10333 (2020).

TANY objects that the Program cannot fall under this statutory exception because transit buses are also larger vehicles but are exempt from Program tolls. *See Truckers*, ECF 56 at 5. This argument fails for two reasons. *First*, nothing in the text of the F4A indicates that limitations based on motor vehicle size must be unvarying or inflexible to fall under 49 U.S.C. § 14501(c)(2)(A). And such a reading would be absurd. For example, TANY's conception of the F4A would preempt

all restrictions on large vehicles on residential streets if they did not also preclude equally sized firetrucks, garbage trucks, ambulances, or public-school buses. "No such design can be attributed to a rational Congress." *Dan's City*, 569 U.S. at 265. *Second*, the Program's narrow exception for transit buses is fully consistent with the Program's and the F4A's purposes. Exempting transit buses recognizes their positive contribution toward reducing congestion in the CBD and does nothing to "constrain participation in interstate commerce." *Id.* at 263. For all these reasons, the Court should dismiss TANY's claim that the F4A preempts the Program.

## III.    The Program Does Not Violate the Green Amendment

Finally, *Chan*, *Mulgrew*, and *New Yorkers* argue that the Program would violate Plaintiffs' right, under the New York Constitution's 2021 "Green Amendment," to "clean air and water, and a healthful environment." N.Y. Const., art. I, § 19. Even accepting Plaintiffs' factual allegations as true, this argument lacks merit as a matter of law. The Program is intended to (and will in fact) improve environmental conditions—including a net positive effect on air quality within the State. In fact, Justice Engeron has declined to dismiss a parallel claim from environmental and advocacy groups that the Governor's direction to pause the Program is a violation of the Green Amendment. *See City Club*, Doc. No. 64; *Riders Alliance*, Doc. No. 57. Accordingly, and for the reasons given below, the Program fully complies with the New York Constitution.

In an effort to supersede this Court's prior decision dismissing their NEPA claims, Plaintiffs suggest the Amendment requires Defendants to take further affirmative action (in the form of analysis and mitigation) to protect "the environment," to protect Plaintiffs from "negative environmental impacts," and to "ensure a habitable climate and healthful environment for Plaintiffs." *Chan* ¶¶ 202-210, 256; *Mulgrew* ¶¶ 176-184, 237; *New Yorkers* ¶¶ 185-189. Plaintiffs are mistaken: the Green Amendment does not impose additional substantive or procedural requirements addressed by other laws such as NEPA.

22

Procedurally, a Green Amendment claim alleging insufficient environmental review does not provide a new limitations period for an otherwise time-barred claim. *See Marte v. City of N.Y.*, 2023 N.Y. Slip. Op. 31198(U), 2023 WL 2971394, at *3 (Sup. Ct., N.Y. Cnty. Apr. 17, 2023) (holding Green Amendment action time-barred where it was too late for plaintiffs to challenge environmental review they claimed was insufficient). Here, the Green Amendment claims in *Mulgrew* and *New Yorkers* hinge on the putative inadequacy of the environmental review conducted for the Program under NEPA. *Mulgrew* ¶¶ 176-184; *New Yorkers* ¶¶ 188-189. As such, the statute of limitations for NEPA claims applies. Since the Plaintiffs in *Mulgrew* and *New Yorkers* filed their actions two months after the statute of limitations had run, on January 4 and January 18, 2024, respectively, their Green Amendment claims are also time-barred. *See Mulgrew*, 2024 WL 3251732, at *15-17.[11]

Substantively, the Green Amendment states as follows: "Each person shall have a right to clean air and water, and a healthful environment." N.Y. Const. art. I, §19. The Amendment's legislative history establishes that it did not change existing environmental law. Indeed, multiple legislators, including the sponsor of the legislation to place the Amendment on the ballot, stressed that it was not intended to add new legal requirements or change existing ones. *See* New York State Assembly Debate on Assembly Bill A1368, Feb. 8, 2021 ("Debate Tr."), at 34, 35-36, 66, 84; *Streeter v. N.Y.C. Dep't of Env't Prot.*, 83 Misc. 3d 417, 422 (Sup. Ct., Kings Cnty. 2024).[12]

---

[11] To the extent *New Yorkers* challenges TBTA's State Administrative Procedure Act ("SAPA") process for failure to consider environmental issues, *New Yorkers* ¶ 189, such a challenge is both unripe and invalid. The Traffic Mobility Act expressly exempted the Program from environmental review under the State Environmental Quality Review Act ("SEQRA") and thus City Environmental Quality Review ("CEQR") (enacted pursuant to SEQRA). N.Y. Veh. & Traf. Law § 1704(6). SAPA imposes no separate environmental review requirements. In any event, in making its recommendations for tolling, which were adopted by the TBTA Board, the TMRB considered the Final EA and FONSI. *See* Central Business District Tolling Program, https://new.mta.info/project/CBDTP (visited Sept. 19, 2024).

