UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL MULGREW, et al.,                           :
                                                   :
                              Plaintiffs,           :
                                                   :
              - against -                           :
                                                   :        1:24-cv-01644 (LJL)
UNITED STATES DEPARTMENT OF                         :        1:23-cv-10365 (LJL)
TRANSPORTATION, et al.,                             :
                                                   :
                              Defendants.           :
                                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ELIZABETH CHAN, et al.,                            :
                                                   :
                              Plaintiffs,           :
                                                   :
              - against -                           :
                                                   :
UNITED STATES DEPARTMENT OF                         :
TRANSPORTATION, et al.,                             :
                                                   :
                              Defendants.           :
                                                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS PLAINTIFFS' CONSTITUTIONAL CLAIMS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

    A.    New York Governor Indefinitely Pauses Congestion Pricing ................................ 3

    B.    FHWA Issues its Re-Evaluation of the Congestion Pricing Plan ......................... 4

STANDARD OF REVIEW ................................................................................................... 5

ARGUMENT ........................................................................................................................ 5

I.     Plaintiffs Successfully State a Claim that the Congestion Pricing Program Violates the Dormant Commerce Clause and Right to Travel Under the *Northwest Airlines/Evansville Test* ................................................................................................ 6

    A.    The Congestion Pricing Program's Fees are Unrelated to the Uses Being Tolled ..................................................................................................................... 9

    B.    The Tolls Paid are Excessive as Compared to the Benefits to Toll-Payers .......... 13

    C.    The Congestion Pricing Program Discriminates Against Out-of-State Commuters ............................................................................................................. 17

II.    Plaintiffs Successfully State a Claim That the Congestion Pricing Program Violates the Green Amendment ................................................................................................. 20

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abadi v. Am. Airlines, Inc.*,
23-cv-4033 (LJL), 2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024)...........................................6

*In re AIG Advisor Grp. Sec. Litig.*,
309 F. App'x 495 (2d Cir. 2009) ...........................................................................5

*Am. Trucking Ass'n v. N.Y. State Thruway Auth.*,
238 F. Supp. 3d 527 (S.D.N.Y. 2017).....................................................................7

*Am. Trucking Ass'ns v. Alviti*,
630 F. Supp. 3d 357 (D.R.I. 2022).................................................................. *passim*

*Am. Trucking Ass'ns v. N.Y. State Thruway Auth.*,
199 F. Supp. 3d 855 (S.D.N.Y. 2016), *vacated on other grounds*, 238
F.Supp.3d 527 (S.D.N.Y. 2017)...................................................................13, 15

*Am. Trucking Ass'ns v. Scheiner*,
483 U.S. 266 (1987)....................................................................................19, 20

*Angus Partners LLC v. Walder*,
52 F. Supp. 3d 546 (S.D.N.Y. 2014)...................................................8, 11, 16, 17

*Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*,
567 F.3d 79 (2d Cir. 2009).......................................................................... *passim*

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*,
405 U.S. 707 (1972)............................................................................................7

*Fresh Air for the Eastside v. State of N.Y.*,
No. E2022000699, 2022 WL 18141022 .............................................................23

*Gen. Motors Corp. v. Tracy*,
519 U.S. 278 (1997).............................................................................................6

*Harkenrider v. Hochul*,
197 N.E.3d 437 (N.Y. 2022)..............................................................................24

*Janes v. Triborough Bridge & Tunnel Auth.*,
977 F. Supp. 2d 320 (S.D.N.Y. 2013), aff'd 774 F.3d 1052....................................8

*Janes v. Triborough Bridge*,
774 F.3d 1052 (2d Cir. 2014)..............................................................8, 16, 17

*Marte v. City of N.Y.*,
No. 159068/2022, 2023 WL 2971394 (N.Y. Sup. Ct. N.Y. Cnty, April 17, 2023) ...............................................................................................22, 23

*Mulgrew, et al. v. U.S. Dep't of Transp., et al.*,
No. 24 Civ. 1644 (S.D.N.Y.), ECF No. 112 ........................................... *passim*

*Northwest Airlines, Inc. v. Cty. of Kent*,
510 U.S. 355 (1994) .................................................................................7

*Pike v. Bruce Church, Inc.*,
397 U.S. 137 (1970) .................................................................................6

*Riders Alliance v. Hochul*,
No. 156696/2024 ....................................................................................24

*Selevan v. N.Y. Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) .............................................................7, 8, 19

*Selevan v. N.Y. Thruway Auth.*,
711 F.3d 253 (2d Cir. 2013) .....................................................................8

*Selevan v. N.Y. Thruway Auth.*,
No. 1:06-cv-291, 2011 WL 5974988 (N.D.N.Y. Nov. 28, 2011) ................8

*Matter of Streeter v. N.Y.C. Dep't of Env't. Prot.*,
83 Misc.3d 417 (N.Y. Sup. Ct. N.Y. Cnty. 2024) ...............................22, 23

*Town of Southold v. Town of E. Hampton*,
406 F. Supp. 2d 227 (E.D.N.Y 2005), *vacated in part*, 477 F.3d 38 (2d Cir. 2007) .....................................................................................................8

*Town of Southold v. Town of East Hampton*,
477 F.3d 38 (2d Cir. 2007) .............................................................8, 18, 19

*Trailer Marine Transp. Corp. v. Rivera Vazquez*,
977 F.2d 1 (1st Cir. 1992) .................................................................8, 19

*Truckers Association of New York v. Metropolitan Transportation Authority, et. al*,
24-cv-41111 (S.D.N.Y.) .............................................................................9

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992) .................................................................................6

**Statutes**

23 U.S.C. § 149 ...........................................................................................7

NEPA ...............................................................................................................20, 21, 24, 25

Traffic Mobility Act ...............................................................................................5

**Other Authorities**

*About PATH*, PORT AUTHORITY OF NEW YORK AND NEW JERSEY,
    https://www.panynj.gov/path/en/about.html (last visited: October 11, 2024).........................16

*About Us*, NJ TRANSIT, https://www.njtransit.com/our-agency/about-us (last
    visited: October 11, 2024)................................................................................16

Assembly Bill A1368...............................................................................................24

CBS News (Nov. 19, 2024), https://www.cbsnews.com/newyork/news/nyc-
    congestion-pricing-mta-board-vote/ .........................................................................5

Citing *Southhold* ...............................................................................................18

Federal Rule 12(b)(6) and 12(b)(1)...............................................................................5

Marcia Kramer et. al, *NYC congestion pricing plan approved by MTA board; $9
    tolls get green light* .........................................................................................5

*Metro-North Railroad Map*, MTA, https://new.mta.info/map/5351 (last visited:
    Oct. 29, 2024) ...............................................................................................16

MTA, https://new.mta.info/tolls/congestion-relief-zone/better-transit (last visited:
    Nov. 13, 2024) ...............................................................................................1

N.Y.C. Admin. Code § 24-182 ...............................................................................22

New York State Constitution Article 1, Section 19...............................................................20

*Port Authority Bridges & Tunnels*, PORT AUTHORITY OF NEW YORK AND NEW
    JERSEY, https://www.panynj.gov/bridges-tunnels/en/index.html (last visited:
    October 11, 2024)...............................................................................................16

Rule 12(b)(6)...............................................................................................2

Senate Bill S2072...............................................................................................24

U.S. Const., art. I, § 8, cl. 3...............................................................................6

## PRELIMINARY STATEMENT

To pass constitutional muster under well-settled Second Circuit caselaw, a fee or a toll impacting interstate commerce or interfering with the right to travel, such as contemplated by the Central Business District Tolling Program ("Congestion Pricing"), must be based on some fair approximate use of the facilities tolled and must not be excessively priced in relation to the benefits conferred to those paying it. While a fee need not be precisely calibrated to benefit those using the facility, there must be a reasonable and functional relationship, supported by evidence, that the revenue to be collected will benefit those paying.

