UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL MULGREW, *et al.*,

                        Plaintiffs,

               - against -                   1:24-cv-01644 (LJL)
                                             1:23-cv-10365 (LJL)

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ELIZABETH CHAN, *et al.*,

                         Plaintiffs,

               - against -

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................. 7

    A.    The Initial Toll Structure ................................................................. 8

    B.    The June 14 Reevaluation ............................................................ 11

    C.    The "Un-Pause" and Reevaluation 2 ........................................... 14

ARGUMENT ................................................................................................................... 15

I.    Defendants' Failure to Conduct a Supplemental Review Violates NEPA ................... 15

    A.    Significant Changes to the Congestion Pricing Tolling Structure ........................ 16

    B.    Significant Changes to the Circumstances Surrounding Congestion Pricing ....... 21

II.    Defendants' Insufficient "Reevaluations" Violate NEPA ................................. 23

    A.    Reevaluation 2 ........................................................................... 24

    B.    Reevaluation 1 ........................................................................... 26

CONCLUSION ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*,
   67 F.3d 723 (9th Cir. 1995) ...............................................................................22, 23

*Animal Def. Council v. Hodel*,
   840 F.2d 1432 (9th Cir. 1988) ...................................................................................24

*California v. Block*,
   690 F.2d 753 (9th Cir. 1982) ...............................................................................15, 20

*Chan v. U.S. Dep't of Transp.*,
   Pl's Mem. in Supp. of Cross-Mot ...................................................................... *passim*

*City of Port Isabel v. Fed. Energy Regul. Comm'n*,
   111 F.4th 1198 (D.C. Cir. 2024)................................................................................16

*Dubois v. U.S. Dep't of Agric.*,
   102 F.3d 1273 (1st Cir. 1996)...............................................................................15, 20

*Highway J Citizens Grp. v. Mineta*,
   349 F.3d 938 (7th Cir. 2003) .....................................................................................15

*Hughes River Watershed Conservancy v. Glickman*,
   81 F.3d 437 (4th Cir. 1996) ................................................................................25, 27

*Idaho Sporting Cong., Inc. v. Alexander*,
   222 F.3d 562 (9th Cir. 2000) .....................................................................................28

*Jersey Heights Neighborhood Ass'n v. Glendening*,
   174 F.3d 180 (4th Cir. 1999) .....................................................................................23

*Mulgrew v. U.S. Dep't of Transp.*,
   Op............................................................................................................2, 3, 17

*Nat. Res. Def. Council v. U.S. Forest Serv.*,
   421 F.3d 797 (9th Cir. 2005) .....................................................................................22

*Nat'l Audubon Soc. v. Hoffman*,
   132 F.3d 7 (2d Cir. 1997) ............................................................................................8

*Nio v. United States Dep't of Homeland Sec.*,
   385 F. Supp. 3d 44 (D.D.C. 2019) ..............................................................................9

*Piedmont Env't Council v. U.S. Dep't of Transp.*,
  159 F. Supp. 2d 260 (W.D. Va. 2001), *aff'd in part, remanded in part*, 58 F.
  App'x 20 (4th Cir. 2003) ..........................................................................................28, 29

*Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*,
  113 F.3d 1505 (9th Cir. 1997) ........................................................................................24

*N.M. ex rel. Richardson v. Bureau of Land Mgm't*,
  565 F.3d 683 (10th Cir. 2009) ........................................................................................19

*Russell Country Sportsmen v. U.S. Forest Serv.*,
  668 F.3d 1037 (9th Cir. 2011) ........................................................................................19

*S.C. Wildlife Fed'n v. Limehouse*,
  549 F.3d 324 (4th Cir. 2008) ..........................................................................................23

*S.C. Wildlife Fed'n v. S.C. Dep't of Transp.*,
  485 F. Supp. 2d 661 (D.S.C. 2007).................................................................................23

*Suffolk Cnty. v. Sec'y of Interior*,
  562 F.2d 1368 (2d Cir. 1977).............................................................................................8

*Trucking Ass's of N.Y. v. Metro Transp. Auth.*,
  1:24-cv-04111-LJL, Mem. of Law in Opp'n to Defs ......................................................13

*Village of Grand View v. Skinner*,
  947 F.2d 651 (2d Cir. 1991).............................................................................................15

*Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*,
  454 U.S. 139 (1981)...........................................................................................................1

## Statutes

NEPA ........................................................................................................................ *passim*

## Other Authorities

23 C.F.R. 771.130 .................................................................................................................15

23 C.F.R. § 771.129 ..............................................................................................................10

40 CFR § 1502.9(d)(1)..........................................................................................................10

## PRELIMINARY STATEMENT

The United States Supreme Court has recognized that the "two-fold purpose of NEPA is to inject environmental consideration into the federal agency's decision-making process and to inform the public that the federal agency has considered environmental concerns in its decision-making process." *Weinberger v. Catholic Action of Hawaii/Peace Educ. Project*, 454 U.S. 139, 143 (1981).  NEPA mandates that agencies take a "hard look" at the environmental impacts of an action before it occurs and is meant to ensure that the public has a role in the decision-making process.

Congestion Pricing in New York has had a far different, albeit dual-purposed, track: (1) secure federal approval for Congestion Pricing without full transparency in order to cure the Metropolitan Transit Authority's ("MTA") perpetual budgetary woes; and, more recently, (2) change the program absent any public input, no matter the environmental impact, to secure political support before the next presidential administration assumes office in January.  A program that Defendants once touted as a beacon of forward-thinking policy to be replicated nationwide has become anything but – mired in political maneuvering, divorced from any congestion and environmental goals, and rushed to completion.  While the MTA's capital budget may be the immediate beneficiary of its desperately sought-after toll cash, New Yorkers as a whole lose in this baldly politically expedient process, one that hurriedly ignores true environmental review and a genuine consideration of what is best for all of New York and its working-class people.  It took less than *one day* for the Federal Highway Administration ("FHWA") to speed through its "Reevaluation 2," a supposed detailed review of a program that would impact millions of hardworking New Yorkers and residents in surrounding areas every day.  Politics has trumped policy.

The backwards, approval-focused NEPA process was destined to conclude this way, given how it was constructed. At the time of the full Environmental Assessment ("EA"), the FHWA found that the Congestion Pricing Plan in New York City would have "no significant impact on the human or natural environment," without knowing any of the actual details of the toll and the public was forced to comment and participate in the NEPA environmental review process without knowing any of the specifics of the actual Congestion Pricing program.

By approving a wide-range of tolling options, Defendants reserved the decision-making and analysis of the actual tolling program for two separate behind-the-scenes "reevaluations," both conducted entirely outside of public view and without any meaningful scrutiny. The first was hurriedly released without public comment on June 14th, leaving little time before the then-anticipated June 30th implementation date. The second has now been released shortly before the new January 5th implementation date. Each was designed to avoid engaging the public or any thorough analysis of the likely environmental and financial burden of the toll, but instead to push Congestion Pricing quickly across the finish line by a self-imposed date certain. This eleventh hour, non-public process for a program of such enormous consequence is precisely the type of action that NEPA was designed to prevent.

