# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ELIZABETH CHAN, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

*Defendants*.

Case No. 1:23-cv-10365 (LJL)
Case No. 1:24-cv-01644 (LJL)
Case No. 1:24-cv-00367 (LJL)
Case No. 1:24-cv-04111 (LJL)

MICHAEL MULGREW, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

*Defendants*.

NEW YORKERS AGAINST
CONGESTION PRICING TAX, *et al.*,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

*Defendants*.

TRUCKING ASSOCIATION OF NEW
YORK,

                            *Plaintiff*,

            v.

METROPOLITAN TRANSPORTATION
AUTHORITY, *et al.*,

                            *Defendants*.

**DEFENDANTS THE METROPOLITAN TRANSPORTATION AUTHORITY, THE
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, THE NEW YORK CITY
DEPARTMENT OF TRANSPORTATION, AND WILLIAM J. CARRY'S
CONSOLIDATED MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR
OMNIBUS MOTION TO DISMISS PLAINTIFFS' CONSTITUTIONAL CLAIMS AND
<u>IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Preliminary Statement ................................................................................................................. 1

Background ................................................................................................................................... 4

    A.    The Program .................................................................................................... 4

    B.    The Current Status of the Program ................................................................ 5

    C.    Program Toll Collection and Refunds ............................................................ 6

    D.    Implementation of the Program ..................................................................... 6

LEGAL STANDARD .................................................................................................................. 7

Argument ...................................................................................................................................... 8

    I.    Plaintiffs do not demonstrate (or even allege) a likelihood of success on the merits ... 8

        A.    The Program does not violate the Dormant Commerce Clause or the Right to Travel ................................................................................................................. 8

            1.    Fair approximation of use .................................................................... 10

            2.    Excessiveness compared to benefits ..................................................... 14

            3.    Discrimination against out-of-state interests ...................................... 15

        B.    The Program is not preempted by the F4A .................................................. 16

            1.    The F4A does not apply to tolling programs ....................................... 16

            2.    Even if the F4A applied, the Program is a permissible weight limitation ...................................................................................... 19

        C.    The Program does not violate the Green Amendment ................................ 19

            1.    Plaintiffs ascribe a nonsensical meaning to the Amendment .................. 20

            2.    Plaintiffs' claims of potential environmental harm are refuted by the EA upheld by this Court .................................................................... 22

    II.    Plaintiffs have not shown irreparable harm ............................................................ 23

        A.    Plaintiffs have not shown that their constitutional claims would result in anything more than compensable, economic harm ................................ 23

        B.    Plaintiffs in *Chan* and *Mulgrew* have not shown irreparable injury under the Green Amendment ........................................................................................ 28

    III.    A preliminary injunction would not serve the public interest ..................................... 29

Conclusion .................................................................................................................................. 31

# TABLE OF AUTHORITIES

## CASES

*A.X.M.S. Corp. v. Friedman*,
  948 F. Supp. 2d 319 (S.D.N.Y. 2013) ...................................................................... 25

*Abadi v. Am. Airlines, Inc.*,
  2024 WL 1346437 (S.D.N.Y. Mar. 29, 2024) .......................................................... 8

*Algood Casters Ltd. v. Caster Concepts, Inc.*,
  2020 WL 5274172 (S.D.N.Y. Sept. 4, 2020) ........................................................... 28

*Allco Fin. Ltd. v. Klee*,
  861 F.3d 82 (2d Cir. 2017) ........................................................................................ 8

*American Trucking Association, Inc. v. Alviti*,
  630 F. Supp. 3d 357 (D.R.I. 2022) .............................................................. 9, 12, 14

*American Trucking Associations v. Scheiner*,
  483 U.S. 266 (1987) ....................................................................................... 9, 13

*American Trucking Associations, Inc. v. Alviti*,
  2020 WL 4050237 ...................................................................................................... 14

*Angus Partners LLC v. Walder*,
  52 F. Supp. 3d 546 (S.D.N.Y. 2014) ................................................................. passim

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
  2014 WL 6772058 (S.D.N.Y. Dec. 2, 2014) ........................................................... 24

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
  842 F. Supp. 2d 672 (S.D.N.Y. 2012) ............................................................... passim

*Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*,
  887 F.2d 417 (2d Cir. 1989) ..................................................................................... 11

*Auto. Club of New York, Inc. v. Port Auth. of N.Y. & N.J.*,
  842 F. Supp. 2d 672 (S.D.N.Y. 2012) ..................................................................... 28

*Barker v. Bancorp, Inc.*,
  2022 WL 595954 (S.D.N.Y. Feb. 25, 2022) ........................................................... 22

*Bartman v. L'Officiel USA Inc.*,
  2022 WL 4085850 (S.D.N.Y. Sept. 2, 2022) .......................................................... 13

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................................. 8

*Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
    567 F.3d 79 (2d Cir. 2009) ................................................................. 10, 12

*Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Authority,*
    2004 WL 840140 (D. Conn. Apr. 15, 2004) ...................................... 23, 24, 25

*Ca. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.,*
    519 U.S. 316 (1997) ............................................................................... 16

*City of Dania Beach v. U.S. Army Corps of Eng'rs,*
    2012 WL 3731516 (S.D. Fla. June 6, 2012) ............................................ 29

*Co. Motor Carriers Ass'n v. Town of Vail,*
    2023 WL 8702074 (D. Colo. Dec. 15, 2023) ........................................... 19

*Coal. for Competitive Elec., Dynergy Inc. v. Zibelman,*
    906 F.3d 41 (2d Cir. 2018) ..................................................................... 18

*Committee of 100 on Fed. City v. Foxx,*
    87 F. Supp. 3d 191 (D.D.C. 2015) ........................................................... 30

*D.D. ex rel. V. D. v. N.Y.C. Bd. of Educ.,*
    480 F.3d 138 (2d Cir. 2007) ...................................................................... 7

*D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.,*
    465 F.3d 503 (2d Cir. 2006) ...................................................................... 7

*Deide v. Day,*
    676 F. Supp. 3d 196 (S.D.N.Y. 2023) ...................................................... 26

*Dilts v. Penske Logistics, LLC,*
    769 F.3d 637 (9th Cir. 2014) ............................................................. 16, 18

*E.E.O.C. v. Loc. 638,*
    1995 WL 355589 (S.D.N.Y. June 7, 1995) ............................................... 27

*Earth Is. Sci. v. Carlton*
    626 F.3d 642 (9th Cir. 2010) ................................................................... 30

*Elrod v. Burns*,
    427 U.S. 347 (1976) .................................................................................................. 26

*Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*,
    405 U.S. 707 (1972) ......................................................................... 8, 11, 14, 15

*Forever Fencing, Inc. v. Bd. of Cnty. Comm'rs of Leavenworth Cnty.*,
    2024 WL 3084973 (10th Cir. June 21, 2024) ........................................................ 9

*Freeman v. Stake.com*,
    2023 WL 4187574 (S.D.N.Y. June 26, 2023) ..................................................... 18

*Fresh Air for the Eastside Inc. v. State of New York*,
    217 N.Y.S.3d 381 (4th Dep't 2024) ..................................................................... 20

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007) ............................................................................. 7, 27

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020) ................................................................ 22

*Haley v. Pataki*,
    106 F.3d 478 (2d Cir. 1997) .................................................................................. 7

*Janes v. Triborough Bridge & Tunnel Auth.*,
    977 F. Supp. 2d 320 (S.D.N.Y. 2013) .................................................................. 2

*Janes v. Triborough Bridge & Tunnel Auth.*,
    774 F.3d 1052 (2d Cir. 2014) .................................................................. 2, 11, 12

*Jones v. Hendrix*,
    599 U.S. 465 (2023) .............................................................................................. 17

*Kane v. DeBlasio*,
    19 F.4th 152 (2d Cir. 2021) ................................................................................. 26

*Kloppel v. Sears Holdings Corp.*,
    2018 WL 1089682 (W.D.N.Y. Feb. 28, 2018) ................................................... 17

*Lost Lake Holdings LLC v. Town of Forestburgh*,
    2023 WL 8947154 (S.D.N.Y. Dec. 28, 2023) .............................................. 25, 26

*Marte v. City of N.Y.*,
    2023 N.Y. Slip. Op. 31198(U) (Sup. Ct. N.Y. Cnty. Apr. 17, 2023) ............... passim

*McBeth v. Porges,*
   171 F. Supp. 3d 216 (S.D.N.Y. 2016)..................................................................... 4

*Mitchell v. Cuomo,*
   748 F.2d 804 (2d Cir. 1984)................................................................................ 27

*Molinari v. N.Y. Triborough Bridge & Tunnel Auth.,*
   838 F. Supp. 718 (E.D.N.Y. 1993) .................................................................... 11

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 (2010)........................................................................................... 28

*Moore v. Consol. Edison Co. of N.Y.,*
   409 F.3d 506 (2d Cir. 2005)................................................................................. 1

*Mulgrew v. U.S. Dep't of Transp.,*
   2024 WL 3251732 (S.D.N.Y. June 20, 2024) (Liman, J.)............................. passim

*N.Y. State Motor Truck Ass'n v. Pataki,*
   2004 WL 2937803 (S.D.N.Y. Dec. 17, 2004) .................................................. 17

*Northwest Airlines, Inc. v. County of Kent,*
   510 U.S. 355 (1994)............................................................................................. 8

*Omya, Inc. v. Vermont,*
   33 F. App'x 581 (2d Cir. 2002) ...................................................................... 9, 16

*Owner Operator Indep. Drivers Ass'n, Inc. v. Pa. Tpk. Comm'n,*
   934 F.3d 283 (3d Cir. 2019).................................................................................. 9