[12] During the State Assembly debate, when asked if the Green Amendment "would create an individual's right of private action," the Amendment's sponsor, Steven Englebright, responded: "[The Green Amendment] does not create anything new in terms of rights of action…No, that's not the purpose." Debate Tr. at 39. Rather, the sponsor explained

Plaintiffs seek to use this broad pronouncement of "optimism," Debate Tr. at 31, to impose on Defendants a duty to conduct analysis and mitigation beyond NEPA's requirements, which this Court has already held were satisfied by the EA and FONSI. *Chan* ¶¶ 205-206, 208, 210; *Mulgrew* ¶¶ 179-184; *New Yorkers* ¶¶ 186-189; *see Mulgrew*, 2024 WL 3251732, at *22-46. But the handful of New York court decisions interpreting the Green Amendment confirm that it does not impose additional requirements beyond those in other environmental laws. For example, in *Marte*, the plaintiffs challenged the Final Environmental Impact Statement ("FEIS") completed under SEQRA, the state equivalent of NEPA, for a proposed housing development. 2023 WL 2971394, at *2. The court dismissed the action, holding that the Green Amendment was not meant "to create a brand-new route to challenge developments on an environmental basis," since SEQRA and its City cohort, CEQR, already "provide substantial environmental protections and require state and city agencies to consider all manner of factors before approving certain projects." *Id.* at *6; *see also Streeter*, 83 Misc. 3d at 422-23 ("The Green Amendment's legislative history confirms it was not intended to change existing laws, such that it allows this Court, in essence, to become the forum to modify the [New York City] Administrative Code."). Indeed, the Green Amendment includes no procedural duty or right analogous to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. The Amendment requires no specific procedure when evaluating whether an action may infringe on the rights it confers—and Plaintiffs thus err in citing it as a basis for imposing additional review processes.

Moreover, the Green Amendment does not provide a pathway to challenge a NEPA process under a different standard than that governing NEPA challenges (which this Court has already

---

that "the primary consequence of [the Amendment's] passage will be…to enable [] citizens to hold Legislature activities…to a higher standard and to have a higher expectation of performance from [the Legislature]." *Id.* at 39-40.

addressed). *See Mulgrew*, 2024 WL 3251732, at *19-46.[13] Nor can the Green Amendment provide Plaintiffs a means of halting the Program based on mere speculation about environmental harms. *See Marte*, 2023 WL 2971394, at *7 (holding speculative environmental harms did "not create a substantive basis for [the] action or require the [defendant] to revisit the completed environmental reviews for [the] project"). To the extent Plaintiffs claim that the Green Amendment prevents the government from taking any action that may cause any amount of pollution, that is baseless: such an interpretation would render unconstitutional virtually any infrastructure project or even the operation of essential municipal services like public transit, garbage collection, and firefighting. The law offers no support for that understanding and this Court should therefore reject it.[14]

## CONCLUSION

For the reasons provided herein, Defendants respectfully request that this Court dismiss Counts Four, Five, and Six in *Chan*; Counts Four, Five, and Six in *Mulgrew*; Count Five in *New Yorkers*; and Counts One, Two, and Three in *Truckers*; and in all events, it should dismiss the TMRB as a Defendant in *New Yorkers*.

---

[13] *Chan* and *Mulgrew* allege that the "purposefully fast-tracked Congestion Pricing Plan review ensures, among other things, that the relevant agencies will not have to comply with local laws, which mandate that agency programs, policies, and processes promote environmental justice, encourage public participation and transparency, and factor environmental justice and environmental concerns in agency-decision making." *Chan* ¶ 255; *Mulgrew* ¶ 236. The basis and purpose for this allegation is unclear. It was not the timing of review of the Program—which spanned several years—which exempted it from application of certain local laws, but rather the Act. *See* N.Y. Veh. & Traf. Law § 1704(6). Plaintiffs have not challenged the constitutionality of the Act based on the Green Amendment.

[14] The Court should dismiss the TMRB as an improper Defendant with respect to the Green Amendment claim in *New Yorkers*. The TMRB's role is strictly advisory; it was not responsible for any of the challenged actions and it cannot provide Plaintiffs with any relief. *See* N.Y. Pub. Auth. Law § 553-k(2); N.Y. Veh. & Traf. Law § 1704-a(3)-(4); *cf. Popovchak v. UnitedHealth Grp. Inc.*, 692 F. Supp. 3d 392, 416 (S.D.N.Y. 2023). Moreover, Plaintiffs did not oppose Defendants' motion to dismiss the TMRB as a Defendant to their NEPA and SAPA claims. *Mulgrew*, 2024 WL 3251732, at *1 n.1.

Dated: September 30, 2024            Respectfully submitted,
      New York, New York

*/s/ Joshua A. Matz*
Joshua A. Matz
Kate Harris (*admitted pro hac vice*)
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington DC, 20001
(212) 763-0883
jmatz@heckerfink.com
kharris@heckerfink.com

Gabrielle E. Tenzer
Ian Robertson (*admission pending*)
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, New York 10118
(212) 763-0883
gtenzer@heckerfink.com
irobertson@heckerfink.com

*/s/ Mark A. Chertok*
Mark A. Chertok
Elizabeth Knauer
John F. Nelson
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com
jnelson@sprlaw.com

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
156 West 56th Street, Suite 207
New York, New York 10019
(212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*Counsel for Defendants the
Metropolitan Transportation Authority,
the Triborough Bridge and Tunnel Authority,
and the Traffic Mobility Review Board*

MURIEL GOODE-TRUFANT
Acting Corporation Counsel of the City of
New York

By: */s/ Nathan Taylor*
  Nathan Taylor
  Senior Counsel
  Environmental Law Division
  New York City Law Department
  100 Church Street
  New York, NY 10007
  (212) 356-2315
  ntaylor@law.nyc.gov

*Counsel for Defendants the New York City
Department of Transportation and William J.
Carry in his official capacity as Assistant
Commissioner for Policy for the New York
City Department of Transportation*