Defendants have moved to dismiss the constitutional claims in *Mulgrew* and *Chan* as a matter of law on a record bereft of the elements needed to refute Plaintiffs' claims. The rate of the approved Congestion Pricing toll has been altered by the Governor (and still subject to approvals), and none of the specific uses for the toll revenue are publicly known. In fact, on its website explaining the Congestion Pricing Program, the Metropolitan Transportation Authority ("MTA") explains that *"[o]nce Congestion Pricing is implemented and revenue is generated, specific funding allocations to individual projects will be made and documented[.]"*[1] Defendants' plans for the billions of dollars in revenue from Congestion Pricing are a black box (or, perhaps given the agency's history of managing its finances, a black hole) within the MTA's budget.

Defendants ask this Court to conduct the calculus as to whether the toll is based on a fair approximation of use or excess in relation to benefits conferred based solely on their say so and an unquantifiable overall benefit to the entire mass transit system. The MTA does not publicly provide any detail about how it would evaluate what projects it would spend its money on or which projects it plans to fund, beyond an imprecise website laundry list of possible projects ranging

---

[1] *See Congestion Pricing makes for better transit*, MTA, https://new.mta.info/tolls/congestion-relief-zone/better-transit (last visited: Nov. 13, 2024) (hereinafter "Congestion Pricing Project").

from set-asides for minority and women-owned businesses, to the Second Avenue Subway, to bus electrification. There is no evidence that the MTA plans to reserve any funds to maintain or improve the road and bridge infrastructure being tolled. It does not promise to add commuting options for New Yorkers, such as Plaintiffs, who live in transit deserts. It does not plan to spend more than a small fraction of toll revenue on investments to mitigate pollution displaced into environmental-justice communities in the Lower East Side, Bronx or Staten Island. It certainly does not plan to share its windfall with transportation systems used by out-of-state commuters or the transit systems they are able to use, like NJ Transit or the PATH system, which will see new burdens from displaced commuters and none of the benefits from Congestion Pricing revenue.

Shorn of such clear benefits for commuters, Congestion Pricing, as pleaded, is unconstitutional as a burden on interstate commerce and the right to travel. The program fails to base the toll's impact on a fair approximation of use of the tolled facilities, is excessive in relation to the benefits conferred on numerous groups of commuters impacted by the toll, and discriminates against interstate commerce by burdening out-of-state commuters. At the very least, in the absence of focused discovery on these questions, the Court cannot readily determine whether the yet-to-be implemented program fulfills these requirements. To this point, the relevant cases cited by Defendants are exclusively cases decided on motions for summary judgment; they are actions resolved *after* the full details of a tolling program and the proposed (or actual) use of its revenue can properly be analyzed. Dismissal under Rule 12(b)(6) is inappropriate at this stage.

Moreover, the Second Amended Complaints assert that Congestion Pricing would divert dangerous pollutants into Plaintiffs' neighborhoods, thus violating Plaintiffs' constitutional rights to clean air and water, and a healthful environment under New York's Green Amendment. Defendants conceded in their environmental review that Congestion Pricing would increase

pollution in vulnerable environmental justice communities, such as parts of Lower Manhattan, Staten Island and the Bronx, which is precisely the sort of action the Amendment was designed to address.  Plaintiffs have pleaded a claim under the Green Amendment.

Alternatively, to the extent the Court is inclined to rule on the merits of the constitutional claims, it should defer until the details of the environmental impact of program – particularly germane to the Green Amendment claims – are fully known.  Defendants will attempt to characterize the phased-in fee as having been already analyzed, but phasing the fee to culminate at $15 over six-years will have an impact on congestion and pollution and how much money will be available for capital improvements.  Moreover, if Defendants' frequently shifting and politically-influenced changes to the program and process to date are any guide, there is no guarantee that Congestion Pricing in its current state will not be altered yet again before January.  Challenging Congestion Pricing has proved to be a constantly moving target, a process motivated by the prevailing partisan winds and the MTA's budget, rather than driven by true concern for congestion in New York and the environment.  The Court should allow Plaintiffs to proceed on their constitutional claims.

## FACTUAL BACKGROUND

The factual background of Congestion Pricing is well-known to the Court from prior motion practice in *Chan* and *Mulgrew* and is incorporated here by reference.  Plaintiffs limit this discussion to the additional, pertinent developments that have occurred since May 2024.

### A.    *New York Governor Indefinitely Pauses Congestion Pricing*

On June 5, 2024, Governor Hochul indefinitely halted the implementation of Congestion Pricing.  (*Mulgrew* Second Amended Complaint ("SAC") at ¶ 152; *Chan* SAC at ¶ 159.)[2]  In her

---

[2] *Mulgrew, et al. v. U.S. Dep't of Transp., et al.*, No. 24 Civ. 1644 (S.D.N.Y.), ECF No. 112; *Chan, et al. v. U.S. Dep't of Transp.*, et al., No. 23 Civ. 10365 (S.D.NY.), ECF No. 124.

statement, Governor Hochul explained that "circumstances have changed" for a program that "was enacted in a pre-pandemic period where workers were in the office five days a week. . . ." (*Mulgrew* SAC at ¶ 153; *Chan* SAC at ¶ 160.)  The Governor stated that implementing Congestion Pricing "risks too many unintended consequences," particularly to working and middle-class New Yorkers.  *Id*.  The Governor stopped short of canceling the program altogether, but suggested in subsequent remarks that "to assume that the only funding source [for improvements to mass transit] has to be congestion pricing shows a lack of imagination" and that there are "other ways to deal with this."  (*Mulgrew* SAC at ¶ 154; Chan SAC at ¶ 161.)

Following this statement, the New York Legislature and Governor began seeking alternatives that would raise revenue for the MTA in place of funds expected to be raised by Congestion Pricing.  (*Mulgrew* SAC at ¶ 155; *Chan* SAC at ¶ 162.)  These alternative funding measures would contribute to the MTA capital program, and alleviate the need to raise the full $15 billion figure from Congestion Pricing alone.  (*Mulgrew* SAC at ¶ 156; *Chan* SAC at ¶ 163.)