The Court's June 20, 2024 Opinion and Order approved Defendants' multi-step review, at least in part, because Defendants promised that the EA and Finding of No Significant Impact ("FONSI") would be followed by a "more granular assessment of whether specific aspects of a project fit within the prior analysis or require additional study." (*Mulgrew v. U.S. Dep't of Transp.*, Op. and Ord. at 68, ECF No. 86). But the two reevaluations fail to provide any such "granular assessment" of the actual tolling structure adopted (and adopted again), despite significant changes, and Defendants certainly have not committed to any additional study. A supplemental EA or, at the very least, a more rigorous second reevaluation is needed to provide that assessment.

2

The purpose of a supplemental EA is to re-examine an environmental assessment for a federal program when there are changed circumstances or new information that warrants it. One key difference between supplementation and reevaluation is that supplementation provides for public input and comment, something Plaintiffs and the public have been deprived of entirely with regard to either "final" version of the tolling program. Supplementation is required when changes to the final design alter the landscape of a project and present new, material issues that may have an environmental impact or "seriously dilute" the relevance of the prior public comment period. That is precisely what occurred here. Both the tolling program itself and the overall circumstances surrounding Congestion Pricing have changed considerably since Defendants first reviewed the seven hypothetical scenarios back in August 2022.

This Court previously determined that while permissible to analyze varying tolling scenarios in the EA, a "necessary consequence" of FHWA's approach was that the ultimate structure could not "deviate too much from the examined scenarios." (*Mulgrew,* ECF No. 86, at 70). The adopted tolling structure deviates "too much" from the hypothetical tolls. Among other changes, the first iteration of the tolling structure chose a never-before analyzed price of $15 as the base toll. Two additional hours were added to peak pricing; a three-level timing structure (peak, non-peak and overnight) was changed to two levels (only peak and overnight), the price of the overnight toll was lowered below the entire range of off-peak and overnight tolls, and perhaps most significantly, the toll for taxis and For-Hire Vehicles ("FHV") was not capped as a once-per-day toll, but instead adopted as an incremental charge passed on to the taxi or FHV passenger of $1.25 and $2.50 per ride (which will arguably have little impact on congestion at all). To put the significance of this last change in context, the Traffic Mobility Review Board ("TMRB") estimates that taxis and FHV's "carried more than one million passengers a day pre-pandemic," are "a significant cause of congestion" and comprise "more than half of all vehicles in the CBD." The

3

change to pass-through toll pricing means that there will now be a possible negligible 0.3% total change in Vehicle Miles Traveled (VMT) within Manhattan for the one million FHV and taxis traveling within the Central Business District ("CBD") each day.

In the latest tolling structure, unilaterally announced by the Governor, the toll was changed further from a flat $15 to a "phase-in," with the toll price starting at $9 in 2025, increasing to $12 within three years and then landing on $15 by 2031. The new pricing methodology alters the project's design and, by necessity, its impact on congestion and the environment. Yet, no serious analysis has been conducted of the new construct – "Reevaluation 2" contains no new substantive analysis. A full environmental review of this last-minute political compromise cannot be eschewed.

Perhaps most importantly, the circumstances, too, have changed. The Governor "paused" Congestion Pricing because of concerns over the affordability and financial burden on every day New Yorkers and indicated that there could be "other ways" to find funding for mass transit, alternatives that could raise revenue for the MTA without a draconian toll. At the time of the EA in 2022, a screening "objective" of $1 billion in annual toll revenue to bond to $15 billion in funding for the capital fund was deemed necessary and used to disqualify virtually all alternatives. Defendants argued before this Court that a phase-in approach was not considered or reasonable under the circumstances because the tolling scenarios reviewed were projected to only "narrowly meet the MTA's revenue generating objectives" and because a phased-in implementation would "delay achievement of revenue goals." (*Chan v. U.S. Dep't of Transp.*, Pl's Mem. in Supp. of Cross-Mot. Summ. J., ECF No. 81 at 14; *Chan*, Defs. Reply Mem. in Supp. of Cross-Mot. Summ. J., ECF No. 82 at 13). The Court accepted Defendants' scant alternatives analysis, in part, given their reliance on the statutory objective of obtaining $15 billion towards the MTA capital fund (using the $1 billion in annual revenue).

Yet, the once unmovable $1 billion in annual revenue from Congestion Pricing is evidently no longer a firm requirement and is instead a flexible, politically bargain-able figure. The $500 million in revenue now projected to be generated from the phase-in program for the first three years falls far short of the MTA's $1 billion "revenue goal" that disqualified so many of the options at the EA phase (in some cases using screening data from as far back as 2007). Reevaluation 2 indicates that the program will meet the Traffic Mobility Act's mandate to raise $15 billion "*over time*" – a different and far more fluid "objective." NEPA obligates an agency to revisit and develop alternatives, whenever there are changed circumstances that affect the factors that were relevant to the development and evaluation of alternatives. That is exactly what has occurred here. That Defendants have made a back-room political pact to implement one type of phase-in model does not relieve them of the obligation to, at the least, publicly review reasonable options (or combinations of options) that would meet their revised objective.

Neither of the two reevaluations can take the place of what is truly needed – a supplemental EA. Despite being released just nine days after the Governor's June 5 "pause," which stressed the economic burden of the toll and the many "other opportunities to fund these projects," the June 14 reevaluation is largely a re-running of the Best Practices Model (BPM) for selected sections of the existing EA, but, critically, omits updating the EA's section on "Alternatives" and contains no further meaningful analysis of economic conditions concluding summarily that "no adverse effects were found for any particular industry or sector of the labor force in the Manhattan CBD." The 175-page June 14 reevaluation looks and reads like an EA, but a reevaluation cannot take the place of the formal EA process, one that involves inter-agency collaboration and requires public participation. It used the same outdated Best Practice Model (BPM) data for traffic modeling and stale U.S. Census data for economic conditions from as far back as 2015 that was used in the Final EA, and made no effort to update these inputs.

The sequel reevaluation, Reevaluation 2, is an "evaluation" in name only. In a four paragraph "Evaluation of Continued Validity of FONSI," the FHWA refers back to the June 14 reevaluation and summarily concludes that "all NEPA requirements have been met" and Congestion Pricing will not result in significant effects. Without any analysis or explanation of how a "phased-in" toll impacts the environment (or any meaningful alteration of the promised mitigation efforts or its timing), Reevaluation 2 proclaims, without support, that there will be "minor variations" through each phase of the new phased tolling, but that the variations would be within the range of impact previously analyzed in the EA and June 14 reevaluation. There is no analysis of how economic circumstances have changed from 2022 or even from when the Governor announced the "pause" in June; there is no analysis of how the new phased-in pricing will incrementally impact air quality in environmental justice communities. It is simply a shorthand document referencing the first reevaluation and, like its longer predecessor, had no public input whatsoever.

It remains only to be said at the outset that the rush for judgment in these actions (and in the NEPA process itself) is one thrust upon the Court and Plaintiffs solely by Defendants, who seek to move this case to the finish line, at whatever cost to the integrity of the NEPA process, so that the switch can be turned on before the next administration takes office on January 20. NEPA is an environmental process statute, not a politically-driven one, and it is designed to ensure public participation in a procedure that sufficiently considers the full impact of a proposed action, including its reasonable alternatives. Congestion Pricing in New York is a significant change to the urban planning and infrastructure of the City. It should not be quickly bulldozed through to implementation in this fashion.