*Park Irmat Drug Corp. v. Optumrx, Inc.,*
   152 F. Supp. 3d 127 (S.D.N.Y. 2016)................................................................. 4

*Pogliana v. U.S. Army Corps of Eng'rs,*
   49 F. App'x 327 (2d Cir. 2002) ........................................................................ 28

*POM Wonderful LLC v. Coca-Cola Co.,*
   573 U.S. 102 (2014)........................................................................................... 17

*Rowe v. New Hampshire Motor Transp. Assoc.,*
   552 U.S. 364 (2008)........................................................................................... 17

*Selevan v. New York Thruway Auth.,*
   711 F.3d 253 (2d Cir. 2013)...................................................................... 8, 9, 15

*Shapiro v. Cadman Towers, Inc.*,
    51 F.3d 328(2d Cir. 1995) ............................................................... 3, 7, 23

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    990 F. Supp. 2d 9 (D.D.C. 2013) .......................................................... 29

*Siracusa v. New Hyde Park-Garden City Union Free Sch. Dist.*,
    2024 WL 3875793 (E.D.N.Y. Aug. 19, 2024) ........................................ 26

*Statharos v. N.Y. City Taxi & Limousine Comm'n*,
    198 F.3d 317 (2d Cir. 1999) ................................................................ 27

*Sunwoo v. JPMorgan Chase & Co.*,
    2021 WL 2443814 (S.D.N.Y. June 15, 2021) ....................................... 22

*Town of Southold v. Town of E. Hampton*,
    477 F.3d 38 (2d Cir. 2007) ............................................................... 8, 15

*Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*,
    613 F.3d 206 (D.C. Cir. 2010) ............................................................ 18

*Ullmo v. Ohio Tpk. & Infrastructure Comm'n*,
    126 F. Supp. 3d 910 (N.D. Ohio 2015) ................................................. 9

*W. Watersheds Project v. Bureau of Land Mgmt.*,
    774 F. Supp. 2d 1089 (D. Nev. 2011) .................................................. 30

*Wallach v. Brezenoff*,
    930 F.2d 1070 (3d Cir. 1991) .............................................................. 11

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008) ................................................................................ 7

**STATUTES**

23 U.S.C. § 129 .......................................................................................... 16

23 U.S.C. § 149 .......................................................................................... 18

29 U.S.C. § 301 .......................................................................................... 16

49 U.S.C. § 14501(c) ................................................................................ 2, 18

49 U.S.C.A. § 13102(9) .............................................................................. 19

N.Y. Pub. Auth. L. § 1264 .......................................................................... 11

N.Y. Veh. & Traf. Law § 1701 ..................................................................................... 4

Pub. L. 105-178 (June 9, 1998) ................................................................................... 16

Pub. L. 109-59 (Aug. 10 2005) ................................................................................... 16

Pub. L. 85-767 (Aug. 27, 1958) .................................................................................. 16

**OTHER AUTHORITIES**

*Toll Rates for all Port Authority Bridges & Tunnels*, https://www.panynj.gov/bridges-tunnels/en/tolls.html ..................................................................................... 17

New York State Assembly Debate on Assembly Bill A1368, February 8, 2021 ........................ 21

New York State Assembly Debate on Assembly Bill A2064, Apr. 30, 2019 ............................. 20

Defendants the Metropolitan Transportation Authority (the "MTA"), the Triborough Tunnel and Bridge Authority (the "TBTA"), the New York City Department of Transportation ("NYCDOT"), and William J. Carry respectfully submit this consolidated memorandum of law in further support of their Omnibus Motion to Dismiss the Constitutional Claims in the *Chan*, *Mulgrew*, *New Yorkers*, and *TANY* cases ("MTD"), and in opposition to the motions seeking a preliminary injunction in *Chan*, *Mulgrew*, and *TANY*.[1]

## **PRELIMINARY STATEMENT**

Relying on unusually short, perfunctory briefing, Plaintiffs request that this Court grant the "extraordinary and drastic remedy" of a preliminary injunction prohibiting implementation of New York's Central Business District ("CBD") Tolling Program (the "Program") in opposition to the stated wishes and ongoing efforts of the People's representatives, including the Legislature, the Governor, and various State and City agencies, not to mention the federal government. *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005). But Plaintiffs have not even plausibly stated claims sufficient to allow them to proceed past a motion to dismiss to discovery, let alone the clear, strong showing necessary to obtain preliminary injunctive relief. Nor have they shown that their purely economic harms would give rise to irreparable injury, or that an emergency injunction in their favor is in the public interest.

---

[1] Citations to "*Chan* Opp." are to the Memorandums of Law in Opposition to Defendants' Motion to Dismiss filed in *Chan v. U.S. Department of Transportation*, No. 23 Civ. 10365 (S.D.N.Y.) ("*Chan*"), ECF 130, and *Mulgrew v. U.S. Department of Transportation*, No. 24 Civ. 1644 (S.D.N.Y.) ("*Mulgrew*"), ECF 118, which are identical; to "*New Yorkers* Opp." to the Memorandum of Law in Opposition to Defendants' Motion to Dismiss in *New Yorkers Against Congestion Pricing Tax v. U.S. Department of Transportation*, No. 24 Civ. 367 (S.D.N.Y.) ("*New Yorkers*"), ECF 112; and to "*TANY* Opp." to the Memorandum of Law in Opposition to Defendants' Motion to Dismiss in *Trucking Association of New York v. Metropolitan Transportation Authority*, No. 24 Civ. 4111 (S.D.N.Y.) ("*TANY*"), ECF 76. Citations to "*Chan* PI" are to the Motions for Preliminary Injunction in *Chan*, ECF 134, and in *Mulgrew*, ECF 122, which are identical; and to "*TANY* PI" to the Motion for Preliminary Injunction in *TANY*, ECF 4. As Plaintiffs in *New Yorkers* have not moved for preliminary injunctive relief on their State constitutional claim, references to "Plaintiffs" in connection with the motions for preliminary injunction are to Plaintiffs in *TANY*, *Chan*, and *Mulgrew* only. For brevity, plaintiffs in each action are referred to by the first plaintiff in the caption.

First and perhaps most fundamentally, as we have shown in our motion to dismiss, *see* MTD,[2] Plaintiffs fail to state a valid constitutional or statutory claim—and obviously, if a claim cannot survive dismissal under Rule 12(b)(6), then there is no likelihood of success on the merits. Beyond that, Plaintiffs' claims certainly do not meet the heightened level of scrutiny required for a preliminary injunction here. As for their dormant Commerce Clause and right to travel claims, which we have shown should be assessed under a form of rational basis review, MTD at 7-11, Plaintiffs do no more than quibble with whether the New York City transportation network is "integrated," or whether the various tolls selected by the TBTA, after years of review and consideration, are "rational" in terms of Plaintiffs' use and benefit. As this Court and the Second Circuit have repeatedly recognized in the face of similar challenges, Plaintiffs cannot overcome this highly deferential, rational-basis standard. *See, e.g.*, *Janes v. Triborough Bridge & Tunnel Auth.*, 774 F.3d 1052, 1055 (2d Cir. 2014), *aff'g* 977 F. Supp. 2d 320, 340-42 (S.D.N.Y. 2013) (Engelmayer, J.); *Angus Partners LLC v. Walder*, 52 F. Supp. 3d 546, 564-70 (S.D.N.Y. 2014) (Torres, J.).

TANY's preemption challenge under the Federal Aviation Administration Authorization Act of 1994, 49 U.S.C. § 14501(c)(1) ("F4A"), likewise fails. MTD at 18-22. The Program's toll rates here are authorized by the Federal Highway Administration ("FHWA") pursuant to a federal statutory scheme created by Congress long before the F4A was enacted, and Congress obviously did not intend to preempt federally authorized tolls on trucks. The Program's toll rates apply generally to the public and do not direct that motor carriers employ any particular "rates, routes,

---

[2] Citations to "MTD" are to the Memorandum of Law in Support of Defendants' Omnibus Motion to Dismiss filed by the MTA, the TBTA, NYCDOT, and Mr. Carey in *Chan*, ECF 118, *Mulgrew*, ECF 105, *TANY*, ECF 63, and *New Yorkers*, ECF 106.

or services." TANY's assertions that the Program subjects carriers to "disparate treatment," or somehow exempts most other forms of vehicle traffic from tolls, are simply false.

Finally, the *Chan*, *Mulgrew*, and *New Yorkers* Plaintiffs' claims under the relatively new Green Amendment to the New York State Constitution are procedurally and substantively insufficient for the reasons set out in our motion to dismiss. MTD at 22-25. Contrary to Plaintiffs' argument, the Final Environmental Assessment ("EA") demonstrated that the Program will not only not have a significant adverse impact on the environment, but will improve the environment overall by reducing congestion and harmful emissions, and will provide adequate protection to environmental justice ("EJ") communities through robust mitigation measures—a determination already upheld by this Court in granting partial summary judgment to Defendants on Chan's National Environmental Policy Act ("NEPA") challenge to the EA and the FHWA's Finding of No Significant Impact ("FONSI"). *Mulgrew v. U.S. Dep't of Transp.*, 2024 WL 3251732 (S.D.N.Y. June 20, 2024) (Liman, J.).