### B.    *FHWA Issues its Re-Evaluation of the Congestion Pricing Plan*

Despite the pause on Congestion Pricing, and with the status of the tolling program (including the contours of any tolling scheme) in flux, on June 14, 2024, at the behest of the MTA, the FHWA issued its "re-evaluation" of the Final EA, finding that the conclusions remained valid in light of the changed tolling schedule.  (*Mulgrew* SAC at ¶ 157; *Chan* SAC at ¶ 164.) Accordingly, Defendants concluded that no further environmental review was warranted.  (*Id*.) The re-evaluation, excluding appendices (and including the Executive Summary), was 175 pages, reflecting significant change to the tolling structure.  (*Mulgrew* SAC at ¶ 158; *Chan* SAC at ¶ 165.)

Thirteen days later, on June 27, 2024 the MTA Board affirmed the Governor's pause, extending the implementation date indefinitely from June 2024 until such time as the Project

Sponsors execute the Value Pricing Pilot Program ("VPPP"). *Mulgrew* SAC at ¶ 179; Chan SAC at ¶ 177. To date, the VPPP has not been signed.

On November 14, 2024, the Governor announced a resumption of Congestion Pricing at $9 rather than $15, and on November 19, 2024, the MTA's Board approved the Governor's proposed modified plan.[3] Putting aside that it is the Traffic Mobility Review Board ("TMRB"), not the Governor who is to set the toll under the Traffic Mobility Act, as with the prior adopted tolling structure, little is known about how or when the revenue from Congestion Pricing will be used on specific MTA projects. A cursory 10-page "re-evaluation" of the environmental impact of the $9 to $15 phase-in was completed by the FHWA at the behest of the MTA only eight days after the Governor's "un-pause" announcement. Unsurprisingly, the barebones "analysis" concluded that the tolling program still complies with the Environmental Assessment ("EA").

## STANDARD OF REVIEW

The standards for dismissal under Federal Rule 12(b)(6) and 12(b)(1) are substantively identical. *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 (2d Cir. 1999). In deciding both types of motions, the District Court must "accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff." *In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x 495, 497 (2d Cir. 2009).

## ARGUMENT

Defendants argue that Counts IV, V, and VI of the *Mulgrew* and *Chan* complaints (the "Constitutional Claims") should be dismissed, claiming that Congestion Pricing does not violate either the dormant Commerce Clause or the constitutionally guaranteed right to travel. Defendants also argue that the Congestion Pricing program does not violate New York State's Green

---

[3] Marcia Kramer et. al, *NYC congestion pricing plan approved by MTA board; $9 tolls get green light*, CBS News (Nov. 19, 2024), https://www.cbsnews.com/newyork/news/nyc-congestion-pricing-mta-board-vote/.

Amendment, contending that Plaintiffs' claims are allegedly time-barred and the Green Amendment does not create substantive rights beyond those already established by other laws. These arguments are unavailing, ignoring well-established law and facts.

**I.**    **Plaintiffs Successfully State a Claim that the Congestion Pricing Program Violates the Dormant Commerce Clause and Right to Travel Under the *Northwest Airlines/Evansville Test***

The Constitution provides Congress with the power "[t]o regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. "The negative or dormant implication of the Commerce Clause prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce and thereby impedes free private trade in the national marketplace." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (citation omitted). Laws may violate the dormant Commerce Clause by clearly discriminating against interstate commerce, *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992), or by imposing a burden on interstate commerce incommensurate with the local benefits secured. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).[4]

---

[4] In addition to the *Northwest Airlines/Evansville* test, Plaintiffs also state a claim that the Congestion Pricing program facially discriminates against interstate commerce and violates the right to travel. Taking all allegations as true, Plaintiffs have sufficiently pleaded that the Congestion Pricing program will deter interstate (and intrastate) travel, and that the classifications under the law penalize exercise of that right. Multiple plaintiffs have pleaded that the cost of consistent payment of the congestion fee—close to $4,000 per year when fully phased in —is prohibitive, and meaningfully restricts their day-to-day activities. (*Chan* SAC ¶ 30, 32, 35-36.) Other plaintiffs have pleaded that the implementation of congestion pricing would require them to find another teaching position outside of Manhattan. (*Mulgrew* SAC ¶¶ 57-59.) This penalizes their right to travel. While Defendants cite heavily to this Court's decision in *Abadi v. Am. Airlines, Inc.*, 23-cv-4033 (LJL), 2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024), that decision is inapposite. The burden faced by the plaintiff in Abadi pales in comparison to Ms. Chan, a mother with a disabled child who is bound to her neighborhood without use of a car (*Chan* SAC ¶ 28), Mr. Carney, who may be deprived of the ability to practice his profession as a violinist due to the cost of commuting to the CBD (*Chan* SAC ¶ 35), or Mr. Caminiti, who may need to find a new job and start his career over (*Mulgrew* SAC ¶ 57). Contrary to Defendants' arguments, strict scrutiny is triggered, and if analyzed under strict scrutiny, Plaintiffs have more than sufficiently pled that Congestion Pricing is not narrowly tailored to serve a compelling governmental interest. No case law establishes, nor have Defendants cited any, that the mitigation of traffic congestion or increases in the budget of public entities constitutes a compelling governmental interest, nor is the Congestion Pricing program—with its blanket tolls— narrowly tailored to achieve those interests.

Where a law establishing a tolling scheme may have constitutionally suspect effects on either interstate commerce or the right to travel, the Second Circuit looks to the test first established in *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc.*, 405 U.S. 707 (1972), later articulated more fully in *Northwest Airlines, Inc. v. Cty. of Kent*, 510 U.S. 355, 369 (1994). Under this test, a toll is constitutionally permissible if it "(1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." *Northwest Airlines*, 510 U.S. at 369 (citing *Evansville*, 405 U.S. at 716-17); *see also Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 96-98 (2d Cir. 2009) ("*Selevan I*") (applying the *Northwest Airlines/Evansville* test to the analysis of road tolls). "The test is disjunctive: failing any of the three is sufficient to invalidate a law under the Commerce Clause." *Am. Trucking Ass'ns v. Alviti*, 630 F. Supp. 3d 357, 379 (D.R.I. 2022). Congestion Pricing fails all three factors of the *Northwest Airlines/Evansville* test and Plaintiffs have sufficiently alleged that the program is unconstitutional in its present form.[5]

As an initial matter, in arguing for dismissal, Defendants tellingly cite only cases decided on a motion for summary judgment. *Janes v. Triborough Bridge*, 774 F.3d 1052, 1053-54 (2d Cir. 2014) (motion for summary judgment); *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) ("*Selevan II*") (same); *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 46-47 (2d

---

[5] The New York State Attorney General ("NYSAG") also argues that Congestion Pricing cannot violate the dormant Commerce Clause because it can only proceed if the City and State enter an agreement with the FHWA pursuant to federal law, thus meaning that Congress has exercised its authority under the Commerce Clause. (*See* NYS Br. [Doc. No. 116] at 5.) However, the NYSAG misstates the law. Congress must be clear about its intent to allow a state to violate the dormant Commerce Clause, which itself requires that this intent be "expressly stated." *Am. Trucking Ass'n v. N.Y. State Thruway Auth.*, 238 F. Supp. 3d 527, 533 (S.D.N.Y. 2017) (citing *Sporhase v. Nebraska*, 458 U.S. 941, 960 (1982).) *Am. Trucking Ass'n* is instructive. There, the court found that the "express intent" named the specific agency—the Thruway Authority—and granted specific authority to engage in the challenged spending on the state canal system. *Id*. at 533-36. No such express authorization exists here under 23 U.S.C. § 149, as proposed by the NYSAG. However, even if the vague sweep of 23 U.S.C. § 149 provides such authorization, this does not immunize Congestion Pricing from being challenged as violating the constitutional right to travel. In the Second Circuit, challenges to laws based on this right follow the same *Northwest Airlines/Evansville* test as dormant Commerce Clause challenges, meaning that Plaintiffs' analysis is fully relevant.