## **FACTUAL BACKGROUND**[1]

After its initial release in August 2022, Defendants published the final EA in 2023, which evaluated the environmental effects of the Congestion Pricing program through seven hypothetical tolling scenarios. DOT_0036292.[2]  The EA had a section on "alternatives" to the Congestion Pricing as consideration of reasonable alternatives is required in NEPA process.  In the EA, the FHWA defined three project objectives: to (1) reduce daily VMT within the CBD by at least 5%; (2) reduce the number of vehicles entering the CBD daily by at least 10%; and, critically; (3) generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program.  DOT_0036266.  As part of the mandatory alternatives screening evaluation, if the FHWA determined that a preliminary alternative would not meet one or more of the three identified objectives used for screening, the FHWA summarily "dismissed that alternative from further consideration as an alternative that is not reasonable." *Id.*  Of the eleven alternatives to Congestion Pricing screened, several alternatives met the criteria of Objectives 1 and 2, but *all* failed to meet the criteria of Objective 3, raising $15 billion towards the MTA capital program, and were therefore dismissed from any further consideration or analysis.  The screening analysis was conducted using decades old data, relying on studies from 2007 and 2008.  DOT_0036268.

---

[1] The full factual background for the Congestion Pricing program, is more fully laid out in the parties' prior summary judgment briefings and are incorporated herein.  *See Chan*, ECF Nos. 54, 65, 68, 78, 81-82.

[2] "DOT_" cites refer to the Administrative Record filed in this action on February 27, 2024, and the Supplemental Administrative Record documents filed on October 25 and November 22, 2024.

Table 2-2.    Results of Preliminary Alternatives Screening[1]

| ALTERNATIVE | PURPOSE AND NEED: Reduce traffic congestion in the Manhattan CBD in a manner that will generate revenue for future transportation improvements | OBJECTIVE 1: Reduce daily VMT within the Manhattan CBD  Criterion: Reduce by 5% (relative to No Action) | OBJECTIVE 2: Reduce the number of vehicles entering the Manhattan CBD daily  Criterion: Reduce by 10% (relative to No Action) | OBJECTIVE 3: Create a funding source for capital improvements and generate sufficient annual net revenues to fund $15 billion for capital projects for MTA's Capital Program |
|---|---|---|---|---|
| NA-1: No Action | Does not meet | Does not meet | Does not meet | Does not meet |
| NTP-1: Parking pricing strategies | Does not meet | Does not meet (see note 2) | Does not meet | Does not meet (see note 2) |
| T-1: Pricing on full roadways: Raise tolls or implement variable tolls on existing toll facilities | Does not meet | Does not meet (see note 3) | Does not meet (see note 3) | Does not meet |
| T-2: Pricing on full roadways: Toll East and Harlem River bridges | Does not meet (see note 4) | Meets | Meets | Does not meet (see note 4) |
| T-3: High-occupancy toll (HOT) lanes | Does not meet (see note 5) | Does not meet | Does not meet | Does not meet (see note 5) |
| T-4: Zone-based pricing: CBD Tolling Program | Meets | Meets | Meets | Meets |
| O-1: Parking pricing: Reduce government-issued parking permits | Does not meet | *[Does not meet (see note 6)]* | *[Does not meet (see note 6)]* | Does not meet |
| O-2: Provide additional taxi stands to reduce cruising | Does not meet | Does not meet (see note [7]) | Does not meet | Does not meet |
| O-3: Create incentives for teleworking | Does not meet | Does not meet | Does not meet (see note [8]) | Does not meet |
| O-4: Ration license plates | Does not meet | Meets | Meets | Does not meet |
| O-5: Mandatory carpooling | Does not meet | Meets | Meets | Does not meet |
| O-6: Truck time-of-day delivery restrictions | Does not meet | Does not meet (see note [9]) | Does not meet (see note [9]) | Does not meet |

Options such as "mandatory carpooling" and rationing license plates (perhaps for share-ride vehicles)—often discussed as an effective way to reduce congestion—stood little chance of raising the requisite $1 billion in annual revenue for the MTA.  The EA therefore only considered the tolling scenarios and a "no-action" alternative.  In June 2023, Defendants published the FONSI, concluding that none of the seven studied tolling scenarios would have a "significant impact on the human or natural environment."  DOT_00363.

## A.    The Initial Toll Structure

On November 30, 2023, the TMRB released its recommended toll price and structure for the congestion pricing program (the "TMRB Recommendation").[3]  *Chan*, Ex. 1 to Mot. for Summ.

---

[3] Defendants did not include the TMRB Recommendation in the Administrative Record.  However, in NEPA cases, courts routinely look to critical evidence outside of the record because "NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record."  *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14-15 (2d Cir. 1997); *see also Suffolk Cnty. v. Sec'y of Interior*, 562 F.2d 1368, 1384 (2d Cir. 1977) ("[I]n NEPA cases, by contrast, a primary function of the court is to ensure that the information available to the decision-maker includes an adequate discussion of environmental effects and alternatives which can sometimes be determined only by looking outside the administrative record to see what the agency may have ignored.").  This includes information such as "events that transpired after the challenged action [that] 'bear upon the issues before [the court],'" particularly when such evidence "illuminates the original

J., ECF No. 54-4. The recommended toll price and structure did not match any of the scenarios analyzed in the EA or FONSI, and had several considerable changes from any of the analyzed tolls. *Id.*

First, the adopted tolling structure applied a $15 toll for passenger vehicles and passenger-type vehicles, even though none of the scenarios analyzed that toll price. TMRB Recommendation at 8. Second, the "peak" daytime toll rate applies for an extra two hours each day compared to all of the scenarios reviewed – from 5:00 AM to 9:00 PM (rather than 6:00AM to 8:00 PM) on weekdays and 9:00 AM to 9:00 PM on weekends (rather than 10:00 AM to 10:00 PM) – capturing many more drivers and causing further diversion of traffic to surrounding areas.[4] *Id.* Third, the tolling structure provided a $5 crossing credit for those entering the CBD through the Lincoln and Holland Tunnels, and a $2.50 crossing credit if entering or exiting the CBD through the Queens-Midtown and Hugh L. Carey Tunnel. MTA, MTA Board Meeting Minutes, *MTA Board Action Items*, at 14 (March 2024).[5] Fourth, the adopted tolling structure charges for-hire-vehicles (*e.g.*, taxis and Ubers) per ride, not to be paid by the driver, but instead always passed on the passenger[6] even though the EA never contemplated a passenger per-ride toll. *Id.* Fifth, the tolling structure adopted a two-period time structure (*i.e.,* peak and overnight) rather than the three-period structure (*i.e.,* peak, off-peak and overnight) analyzed in EA. All of these changes, the amount, times,

---

decision or shows 'that the Agency proceeded upon assumptions that were entirely fictional'" or without support. *Nio v. United States Dep't of Homeland Sec.*, 385 F. Supp. 3d 44, 61- 62 (D.D.C. 2019) (citations omitted).

[4] All other hours are considered "off-peak" and are priced 75% lower than the peak toll.

[5] Available at: https://new.mta.info/document/135591.

[6] Taxis will be charged $1.25 per ride, while Ubers will be charged $2.50 per ride.

locations of the toll pricing, and structure impact the volume, location of traffic and environmental impact of Congestion Pricing.  DOT_0040644.