But the Court does not even have to go that far. Plaintiffs have not demonstrated that the payment of a toll—which easily can be refunded (mostly through payers' E-ZPass accounts) if necessary—constitutes irreparable harm. Instead, Plaintiffs argue that they do not need to show irreparable harm because they have demonstrated a likelihood of success on the merits with respect to their constitutional claims. But it is black-letter law that irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," and Plaintiffs cannot evade that requirement simply because they have asserted non-dignitary, economic constitutional claims here. *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 842 F. Supp. 2d 672, 676 (S.D.N.Y. 2012) (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)). Nor have Plaintiffs demonstrated that the public interest would be served by derailing implementation of the

Program.  Notwithstanding the nature of Plaintiffs' objections to the Program, there can be no dispute that it is the solution chosen by New York's elected representatives at every level for addressing the serious challenges resulting from traffic congestion in Manhattan, the region's air quality, and our aging mass transit infrastructure.  For this reason alone, Plaintiffs' motions for a preliminary injunction should be denied.

## BACKGROUND[3]

### A.    The Program

The New York State Legislature enacted the Traffic Mobility Act (the "Act") in 2019, N.Y. Veh. & Traf. Law § 1701 *et seq.*, authorizing the TBTA to establish and implement a plan for tolling vehicles that enter or remain in the Manhattan CBD. *Mulgrew*, 2024 WL 3251732 at *1. In 2019 the New York State Department of Transportation, the TBTA, and the NYCDOT (collectively, the "Project Sponsors") submitted an Expression of Interest to the FHWA under the federal Value Pricing Pilot Program ("VPPP").  Declaration of Allison L. C. de Cerreño, Ph.D. ("C. de Cerreño Decl.") ¶ 3.    Following this, the FHWA conducted a lengthy environmental review process under NEPA, which culminated in April 2023 with the EA and the June 2023 FONSI.  *Id.*

In March 2024, the TBTA adopted a toll rate schedule for the Program initially planned to go into effect in June 2024.  On June 14, 2024, FHWA confirmed that the reevaluation was consistent with FHWA's regulations, and determined that the FONSI remained valid.  C. de

---

[3] Citations to "*Chan* ¶" are to the amended complaint in *Chan*, ECF 39; to "*Mulgrew* ¶" to the amended complaint in *Mulgrew*, ECF 19; to "*New Yorkers* ¶" to the amended complaint in *New Yorkers*, ECF 54; to "*TANY* ¶" to the amended complaint in *TANY*, ECF 14; to "TMRB" to pages of the Traffic Mobility Review Board's Report, available at https://new.mta.info/document/127761, which is incorporated by reference in the amended complaints; and to "TBTA" to pages of the toll rate schedule adopted by the TABA, available at https://new.mta.info/document/138931, which is incorporated by reference in the *TANY* complaint, *see, e.g.*, *TANY* ¶¶ 5-8, 33, and is otherwise a public record subject to judicial notice, *McBeth v. Porges*, 171 F. Supp. 3d 216, 221 (S.D.N.Y. 2016).  "In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."  *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016).

Cerreño Decl. ¶ 4.  On June 5, 2024, the Governor announced a pause in implementation of the Program.

**B.    The Current Status of the Program**

On November 14, 2024, the Governor announced a proposal to proceed with the Program, but with the toll structure and rates that had been adopted by the TBTA in March 2024 to be phased in gradually over several years.  *Id.* ¶ 6.  On November 18, 2024, the TBTA Board adopted the phase-in feature of the toll rate schedule that it had approved in March (the "Phase-In Approach"). *Id.*

Under the Phase-In Approach, subject to certain tunnel crossing credits, from 2025 to 2027, the peak-period E-ZPass entry toll rate charged for passenger vehicles will be $9; for motorcycles, $4.50; for larger vehicles including transit and commuter buses and trucks, $14.40 or $21.60, depending on their size; for taxis, $0.75 per trip; and for FHVs, $1.50 per trip.  *Id.* ¶ 7.  The toll rates later increase proportionally for each vehicle category, once in 2028 then again in 2031, as set forth in the toll rate schedule.  *Id.*  Taxis and FHVs are not exempt from tolls under the Program: The toll rate applicable to taxis and FHVs is set on a per-ride basis consistent with taxis and FHVs passing the toll on to their customers in accordance with existing regulations.  *Id.* ¶ 8.  In turn, the TBTA will collect the aggregate toll receipts directly from the taxi/FHV companies.  *Id.*

On November 21, 2024, the FHWA confirmed that a second re-evaluation, in light of the adoption of the Phase-In Approach, was consistent with FHWA's regulations, and determined that the FONSI remained valid.  *Id.* ¶ 10. That same day, the FHWA and the Project Sponsors signed an agreement under the VPPP authorizing the tolls.  *Id.* The Program is now scheduled to begin on January 5, 2025.[4]

---

[4] MTA, *Central Business District Tolling Program*, https://new.mta.info/project/CBDTP (last accessed Dec. 2, 2024).

### C.    Program Toll Collection and Refunds

Eligible vehicles entering the CBD will be charged, and will pay, the applicable toll using one of two mechanisms. *Id.* ¶¶ 12. Toll payers with an E-ZPass account (which is the overwhelming majority of drivers) can pay using E-ZPass and if necessary could be refunded in this manner. *Id.* 12-13. If a vehicle is not associated with an E-ZPass account, the registered owner of the vehicle will receive a toll bill in the mail. *Id.* ¶ 14. No matter the payment method used, the identity of the vehicle, and thus of the toll payer, and the amount that they have paid is recorded. *Id.* ¶ 12. With this information, the MTA would be able to fully refund Plaintiffs and any other toll payers in the unlikely event that Plaintiffs prevail in these actions. *Id.* ¶¶ 11-14.

### D.    Implementation of the Program

TBTA budgeted over $500 million to establish the Program, and much of that budget has been spent, including on developing the back-office expertise to design and implement the necessary technology, installing the equipment on roadways, and outreach costs. *Id.* ¶ 17. If the Program is temporarily enjoined, TBTA will incur approximately $12 million per month in additional costs related to, among other things, operations and maintenance of the roadside tolling system and back-office operations, and these costs cannot be deferred pending implementation of the Program, if the start date of tolling is delayed. *Id.* ¶ 18.

Absent implementation of the Program, the TBTA will lose estimated tolling revenue of over $40 million each month from the first phase of the tolls. *Id.* ¶ 19. This means that the MTA will be prevented from proceeding with vitally important work under the MTA's 2020–2024 Capital Program, including improving outdated signaling and other measures to improve system reliability, enhancing accessibility to numerous subway stations consistent with the Americans with Disability Act, and extending public transit to under-served areas. *Id.* ¶ 21. Further, delaying implementation will leave the severe congestion plaguing the lower Manhattan CBD unabated,

with its concomitant economic and environmental costs to businesses, residents, commuters, workers, and visitors. *Id.* ¶ 23. It would also delay execution of the mitigation measures intended to lessen burdens on EJ communities. *Id.* ¶ 22.

## LEGAL STANDARD

Defendants previously set out the applicable standard on their motions to dismiss in their moving papers. MTD at 6. As for Plaintiffs' motions for a preliminary injunction—in *TANY*, *Chan*, and *Mulgrew*—the exercise of judicial power to enjoin action before the merits have been resolved is an "extraordinary and drastic remedy" that should not be granted unless the movant carries its burden of persuasion "by a clear showing." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). To satisfy that burden, a plaintiff must show that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent preliminary injunctive relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *see also* TANY PI at 8 (citing same). Where, as here, a plaintiff seeks to stop governmental action, they must "meet the more rigorous likelihood-of-success standard" by establishing a "clear or substantial likelihood of success on the merits." *Auto. Club of N.Y.*, 842 F. Supp. 2d at 676. That enhanced burden is especially important where, as here, a plaintiff seeks to "alter the status quo by commanding a positive act"—namely, to stop the various governmental actors from proceeding with the implementation of the Program. *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 510 (2d Cir. 2006), *amended on denial of reh'g*, 480 F.3d 138 (2d Cir. 2007); *see also Haley v. Pataki*, 106 F.3d 478, 483 (2d Cir. 1997) ("mandatory injunctions are not granted in doubtful cases in which the facts and law do not clearly favor the moving party").

To establish irreparable harm, which is still required even when, as here, a plaintiff has asserted constitutional claims, *see infra* 25-28, a plaintiff must demonstrate that they will suffer

"an actual and imminent" injury that cannot be remedied "if a court waits until the end of trial to resolve the harm," *Grand River*, 481 F.3d at 66. An irreparable injury is one "that cannot be remedied by an award of monetary damages." *Auto. Club of N.Y.*, 842 F. Supp. 2d at 676 (quoting *Shapiro*, 51 F.3d at 332).

## ARGUMENT

### I.    Plaintiffs do not demonstrate (or even allege) a likelihood of success on the merits

Plaintiffs fail to plausibly allege a violation of law, and those Plaintiffs moving for preliminary injunctions (in *TANY*, *Chan*, and *Mulgrew*) have come nowhere close to establishing a "clear or substantial likelihood of success on the merits" that would be necessary (but not sufficient) to grant them relief at this stage. *Auto. Club of N.Y.*, 842 F. Supp. 2d at 676.

### A.    The Program does not violate the Dormant Commerce Clause or the Right to Travel

As an initial matter, Chan and Mulgrew do not seriously dispute that the Program is reviewed under the deferential, three-part test of *Evansville-Vanderburgh Airport Authority District v. Delta Airlines, Inc.*, 405 U.S. 707 (1972), and *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355 (1994). MTD at 7-11. TANY does not claim otherwise. And while Chan and Mulgrew argue, in a footnote, that strict scrutiny applies, the Second Circuit has said in no uncertain terms that "[t]his principle … is not applicable to … 'minor restrictions on travel [which] simply do not amount to the denial of a fundamental right.'" *Selevan v. New York Thruway Auth.*, 711 F.3d 253, 258 (2d Cir. 2013) (quoting *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 53 (2d Cir. 2007)); *see also* MTD at 7-11.