Cir. 2007); *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546 (S.D.N.Y. 2014) (same). In each case, the district court ruled based on an extensive fact record, including expert reports, concerning the at-issue program, including both the impact of the toll and how proceeds from the toll would be spent. *Janes v. Triborough Bridge & Tunnel Auth.*, 977 F. Supp. 2d 320, 325-42 (S.D.N.Y. 2013), aff'd 774 F.3d 1052; *Selevan v. N.Y. Thruway Auth.*, No. 1:06-cv-291 (GLS/DRH), 2011 WL 5974988 at *3-6 (N.D.N.Y. Nov. 28, 2011); *Town of Southold v. Town of E. Hampton*, 406 F. Supp. 2d 227 (E.D.N.Y 2005), *vacated in part*, 477 F.3d 38 (2d Cir. 2007); *Angus Partners LLC*, 52 F. Supp. 3d at 554-57.

On a motion to dismiss, however, the court "need only consider whether the complaint alleges a plausible claim that the regulation violates the Commerce Clause. Whether [the toll] is a burden on interstate commerce is a question left for later proceedings." *Selevan I*, 584 F.3d at 92. Thus, few dormant Commerce Clause or right-to-travel cases are dismissed on a motion to dismiss. *See, e.g., Selevan I*, 584 F.3d at 95; *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 10 (1st Cir. 1992) ("Deciding under the Commerce Clause precedents whether discrimination exists is heavily dependent upon the facts."); *Alviti*, 630 F. Supp. 3d at 394 (citing *Am. Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 280 (1987)) ("[T]he fact-dependent nature of dormant Commerce Clause challenges has long been understood as part of what makes them difficult.").

In this case, while there is a record concerning Defendants' environmental review, there is no record concerning the burden of the toll or how Defendants' plan to use the revenue generated from it. While the EA estimates the program's impact on traffic flows, commuting patterns, and pollution for certain models of congestion pricing (though, tellingly, it did not analyze the current "phased-in" approach as an alternative), it did not address whether the price is excessive or a fair

approximation of use.  The burden and impact on commuters from a constitutional perspective is distinct from the environmental review.

Without facts concerning the actual impact of the toll and how the revenue will be spent, the Court cannot decide whether Congestion Pricing meets the constitutional standard.  This is vital for analysis under the *Northwest Airlines/Evansville* test, where the particular distribution of burdens and benefits for toll payers can be determinative of a program's constitutionality.  As such, the Court should deny Defendants' motion to dismiss on this basis alone.[6]

A.    *The Congestion Pricing Program's Fees are Unrelated to the Uses Being Tolled*

Plaintiffs have sufficiently alleged that Congestion Pricing's toll is fundamentally unrelated to the likely uses or the purpose of the program and is thus not based on a fair approximation of the use of the tolled area's facilities.  Rather, Congestion Pricing's central goal is simple: revenue generation for wide-ranging uses relating to transit, and plugging the massive and persistent gap in the MTA's budget.

"The fair approximation test asks whether the tolls 'reflect a fair, if imperfect, approximation of the use of the facilities for whose benefit they are imposed' and whether the law has reasonably drawn the line between users it exempts and users it charges for use of a facility." *Alviti*, 630 F. Supp. 3d at 380-81 (citing *Evansville*, 405 U.S. at 717).  Tolls may support the budget of a governmental unit that operates facilities so long as those facilities "bear at least a 'functional relationship' to facilities used by the fee payers." *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009).

---

[6] Discovery can proceed even after implementation of the toll, expected on January 5, 2025, regardless of the Court's ruling on the preliminary injunction application in the related case of *Truckers Association of New York v. Metropolitan Transportation Authority, et. al*, 24-cv-41111 (S.D.N.Y.), joined by the Plaintiffs in this action.

While Defendants claim that the toll regime was established after an "exhaustive process" to balance the interests of different parties, (DOT Br. [Doc. No. 105], at 12), Congestion Pricing fails to establish a fair approximation of use.  As the Governor has recognized, a $15 daily toll to be phased in from $9 is a significant burden on many New Yorkers unrelated to the use of New York's roadways.  Plaintiffs and other New Yorkers, many of whom have no choice but to drive into Manhattan will not benefit from the toll revenue, but will pay to plug the MTA's persistent budgetary holes.  The tolls are imposed not on those using and benefiting from the facilities, but on rather on an entirely separate segments of the public many of whom who must drive into and within the CBD.  Plaintiffs have pleaded and Defendants have admitted that the central goal of the Congestion Pricing program is to hit a particular revenue goal. (*Chan* SAC ¶¶ 61-62, 134-35; *Mulgrew* SAC ¶¶ 9-13, 78-81, 124-24.)  The amount of revenue to be raised—$15 billion—is not based on an approximation of the public's use of the facilities to support the facilities.  Rather, Defendants worked backwards from the revenue number they hoped to hit, dismissing possibly less lucrative but more targeted and less systematically burdensome alternatives to the Congestion Pricing program because they did not garner enough money.  *Id*.  Defendants have now massaged the $15 fee down to a temporary $9 to be increased, not based on any principled view of approximate use, but rather strictly for political considerations.  Plaintiffs are, at the very least, entitled to discovery on the issue.

The principal case Defendants rely upon, *Angus Partners LLC*, illuminates the lack of a functional relationship between the payment of tolls and toll payers' use of the system under Congestion Pricing.  There, after extensive discovery including expert reports on the planned use of MTA funds, the court upheld a tolling scheme on certain bridges within New York City to help fund certain designated MTA programs.  More than half of the toll revenue was specifically

reserved for the MTA commuter railroads that served many of the same commuters who would otherwise be paying the tolls. 52 F. Supp. 3d at 551-55.  The toll payers, therefore, would clearly benefit from the specific improvements to the commuter railroads.  And the bridges in question were all within New York City itself and were maintained by MTA Bridges & Tunnels.  *Id*.

Defendants cling to the court's finding in *Angus Partners LLC that* the MTA is an "integrated transportation system."  Yet, while the court held that the bare existence of transportation infrastructure outside of the MTA's control did not preclude the MTA from being considered an integrated transportation system, neither the tolls at issue in *Angus Partners LLC* nor the other cases cited by Defendants concerned tolls charged on individuals using transportation facilities entirely outside of the control of the MTA.  *Id*. at 565-67.