As contemplated in the initial review, FHWA conducted a reevaluation to determine whether their existing FONSI remained valid in light of the changes in the program.  23 C.F.R. § 771.129.  If Defendants concluded in the reevaluation that the adopted toll structure reflected "substantial changes to the proposed action that are relevant to environmental concerns," Defendants were required to conduct and publish a supplemental analysis.  40 CFR § 1502.9(d)(1).

The conclusion in the June 14 reevaluation was pre-ordained.  In late April 2024, even before the publication of the reevaluation, the MTA publicly announced that Congestion Pricing would begin on June 30, 2024, following the execution of an agreement authorizing tolling under the Value Pricing Pilot Program ("VPPP").  *Chan*, Letter to Court, ECF No. 85.

However, on June 5, 2024, the process was unexpectedly halted in its tracks.  The Governor issued a statement indefinitely pausing the implementation of Congestion Pricing, explaining that "circumstances have changed" for a program that "was enacted in a pre-pandemic period where workers were in the office five days a week…."  The Governor stated that implementing Congestion Pricing "risks too many unintended consequences," particularly to working and middle-class New Yorkers.[7]  The Governor stopped short of canceling the program altogether, but suggested in subsequent remarks that "to assume that the only funding source [for improvements to mass transit] has to be congestion pricing shows a lack of imagination" and that there are "other ways to deal with this."[8]  Following this statement, the New York Legislature and Governor began

---

[7] Press Release ,Governor Kathy Hochul, *Governor Hochul Addresses New Yorkers on Affordability and the Cost of Living,* NYS (June 5, 2024), https://www.governor.ny.gov/news/video-audio-rush-transcript-governor-hochul-addresses-new-yorkers-affordability-and-cost.

[8] *Hochul Still 'Committed' to MTA Improvements Despite Congestion Pricing Pause*, ABC7 NY (June 10, 2024), https://abc7ny.com/post/congestion-pricing-pause-hochul-committed-mta-improvements/14932184/.

seeking alternatives that would raise revenue for the MTA in place of funds expected to be raised by Congestion Pricing.

**B.    The June 14 Reevaluation**

Despite the pause, and with the status of the tolling program in flux, the following week, at the behest of the MTA, on June 14, 2024, the FHWA released its reevaluation, concluding that the FONSI remained valid, despite the substantial changes between the hypothetical scenarios in the EA and the actual tolling structure.  DOT_0045437.

The reevaluation, excluding appendices (and including the Executive Summary), was 175 pages, evidencing significant change to the tolling program.  *See* DOT_0045437-624.  In format, the reevaluation document mirrored the format of the EA (without any public comment or participation).  The reevaluation found that there would still be adverse environmental impacts from Congestion Pricing in five of the areas analyzed, including, as the EA found, to vulnerable environmental justice communities, but nonetheless concluded that the "package of regional and place-based investments" – still not developed with any specificity – would sufficiently mitigate any adverse consequences.  DOT_0045442; DOT_0045448.

The reevaluation made no mention of the "pause" of Congestion Pricing or any of the reasons for the pause implemented just days earlier.  Though Governor Hochul had referred to affordability and alternate forms of funding, the reevaluation simply re-ran the outdated BPM and similar models to the new tolling structure, without any further discussion of "Alternatives" or any further analysis of the economic impact of a $15 toll post-pandemic.  For the transportation analysis, the reevaluation "modeled the adopted toll structure using the same version of the BPM as was used for Final EA," DOT_0045477, as a comparator, but made no effort to update the statistics.  To evaluate "economic conditions," the Final EA used U.S. Census Bureau data from

as far back as 2012 and from 2015 to 2019; the June 14 reevaluation used the same outmoded data and tables and simply overlaid the outdated BPM modeling.  DOT_0045479.

The reevaluation did not fully appreciate the impact of the changed toll on taxis and for-hire-vehicles, given that taxis and FHV have little reason to be deterred from continuing to drive throughout the CBD.  Under the adopted program, taxis and FHV may drive as many miles as desired throughout the CBD – and create a great deal of congestion – without being charged any toll.  Passengers, not drivers, will be charged a negligible fee ($1.25 and $2.50).  DOT_0045439.  Much of the reevaluation analysis of taxis and FHVs focused on addressing the economic impact to minority and low-income taxi drivers rather than its impact on congestion.  *See, e.g.*, DOT_0045612.  In fact, the reevaluation predicts a decrease of only 0.3% in VMT by taxis and FHV, which, as the TMRB suggests, accounts for approximately half the congestion, or over one million daily rides in Manhattan.   DOT_0045526; TMRB Recommendation at 11.   The reevaluation touts "the potential decrease in taxi/FHV VMT across the region and within the Manhattan CBD" as "much smaller than the larger potential decreases predicted in the Final EA." Reevaluation 11.  And taxis and FHVs are a single mode in the BPM and therefore cannot be presented separately, yet separate tolls are assigned for each type of vehicle.

Beyond re-rerunning the BPM with the new $15 toll, the reevaluation did not analyze the impact of the change in peak and overnight hours.  It did not review the time-period structure evaluated in the EA as compared to the adopted two time-period structure (only peak and overnight).  The sole treatment of the changed structure in the reevaluation is a footnote, which states: "The transportation modeling conducted for the adopted toll structure accounts for this

change in the peak and off-peak periods and thus the model results reflect this change." DOT_0045440.

The reevaluation confirms that the toll will adversely impact vulnerable environmental justice communities. It found that the $15 toll would result in a higher percentage of air pollutants in nearly every category of mesoscale and mobile source air toxics (MSAT) emissions in the Bronx and in all categories of these pollutants for Richmond and Bergen Counties. DOT_0045543. Despite assertions to the contrary, the environmental mitigation remains largely the same. Indeed, attempting to artificially inflate the amount of supposed mitigation provided to counteract Congestion Pricing's otherwise significant adverse effects, the reevaluation emphasizes the lower and longer overnight toll (solely an overnight charge rather than off-peak and overnight charge) as "mitigation" and included the discount in the total amount of mitigation. *See* DOT_0045441 ("With those additions, the total mitigation commitment made by the Project increased, from $207.5M to $330M."). In a related action before this Court, the Truckers' Association of New York has explained that this purported mitigation or "concession" on overnight tolls is largely unusable for trucks, which cannot simply shift to overnight hours for deliveries.[9] The same holds true for Plaintiffs, who must enter the CBD to go to work (among other reasons), during the now-expanded, more expensive peak hours.

Despite the publication of the reevaluation, shortly thereafter, on June 27, the MTA Board affirmed the Governor's pause, extending the implementation date indefinitely from June 2024 until such time as the Project Sponsors execute the VPPP.

---

[9] *Trucking Ass's of N.Y.  v. Metro Transp. Auth.*, 1:24-cv-04111-LJL, Mem. of Law in Opp'n to Defs.' and Intervenor's Mot. to Dismiss at 9, ECF No. 76.