Properly analyzed under *Evansville/Northwest Airlines*, Plaintiffs' claims fail as a matter of law. While Chan and Mulgrew note that some opinions in this area have been decided on a motion for summary judgment, *Chan* Opp. at 7, that does not mean that the dormant Commerce

Clause and right to travel claims here are unsuitable for resolution based on the pleadings, *see, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (complaint must plead facts sufficient "to state a claim to relief that is plausible on its face").  Indeed, both Your Honor and the Second Circuit have resolved these types of claims on motions to dismiss.  *See Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 108 (2d Cir. 2017); *Abadi v. Am. Airlines, Inc.*, 2024 WL 1346437, at *1 (S.D.N.Y. Mar. 29, 2024).[5]  Numerous other courts have done the same.  *See, e.g.*, *Forever Fencing, Inc. v. Bd. of Cnty. Comm'rs of Leavenworth Cnty.*, 2024 WL 3084973, at *6 (10th Cir. June 21, 2024); *Owner Operator Indep. Drivers Ass'n, Inc. v. Pa. Tpk. Comm'n*, 934 F.3d 283, 295-96 (3d Cir. 2019); *Ullmo v. Ohio Tpk. & Infrastructure Comm'n*, 126 F. Supp. 3d 910, 916 (N.D. Ohio 2015).[6]

Indeed, Chan and Mulgrew's position on the supposed difference between a motion to dismiss and one for summary judgment in these circumstances makes little sense.  On the one hand, they ask the Court to immediately enjoin implementation of the Program because they purport to have not just plausibly stated a claim for constitutional violations, but to have done so clearly and irrefutably.  *Chan* PI at 2.  On the other hand, Chan and Mulgrew argue that the Court should not dismiss their claims on the pleadings because their claims require discovery.[7]  *Chan* Opp. at 7-8.  But Plaintiffs cannot have it both ways.  Either the record is sufficient at this point to determine whether they have plausibly alleged a claim—and done so clearly—or it is not.  Here,

---

[5] Even in *Selevan*, which Chan and Mulgrew principally rely upon, the Second Circuit did not hold that it would be improper to engage in the *Evansville/Northwest Airlines* analysis on a motion to dismiss; rather, the court held that "on remand" the district court needed to determine whether "strict scrutiny" applied (it did not), and otherwise "apply the *Northwest Airlines* test to determine if the toll discriminates against interstate commerce."  584 F.3d at 102.

[6] Although Chan and Mulgrew contend that the Supreme Court in *American Trucking Associations v. Scheiner* stated "the fact-dependent nature of dormant Commerce Clause challenges has long been understood as part of what makes them difficult," that language does not appear anywhere in the decision.  *Chan* Opp. 8 (purporting to quote 483 U.S. 266, 280 (1987)).  This quote appears to come from *American Trucking Association, Inc. v. Alviti*, 630 F. Supp. 3d 357, 393 (D.R.I. 2022), *appeal filed*, No. 22-1796 (1st Cir.).

[7] Plaintiffs' position that they are entitled to discovery is curious in light of their statement at the recent conference before the Court on November 21, 2024 that they were not seeking an evidentiary hearing on their motions for a preliminary injunction.

under black-letter law, the Court can and should determine that Plaintiffs' allegations cannot withstand even a motion to dismiss.

       1. *Fair approximation of use*

As Plaintiffs acknowledge, fair approximation requires only "rational distinctions among different classes of motorists." *TANY* Opp. at 15 (quoting *Selevan*, 711 F.3d at 260). "Tolls may support the budget of a governmental unit that operates facilities so long as those facilities 'bear at least a functional relationship to facilities used by the fee payers.'" *Chan* Opp. at 9 (quoting *Bridgeport and Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 87 (2d Cir. 2009). That test is easily satisfied here.

While Chan and Mulgrew dispute Defendants' "exhaustive process to balance the interests of different parties," *Chan* Opp. at 10, their conclusory denials of fact do not give rise to a plausible claim—let alone grounds to enjoin the Program—since they are clearly contradicted by the TMRB Report and other Program documentation.[8] The record before the Court demonstrates that Defendants adopted the Program after an intensive, multi-year effort that indeed balanced a multitude of interests, and obviously reflects "rationality." *See Mulgrew*, 2024 WL 2351732, at *3-4.

Unable to show otherwise, Chan and Mulgrew focus their efforts on denying that the CBD is part of an "integrated transportation system." *Chan* Opp. at 10. According to Chan and Mulgrew, the New York City metropolitan system is not an integrated transportation system—and this case is distinguishable from *Angus Partners*, where Judge Torres held it is, 52 F. Supp. 3d at 564-70—because "[a] key element of the program is tolling a large number of drivers who do not *use* (and effectively cannot use) the MTA," *Chan* Opp. at 11 (emphasis added). In their view,

---

[8] Chan and Mulgrew appear to recognize this, stating that they "are, at the very least, entitled to discovery on the issue." *Chan* Opp. at 10. But they are only entitled to discovery if they have pleaded a plausible claim.

because New York City's transit system is not an integrated transportation system, there is an unconstitutional disconnect between the tolls that drivers pay to enter the CBD and the City's transportation facilities that they are required to support.

Not only does this version of the facts blink reality, but the constitutional analysis is far more straightforward than Plaintiffs contend. Here, what constitutes the "integrated transportation system," as Judge Torres recognized, is "the means of transportation in [the] region"—not merely one component of it. *Angus Partners LLC*, 52 F. Supp. 3d at 566; *see also Janes*, 774 F.3d at 1055 & n.6 (upholding finding that "tolls [on bridges] at issue provide crucial revenue that supports the larger Metropolitan Transportation System," a "large integrated transportation system"); *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, 887 F.2d 417, 421 (2d Cir. 1989) (upholding finding that Port Authority, which operates PATH trains, buses, and certain bridges and tunnels connecting New York and New Jersey, is "integrated interdependent transportation system"). Indeed, the New York Legislature has stated that the MTA's purpose is to "develop and implement a unified mass transportation policy." N.Y. Pub. Auth. L. § 1264. The integrated transportation system covers the entirety of the metropolitan area—and beyond—as all such areas are interdependent and benefit from transportation options throughout the region.

Moreover, there is no dispute that "drivers" are only tolled if they "use" certain vehicles (e.g., cars) in certain areas (lower Manhattan) that are part of this integrated transportation system. Under the Program, a toll is charged only if a driver enters the CBD and thus takes advantage of that system. It is not required for purposes of *Evansville/Northwest Airlines* that a driver paying a toll to enter the CBD must also use the subway, bus, or train system.[9] As the Second Circuit

---

[9] Whether it is MTA or one of its subsidiaries or affiliates that operates a particular train system—or another entity entirely—is irrelevant for these purposes. *See Chan* Opp. at 16. As Judge Torres recognized, no case has "required all means of transportation in a region to be exclusively operated by a single entity in order to establish the existence of an integrated transportation system." *Angus Partners LLC*, 52 F. Supp. 3d at 566 (quoting 887 F.2d at 421)) (citing

recognized in *Janes*, where tolls "are used to defray the cost of … the facilities of a large integrated transportation system, the operation of which facilitates interstate travel," and "divert[] numerous travelers in the region from the roadways" and "make[] it possible for users of the roadways to travel without excessive road congestion," the dormant Commerce Clause and right to travel are satisfied. 774 F.3d at 1055.[10]

Plaintiffs' reliance on *Bridgeport* only shows how off base their arguments really are. *TANY* Opp. at 20; *Chan* Opp. at 12. In that case, the Second Circuit held that a ferry fee imposed on trips from Bridgeport, Connecticut to Port Jefferson, New York that was used to "cover all of the Port Authority's operating costs and development projects throughout the Port District," "many" of which "activities" were "not available to the ferry passengers," failed the fair approximation test because "quality-of-life improvements" like "reduction in traffic" and "reduce[d] air pollution" on the highway did not "confer an actual or potential benefit to the ferry passengers as users of the ferries." 567 F.3d at 84, 87. But this case, of course, has nothing to do with "quality of life" improvements, the Bridgeport-Port Jefferson ferry, the L.I.E., or I-95. Here, in contrast to *Bridgeport*, the New York City metropolitan region is a heavily traversed, interconnected transportation system, and Plaintiffs will benefit from reduced traffic and congestion in the CBD and improved public transit as users of that system—whether they drive by car or truck, or instead commute by bus, subway, or train.[11] Indeed, TANY's own declarations

---

Auto. Club, 887 F.2d at 421; *Wallach v. Brezenoff*, 930 F.2d 1070, 1071 (3d Cir. 1991); *Janes*, 977 F. Supp. 2d at 340-42; *Molinari v. N.Y. Triborough Bridge & Tunnel Auth.*, 838 F. Supp. 718, 726 (E.D.N.Y. 1993)).

[10] TANY similarly argues there is no functional relationship between the tolls and the "facilities supported by those fees" because trucks cannot use mass transit and thus "have no way to benefit from improvements to subways, buses, and railroads." *TANY* Opp. at 19. But again, the question is not whether "trucks" can use mass transit. It is whether they will benefit, in their use of the integrated transportation system, from reductions in congestion. Here, they clearly will. *See, e.g.*, *Janes*, 774 F.3d at 1055 & n.6. Indeed, this is one of the primary purposes of the Program.