Here, that is precisely the issue.  A key element of the program is tolling a large number of drivers who do not use (and effectively cannot use) the MTA, whose budget their daily tolls are funding.[7]  The SAC is not conclusory, as Defendants suggest.  For Plaintiffs who reside in New Jersey and Pennsylvania, there is no functional relationship between their payment of the tolls and their use of the system.  The tolls in question fund the MTA, which operates public transit in New York State and Connecticut with nothing in the record showing any proposed infrastructure improvements outside of these two states.  Even if the improvement of the MTA transit system provides some intangible benefit, individuals driving from outside of the state—like Plaintiff John Bailey of Pennsylvania (*Chan* SAC ¶ 34) or Plaintiffs Sean Carney or Lindsey Lampf of New

---

[7] While some commuters from outside of New York may use some form of transportation to enter the City and then subsequently use the MTA to complete their journey, these commuters are still faced with paying tolls to support an entity whose services they can only access through means unfunded by the toll.  Moreover, to what extent interstate commuters also use the MTA is not in the record.  Any determination relying on this fact should await discovery.

Jersey (*Chan* SAC ¶ 35; *Mulgrew* SAC ¶ 61)—cannot switch from driving to using the MTA, as the MTA does not exist in their states. [8]

Moreover, there is also no functional relationship between the funds collected and the facilities used for New York commuters absent information about the MTA's actual spending plans. Congestion Pricing adds upwards of $1 billion in tolls. Unlike in *Angus Partners*, this massive increase in funding is not matched to "approximate use" by experts or a fact record; it is a predetermined number designed to fund MTA capital projects generally. An additional $9 charge (increasing to $15) per entrance, falling disproportionately on commuters with no feasible alternatives, is not a fair approximation of use.

In this way, Congestion Pricing is akin to the tolls rejected as unconstitutional by the Second Circuit in *Bridgeport*. There, the court examined the fees charged by the Bridgeport Port Authority on passengers traveling by ferry from Bridgeport to Port Jefferson. The court upheld the district court's determination that a range of expenditures—including programs related to the operation of the ferry system (such as establishing a ferry from Bridgeport to Stamford and New York City) were activities that provided no actual benefit to the Bridgeport-Port Jefferson ferry passengers, and therefore the fee violated the Constitution. *Bridgeport*, 567 F.3d at 87-88. While the projects in question might benefit some or many of the fee-paying passengers, they were too unrelated to the fee itself to pass constitutional muster. *Id*. Other cases in the Southern District of New York have held similarly. *See Am. Trucking Ass'ns v. N.Y. State Thruway Auth.*, 199 F. Supp. 3d 855, 878-79 (S.D.N.Y. 2016), *vacated on other grounds*, 238 F.Supp.3d 527 (S.D.N.Y. 2017)

---

[8] The NYSAG separately argues that Congestion Pricing tolls do not constitute a "user fee," and therefore the *Northwest Airlines/Evansville* test is inapplicable, because the toll revenue will not be used to maintain or repair roads within the CBD, but will instead be spent on the MTA. (NYS Br. at 9-10.) This flatly undercuts all other Defendants' argument that the toll is subject to *Northwest Airlines/Evansville* and is justified as part of an integrated transportation system. If tolls do not constitute a user fee because they do not fund the specific roads used, the toll's benefit to the MTA cannot then be used to justify its burden on commuters. Defendants cannot have it both ways, and Defendants' inconsistency belies the weakness of their asserted "integrated transportation system" defense.

(use of highway tolls to fund the state's canal system was unconstitutional under the dormant Commerce Clause, as the canal and highway systems lacked a functional relationship).

*Alviti* is also illustrative. There, Rhode Island implemented RhodeWorks, a program of tolls on certain highway bridges for Class 8 trucks, used predominantly by out-of-state firms. 630 F. Supp. 3d at 363-67. RhodeWorks was intended to pay for maintenance of Rhode Island's roads, which drew significant interstate through-traffic. *Id*. at 366 (cleaned up). On a motion for summary judgment, the court held that the tolls failed all three portions of the *Evansville/Northwest Airlines* test. *Id*. at 379-84. On the question of "fair approximation," the court expressly rejected the argument advanced here, namely, that tolled bridges have a functional relationship with all Rhode Island bridges or the entire Rhode Island transportation system. The court held that that this "would stretch the functional relationship doctrine beyond all recognition and effectively gut the fair approximation test." *Id*. at 382.

The same logic applies to Congestion Pricing. Tolls for access to a portion of Manhattan, which largely benefits certain individuals living in areas such as midtown Manhattan and those using mass transit, but are paid disproportionately by those unlikely to benefit from a transit investment, lack a functional relationship to toll payers. Accepting that premise would permit any toll to be imposed without scrutiny so long as it benefits the MTA in a general sense, and "stretch the functional relationship doctrine beyond all recognition and effectively gut the fair approximation test."

### B.    The Tolls Paid are Excessive as Compared to the Benefits to Toll-Payers

Relatedly, Plaintiffs have also sufficiently alleged that Congestion Pricing fees are excessive compared to the benefits accrued by the users. As discussed *supra*, the alleged benefits to the regional transportation system through the MTA's windfall revenues are extremely vague,

as the MTA has provided little information concerning how the money would be spent.[9]  While Defendants emphasize that funding the MTA would benefit commuters by "diverting people to mass transit[,]"  (DOT Br. at 12), there is no indication that any of that money would be reserved for capital improvements that would allow any of the Plaintiffs to switch to public transit in their daily lives.  Putting aside whether the current system could even handle a mass diversion of travelers, that the MTA would ostensibly benefit—even if true—is not the question under the constitutional test (all transit systems benefit from additional revenue); the burden must not be excessive in relation to the benefit received by the *toll payers*.

*Bridgeport, New York State Thruway Authority*, and *Alviti* are once again instructive.  In Bridgeport, even though several of the projects funded by the passenger fee had positive consequences for many of the fee-paying passengers, the burden on passengers far outweighed the benefits.  567 F.3d at 87-88.  As the Second Circuit held discussing one such project:

> No doubt those ferry passengers who drive to or from the Dock along I-95 are grateful for any reduction in traffic, but they would be equally grateful for whatever steps the BPA or the City of Bridgeport might take to reduce air pollution or otherwise improve the environment along I-95. Such quality-of-life improvements cannot be said to confer an actual or potential benefit to the ferry passengers as users of the ferries and thus exceed the bounds of what may reasonably serve as the basis for the BPA's fee.