Prior to the pause, in May 2024, then-candidate Trump vowed to "TERMINATE Congestion Pricing in my FIRST WEEK back in Office!!"[10]

### C.    The "Un-Pause" and Reevaluation 2

Shortly after the results of the presidential election, Governor Hochul and Defendants mobilized quickly to attempt to re-start Congestion Pricing before the next administration takes office.  On November 14, 2024, just 9 days after the election, the Governor announced a resumption of Congestion Pricing, now starting at $9 and ratcheting up to $15.  Just five days later, the MTA's board approved the Governor's proposed modified plan and quickly turned to the FHWA to "re-evaluate" the new phased-in proposed schedule.[11]

A cursory 10-page "reevaluation" of the environmental impact of the $9 to $15 phase-in was completed by the FHWA at the behest of the MTA only eight days after the Governor's "un-pause" announcement and less than one day after it was requested.   DOT_0047523-39; DOT_0047522.  In a four paragraph "Evaluation of Continued Validity of FONSI," the FHWA refers back to the June 14 reevaluation and summarily concludes that "all NEPA requirements have been met" and Congestion Pricing will not result in significant effects. DOT_0047539.  None of the models were re-run; none of the mitigation was re-evaluated or timed with the varying tolls. Without any analysis or explanation of how a "phased-in" toll impacts the environment or when particular mitigation would be required, Reevaluation 2 proclaimed that there will be "minor variations" through each phase of the new phased tolling, but that the variations would be within the range of impact previously analyzed in the EA and June 14 Reevaluation.  *Id*.  Unsurprisingly, the barebones "analysis" concluded that the tolling program still complies with the EA.  The VPPP

---

[10] Jason Beeferman, *After all this, who won?*, Politico (Nov. 14, 2024), https://www.politico.com/newsletters/new-york-playbook-pm/2024/11/14/congestion-pricing-kathy-hochul-political-winners-janno-lieber-00189668.

[11] Marcia Kramer et. al, *NYC congestion pricing plan approved by MTA board; $9 tolls get green light*, CBS News (Nov. 19, 2024), https://www.cbsnews.com/newyork/news/nyc-congestion-pricing-mta-board-vote/.

was signed the very same day and the MTA and Governor have announced an intended implementation date for Congestion Pricing of January 5, 2025.

## ARGUMENT

### I.     Defendants' Failure to Conduct a Supplemental Review Violates NEPA

NEPA requires supplementation of an EA, which can occur at any time, when "new information" or "new circumstances" make substantial changes to a project not evaluated in an EA, even when the full environmental impact is unknown.  23 C.F.R. 771.130.  Courts reviewing an agency's decision not to prepare a supplemental EA look to (1) whether the agency took the "hard look" that the new circumstances require; and (2) whether the agency's decision based on what it learned was arbitrary and capricious.  *Village of Grand View v. Skinner*, 947 F.2d 651, 657 (2d Cir. 1991).  Supplemental review is required when changes in the final project from initial review pose new environmental issues that "seriously dilute[]" the relevance of the prior public comment period.  *California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982); *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273 (1st Cir. 1996).  The purpose of supplementation is clear: NEPA contemplates the reality that after the formal issuance of an EA, "it is often the case that new information comes to light or the project changes."  *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 959 (7th Cir. 2003).  Importantly, neither the case law nor the regulations condition the requirement of a supplemental review on a new determination of "significance" or adverse impact, only that a seriously different picture of the overall landscape is presented.  *City of Port Isabel v. Fed. Energy Regul. Comm'n*, 111 F.4th 1198 (D.C. Cir. 2024).

A seriously different picture of Congestion Pricing exists today than when it was initially introduced and when the EA was released.  It was April 2019, five years and a global pandemic ago, when the outlines of a Congestion Pricing program first passed in the New York State budget.  As the Governor aptly stated in announcing the "pause" on June 5, 2024, "[c]ircumstances have

15

*changed and we must respond to the facts on the ground and not the rhetoric of five years ago*." Both new information and changes (twice) to the Congestion Pricing scheme since the issuance of the EA have changed the complexion of the project, requiring full supplementation. There has also been a sea-change to the $ 1 billion in toll revenue "objective" and an apparent new ability to find alternate sources of funding for the MTA. The Governor committed this past June to tackling congestion "in other ways," and "without the projected revenue having to come just from congestion pricing."[12] None of these "other ways," or alternatives were ever explored in the EA.

The tolling structure has plainly been materially altered since the issuance of the EA, despite Defendants' attempts to minimize the differences. As just one example, the approved toll in March extended the peak tolling period by two additional hours (5:00AM to 9:00PM), a period larger than each of the seven scenarios reviewed in the EA. DOT_0045439. To put the difference in context, this two-hour change amounts to some 520 additional hours of tolling per year, affecting approximately 60,000 vehicles entering the CBD each weekday. TMRB Recommendation at 19. The change affects 15.6 million cars in a given year, not including the 104 hours of added peak tolls on weekends. While Defendants have asserted in their reevaluations that the impact of these toll changes falls within the range of outcomes analyzed in the EA, the conclusion is unsupportable. The project scope, impact, and alternatives for Congestion Pricing have materially changed, and the FHWA cannot simply rubber-stamp the program – now changed a second time – mere weeks before the January 5th implementation date without a supplemental review.

A.     **Significant Changes to the Congestion Pricing Tolling Structure**

It took 175-pages of analysis in the June 2024 Reevaluation to detail the impact of the adopted tolling structure, as compared with the seven scenarios previously reviewed in the Final

---

[12] *Id.*

EA.  That alone suggests that the altered tolling structure materially differs from the hypothetical tolls analyzed in the EA.  In significant ways – in toll price, peak hours, time-period structure, fees for taxis and for-hire vehicles and, now, the timing of toll rate increases – in short, all the things that individually and together as a package effect behavior.  While this Court held that FHWA could analyze tolling scenarios (rather than the exact structure) in the EA, the final tolling structure, by necessity, could not "deviate too much from the examined scenarios."  (*Mulgrew*, ECF No. 86, at 70).  The combination of new elements in the adopted tolling structure deviates too much from the examined scenarios, requiring not only review in the form of a reevaluation, but a transparent process with the public's participation.

First, the March 2024 iteration of the tolling structure chose a never-before analyzed price of $15 as the base toll.  DOT_0045438.  The Executive Summary of the FHWA Final EA states that the "most important factor in the magnitude and distribution of effects from the Project is the toll rate."  DOT_0036204.  Second, as noted, the final tolling structure extends peak hour pricing by an additional two hours every weekday (5:00am – 9:00pm), which represents a 12.5% increase in peak hour pricing, and will necessarily divert more traffic.  DOT_0045439.  Third, a three-level timing structure – peak, non-peak and overnight – was changed to two levels – only peak and overnight.  DOT_0040644.  The price of the overnight toll was lowered below the entire range of off-peak and overnight tolls, now ranging from $2.25 to $3.75.  *Compare* DOT_0040643 *with* DOT_0047533.  Fourth, the crossing credits for passenger vehicles entering the Lincoln Tunnel, Holland Tunnel, Hugh Carey and Queens-Midtown now range from $1.50 to $5.00, which are significantly lower than the $13.10 studied in the EA.  DOT_0047533.  Fifth, the scenarios analyzed in the Final EA evaluated a variety of tolling policies for taxis and FHV, including varying caps on the number of tolls, exemptions for taxis (not FHVs) and full toll fares for all trips.  But the scenarios were all analyzed as driver-incurred tolls.  DOT_0040643.  The adopted tolling

structure was passed not as a standard toll (whether capped at once-a-day or more), but instead as an incremental charge passed on to the taxi or FHV passenger of $1.25 and $2.50 per ride. DOT_0047534.  Under both the March program and the November phase-in, taxis and FHVs may drive as many miles as desired throughout the CBD – and create a great deal of congestion – without being charged any toll.  Taxis and FHV will not be deterred from driving in and out of the CBD.  Unsurprisingly, the June 14 reevaluation predicts a decrease of only 0.3% or 904 miles in total daily VMT for all taxis and FHV within New York City, which, as the TMRB suggests, accounts for 52% of all congestion in Manhattan.  DOT_0045526; TMRB Recommendation at 11. As a point of comparison for this change, the Final EA predicts that under tolling scenario D, a $19 toll charged to taxi and FHV upon each entry, would decrease congestion for taxis and FHVs inside Manhattan by 54,476 VMT or 16.8% (DOT_0040664), a far cry from 0.3%.