[11] For the same reasons, this case is miles away (pun intended) from *Alviti*, 630 F. Supp. 3d 357. *Chan* Opp. at 13. This is not a dispute about a toll imposed on the use of a bridge to support the maintenance and upkeep of certain bridges throughout Rhode Island. *See* 630 F. Supp. 3d at 382 (declining to define "facility" to include non-tolled bridges). It is a dispute over tolls imposed for entering the nation's densest metropolitan area, which the courts have

demonstrate that its members' need to make "frequent and efficient" deliveries within the CBD, *TANY*, ECF 8 at 3, and it is these very trucks that will enjoy the benefits of reduced congestion as the tolls and improvements to the mass transportation system "divert[] numerous travelers in the region from the roadways to mass transportation." *Janes*, 774 F.3d at 1055 & n.6.

TANY separately argues that the Program's imposition of a $14.40 or $21.60 toll on trucks (depending on their size) each time they enter the CBD is irrational and not a fair approximation of their use of the City's transportation facilities because trucks "make up only 4% of total vehicles in the Zone," whereas according to TANY, taxis and FHVs, "which combined make up 52% of all traffic in the Zone, are fully exempt under the Tolling Program." *TANY* Opp. at 18. But that is factually incorrect. Under the Program, taxis will be charged $0.75 per trip, while FHVs will be charged $1.50 per trip. Declaration of Roberta A. Kaplan ("Kaplan Decl."), Ex. 1. As the TMRB Report explains taxis and FHVs are "exempted *from the daily system toll* on vehicles" and "[i]nstead, a *per-ride CBD toll* [is] added to each paid passenger trip fare for rides made to, from, or within the CBD…" TMRB at 8. Indeed, TANY itself cites language from the Report to that effect. *TANY* Opp. at 12 (citing TMRB at 22). The Report notes that imposing tolls on taxis and FHVs in this manner furthers the Program's objectives because "[u]ltimately, it is passengers—not drivers—who make the choice to add to vehicle congestion in the CBD, despite readily accessible public transportation to and within the CBD," and it is they "whose travel patterns must be influenced to fight congestion in the CBD." TMRB at 22.[12] In other words, this is not a battle

---

already repeatedly held constitutes an integrated transportation system. In any event, *Alviti* appears to have expressly disagreed with *Angus Partners*, and insofar as it conflicts, it is not persuasive here. *Id.*

[12] The TMRB Report also observes that imposing a toll in this manner was administratively desirable because it was otherwise unclear how a daily toll would be applied ("Would it be paid by the driver, or by the first passenger of the day entering the CBD? Would it be split between passengers, and if so, how?"), and because many taxi and FHV drivers "are considered an environmental justice population" and so should "not be subject to more than the daily toll for automobiles." TMRB at 22-23.

over "semantics." *TANY* Opp. at 12. In fact, taxis and FHVs are subject to the toll as well, and TANY's case for overturning the Program rests on a blatant misrepresentation of how the Program actually works. *Bartman v. L'Officiel USA Inc.*, 2022 WL 4085850, at *3 (S.D.N.Y. Sept. 2, 2022) (where "allegations are contradicted by a document that the complaint incorporates by reference, the document controls").[13] And even if the toll were directly paid by passengers (which it is not), the Supreme Court has already explained that would be irrelevant to the *Evansville/Northwest Airlines* inquiry. *See Evansville-Vanderburgh Airport*, 405 U.S. at 714-15 ("[W]e do not think it particularly important whether the charge is imposed on the passenger himself, to be collected by the airline, or on the airline, to be passed on to the passenger if it chooses.").[14]

### 2. *Excessiveness compared to benefits*

Plaintiffs' arguments on excessiveness are equally unavailing. For starters, in *Alviti*, a case that Plaintiffs cite, *Chan* Opp at 7; *TANY* Opp at 17, all parties agreed that authorization of the program at issue under the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA") "dispensed with at least one element of the Commerce Clause analysis—the excessiveness prong." 2020 WL 4050237, at *2 (D.R.I. July 20, 2020); *see also Alviti*, 630 F. Supp. 3d at 379 ("congressional authorization takes excessiveness out of play"). In other words, the nature of the tolling program at issue here—and its authorization by Congress under that same statute—means

---

[13] Plaintiffs appeal to *Am. Trucking Ass'cs, Inc. v. Scheiner*, 483 U.S. 266, 274-75 (1987), where the Supreme Court analyzed the combined effect of several taxes that, when taken together, the cost per mile for state trucks was "five times as heavy as the cost per mile borne by local trucks, the taxes are plainly discriminatory." *Id.* at 285-86. The same is simply not true here where there is no disparate treatment of out-of-state payers, out-of-state payers will also equally share in the benefits of the tolls felt on the roadways they share, and tolls are not taxes.

[14] TANY also disputes the MTA's findings that "a truck contributes more to congestion than a passenger vehicle" on the ground that "commercial trucks make up only 4% of all vehicle traffic in the Zone while passenger vehicles, taxis, and For-Hire Vehicles make up 87%." TANY Opp. at 17. But that is a non-sequitur. Obviously, trucks contribute more to congestion in the CBD on a per-capita basis even if they make up a smaller percentage of vehicle traffic in the CBD overall. TMRB at 20.

that Plaintiffs cannot challenge the Program on (at least) this basis in the first place.  *See TANY*, ECF 61 at 7-8; *TANY*, ECF 79 at 4.

But Plaintiffs cannot show excessiveness anyway.  Chan and Mulgrew argue that the toll is excessive because "there is no indication that any of the money would be reserved for capital improvements that would allow any of the Plaintiffs to switch to public transit in their daily lives." *Chan* Opp. at 14.  But that is, again, a bald conclusory statement that contradicts the extensive findings underlying the Program.  More importantly, Plaintiffs identify no reason why it could possibly be relevant whether a specific individual switched to public transit.  Obviously, the actions of one person have nothing to do with the excessiveness analysis under *Evansville/Northwest Airlines*.  Plaintiffs' argument here is similar to a person focusing through binoculars so much that they can no longer see the forest through the trees.

TANY also asserts that the Program is irrational because its aim "is to reduce congestion in the Zone by encouraging drivers to pursue other travel options, such as using subways and busses," but "delivery trucks cannot take advantage of any of these other options." *TANY* Opp. at 17.  But the fact that delivery trucks—obviously—cannot use mass transit again misses the point.  And TANY's bald contention that "delivery trucks cannot avoid the Zone by changing their routes or delivery times," *TANY* Opp. at 17, is also irrelevant for these purposes.

### 3.  *Discrimination against out-of-state interests*

Plaintiffs clearly fail to establish that the Program, which imposes tolls without regard to residence, discriminates against out-of-state commuters.  MTD at 13-14; *see also Angus Partners*, 52 F. Supp. 3d at 562-64.  A benefit for in-state commuters does not violate the Constitution. *Contra* Chan Opp. at 17-18.[15]  Chan and Mulgrew attempt to silo off *Southold* because it "involves

---

[15] The Second Circuit in *Selevan* explained that bare allegations that a toll placed burdens on interstate commerce that exceeded any benefit were not sufficient to state a claim under the dormant Commerce Clause.  711 F.3d at 260-61.

restrictions on what vehicles may use a single-ferry terminal." *Id*. at 18.  But they identify no reason why that would make a difference: the test remains the same.[16]

B.  **The Program is not preempted by the F4A**

1.  *The F4A does not apply to tolling programs*

As TANY concedes, no court has ever held that the F4A preempts a tolling program.  *TANY Opp*. at 23.  And for good reason: the specific authority to impose tolls is regulated and authorized by an entirely different federal statutory scheme, enacted decades before the F4A.  *See* 23 U.S.C. §§ 129, 301 (1958).[17]  There is zero evidence to suggest that, in passing the F4A, Congress intended to surreptitiously preempt state tolling programs that it had already authorized under previously enacted federal tolling statutes.  *See Ca. Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 330 (1997).  Indeed, when amending the F4A's preemption provision in the Transportation Equity Act for the 21st Century of 1998, Congress reaffirmed the federal statute under which the Program is authorized, Section 1012(b) of the ISTEA, by amending that statute and appropriating funds for additional value pricing pilot programs.  Pub. L. 105-178, §§ 1216, 4016, 1101(12) (June 9, 1998).[18]  Congress therefore obviously "expected" that value pricing programs, such as the Program here, "would continue."  *Dillingham*, 519 U.S. at 330.

---

The Court cited the "reasonableness of the basis for granting a rate preference to [local] residents," the "very small amount of the differential between the rates charged," and "the fact that the beneficiaries of the differential represent only a tiny percentage of New York residents."  *Id.* at 261 n.8.  Here the tax credit for local residents earning less than $60,000 is the exact same—reasonable and only applicable to a subset of residents.

[16] Chan and Mulgrew's reliance on the internal-consistency test fails for the reasons stated in the State's brief.

[17] Pub. L. 85-767, §§ 129, 301 (Aug. 27, 1958).

[18] Congress further amended the F4A's preemption provision in the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") of 2005, Pub. L. 109-59, § 4105 (Aug. 10 2005).  Once again, Congress reaffirmed, and appropriated additional money for, value pricing programs.  *Id.* § 1604.  And when Congress has chosen to restrict tolling programs, it has done so expressly.  *See* MTD at 20 n.10 (citing 29 U.S.C. §§ 129, 301).

As a result, TANY has no basis for its argument that Congress through the F4A intended to preempt a tolling program that is actually authorized by federal law, *see* Kaplan Decl. Ex. 2, that applies to the general public at large, does not target specific motor carriers, and "does not speak" to motor carriers' "rates, routes, or services." *Omya, Inc. v. Vermont*, 33 F. App'x 581, 584 (2d Cir. 2002); *see also Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647 (9th Cir. 2014) (state regulations that do not "directly or indirectly mandate, prohibit, or otherwise regulate certain prices, routes, or services" are not preempted by the F4A).  If accepted, TANY's argument—that Congress intended to give trucks and only trucks a special exemption from federally authorized tolling programs—would obviously have disastrous consequences for transportation projects across the nation.  "Basic principles of statutory interpretation" strongly weigh against such a nonsensical position.  *Jones v. Hendrix*, 599 U.S. 465, 478 (2023) (statutes must be read "in harmony"); *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 112 (2014) (recognizing canon against implied repeal and canon that the more specific statute controls over the more general statute).