*Bridgeport*, 567 F.3d at 87.  The unconstitutionally excessive fee in Bridgeport was approximately $3.  Here, it will eventually be $15 per day.  Similarly, in *New York State Thruway Authority*, even though 86% to 91% of the Authority's collected tolls were spent on highway-related purposes, and the canal system provided a major economic benefit to New York overall, the truckers did not

---

[9] In announcing the phased-in Congestion Pricing toll, the Governor mentioned the usual list of capital fund projects – modern signals, the Second Avenue subway, electric busses and elevators, but also appeared to announce certain new projects including "service enhancements to at least 23 bus routes in the outer boroughs."  Yet, there has been no further mention of these projects from the MTA or the Governor's Office besides this passing reference, let alone sufficient detail to decide whether these projects cure the toll's constitutional infirmities.

benefit from the canals in their role as truckers and thus as toll payers.  199 F. Supp. 3d at 879-82. This diversion of revenue rendered the tolls excessive and therefore unconstitutional.  Finally, in *Alviti*, despite the tolled trucks being the single largest contributor to relevant costs while constituting only 3.7% of traffic, the court held that placing the entire toll burden on the tolled trucks was too burdensome.  630 F. Supp. 3d at 385-89.  The court held both that the state could not consider other taxes or fees used to support state highway infrastructure in determining the relative burden on the tolled trucks, as "tolls must be evaluated on their own[,]" and that looking only at the tolls, the system failed to fairly apportion the burden between toll-payers and non-toll-payers.  *Id*.

Many of the drivers, including those Plaintiffs, that would be charged the proposed toll when they enter the Manhattan CBD would not benefit from any of the proposed improvements to the MTA transit system, including the subway system.  Plaintiff Chan, living in Battery Park City, has a child with disabilities and related serious health issues that make transporting her family outside of her neighborhood—including for medical care—implausible without a car, yet there is no guarantee that Battery Park City will see any transit investment (there are few, if any, readily available mass transit options in the area), and the MTA has not identified any relevant capital projects.  (*Chan* SAC ¶ 28.)[10]  Similarly situated Plaintiffs residing within the zone will be trapped within the confines of the CBD or else forced to pay each time they leave and return home from doctors' appointments, visiting family and taking their children to school. Other Plaintiffs cannot simply switch to mass transit because they live in transit deserts. Plaintiff Garcia, for example, living in Rockland County, cannot feasibly commute via transit for two hours each way, yet there is no guarantee that Rockland County will see any transit investment, and the MTA has not

---

[10] *See* Congestion Pricing Projects, *supra* note 1.

identified any capital projects for Metro-North at its Rockland County stations of Spring Valley, Nanuet, Pearl River, Sloatsburg, or Suffern. (*Mulgrew* SAC ¶ 60.)[11] Moreover, his health would be harmed by pollution generated from the diversion of traffic into the Bronx where he works. *Id*.

In general, the commuters most likely to benefit the most from Congestion Pricing's investments live in places with pre-existing convenient and well-connected MTA options, who are already less likely to pay Congestion Pricing tolls. Instead, the burden will fall on those, like Plaintiffs, who lack options other than commuting by car, and the MTA has made no indication that it will spend its additional sums building new lines or stations to eradicate those deserts.[12] Moreover, there is an especially excessive burden on out-of-state commuters. Even assuming, *arguendo*, that in-state commuters with theoretical access to the MTA would benefit, out-of-state commuters do not see any of the benefit. Unlike in cases like *Angus Partners LLC* or *Janes*, where the bridges and transit system in question were integrated under the auspices of the MTA through the Triborough Bridge and Tunnel Authority, the points of access from New Jersey (and beyond) into the CBD—including the Hudson River bridges and the PATH train system (run by the Port Authority of New York and New Jersey),[13] and NJ Transit (run by the State of New Jersey)[14]— are expressly outside of the integrated transportation system. Whether out-of-state commuters like

---

[11] *See id*; *see also Metro-North Railroad Map*, MTA, https://new.mta.info/map/5351 (last visited: Oct. 29, 2024).

[12] Moreover, to the extent that large number of commuters *did* shift to public transit, the toll revenue financing the promised substitutes would precipitously decline, requiring either more costly tolls or another revenue source. Those paying the tolls and those benefitting from the revenue would remain distinct groups. To the extent that Defendants dispute this point, Plaintiffs are entitled to discovery.

[13] *About PATH*, PORT AUTHORITY OF NEW YORK AND NEW JERSEY, https://www.panynj.gov/path/en/about.html (last visited: October 11, 2024); *Port Authority Bridges & Tunnels*, PORT AUTHORITY OF NEW YORK AND NEW JERSEY, https://www.panynj.gov/bridges-tunnels/en/index.html (last visited: October 11, 2024).

[14] *About Us*, NJ TRANSIT, https://www.njtransit.com/our-agency/about-us (last visited: October 11, 2024).

Plaintiffs Bailey, Carney, and Lampf keep driving (and paying tolls) or switch to public transit not funded by the tolls, they will see no benefit from Congestion Pricing.

Defendants fail to address any of these issues, but instead lean on the argument that tolls are self-justifying, creating a sufficient benefit by blocking drivers from accessing the CBD, thus reducing use of the CBD and therefore reducing congestion. (DOT Br. at 12-13). Defendants' argument finds no basis in the law. In both cases cited for this proposition, the tolls were used to fund both the tolled infrastructure itself and usable public-transit alternatives to said infrastructure, with the diversion of travelers producing a side benefit to this investment. *See Angus Partners LLC*, 52 F. Supp. 3d at 569; *see also Janes*, 774 F.3d at 1055 & n.6. Neither case holds that the diversion of traffic ***alone*** is a sufficient benefit to render tolls non-excessive. Nor could they. Were the side effect of limiting access—fewer users and less congestion—sufficient to justify limits on interstate commerce, every restriction on access would survive judicial review.

Defendants have done nothing to demonstrate that the concrete costs to Plaintiffs and others are outweighed by Congestion Pricing. Even assuming some benefits exist for individuals with access to public transit and other infrastructure funded by Congestion Pricing's tolls, Plaintiffs and tens of thousands of CBD commuters live in places with little to no access to the MTA, instead relying on infrastructure—whether roads or public transit—that receives no benefit from Congestion Pricing. The program is therefore constitutionally infirm. At the very least, targeted discovery should be permitted to properly evaluate the excessiveness of the toll, as compared with its proposed benefits to toll payers.

### C.     The Congestion Pricing Program Discriminates Against Out-of-State Commuters

Plaintiffs have sufficiently alleged that Congestion Pricing discriminates against interstate commerce. Out-of-state commuters do not receive the same tax benefits as certain in-state

commuters who live in the CBD.  Similarly, out-of-state commuters—who must either pay the toll, or crowd onto non-MTA public transit that does not benefit from the toll, to access the allegedly improved MTA or enter the CBD—face an increased burden without any benefit even from a supposed improved "integrated" mass transit system.  Moreover, the discriminatory effect of the barrier is especially high because of the CBD's role as a nexus of interstate commerce and center of multiple industries.

Defendants argue that the appropriate test is whether Plaintiffs have identified an "in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors[,]" and contend further that the above-mentioned tax credit and lack of discounted tolls on the George Washington Bridge are insufficient to show discrimination.  (DOT Br. at 13-14 (citing *Angus Partners LLC*, 52 F. Supp. 3d at 561).)  Citing *Southold*, Defendants also lean on the argument that Congestion Pricing does not discriminate against interstate commerce because "travelers do not have a constitutional right to the most convenient form of travel[,]". (*See* NYS Br. at 16-17).