Finally, the phase-in pricing toll now slated for January 5 will replace the flat fee structure previously analyzed.  Defendants have brushed off the change as "within the range of effects studied in the EA and June 2024 reevaluation," but the structure – using three incremental prices for Congestion Pricing instead of one – differs considerably from the analyzed tolling scenarios, and no evaluation has meaningfully addressed the effects of laddering the toll price in this manner, let alone with this package of other elements.  With respect to mitigation, this Court permitted the EA's flexible, or "adaptive management" program, in which Defendants would monitor and assess the magnitude of changes in air quality to determine how best to implement certain unspecified place-based measures to mitigate adverse effects, including electric truck charging stations, air filtration units at schools near highways and renovating parks and greenspaces with vegetation. (ECF No. 86 at 99).  However, that flexible approach was based on a *two-year* monitoring period and the mitigation measures were to be implemented on a *five-year* timeline.  Under the phase-in,

the $15 toll will not be implemented until 2031, yet there has been no material adjustment to the mitigation in light of the changed toll amounts and structure.

Agencies, of course, need not supplement an EA or an EIS every time there is a change in circumstances or new information comes to light.  When a change to a federal project is a "minor variation" or when "there is very little reason to believe the [modification] will have environmental impacts that the agency has not already considered" a supplemental analysis may not be necessary. *Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1048-1049 (9th Cir. 2011) (changes to the travel and parking buffer along trails and roads from 300 to 70 feet did not require an EIS supplementation).  But when an agency makes a "substantial change" and there is no "direct or reliable way to compare the [environmental] effects of [these changes]" to those elements previously analyzed, supplementation is required.  *N.M. ex rel. Richardson v. Bureau of Land Mgm't,* 565 F.3d 683, 707 (10th Cir. 2009).

The adopted phase-in tolling structure is not a "minor variation" to the Congestion Pricing; it *is* the Congestion Pricing program and it was created after the Final EA.  All of the changes from the scenarios analyzed in the EA will have significant effects on the environment due to redirected traffic: (1) varying toll prices will result in various degrees of traffic diversion; (2) providing crossing credits on certain bridges will result in more traffic over those bridges; (3) longer peak hours will result in additional redirected traffic; (4) tolling passengers of taxis and for-hire vehicles a marginal increase per trip instead at the full peak toll rate[13] will not meaningfully deter these vehicles from driving throughout the CBD (and may in fact increase demand and congestion for FHV's to avoid a larger driving toll); and (5) varying toll price requires an alignment on timing

---

[13] Taxis and app-based for-hire vehicles already make up 52% of congestion in the CBD and are only expected to be charged $1.25 and $2.50 per ride, respectively.  TMRB Recommendation at 11.

and degree of mitigation measures. The impact of these changes should be studied in a full supplemental analysis.

*Dubois*, *supra*, is instructive. There, the First Circuit held that the relevant agency should have conducted a supplemental EIS where the final project for a ski resort's trails and location was "configured differently" than the previously-analyzed alternatives. 102 F.3d at 1293. Unlike the reviewed ski resort, the final project proposal widened existing trails, developed new ones and moved a lodge facility's location. The agency argued that the plan not studied in the initial EIS was "merely a scaled-down modification" and the environmental effects of the earlier approved plan would therefore have been "far larger and far more intrusive on the environment than the new preferred [Plan]." *Id*. at 1292. Essentially, Defendants argued that they studied the worst-case scenarios and need not separately study any specific "lesser" scenario. But the court in *Dubois* held that the agency failed to take a hard look at the actual plan, the public did not have an opportunity to consider "wholly new problems posed by the new" resort proposal, and required a supplemental EIS with full public participation. *Id*. at 1293.

The similarities here are abundant. As in *Dubois*, the final tolling structure – the import of which extends far beyond that of a ski resort – is "configured differently" than the toll scenarios in the EA and contains changes that could not be fairly anticipated. *Id.* at 1292-93; *see also Block*, 690 F.2d at 772 (requiring supplemental review where substantial changes in the final project proposal "could not be fairly anticipated"). Particularly with respect to the latest "phased-in" model, while Defendants self-servingly suggest that the phased toll prices will result in only "minor variations," the public and other federal agencies should be engaged to consider "wholly new problems" posed by the new construct.

**B.      Significant Changes to the Circumstances Surrounding Congestion Pricing**

Aside from the change to the toll structure, new information has changed the analysis for Congestion Pricing since the EA was issued.  Most notably, the requirement that Congestion Pricing must achieve $1 billion in annual revenues, a figure that Defendants used as a threshold screening criterion in its EA analysis, is now abandoned.  At the time of the EA, Defendants refused to consider any project alternatives that would not raise a requisite $1 million each year in toll collections.  As just one example, the EPA proposed examining a combination of alternatives to the tolling scenarios, in lieu of a burdensome toll.  While the FHWA acknowledged the alternative as perhaps sufficient to meet the project's congestion reduction objective, it nonetheless rejected the possibility (in conclusory fashion) as failing to meet the revenue goal.  (ECF No. 86, at 65).  The Court held that Defendants' EA alternatives review was appropriate because they "sought at least $1 billion in annual net revenue" and the criteria was a legitimate legislative reason for rejecting many alternatives.  (ECF No. 86 at 62).  While Defendants attempt to gloss over the change to revenue, the new phase-in approach could only be adopted as compliant if this key once-limiting criteria is no longer applicable.  Accordingly, Reevaluation 2 projects that for the first three years, from 2025-2027 (Phase 1), Congestion Pricing will raise approximately $500 million in toll revenues; from 2028-2030 (Phase 2), it will raise $700 million in revenues; and that only by 2031 (Phase 3), will raise Congestion Pricing raise approximately $900 million, a figure projected to (still) be enough to bond to the $15 billion targeted figure.  Defendants' principal criterion has changed, undercutting the rationale of the initial EA review.