TANY's authorities do not demonstrate otherwise.  *TANY* Opp. at 21-22.  In two of the three F4A cases TANY cites, the courts were not even presented with tolls, and they declined to hold that preemption applied.  *See Kloppel v. Sears Holdings Corp.*, 2018 WL 1089682, at *6 (W.D.N.Y. Feb. 28, 2018); *N.Y. State Motor Truck Ass'n v. Pataki*, 2004 WL 2937803, at *6 (S.D.N.Y. Dec. 17, 2004).  And the Program is nothing like the regulation at issue in *Rowe v. New Hampshire Motor Transportation Association*, which sought to "directly" regulate "a significant aspect" of motor-carrier services.  552 U.S. 364, 370-72 (2008).  While TANY asserts that the Program subjects trucks to "disparate treatment" because only carriers are required to pay for each crossing into the CBD, *TANY* Opp. at 23, that again is not accurate.  Under the Program, passenger

vehicles and motorcycles are the only vehicles entitled to a once-per-day toll cap; all other vehicles entering the CBD (including noncommuter buses, pick-up trucks with modified beds, and vans with extended roofs above the windshield, as well as taxis and FHVs) will be charged each time they enter. TBTA at 1-2 (setting "[d]aily toll cap of once per day for Class 1 and Class 5 vehicles").

TANY further contends that the Program's non-peak period toll schedule, which grants a 75% discount to vehicles entering the CBD overnight, somehow shows that the Program's "intent" is to alter carriers' delivery and service patterns. *TANY* Opp. at 23. It is extremely commonplace, however, for tolling authorities to charge different rates during peak and non-peak hours,[19] and the 75% overnight discount applies equally to all categories of vehicles, not just to trucks. TANY cites no authority to suggest that a state's intent is relevant to the preemption analysis; rather when it comes to preemption, "the purpose of Congress is the ultimate touchstone." *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 49 (2d Cir. 2018); *see also Air Transp. Ass'n of Am., Inc. v. U.S. Dep't of Transp.*, 613 F.3d 206, 217 (D.C. Cir. 2010) (rejecting similar argument, and explaining only relevant question is whether state regulation is "related to a price, route, or service"). Nor can TANY argue that the non-peak period toll schedule will substantially affect its members' services or routes, given TANY's prior admissions to the contrary. *See, e.g.*, *TANY* ¶ 59 ("[T]he Tolling Program's off-peak pricing 'concession' will have little to no effect on TANY members' delivery schedules."); *see also Freeman v. Stake.com*, 2023 WL 4187574, at *5 (S.D.N.Y. June 26, 2023) (briefing in opposition to dismissal cannot contradict allegations).

TANY argues that the Program is different from other tolls because one of its purposes is to reduce congestion by rerouting travel. *TANY* Opp. at 23. But congestion reduction is a permitted use for a value pricing plan authorized under the ISTEA. *See* 23 U.S.C. § 149 notes (Value Pricing

---

[19] *See, e.g.*, https://www.panynj.gov/bridges-tunnels/en/tolls.html.

Pilot Program), cl. 8.    Indeed, the authorizing statute, prior to its amendment, was titled "Congestion Pricing Pilot Program."  Pub. L. 102-240 § 1012(b) (Dec. 18, 1991).  In any event, the Program does not "mandate, prohibit, or otherwise regulate" the routes that trucks may take. *Dilts*, 769 F.3d at 647.  As TANY concedes, its members' services will be unaffected by the Program, as they will continue to make deliveries in the CBD along their usual routes and schedules.  *See* MTD at 20 (citing *TANY* ¶¶ 49, 54, 59).

2.  *Even if the F4A applied, the Program is a permissible weight limitation*

Even if the F4A applied (which it does not), the Program falls within the F4A preemption exception that preserves "the authority of a State to impose highway route controls or limitations based on the size … of the motor vehicle."  49 U.S.C. § 14501(c)(2)(A); *see* MTD at 21-22.  It is frivolous to argue, as TANY does, that streets in the CBD are not "highways."  *TANY* Opp. at 25. For purposes of the F4A, a "highway" means "a road, highway, street, and way in a State."  49 U.S.C.A. § 13102(9).  TANY again does not explain why the Program's "purpose" should matter but, even assuming that it does, the TMRB explained that its recommendation for charging trucks higher tolls was driven by trucks' "outsized impact on congestion, because of their large size." TMRB at 20.  TANY offers no authority to suggest "that limitations based on motor vehicle size must be unvarying or inflexible" to fall within the weight-limitation preemption exception.  MTD at 21.  The only case cited by TANY in this regard concerns an entirely different preemption exception.  *See Co. Motor Carriers Ass'n v. Town of Vail*, 2023 WL 8702074, at *8 (D. Colo. Dec. 15, 2023) (ordinance prohibiting nearly all deliveries within town center likely not authorized by safety-regulation exception).

### C.    The Program does not violate the Green Amendment

Plaintiffs' Green Amendment claim can be dispensed with easily.  At bottom, Plaintiffs argue that the Green Amendment precludes government action from increasing pollution even by

19

the tiniest amount, and even when the increase in pollution has been deemed insignificant, and when it will be sufficiently mitigated as the result of an extensive environmental review process. But this argument cuts against any reasonable interpretation of the Amendment's legislative history and the case law interpreting it, not to mention common sense.[20]  After all, the EA concluded that overall air quality in the local and regional study areas is projected to improve due to the Program, including in the CBD (which includes BPC and Lower Manhattan). DOT_0007303, DOT_0036838–41.[21]

### 1.  *Plaintiffs ascribe a nonsensical meaning to the Amendment*

Plaintiffs' interpretation of the Green Amendment would: (1) invalidate the entire schemes of environmental review and mitigation provided for under both federal (NEPA) and State law (the State Environmental Quality Review Act ("SEQRA"), as had been completed in *Marte*); and (2) render unconstitutional virtually any infrastructure project or even the operation of essential municipal services like public transit, garbage collection, and firefighting that place gas-fueled vehicles on roadways.  Such an application would also prevent the implementation of technologies designed to protect the environment, such as renewable energy development, because any such project obviously has "some" environmental effect.  Indeed, the instant challenges seek to hinder a Program that will cause an overall *decrease* in vehicular emissions within the region and the CBD.  DOT_0007303, DOT_0036838–41.  Plaintiffs have no basis for reading a "no-growth

---

[20] As part of their Green Amendment argument, Plaintiffs effectively challenge the NEPA review for the Program as resulting in insufficient mitigation.  In this respect the *Mulgrew* and *New Yorkers* Plaintiffs' Green Amendment claims are time-barred.  *Mulgrew* ECF 105 at 23 (citing *Marte v. City of N.Y.*, 2023 N.Y. Slip. Op. 31198(U), 2023 WL 2971394, at *6-7 (Sup. Ct. N.Y. Cnty. Apr. 17, 2023) (holding that Green Amendment does not provide "yet another 'bite at the apple'" to belatedly challenge an environmental review)).  Mulgrew's argument that *Marte*'s holding does not apply in the context of an environmental review completed under NEPA rather than the state law equivalent, because NEPA imposes purely procedural requirements, is inapposite here, where Plaintiffs raise a procedural challenge to a finding that, with the mitigation identified, the Program will have no significant impacts. DOT_0000363.

[21] Citations formatted as DOT_XXXX refer to the Administrative Record lodged in *Chan*.

policy" into the State constitution.  Moreover, Plaintiffs' theory under the Green Amendment was

rejected in *Marte*, one of a handful of state court decisions addressing Green Amendment claims

so far.  2023 WL 2971394, at *4 ("City and state agencies considering a zoning change must

balance environmental impacts with the benefits of that development; here, that includes increased

housing.").

Chan and Mulgrew's attempts to reframe the legislative history of the Green Amendment

do not help.  *Mulgrew* ECF 118 at 23, n.16.  The Green Amendment does not apply to private

actors, so Plaintiffs' purported distinction makes no sense.  *Fresh Air for the Eastside Inc. v. State*

*of New York*, 217 N.Y.S.3d 381 (4th Dep't 2024).  Rather, when asked during the 2019 debate if

the Green Amendment was intended to change current law, including "standing issues that limit a

person's access," the "statute of limitations," or "specific procedures under SEQR[A]," the sponsor

responded: "This doesn't … change any of that."  *See* Kaplan Decl. Ex. 3 at 33.  Similarly, when

asked if the Green Amendment would "transfer authority from [the] Legislature and [its]

environmental experts in [government agencies] to the court system," the sponsor replied "I

respectfully disagree…."  *Id.* at 30.

While Plaintiffs reference statements made by Assembly Member Septimo during the 2021

Assembly debate, *Chan* Opp at 23 n.16, they ignore his statements that the Green Amendment is

not aimed at creating a new legal pathway to address environmental harms.  Assembly Member

Septimo explained that the Green Amendment "will simply make it so that companies, developers,

governments, and everyone in between must be thoughtful about environmental impact and how

that impact relates to real living, breathing people."  *See* Kaplan Decl. Ex. 4 at 70.  His

characterization of the Green Amendment as a "backstop," relied upon by Chan and Mulgrew,

*Chan* Opp. at 23 n.16, is consistent with the understanding that it was intended to discourage the

rolling back of existing environmental protections, not adding a new pathway for litigants. *See Marte*, 2023 WL 2971394, at *3 ("The Court hesitates to create a brand-new route to challenge developments on an environmental basis, which is exactly what plaintiffs' action would entail. SEQRA and CEQR [City Environmental Quality Review] provide substantial environmental protections and require state and city agencies to consider all manner of factors before approving certain projects. A Court is not the right forum to, essentially, modify the state's environmental regulatory scheme regarding consideration of proposals for developments—that is the province of the legislature.").