Defendants' argument misstates the relevant test and ignores substantial other ways in which Congestion Pricing is discriminatory.  As an initial matter, *Southold* did not involve a comprehensive tolling scheme like Congestion Pricing, but rather involves restrictions on what vehicles may use a single ferry terminal.  *Southold*, 477 F.3d at 43-45.  In the Second Circuit, a tolling scheme is reviewed under the *Northwest Airlines/Evansville* test, not the framework used in *Southold*.  *See Selevan I*, 584 F.3d at 96-98.  As Defendants tacitly admit by analyzing Congestion Pricing under the *Northwest Airlines/Evansville* test, Southold is inapplicable.

Under the *Northwest Airlines/Evansville* test, "[f]orbidden discrimination may be facial [or] may also infect a regulation or tax that is neutral on its face but discriminatory in operation or

effect." *Trailer Marine*, 977 F.2d at 10 (citing *Kraft Gen. Foods v. Iowa Dep't of Revenue*, 505 U.S. 71 (1992)).  One key factor in determining whether a facially neutral toll or fee is actually discriminatory is the "internal consistency" test, which provides that "a state tax must be of a kind that, 'if applied by every jurisdiction, there would be no impermissible interference with free trade.'" *Scheiner*, 483 U.S. at 284 (citing *Armco, Inc. v. Hardesty*, 467 U.S. 638, 644 (1984)). Similarly, differential allocation of the burden and benefit of a tolling scheme, even one that is facially neutral, can be discriminatory if out-of-state payers are burdened more than in-state payers. *Scheiner*, 483 U.S. at 296 ("imposition of the flat taxes for a privilege that is several times more valuable to a local business than to its out-of-state competitors is unquestionably discriminatory and thus offends the Commerce Clause").

Congestion Pricing fails both the internal-consistency test and the requirement that burdens not be unevenly distributed to out-of-state payers.  The program fails the internal-consistency test because, were such a program implemented in every state, it would interfere with interstate commerce.  If every region were to enact a program charging tolls for entry that were only allocated to infrastructure that a limited percentage of individuals accessing the region could plausibly use, it would "exert[] an inexorable hydraulic pressure" on businesses and commuters to structure their operations and commutes around the patchwork of congestion tolls.  *Scheiner*, 483 U.S. at 286.

Similarly, Congestion Pricing discriminates against out-of-state commuters by placing a disproportionate burden on them through collecting toll revenue from which they will necessarily never see a benefit to infrastructure serving them.  In *Scheiner*, for instance, the Supreme Court considered a Pennsylvania policy that imposed lump-sum fees on trucks and truck tractors—most of which were based outside of Pennsylvania—for use of the state's roads while reducing the state's general vehicle-registration fee.  The court held that, even though the policy was facially

neutral, that out-of-state trucks paid the same flat fees as in-state trucks, despite the latter using Pennsylvania roads more frequently and thus receiving a greater benefit, made the program unconstitutional. *Id*. at 282-87. Here, the situation is even more egregious. Congestion Pricing provides no benefits to out-of-state commuters beyond the theoretical possibility that congestion would be reduced. Even if in-state and out-of-state commuters pay the same toll at the entrances to the CBD, out-of-state commuters receive ***none*** of the tolls' benefit, sums which are to be spent entirely on in-state infrastructure (and not the infrastructure that is being tolled), while diverting pollution into their communities. This works a clear discriminatory effect on interstate commerce.

## II.    Plaintiffs Successfully State a Claim That the Congestion Pricing Program Violates the Green Amendment

Finally, Plaintiffs have sufficiently alleged that the Congestion Pricing program violates Article 1, Section 19 of the New York State Constitution, also known as the "Green Amendment." The Green Amendment guarantees the substantive—rather than purely procedural—right of each and every New Yorker to "clean air and water, and a healthful environment." By admittedly planning to increase air pollution in particular localities with highly limited mitigation and unclear benefits, Defendants have violated Plaintiffs' state constitutional rights.

Defendants raise two objections to Plaintiffs' Green Amendment claims, one procedural and one substantive. Neither holds water, particularly at this stage in the litigation.

Procedurally, Defendants argue that Plaintiffs' Green Amendment claims hinge solely on the inadequacy of Defendants' NEPA review, that NEPA's statute of limitations applies, and therefore Plaintiffs' claims are time-barred. (DOT Br. at 22-23).[15] Not so. First, Defendants cite no case applying NEPA's statute of limitations to such a claim. A claim under the Green

---

[15] Separately, while the Court found that the *Mulgrew* NEPA claims were time-barred, those raised by the *Chan* Plaintiffs are not, and Defendants' argument categorically does not apply to them.

Amendment—one brought against state agencies for taking an action that deprives New Yorkers of a constitutional right—is distinct from any NEPA claim.  There is no basis to conflate the two causes of action.  As Defendants argued earlier in this action and the Court agreed, "'NEPA imposes only procedural requirements on federal agencies[.]'"  *Opinion and Order at 25, ECF No. 86* (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004)).  NEPA does not forbid negative environmental impacts, but rather requires disclosure and consideration.   Here, Defendants have, pursuant to NEPA, disclosed environmental impacts that would harm New Yorkers such that their individual constitutional rights would be trammeled.  The EA concluded that although Congestion Pricing would decrease harmful emissions as a whole in Manhattan, the redirected traffic from drivers attempting to avoid the toll would result in added congestion and increases in six categories of mesoscale pollutants and nine categories of MSAT pollutants in the Bronx, Staten Island, and Bergen County, in some cases for the next 20 years.  *See* AR 36 at 10-21 to 10-35.  Unlike NEPA, the Green Amendment on its face provides a substantive right to clean air and water, not a requirement that the government follow certain procedures and explain how and why it prefers to burden one community with pollution to benefit another group.

Second, even assuming, *arguendo*, that NEPA's statute of limitations applied to claims concerning the issuance of the final EA or the approval of the Congestion Pricing program by TBTA and TMRB—and it does not—that is not the only basis for Plaintiffs' Green Amendment claims.  Rather, Plaintiffs pleaded that the adopted Congestion Pricing plan caused increased pollution in their communities (*Chan* SAC ¶ 206; *Mulgrew* SAC ¶ 180.)  The prospective harmful effects of the pollution are substantive, not procedural.

Substantively, Defendants effectively argue that the Green Amendment is a nullity, creating no rights outside of existing law.  (DOT Br. at 23-25.)  This is in error.  Defendants cite

21

two cases, both of which are distinguishable.  In *Matter of Streeter v. N.Y.C. Dep't of Env't. Prot.*, 83 Misc.3d 417, 418-19 (N.Y. Sup. Ct. N.Y. Cnty. 2024), a "citizen reporter" sought to independently advance two complaints against an idling vehicle creating air pollution in his neighborhood under N.Y.C. Admin. Code § 24-182.  The DEP determined that the second complaint was duplicative of the first and thus not eligible for private action.  The citizen reporter sought judicial review, arguing in part that DEP's effort to block his complaint violated the Green Amendment.  *Id*. at 419.  While the court rejected the plaintiff's claim as the agency's action did not even arguably impact the plaintiff's individual right to clean air and water and a healthful environment, it held that the Green Amendment requires municipal agencies to take "appropriate action regarding the amendment's impact on their decision-making processes" to ensure those processes do not trammel New Yorkers' substantive rights.  *Id*. at 422-23.  Unlike in Streeter, where the plaintiff invoked a purely procedural right to report pollution, Plaintiffs seek here precisely the "appropriate action" anticipated by the *Streeter*; the formulation of a policy that will directly and substantively impact their access to clean air.