"NEPA obliges an agency to revisit its alternatives analysis, whenever there are changed circumstances that affect the factors relevant to the development and evaluation of alternatives." *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 809, 813–14 (9th Cir. 2005) (remanding for a fresh consideration of alternatives because the Forest Service used inaccurate data for market

demand in developing its original NEPA analysis, rendering the alternatives consideration inadequate because it was impossible to tell what other alternatives the agency might have considered based on accurate information).  Revisiting the review is necessary because the reasonable alternatives analysis is at the "the heart" of an EIS or EA, and the "existence of a viable but unexamined alternative render [the assessment] inadequate."  *Id.*

*Alaska Wilderness Recreation and Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995), is particularly apt.  There, the plaintiffs challenged the U.S. Forest Service's decision to forgo a supplemental EIS and perform only a reevaluation when the cancellation of a long-standing timber processing contract after the publication of an EIS broadened the possible range of alternatives available for the agency to consider.  The court explained that the final EIS was timber "contract driven," and because one of the primary objectives used to analyze alternatives, meeting volume requirements for the contract, had been eliminated, the agency was required to perform a more serious and detailed review of newly expanded alternatives in a supplemental EIS rather than with a short reevaluation.  *Id.*  While the court "could not predict" what impact the elimination of the contract would have on the agency's ultimate decision, "clearly it affect[ed] the range of alternatives to be considered" and the agency was required to consider alternatives "outside the contract boundary."  *Id.* at 730-31.

The similarities here are self-evident.  Defendants performed a "revenue driven" EA, using the $1 billion annual revenue goal as a justification for disqualifying any reasonable consideration of other alternatives.  As in *Alaska Wilderness,* with the mandatory annual revenue requirement eliminated (or at the very least relaxed), Defendants should revisit and redevelop the alternatives analysis in a full supplemental EA.  The non-public reevaluations have not examined alternatives at all and are insufficient to study these options.  While we may not be able to predict how Defendants' changed criteria impacts the analysis of the unconsidered alternatives, the point is that

22

Defendants should be required to assess them (and perhaps others raised) with this newfound revenue flexibility.

Plaintiffs previously suggested that a "phase-in" tolling program was one of the reasonable alternatives not considered by Defendants in the EA. That argument was flatly rejected by Defendants because, as represented to the Court at the time, the "tolling scenarios analyzed by FHWA were projected to narrowly meet the MTA's revenue-generating objectives" (*Chan* ECF No. 81, at 14) and a "phase-in" would "delay achievement of revenue goals." (*Chan* ECF No. 82, at 13). Yet, the once immutable requirement of $1 billion in annual toll revenues, like the timber contract in *Alaska Wilderness*, has now been relaxed, and the FHWA and the Governor have approved a tolling program that will generate, according to Defendants' latest reevaluation, *$500 million* dollars in revenue the first three years. Thus, the purported inviolate statutory requirement that drove Defendants' analysis is evidently more an aspirational goal than a mandate. A lower annual revenue threshold expands the universe of viable alternatives (including the EPA's suggestion of a possible combination of alternatives) for a Congestion Pricing program, and a supplemental EA is necessary (with updated data and studies) to explore and develop these options.

## II.    Defendants' Insufficient "Reevaluations" Violate NEPA

While Defendants' failure to supplement the EA violates NEPA, the Reevaluations themselves, which determined that no further review was needed, also fail on their own merits. In determining whether an agency's reevaluation of an EA/FONSI is arbitrary and capricious, judicial review is limited only to the actions taken in reevaluating the EA/FONSI. *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 190 (4th Cir. 1999); *see also S.C. Wildlife Fed'n v. S.C. Dep't of Transp.*, 485 F. Supp. 2d 661, 671 (D.S.C. 2007), aff'd in part sub nom. *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324 (4th Cir. 2008). In undertaking this analysis, the court must "carefully review the record 'to ascertain whether the agency decision is founded on a

reasoned evaluation of the relevant factors.'" *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997) (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989). Ultimately, the court must be "satisfied that an agency's exercise of discretion is truly informed" in order to defer to the agency's discretion in the results of the reevaluation. *Id.* Whether an agency has made a reasoned decision not to supplement depends on the significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered its impact and the degree to which the agency "supported its decision not to supplement with a statement of explanation or additional data." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1438 (9th Cir. 1988).

### A.    Reevaluation 2

Defendants have not demonstrated an adequate degree of care or sufficiently supported the most recent decision not to supplement the EA with the necessary statement of explanation. The operative reevaluation for Congestion Pricing is Reevaluation 2, a 10-page assessment issued on November 22, 2024, purporting to "re-evaluate[] the CBD Tolling under the Phase-In Approach to determine if the FONSI is still valid." It contains only three sections – an Introduction, a Project Description and an "Evaluation of Continued Validity of FONSI," and, by any measure, cannot be seriously viewed as a "reasonable evaluation" of relevant factors or one that provides the public with adequate information as to how the FHWA arrived at its conclusions. Indeed, the "Evaluation" section effectively consists of one sentence: "as the implementation progresses through each phase, the effects of the CBD may have minor variations but would be within the ranges studied in the Final EA." Adding only updated tables and a chart to reflect the evaluation of the three screening criteria, Reevaluation 2 concludes, without any analysis that "all NEPA requirements have been met," the "FONSI is still applicable" and Congestion Pricing does not result in "significant effects." There is no environmental review of the phased-in toll; there is no

air quality analysis or appendices, there are no statistics regarding the impact on congestion or trips to or within Manhattan over time as the toll is phased-in; and there is no consideration of the toll's impact on environmental justice communities or how the timing of the phase-in will impact the timeline of air quality monitoring and needed mitigation efforts (such as they are). While the Court found that a "phase-in" need not be examined as an alternative because it would simply be a "postponement" to study the program, that is not what is planned here. Congestion Pricing is not being postponed or studied further as a pilot-program; it is being qualitatively altered and implemented now.

Defendants hurriedly produced a conclusory reevaluation to ensure implementation before the next presidential administration. This is evidenced not only by the document's length (a fraction even of the first reevaluation), but also by the timeline of its publication. Reevaluation 2 was released just *8 days* after Governor Hochul announced the "unpausing" and the proposal to proceed with a phased-in version of the Program,[14] and less than a day after the MTA asked for a reevaluation. There could hardly have been a meaningful review of the changed toll. Reevaluation 2 fails to demonstrate that Defendants took the requisite "hard look" at Congestion Pricing following the significant changes to the program's structure and surrounding circumstances. *See e.g., Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996) (agencies must take a "hard look" at the new information or circumstances in a NEPA reevaluation).

---

[14] Press Release, Governor Kathy Hochul, *Governor Hochul Unveils Plans for Future of Transit and Traffic in New York City, Including a 40 Percent Reduction in Congestion Pricing Tolls*, NYS (Nov. 14, 2024), https://www.governor.ny.gov/news/video-audio-photos-rush-transcript-putting-commuters-first-keeping-costs-down-governor-hochul.

###### B.    Reevaluation 1

On its face, it is clear that Defendants intend to rely upon the June 14 reevaluation and the Final EA to cure the plain deficiency of Reevaluation 2. For all the reasons discussed, *supra* at Sec. I.A., the substantial changes to the tolling structure render that reevaluation insufficient. And while certainly lengthier than Reevaluation 2, neither the EA nor initial reevaluation analysis is a substitute for full supplemental review of the new phased-in tolling structure.