  2.  *Plaintiffs' claims of potential environmental harm are refuted by the EA upheld by this Court*

In an effort to overcome Defendants' arguments demonstrating why Mulgrew and New Yorkers' Green Amendment claims are barred by the statute of limitations,[22] Plaintiffs assert that the NEPA statute of limitations does not apply because they are not asserting a procedural harm; rather, they purport to seek redress for alleged anticipated effects of the Program. *See New Yorkers* Opp. at 6; *Chan* Opp. at 21. But the Green Amendment cannot be deployed to halt the Program based on mere speculation about "prospective" environmental harms. *See Marte*, 2023 WL 2971394, at *7 (holding speculative environmental harms did "not create a substantive basis for [an] action" brought under the Green Amendment).

Even more importantly, Plaintiffs' claims regarding the potential impacts of the Program and the sufficiency of mitigation have largely already been rejected by this Court, *Mulgrew*, 2024 WL 3251732, at *22-46, and the Green Amendment does not provide an avenue to revisit them, *see Marte*, 2023 WL 2971394 at *7-8. Plaintiffs base their arguments on the findings in the EA.

---

[22] *See Mulgrew* ECF 105 at 23; *supra* 20-21 & n.21.

*Chan* Opp. at 26.  But the EA demonstrated that the Program will not have a significant adverse impact on the environment and will provide adequate protection to EJ communities through robust mitigation measures, a determination upheld by this Court in granting summary judgment to Defendants with respect to the *Chan* Plaintiffs' challenge to the FONSI.  *See Mulgrew*, 2024 WL 3251732, at *46.[23]

The EA here specifically accounted for overburdened EJ communities, which the EA found could experience increases in traffic and associated emissions.  DOT_0007303.  To address these potential impacts, "the FWHA and Sponsors acknowledged the problem and developed [both regional and place-based mitigation] measures to address it…opt[ing] for a two-pronged approach: region-wide measures for the benefit of all overburdened EJ communities, and additional place-based mitigation for those EJ communities with particularly severe preexisting burdens." *Mulgrew*, 2024 WL 3251732, at *93.  As with the unsuccessful NEPA challenge in *Chan*, "Plaintiffs contrive a concerning portrait of non-binding EJ mitigation measures … whose purposes are never stated, much less evaluated." *Id.* at *106.  But "that picture bears little resemblance to the reality of the Project Sponsors' commitments here." *Id.*

## II.    Plaintiffs have not shown irreparable harm

### A.    Plaintiffs have not shown that their constitutional claims would result in anything more than compensable, economic harm

Although irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," *Shapiro*, 51 F.3d at 332, Plaintiffs offer little more than a page of

---

[23] A court does not need to accept as true factual allegations contradicted by documents integral to the pleading, incorporated by reference, subject to judicial notice, or "fairly implicated" but selectively ignored by the pleading. *E.g., Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382-83 (S.D.N.Y. 2020) (Liman, J.); *see also Barker v. Bancorp, Inc.*, 2022 WL 595954, at *6 (S.D.N.Y. Feb. 25, 2022); *Sunwoo v. JPMorgan Chase & Co.*, 2021 WL 2443814, at *6 (S.D.N.Y. June 15, 2021).  This is particularly true where, as here, the Court has already found to the contrary in a decision on the merits in this case.  *See Mulgrew*, 2024 WL 3251732, at *44-45.

halfhearted briefing on this issue. *TANY* PI at 25-26, *Chan* PI at 3. According to Plaintiffs, this requirement is not really a requirement at all because they have shown a likelihood of success on the merits of their constitutional claims, and that constitutes per-se irreparable harm. *TANY* PI at 25-26; *Chan* PI at 3. Plaintiffs also argue that, "it is simply not workable to redress this harm"—whatever that harm is—"several years in the future," given "the tremendous number of vehicles entering the Zone." *TANY* PI at 26. As demonstrated below, however, both of these points are flatly refuted by Judge Holwell's decision in *Automobile Club of New York, Inc.,* 842 F. Supp. 2d at 676-77, and then-District Judge Droney's decision in *Bridgeport, Port Jefferson Steamboat Co. v. Bridgeport Port Authority*, 2004 WL 840140 (D. Conn. Apr. 15, 2004).

In *Automobile Club*, the AAA sought to enjoin the Port Authority from collecting increased toll rates on its bridges and tunnels because those tolls supposedly violated the dormant Commerce Clause. 842 F. Supp. 2d at 676-77. On the AAA's motion for a preliminary injunction, Judge Holwell made two determinations that are critical here. First, he recognized that the plaintiffs needed to establish irreparable harm, separate and apart from a likelihood of success on the merits. *See id.* Second, he held that the plaintiffs could not show irreparable harm because the Port Authority had "persuasively argued that any harm alleged by AAA can be adequately remedied through a monetary refund," since 80% of drivers paying the toll would use E-Z Pass, which would facilitate a refund if the Court reversed the tolls, and any cash-paying customers could be offered a discounted rate following reversal. *Id.* While this latter component of compensation would "not be perfect," Judge Holwell held that the AAA failed to meet its burden to show "that a substantial number of drivers would be unreimbursed." *Id.* at 676-77;[24] *see also Auto. Club of N.Y., Inc. v.*

---

[24] Judge Holwell also concluded that any fear that the tolls would irreparably harm the Staten Island manufacturing sector were "too remote and speculative" to support the motion. *Id.* at 677 n.3.

*Port Auth. of N.Y. & N.J.*, 2014 WL 6772058, at \*3 (S.D.N.Y. Dec. 2, 2014) (denying subsequent preliminary injunction where AAA had not shown "remedy proposed by then Port Authority (i.e., cash discounts for those who pay by cash) would leave large numbers unreimbursed").

Judge Droney reached a similar result eight years earlier in *Bridgeport Port Authority*. In that case, the plaintiff challenged a ferry surcharge under the dormant Commerce Clause and right to travel, among other things, and sought a preliminary injunction. The court recognized that the plaintiffs were required to show irreparable harm, separate and apart from any alleged constitutional violation, and that they could not do so because, "[a]s to whether all the passengers could be located to receive their portion of any repayment, the plaintiffs have not shown that it would be unlikely or that another method of relief is unavailable." 2004 WL 840140, at \*4.

The facts with respect to irreparable injury in both of these cases are completely consistent with the situation here. As in *Automobile Club* and *Bridgeport Port Authority*, the TBTA has affirmed that it will be able to issue refunds in the event that the toll is overturned. C. de Cerreño Decl. ¶¶ 11-14. Indeed, the record shows that a similar proportion of customers will pay the toll via E-ZPass here as in *Automobile Club*. *Id.* at ¶13. Unlike in *Automobile Club*, there is no mechanism for a customer to pay the toll in cash unless it is in-person at an authorized facility where the transaction and customer will be recorded, so there is no risk that that the TBTA would be incapable of refunding such customers. *Id.* ¶ 14. In other words, because Plaintiffs' alleged harm is economic, it is "the antithesis of irreparable." *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 331 (S.D.N.Y. 2013).

Unable to avoid the monetary nature of their alleged injury, Plaintiffs attempt to erase this requirement altogether by arguing that every alleged constitutional harm is somehow per-se irreparable. *TANY* PI at 25-26; *Chan* PI at 3-4. But in *Automobile Club* and *Bridgeport Port*

*Authority*, which involved similar constitutional challenges to tolls as the ones here, the courts were clear that irreparable harm *and* a likelihood of success are independently necessary showings, and they engaged in distinct inquiries as to each.  While it is true that certain dignitary violations of constitutional rights can amount to per se irreparable injury, that principle does not apply when the alleged constitutional injury (*i.e.* paying a toll) is economic in nature.  Indeed, the courts routinely distinguish between plaintiffs whose constitutional rights are "directly regulated or restrained" and those who retain their rights, but "suffered only economic injury in pursuit thereof."  *Lost Lake Holdings LLC v. Town of Forestburgh*, 2023 WL 8947154, at *6 (S.D.N.Y. Dec. 28, 2023) (analyzing caselaw and holding alleged economic harm from First Amendment violation was compensable and not irreparable).  As the *Lost Lake* court cogently explained:

> This distinction is well illustrated by the Second Circuit's decision in *Kane v. DeBlasio*, a free exercise case brought by a group of teachers and administrators who were suspended from work because they had refused to comply, for religious reasons, with a COVID-19 vaccine mandate.  The *Kane* court found the government should be enjoined from employing administrative procedures that challenged the sincerity of plaintiffs' religious beliefs and practices.  However, the plaintiffs were not entitled to a preliminary injunction immediately reinstating them and awarding back pay because they were "not required to perform or abstain from any action that violates their religious beliefs."  Although the plaintiffs were undoubtedly harmed by a loss of income while on leave, "that harm is not irreparable."

2023 WL 8947154, at *7 (quoting 19 F.4th 152 (2d Cir. 2021)).  Indeed, were it otherwise, the frequency of the issuance of preliminary injunctions in constitutional cases would go from being relatively rare to a routine, daily occurrence.  *See Kane*, 19 F.4th at 171-72 (recognizing that even in First Amendment context, where presumption principle arose, constitutional violations that "could be remedied with money damages … do not justify an injunction") (citing, *inter alia*, *Elrod*

*v. Burns*, 427 U.S. 347 (1976) (plurality op.)); *see also Siracusa v. New Hyde Park-Garden City Union Free Sch. Dist.*, 2024 WL 3875793, at *8 (E.D.N.Y. Aug. 19, 2024) (same).