Similarly, in *Marte v. City of N.Y.*, No. 159068/2022, 2023 WL 2971394 (N.Y. Sup. Ct. N.Y. Cnty, April 17, 2023), the court considered whether the Green Amendment required defendants to take certain action in connection with a housing development, the legality of which's approval had already been determined.  The court declined to apply the Green Amendment retroactively, as the Amendment was only passed after the project had been approved.  *Id*. at *5.  The court also held that "[t]he construction of these buildings does not evince the same sort of environmental concerns that might accompany, for example, a landfill or toxic waste site [as at issue in *Fresh Air for the Eastside*]."  *Id*. at *4.  Conversely, here, Plaintiffs identify the specific environmental and health harms they will face from increased localized emissions.  (*See, e.g.*, *Chan*

SAC ¶¶ 81-99; *Mulgrew* SAC ¶¶ 15, 60, 95-101).  These are precisely the kind of harms that the Green Amendment—in effect at the time of the decisions relevant here—was meant to stop.  *See Fresh Air for the Eastside v. State of N.Y.*, No. E2022000699, 2022 WL 18141022, at *10 (N.Y. Sup. Ct. Monroe Cnty, December 20, 2022).

Moreover, unlike in *Streeter* or *Marte*, there is no demand from Plaintiffs that the Court change the *law*.  Rather, Plaintiffs seek relief from a comprehensive policy plan that, once implemented, would admittedly cause increased pollution affecting particular plaintiffs.  The EA openly states that the redirected traffic from drivers attempting to avoid the toll would result in added congestion and pollution along the FDR Drive, in the Bronx, Staten Island, and in Bergen County.  No court has yet addressed a challenge to a broader policy program that, when implemented, would so clearly trammel numerous New Yorkers' rights under the Green Amendment.  Prior case law concerning an agency's method of determining whether an emissions complaint against a single motor vehicle was duplicative, or approval of an individual construction project, is of minimal applicability.

Defendants also cherry-pick parts of the legislative history of the Green Amendment to argue that it is effectively meaningless.  The argument is meritless.  As the *Fresh Air* court held, while "[t]he legislative history is interesting . . . there is no ambiguity in the plain language of the Green Amendment." 2022 WL 18141022, at *10 (citing *Makinen v. City of N.Y.*, 86 N.E.3d 514, 518 (2017)).[16]  The Green Amendment provides that **"*[e]ach person*** shall have a right to clean air

---

[16] The legislative history is far from uniform. During debate coinciding with the first passage of the amendment in the State Senate, Sen. Carlucci, the lead Senate sponsor, advocated for the amendment as a measure "to make sure that as we learn more, as laws do change -- as they will -- that we have a backstop, we have a protection in our constitution to something that we know is so fundamental to the health of our community[.]" New York State Senate Debate on Senate Bill S2072, Apr. 30, 2019 ("2019 Senate Debate Tr.").  This focus on the Green Amendment as a "backstop" in the face of changing law and policy is inconsistent with reading the Green Amendment as co-extensive with state environmental legislation.  During the Assembly debate, critical questions were asked of lead Assembly sponsor Englebright, but these exclusively focused on whether the Green Amendment would create a private right of action

and water, and a healthful environment." (emphasis added).  It is hornbook law that "'[i]n the construction of constitutional provisions, the language used, if plain and precise, should be given its full effect'" and "'[i]t must be presumed that its framers understood the force of the language used and, as well, the people who adopted it.'" *Harkenrider v. Hochul*, 197 N.E.3d 437, 447 (N.Y. 2022) (citation omitted).  Plaintiffs have individual rights under the Green Amendment distinct from their purely procedural rights under NEPA.

While Defendants claim that the recent state court's denial of a motion to dismiss an Article 78 petition case seeking implementation of Congestion Pricing supports its motion to dismiss (DOT Br. at 22), the court's holding actually supports Plaintiff's claim.  There, the issue was limited to whether the Congestion Pricing advocates had standing to bring a claim under the Green Amendment for pollution allegedly resulting from the Governor's pause.  *Riders Alliance v. Hochul*, No. 156696/2024, NYSCEF Doc. No. 64 (Sep. 30, 2024).  The court held that the individual petitioners did as they lived in the CBD and would be particularly affected by the pause. *Id*. at 3.  Here, it is Defendants who seek to change the status quo in a way that would negatively impact Plaintiffs.  If the petitioners' claim in *Riders Alliance* survives, Plaintiffs' should as well. Determining how admitted pollution negatively effects litigants is at the very least a disputed issue of fact unresolvable on a motion to dismiss, and nothing in the Green Amendment provides that competing claims cannot be asserted.  Even assuming, *arguendo*, that Defendants' promises of pollution mitigation are sufficient to satisfy the purely procedural requirements of NEPA, Plaintiffs

---

against *private* actors, rather than whether the State and its agencies could violate the Green Amendment. *See* New York State Assembly Debate on Assembly Bill A1368, Apr. 30, 2019 ("2019 Assembly Debate Tr."), at 28-51.

Coinciding with the amendment's second passage, the legislative floor debate evinced that a particular motivation for the Green Amendment was protecting environmental-justice communities like the Bronx from localized pollution even as the state as a whole might satisfy federal pollution guidelines. *See* New York State Assembly Debate on Assembly Bill A1368, Feb. 8, 2021 ("2021 Assembly Debate Tr."), at 69-71 (speech by Assembly Member Septimo).

have still pleaded that Congestion Pricing's insufficient mitigation would cause them harm that cannot be dismissed in the absence of discovery.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motions to Dismiss.

Dated: New York, New York
      November 25, 2024

STEPTOE LLP

By:    /s/ Alan M. Klinger
       Alan M. Klinger
       Dina Kolker
       David Kahne
       1114 Avenue of the Americas
       New York, New York 10036
       (212) 506-3900
       aklinger@steptoe.com

*Co-Counsel for the Mulgrew and Chan Plaintiffs*

Of Counsel:

                         -and-

Carly Rolph
Alexander Langer

BETH A. NORTON, Esq.
United Federation of Teachers
52 Broadway
New York, NY 10004
(212) 701-9420

*Co-Counsel for the United Federation of Teachers and Individual Plaintiffs*

       -and-

THE OFFICE OF LOUIS GELORMINO, Esq. & FONTE & GELORMINO LEGAL GROUP
2550 Victory Blvd.
Suite 304
Staten Island, NY 10314
(917) 968-1619
(718) 720-4949

*Co-Counsel for Vito J. Fossella*