As an initial matter, the $9, $12 prices of the phase-in tolling program have not been studied or re-evaluated. While Defendants may argue that the $9 and $12 phase-in prices fall within the $9-$23 "range" of alternatives studied, a closer look reveals that the actual tolling structures considerably deviate from those examined. The initial EA reviewed scenarios with a $9 base peak toll price, but with a $7 off-peak and $5 overnight price and a $12 peak price with a $9 off peak and $7 overnight price scenario. DOT_0040643. The first two "phases" Defendants intend to charge starting in January do not match the scenarios in either the Final EA or the June 14 Reevaluation. In short, the packages have changed, not just the price.

|  | Final EA Scenarios ($9) | Final EA Scenarios ($12) | June 14 Reevaluation Structure | Final Tolling Structure ($9) | Final Tolling Structure ($12) | Final Tolling Structure ($15) |
|---|---|---|---|---|---|---|
| Peak | $9 | $12 | $15 | $9 | $12 | $15 |
| Off-Peak | $7 | $9 | $3.75 | $2.25 | $3 | $3.75 |
| Overnight | $5 | $7 | $3.75 | $2.25 | $3 | $3.75 |

The crossing-credits, exemptions, taxi/FHV charges and the length of the peak-hour period in the phase-in tolls are all different than the scenarios evaluated in the Final EA. The record demonstrates that these changes are significant. The Final EA projects that the $9 and $12 peak rate tolling scenarios would generate $1.06 billion and $1.1 billion in annual net revenue, respectively. Yet, Reevaluation 2 suggests that the same phased-in toll amounts of $9 and $12 in the new adopted plan will generate $500 million and $700 million on yearly basis. *Compare*

26

DOT_0036300 *with* DOT_0047537. This Court held that the use of tolling scenarios – with various exemptions, discounts and times – was permissible provided the final tolling structure did not deviate "too much" from the examined scenarios (ECF No. 86 at 70); all seven scenarios studied – no matter the exemptions or discounts – achieved approximately $1 billion in annual tolling revenue from inception. Yet, the current plan will not achieve that goal until, at the earliest, 2031, evidencing material differences from the final EA.[15]

As set out above, aside from re-running the BPM, the June 14 Reevaluation failed to directly analyze the impact of the change in peak and overnight hours, the change to a two time-period structure, and the discounted toll for the overnight period of $3.75, which falls below the range of both overnight and off-peak tolls analyzed in the EA and FONSI. The sole treatment of the changed tolling structure in Reevaluation 1 was a single footnote, which states: "The transportation modeling conducted for the adopted toll structure accounts for this change in the peak and off-peak periods and thus the model results reflect this change." DOT_0045440. And in re-running the key models, the June 14 Reevaluation fails to update any of the data inputs from the already outdated Final EA (the BPM and U.S. Census Data, in particular), yet utilizes an updated emissions model, MOVES3.1 and ERMOD version 23132, to test air quality (without

---

[15] While Defendants may assert that the (initial) lower price of the new structure or alleged lessened environmental impact from traffic diversion of the phase-in (within certain areas) absolves the agencies of any further review, the argument is flawed. First, traffic diversion is only one of the environmental impacts of NEPA; while a $9 toll may mitigate some diversion, the majority of congestion causing vehicles – FHVs and trucks – will likely not see a reduction and FHV congestion may, in fact, increase within and into the CBD zone, as drivers switch to less expensive transport. Second, a smaller overall economic benefit for the program will be generated under a phase-in. NEPA requires agencies to "balance a project economic benefits against its adverse environmental effects." *Glickman,* 81 F.3d at 446. Using "inflated economic benefits," in this balancing process "may result in approval of a project that otherwise would not have been approved because of its environmental effects." *Id.* (NEPA violated because inflated benefits impaired fair consideration of the projects adverse environmental effects."). The decreased "phase-in" toll revenue means that the prior environmental reviews used inflated economic benefits. Refusing to supplement because the toll is (at least initially) less ignores the net-benefit balancing that NEPA requires.

public facing input from the Environmental Protection Agency, as was required in the EA). *See* DOT_0045479; DOT_0045538.

While the June 14 Reevaluation finds that a $15 toll will result in more pollution – in all categories for mesoscale and MSAT pollutants – to environmental justice communities such as Richmond County and the Bronx (DOT_0045539-40), it touts as additional "mitigation" a further discount during a longer overnight toll period, rather any environmental remediation. DOT_0045569. The June 14 Reevaluation also completely failed to analyze the economic issues raised by the Governor in her June assessment. The "economic conditions" section quickly recasts some of the EA's models using outdated U.S. Census Data regarding worker trips to and from Manhattan, without any further discussion. DOT_0045523. No recognition was given to the Governor's and Legislature's plan to explore new funding alternatives that would alleviate burdens on the human and natural environment and the need to raise the full $15 billion solely through Congestion Pricing. In fact, there is no mention of the "pause" in Reevaluation 1 at all. The June 14 Reevaluation was more a *post-hoc* rationalization of the EA than a true environmental reassessment. Defendants used Reevaluation 1 to substitute for the failure of the EA to discuss the actual tolling structure. *See Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562 (9th Cir. 2000) (finding that reevaluations cannot be used as a substitute for analysis that should have been contained in the original EA).

*Piedmont Env't Council v. U.S. Dep't of Transp.*, 159 F. Supp. 2d 260, 265 (W.D. Va. 2001), *aff'd in part, remanded in part*, 58 F. App'x 20 (4th Cir. 2003), is illustrative. *Piedmont* involved a proposed four lane, 6.2-mile bypass of Route 29 around the City of Charlottesville and through Albemarle County, Virginia. Several changes to the design of the bypass were proposed after the FHWA issued the Final EIS and Record of Decision (ROD). As here, FHWA determined that it was necessary to perform a reevaluation of the previous environmental documents, to

examine whether the Final EIS was still valid.  *Id*. at 267.  The Reevaluation concluded that the changes and new issues resulted in no new significant impacts that would necessitate the completion of a new or supplemental EIS.  *Id*.  The court rejected portions of the Reevaluation with respect to FHWA's analysis of the impacts of the bypass on a reservoir, finding that it discussed "matters that should have been dealt with more thoroughly in the FEIS and EA," making it "a post hoc discussion of an issue about which final agency decisions had already been made in the form of . . . a FONSI" in violation of NEPA.  *Id*. at 273.

This Court should likewise reject Defendants' June 14 Reevaluation.  As in *Piedmont,* it is a post-hoc rationalization for the sufficiency of the EA and deals with matters – the actual tolling plan – that should have been dealt with more thoroughly in a public-facing EA process.  The Court should require a supplemental EA.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment.


Dated: New York, New York    **STEPTOE LLP**
   December 2, 2024

         By: <u>/s/ Alan M. Klinger</u>
           Alan M. Klinger
           Dina Kolker
           David Kahne
           1114 Avenue of the Americas
           New York, New York 10036
           (212) 506-3900
           aklinger@steptoe.com

         *Co-Counsel for the Mulgrew and Chan Plaintiffs*

Of Counsel:           -and-

Carly Rolph          BETH A. NORTON, Esq.
Alexander Langer        United Federation of Teachers

52 Broadway
New York, NY 10004
(212) 701-9420

*Co-Counsel for the United Federation of Teachers and Individual Plaintiffs*

-and-

THE OFFICE OF LOUIS GELORMINO,
Esq. & FONTE & GELORMINO LEGAL
GROUP
2550 Victory Blvd.
Suite 304
Staten Island, NY 10314
(917) 968-1619
(718) 720-4949

*Co-Counsel for Vito J. Fossella*