Plaintiffs' authorities relied upon do nothing to undermine this basic principle since they all involve non-compensable harms, concerning the deprivation of a constitutional right. In *Deide v. Day*, for example, the court presumed irreparable harm after finding the plaintiffs were likely to succeed on the merits of their right to travel claims. 676 F. Supp. 3d 196, 204 (S.D.N.Y. 2023). But the plaintiffs in *Deide* were recent migrants who challenged Rockland and Orange County executive orders barring local hotels from making rooms available to migrants and asylum seekers. *Id.* at 232. Beyond any economic injury, the challenged executive orders "directly regulated or restrained" the constitutional rights of the plaintiffs, and that is what constituted the irreparable injury. *See Lost Lake Holdings*, 2023 WL 8947154, at *6. Plaintiffs' other authorities are similarly inapposite. *See Statharos v. N.Y. City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) (challenged regulation would have required disclosure of personal financial information, effectively restraining right to privacy); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (inmates sought to enjoin jail closure which would force them into overcrowded conditions directly restraining their rights under Eighth and Fourteenth amendments).

Here, Plaintiffs do not and cannot assert that they are being prohibited from traveling, only that increased costs from the Program's tolls will cause them economic injury. *See Chan*, ECF 78-4 ("Chan Decl.") ¶ 4-5; *Chan*, ECF 78-14 ("Katz Decl.") ¶ 3; *Chan*, ECF 78-15 ("Ehrenpreis Decl.") ¶¶ 1, 5 17; *Chan*, ECF 78-16 ("Carney Decl.") ¶¶ 2-3. Even if they could show a strong and clear likelihood of success on the merits of their constitutional claims—and they cannot—their alleged (and hypothetical) injuries would be entirely compensable by monetary damages and refunds through E-ZPass. *See e.g.*, *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 68

(2d Cir. 2007) (denying preliminary injunction where plaintiffs failed to demonstrate irreparable harm on Commerce Clause claims); *E.E.O.C. v. Loc. 638*, 1995 WL 355589, at *6 (S.D.N.Y. June 7, 1995) ("Whenever the Second Circuit has found that a constitutional violation constitutes per se irreparable injury, the protected right has been personal and the violation non-compensable.").

**B.      Plaintiffs in *Chan* and *Mulgrew* have not shown irreparable injury under the Green Amendment**

Plaintiffs also fall far short of their burden to make a "clear showing" that they will suffer "actual and imminent," irreparable harm if the Program is not enjoined pending adjudication of their Green Amendment claims.  There is no dispute that the Program will meaningfully improve air quality for residents and commuters in the New York City region.  While Chan, for instance, states that air pollution will increase in the area where she lives in Battery Park City, Chan Decl. ¶ 7, the FHWA concluded that "that Congestion Pricing would not adversely impact air quality in [Battery Park City]," *Mulgrew*, 2024 WL 3251732, at *33.  And while implementation of the Program will result in shifting traffic patterns, the FHWA found after an exhaustive study that "[f]or all tolling scenarios, the changes in traffic volumes, including changes in truck trips, would not result in regional or localized exceedances of National Ambient Air Quality Standards." *Mulgrew*, 2024 WL 3251732, at *32 (quoting DOT 36942).  As for the traffic increases on the West Side Highway posited by Chan for her claim of a health-related injury, traffic on that roadway is projected to actually decrease under the Program.  *Chan*, ECF 68 at 20.  Against this backdrop, Plaintiffs' concerns that the Program may have limited localized impacts on air quality "are insufficiently concrete to justify preliminary relief." *Algood Casters Ltd. v. Caster Concepts, Inc.*, 2020 WL 5274172, at *4 (S.D.N.Y. Sept. 4, 2020) (Liman, J.); *see also Auto. Club of New York, Inc. v. Port Auth. of N.Y. & N.J.*, 842 F. Supp. 2d 672, 677 n.3 (S.D.N.Y. 2012) (holding impacts

of increased toll on borough's manufacturing industry too removed from program to constitute irreparable harm.).

Indeed, no court has ever granted a motion for a preliminary injunction for claims under the Green Amendment, since doing so would be inconsistent with *Marte*, which declined to construe the Green Amendment as creating new litigation pathways to raise environmental challenges against planned projects already regulated by existing statutory schemes. 2023 WL 2971394 at *6; *see supra* at 21-22. *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (noting "erroneous presumption that an injunction is generally the appropriate remedy for a NEPA violation."). The Second Circuit has similarly recognized that, where environmental mitigation efforts are available as a remedy, and an injunction would not affect those mitigation efforts, there is no irreparable harm that needs to be addressed at the outset before trial. *Pogliana v. U.S. Army Corps of Eng'rs*, 49 F. App'x 327, 329 (2d Cir. 2002).

### III.    A preliminary injunction would not serve the public interest

Finally, while "allowing challenged conduct to persist may certainly be harmful to a plaintiff and the public, harm can also result from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). Here, Plaintiffs can identify no irreparable harm that will occur from the Program's implementation, and the Project Sponsors and the region's public will suffer substantial prejudice if the Program cannot proceed. According to Dr. Allison C. de Cerreño, a preliminary injunction postponing the Program's start date by even a limited period would cause TBTA to incur substantial costs of $12 million each month; lose average monthly revenues of some $40 million, delay air-quality improvements and other mitigation measures for historically overburdened EJ communities; delay implementation of improvements critical to ensuring the continued reliability of North America's largest public transit system; and delay relief from

congestion in the CBD, with concomitant economic and environmental costs.  C. de Cerreño Decl.
¶¶ 18-23.

The public has a clear interest in avoiding the loss of the value of public funds that have
already been spent to prepare for the Program's design, implementation, and operation.  TBTA
has already expended much of its $500 million budget for such work.  *Id.* ¶ 17.   The public also
has a compelling interest in avoiding the unnecessary costs that would be incurred if, as a result of
an injunction, TBTA was required to pay continued operating costs to avoid yet additional costs
of stopping and starting the Program.  *See id.* ¶ 18.  The Program's operating costs are substantial
and many need to be paid regardless of whether the Program is delayed.   *Id.* ¶ 18.  And TBTA
will incur at least $12 million in additional costs per month if implementation is delayed.  *See id.*
These expenses would amount to a preventable loss of public resources which the public has an
undeniable interest in avoiding.  *See City of Dania Beach v. U.S. Army Corps of Eng'rs*, 2012 WL
3731516, at *9 (S.D. Fla. June 6, 2012) (denying preliminary injunction in action challenging
airport runway expansion, "given the immense costs to [the] County and the community at large").

In sum, after decades of worsening congestion throughout the region, the public has a
substantial interest in avoiding further delay in realizing the significant benefits that the Program
will provide, particularly congestion reduction and dedicated revenue to fund the MTA's capital
projects, all of which outweigh any individual effects or minor inconveniences on Plaintiffs.  *See,
e.g.*, *Earth Is. Sci. v. Carlton*, 626 F.3d 642 (9th Cir. 2010) (affirming district court's denial of
preliminary injunction based on economic harm that enjoining project would have on local
economy); *W. Watersheds Project v. Bureau of Land Mgmt.*, 774 F. Supp. 2d 1089, 1103 (D. Nev.
2011) (denying preliminary injunction in part because project would benefit Nevada's economic
recovery); *see also Comm. of 100 on Fed. City v. Foxx*, 87 F. Supp. 3d 191, 220 (D.D.C. 2015)

(recognizing plaintiff's "understandable misgivings over the prospect of a large-scale construction project outside her front window in the coming years," but concluding that "her concerns do not outweigh the broader public's substantial interest in modernizing this deteriorating and outmoded tunnel").

## CONCLUSION

For the reasons provided herein, the MTA, the TBTA, NYCDOT, and William J. Carry respectfully request that this Court deny Plaintiffs' motions for a preliminary injunction and dismiss Counts Three, Four, and Five in *Chan*; Counts Three, Four, and Five in *Mulgrew*; Count Five in *New Yorkers*; and Counts One, Two, and Three in *TANY*.

Dated: December 2, 2024
New York, New York

Respectfully submitted,

*/s/ Roberta A. Kaplan*
Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
KAPLAN MARTIN LLP
156 West 56th Street, Suite 207
New York, New York 10019
(212) 316-9500
rkaplan@kaplanmartin.com
btrice@kaplanmartin.com
mcrema@kaplanmartin.com

*/s/ Mark A. Chertok*
Mark A. Chertok
Elizabeth Knauer
John F. Nelon
SIVE, PAGET & RIESEL, P.C.
560 Lexington Avenue, 15th Floor
New York, New York 10022
(212) 421-2150
mchertok@sprlaw.com
eknauer@sprlaw.com
jnelson@sprlaw.com

*Counsel for Defendants the*

31

*Metropolitan Transportation Authority
and the Triborough Bridge and Tunnel
Authority*

MURIEL GOODE-TRUFANT
Acting Corporation Counsel of the City of
New York

By : */s/ Nathan Taylor*
     Nathan Taylor
     Senior Counsel
     Environmental Law Division
     NEW YORK CITY LAW DEPARTMENT
     100 Church Street
     New York, New York 10007
     (212) 356-2315
     ntaylor@law.nyc.gov

*Counsel for Defendants the New York City
Department of Transportation and William J.
Carry in his official capacity as Assistant
Commissioner for Policy for the New York
City Department of Transportation*