**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

ELIZABETH CHAN, *et al.*,

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

                    Defendants.

No. 23 Civ. 10365 (LJL)

MICHAEL MULGREW, *et al.*,

                    Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

                    Defendants.

No. 24 Civ. 1644 (LJL)

### MEMORANDUM IN SUPPORT OF THE FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2728
Email:  zachary.bannon@usdoj.gov

ZACHARY BANNON
DOMINIKA TARCZYNSKA
Assistant United States Attorneys
– Of Counsel –

**Table of Contents**

Preliminary Statement ........................................................................................................... 1

Background ............................................................................................................................. 2

   I.    Congestion Pricing Project ................................................................................... 2

   II.   The Final EA, the FONSI, and the Prior Litigation ......................................... 3

   III.  The MTA's March 2024 Tolling Structure and the *Re-Evaluation* ............................ 4

   IV.  The MTA's Adoption of a Phase-In Approach and the *Re-Evaluation 2* ..................... 8

Argument ............................................................................................................................... 10

   I.    The FHWA's Determination That Not Supplemental EA Was Required As A
       Result of the March 2024 Tolling Structure Was Neither Arbitrary Nor
       Capricious ........................................................................................................... 12

      A.  The March 2024 Final Toll Structure Fell Within the Tolling Scenarios
          Analyzed in the EA ........................................................................................ 12

      B.  The *Re-Evaluation* Reasonably Utilized the Methodology from the Final
          EA to Determine that the Adopted Tolling Structure Would Not Result in
          Impacts that Were Not Analyzed in the Final EA ..................................... 16

   II.   FHWA'S Determination in *Re-Evaluation 2* That No Supplemental EA Was
       Required By the Phase-In Was Neither Arbitrary Nor Capricious ............................ 18

      A.  The Phase-In Will Not Cause Additional Significant Environmental Impacts ...... 18

      B.  The Mitigation Measures in the Final EA and FONSI Remain Valid ................... 20

      C.  Arguments Regarding the Timing and Format of the *Re-Evaluation 2* Are
          Meritless ........................................................................................................ 21

   III.  There Have Been No Changed Circumstances That Would Require
       Supplementation of the EA ................................................................................ 22

      A.  The MTA Did Not Change Its Funding Objectives ....................................... 22

      B.  Allegedly Changed Economic Circumstances Does Not Require Final EA
          To Be Supplemented ..................................................................................... 25

Conclusion ............................................................................................................................. 26

## Table of Authorities

**Cases**                                                                                                  Page(s)

*Brodsky v. U.S. Nuclear Regulatory Commission,*
    783 F. Supp.2d 448 (S.D.N.Y. 2011)..................................................................................... 21

*Chemical Weapons Working Group v. U.S. Dep't of Defense,*
    655 F. Supp. 2d 18 (D.D.C. 2009) ....................................................................................... 25

*Massachusetts v. U.S. Nuclear Regulatory Comm'n,,*
    708 F.3d 63 (1st Cir. 2013)................................................................................................... 17

*Communities Against Runway Expansion, Inc. v. FAA,*
    355 F.3d 678 (D.C. Cir. 2004).............................................................................................. 17

*Dubois v. U.S. Dep't of Agriculture,*
    102 F.3d 1273 (1st Cir. 1996)............................................................................................... 19

*Earth Island Inst. v. U.S. Forest Serv.,*
    87 F. 4th 1054 (9th Cir. 2023) ............................................................................................. 11

*Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Engineers,*
    374 F. Supp. 2d 1116 (S.D. Fla. 2005) ................................................................................ 23

*Gunpowder Riverkeeper v. FERC,*
    807 F.3d 267 (D.C. Cir. 2015).............................................................................................. 26

*Hughes River Watershed Conservancy v. Glickman,*
    81 F.3d 437 (4th Cir. 1996) ............................................................................................ 24, 25

*In re Operation of Missouri River System Litigation,*
    516 F.3d 688 (8th Cir. 2008) ............................................................................................... 19

*Little Rock Downtown Neighborhood Association, Inc. v. Federal Highway Administration,*
    2022 WL 990341 (E.D. Ark. Mar. 31, 2022) .................................................................. 10, 17

*Marsh v. Oregon Natural Resources Council,*
    490 U.S. 360 (1989).......................................................................................................... 11, 17

*New Mexico Navajo Ranchers Ass'n v. ICC,*
    850 F.2d 729 (D.C. Cir. 1988).............................................................................................. 23

*North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.,*
    151 F. Supp. 2d 661 (M.D.N.C. 2001) ................................................................................ 25

*North Idaho Community Action Network v. U.S. Dep't of Transp.*,
   545 F.3d 1147 (9th Cir. 2008) ................................................. 10

*Price Road Neighborhood Ass'n Inc. v. U.S. Dep't of Transp.*,
   113 F.3d 1505 (9th Cir. 1997) ........................................... 11, 13

*S. Trenton Residents Against 29 v. Fed. Highway Admin.*,
   176 F.3d 658 (3d Cir. 1999) ................................................. 19

*Senville v. Peters*,
   327 F. Supp. 2d 335 (D. Vt. 2004) ........................................ 17

*Spiller v. White*,
   352 F.3d 235 (5th Cir. 2003) ............................................... 21

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
   433 F.3d 852 (D.C. Cir. 2006) ......................................... 22, 23

*Wisconsin v. Weinberger*,
   745 F.2d 412 (7th Cir. 1984) ............................................... 11

## Statutes

23 U.S.C. § 129 ........................................................................ 3
23 U.S.C. § 301 ........................................................................ 3
Pub. L. 109-59 § 1604(a) .......................................................... 3
Pub. L. 109-59 § 1604(b)(3)(C) ................................................ 3

## Regulations

23 C.F.R. § 771.129 ......................................................... 4, 10, 12
23 C.F.R. § 771.130 ................................................... 11, 13, 26, 19

## PRELIMINARY STATEMENT

This Court has already found that the Federal Highway Administration's ("FHWA") environmental review of the Manhattan Central Business Tolling Program ("the Project")—conducted based on a range of potential tolling structures and using the worst-case tolling scenario for each relevant environmental impact to conservatively measure the effects of the Project—satisfied the requirements of the National Environmental Policy Act ("NEPA").  As a result, the question that remains in this case is narrow: will the changes to the Project that have occurred since the initial environmental review result in impacts that fall so far outside the broad parameters of the FHWA's initial analysis that a supplemental review is required?  The answer is no.

Specifically, and as set forth in more detail below, Plaintiffs' motion takes aim at two separate events—(1) the Metropolitan Transportation Authority's ("MTA") March 2024 adoption of a tolling structure, which was assessed by the FHWA in June 2024 and determined not to require a supplemental environmental assessment (the "*Re-Evaluation*");  and (2) the MTA's adoption of a phase-in period for that tolling structure in November 2024, which was shortly thereafter evaluated by the FHWA and again determined not to require supplementation (the "*Re-Evaluation 2*").  Plaintiffs argue that virtually every feature those tolling structures falls outside the bounds of the FHWA's May 2023 Final Environmental Assessment ("EA") and June 2023 Finding of No Significant Impact ("FONSI").  But their arguments improperly attempt to relitigate many issues this Court has already decided.  Moreover, they also ignore the voluminous record at issue, including the two re-evaluations conducted by the FHWA.  These re-evaluations confirmed that the effects of the Project's final tolling structure fall comfortably within those modeled in the original analysis.  The FHWA's conclusion that the tolling structure adopted by the MTA did not require supplementation was not arbitrary, nor capricious.  And, as this Court has already

recognized, the adoption of a phase-in period does not substantively alter the Project but "merely postpones the full operation of Congestion Pricing." Dkt. No. 99 ("Op.") at 64. [1]

For the reasons outlined below, the Court should deny Plaintiffs' motion for summary judgment and grant the Federal Defendants'[2] cross-motion for summary judgment.

## BACKGROUND

## I.    The Congestion Pricing Project

This matter arises out of efforts by the MTA and several other state and local entities (the "Project Sponsors") to implement the MTA Reform and Traffic Mobility Act, passed in April 2019. DOT_2400. That Act required the MTA to establish a "program to establish tolls for vehicles entering or remaining in the most congested area of the state," which was described as "necessary and [] a matter of substantial state concern." DOT_2403. The Act established the Traffic Mobility Review Board ("TMRB") to "make a recommendation regarding the . . . toll amounts to be established," which would inform the Triborough Bridge and Tunnel Authority's ("TBTA") decision to approve and adopt a final toll structure. DOT_2415. As explained in more detail below, the TMRB made its recommendations on November 30, 2023, the TBTA adopted a tolling structure on March 27, 2024, and then the TBTA modified the tolling structure to adopt a phase-in period for the toll on November 18, 2024. *See* MTA, Central Business District Tolling Program, *available at* https://new.mta.info/project/CBDTP. The MTA intends to begin charging the congestion pricing toll on January 5, 2025. *See id.*

---

[1] Unless otherwise noted, docket citations in this brief refer to Docket No. 23 Civ. 10365.

[2] The Federal Defendants are the U.S. Department of Transportation ("DOT"), the FHWA, Shailen Bhatt, in his official capacity as Administrator of FHWA, and Richard J. Marquis, in his official capacity as Division Administrator of the New York Division of FHWA.

## II.    <u>The Final EA, the FONSI, and the Prior Litigation</u>

As a precondition to participation in the federal Value Pricing Pilot Program ("VPPP"),[3] the Project Sponsors were required to conduct a review of the Project under NEPA.  SAFETEA-LU Act, Pub. L. 109-59 § 1604(b)(3)(C), 119 Stat. at 1250.  The Project Sponsors began working with the FHWA in 2019 to complete that environmental review.  DOT_38307.  After years of analysis, the Final EA was published on May 5, 2023, DOT_36150, and FHWA issued the FONSI on June 23, 2023, DOT_363.[4]

At the time the Final EA and FONSI were issued, the TBTA had not yet adopted a final tolling structure. As a result, the FONSI expressly contemplated that, after the adoption of a tolling structure, the Final EA and FONSI "w[ould] have to be re-evaluated to determine if the decision made in the FONSI is still valid."  DOT_394.  "This requires that the TBTA demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid."  *Id.*

Plaintiffs filed suit on November 22, 2023, and January 4, 2024, challenging the Final EA and FONSI under NEPA, claiming the analyses were "superficial" and "perfunctory."  *See* 23 Civ. 10365, Dkt. No. 1, Dkt. No. 39 ¶ 2; 24 Civ. 1644, Dkt. No. 1 ¶ 2.  On June 20, 2024, the Court issued an opinion rejecting Plaintiffs' NEPA challenges to the Final EA and FONSI, finding that, "[i]n light of Defendants' meticulous analysis," the environmental review of the Project conformed with NEPA.  Op. at 5.

---

[3] Title 23, United States Code, generally prohibits the imposition of tolls on Federal-aid highways. *See* 23 U.S.C. § 301. However, Congress has enacted tolling exceptions under various pilot programs. *See, e.g.*, 23 U.S.C. § 129. The VPPP is one such program. *See* SAFETEA-LU Act, Pub. L. 109-59 § 1604(a), 119 Stat. 1249 (Aug. 10, 2005).

[4] The Final EA and FONSI are described in detail in both Federal Defendants' summary judgment briefing from an earlier phase of this litigation, *see* Dkt. No. 65 ("First Gov't MSJ"), and the Court's opinion granting summary judgment in Federal Defendants' favor on Plaintiffs' claim that the Final EA and FONSI violated NEPA, *see* Dkt. No. 99 ("Op."). In the interest of brevity Federal Defendants therefore assume the Court's familiarity with the Final EA, FONSI, and its opinion and this brief discusses them only to the extent necessary to adjudicate Plaintiffs' new claims.

Although the Court's June 20 Opinion resolved all NEPA challenges concerning the Final EA and FONSI, it left open the question whether supplemental NEPA analysis would be required after a tolling structure had been adopted by the MTA in March. The Court noted that, in the Final EA, "[t]he FHWA performed a broad analysis of potential tolling scenarios based on the information available at the time, including the Project Sponsors' objectives and statutory parameters, but left open the question of whether the final tolling structure would comport with those scenarios." Op. at 69. The Court's opinion recognized that FHWA would perform a re-evaluation to determine "whether the EA 'remains valid' in light of the final tolling scenario." *Id.* at 70 (citing 23 C.F.R. § 771.129(c)). Accordingly, the Court deferred ruling on the merits of the re-evaluation pending supplemental briefing. Op. at 22, 70.

### III.    The MTA's March 2024 Tolling Structure and the *Re-Evaluation*

The TBTA adopted a tolling structure on March 27, 2024. *See* MTA, Central Business District Tolling Program, *available at* https://new.mta.info/project/CBDTP. The major features of that tolling structure include: (1) a $15 peak-period toll on passenger vehicles between 5 a.m. and 9 p.m. on weekdays, with a $3.75 off-peak toll during other hours; (2) differing rates for trucks and motorcycles, following the same peak off-peak structure with a 75% off-peak discount; (3) tunnel crossing credits during peak periods at the Queens-Midtown, Hugh L. Carey, Holland, and Lincoln Tunnels; and (4) $1.25-per-trip charges for taxis and $2.50-per-trip charges for other for-hire vehicles ("FHVs"). DOT_45438, 45439.

On May 23, 2024, the FHWA received a request from the Project Sponsors that it review and approve the *Re-Evaluation*, which examined that tolling structure (referred to in the *Re-Evaluation* as the "adopted toll structure"). DOT_45450; *see also* DOT_45625. The purpose of this re-evaluation was to make sure that the environmental effects of this toll structure were

4

consistent with the effects disclosed in the Final EA, and that the mitigation identified in the FONSI remained valid.  DOT_45450.[5]

The table below reflects how the adopted toll structure fell within the range of seven tolling scenarios analyzed in the EA:

*Table 2.1 - Modified Final EA Table 2-3. Tolling Scenarios Evaluated for the CBD Tolling Alternative – with the Adopted Toll Structure Added*

| PARAMETER | SCENARIO A<br>Base Plan | SCENARIO B<br>Base Plan with Caps and Exemptions | SCENARIO C<br>Low Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO D<br>High Crossing Credits for Vehicles Using Tunnels to Access the CBD | SCENARIO E<br>High Crossing Credits for Vehicles Using Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO F<br>High Crossing Credits for Vehicles Using Manhattan Bridges and Tunnels to Access the CBD, with Some Caps and Exemptions | SCENARIO G<br>Base Plan with Same Tolls for All Vehicle Classes | ADOPTED TOLL STRUCTURE |
|---|---|---|---|---|---|---|---|---|
| **Time Periods[1]** | | | | | | | | |
| Peak: Weekdays | 6 AM – 8 PM | 6 AM – 8 PM | 6 AM – 8 PM | 6 AM – 8 PM | 6 AM – 8 PM | 6 AM – 10 AM; 4 PM – 8 PM | 6 AM – 8 PM | 5 AM – 9 PM[2] |
| Peak: Weekends | 10 AM – 10 PM | 10 AM – 10 PM | 10 AM – 10 PM | 10 AM – 10 PM | 10 AM – 10 PM | 10 AM – 10 PM | 10 AM – 10 PM | 9 AM – 9 PM |
| Off Peak: Weekdays | 8 PM – 10 PM | 8 PM – 10 PM | 8 PM – 10 PM | 8 PM – 10 PM | 8 PM – 10 PM | 10 AM – 4 PM | 8 PM – 10 PM | |
| Overnight: Weekdays | 10 PM – 6 AM | 10 PM – 6 AM | 10 PM – 6 AM | 10 PM – 6 AM | 10 PM – 6 AM | 8 PM – 6 AM | 10 PM – 6 AM | 9 PM – 5 AM |
| Overnight: Weekends | 10 PM – 10 AM | 10 PM – 10 AM | 10 PM – 10 AM | 10 PM – 10 AM | 10 PM – 10 AM | 10 PM – 10 AM | 10 PM – 10 AM | 9 PM – 9 AM |
| **Potential Crossing Credits** | | | | | | | | |
| Credit Toward CBD Toll for Tolls Paid at Tunnel Entries | No | No | Yes - Low | Yes - High | Yes - High | Yes - High | No | Yes - Low |
| Credit Toward CBD Toll for Tolls Paid at Bridges to Manhattan | No | No | No | No | No | Yes - High | No | No |
| **Potential Exemptions and Limits (Caps) on Number of Tolls per Day[4,5,6]** | | | | | | | | |
| Autos, motorcycles, and mercial vans | Once per day | Once per day | Once per day | Once per day | Once per day | Once per day | Once per day | Once per day |
| Taxis | No cap | Once per day | Exempt | No cap | Exempt | Once per day | No cap | $1.25 per trip toll on trips to, within, or from the CBD (see note 4) |
| FHVs | No cap | Once per day | Three times per day | No cap | Three times per day | Once per day | No cap | $2.50 per trip toll on trips to, within, or from the CBD (see note 4) |
| Small and large trucks | No cap | Twice per day | No cap | No cap | No cap | Once per day | No cap | No cap |
| Buses | No cap | Exempt | No cap | No cap | Transit buses – Exempt No cap on other buses | Exempt | No cap | Certain buses – Exempt (see note 5) |
| **Approximate Toll Rate Assumed for Autos, Commercial Vans, and Motorcycles[3]** | | | | | | | | |
| Peak | $9 | $10 | $14 | $19 | $23 | $23 | $12 | $15 |
| Off Peak | $7 | $8 | $11 | $14 | $17 | $17 | $9 | $3.75 |
| Overnight | $5 | $5 | $7 | $10 | $12 | $12 | $7 | $3.75 |
| **Approximate Toll Rate Assumed for Trucks (Small Trucks/Large Trucks)[3]** | | | | | | | | |
| Peak | $18 / $28 | $20 / $30 | $28 / $42 | $38 / $57 | $46 / $69 | $65 / $82 | $12 / $12 | $24 / $36 |
| Off Peak | $14 / $21 | $15 / $23 | $21 / $32 | $29 / $43 | $35 / $52 | $49 / $62 | $9 / $9 | |
| Overnight | $9 / $14 | $10 / $15 | $14 / $21 | $19 / $29 | $23 / $35 | $33 / $41 | $7 / $7 | $6 / $9 |

DOT45473-74.

To evaluate the adopted toll structure's effects, the Project Sponsors used the same methodologies as in the Final EA and compared the effects of the adopted toll structure to the

---

[5] The *Re-Evaluation* is a 195-page document with appendices that, for ease of comparison, follow the same order and format of the final EA, and provide tables with side-by-side comparisons of the results of the adopted toll structure along with the seven tolling scenarios analyzed in the EA.  *Id.; see also generally* DOT_45430.

effects for the seven tolling scenarios originally evaluated. DOT_45476. As explained in the *Re-Evaluation*, "[i]f preliminary evaluation of the adopted toll structure demonstrated that effects would be same as, or less than, those described in the Final EA, more detailed quantified analysis (such as modeling) was not conducted. For any effects where the preliminary evaluation was not conclusive, additional quantified analysis was conducted to further explore the effect." *Id.* In particular, the *Re-Evaluation* used the same Best Practice Model ("BPM") transportation methodology as the Final EA, explaining that "[t]his allowed comparison of the results for the adopted toll structure to the results presented in each analysis included in the Final EA." DOT_45477; *see also, e.g.,* DOT_45478 (explaining that same regional transportation model was used for re-evaluations as the Final EA).

The *Re-Evaluation* considered the same 20 areas of analysis as the Final EA and concluded that in 16 of those areas "the Program will benefit communities or create no adverse effects: the regional transportation system, parking, social conditions (in terms of population, neighborhood character, public policy), economic conditions, energy, parks and recreational resources, historic and cultural resources, visual resources, air quality, noise, natural resources, hazardous waste/contaminated materials, and construction effects." DOT_45442. In four areas of analysis, "the reevaluation, like the Final EA, found some potential adverse effects: highways and intersections; transit; pedestrian and bicycles." *Id.* The *Re-Evaluation* contains detailed analysis of the effects in these four areas, including analyses of specific highway segments and local intersections, DOT_45480-87, 45485; transit lines, specific transit stations, specific elements within specific stations where adverse effects and accompanying projected improvements have been identified, and parking structures, DOT_45488-505; and pedestrian and bicycle circulation at specific locations, DOT_45506-16.

Ultimately, based on this analysis, the *Re-Evaluation* concluded that "the effects associated with the adopted toll structure fall within the range of effects and analysis presented in the Final EA/FONSI except in the areas identified in the discussion [and that in those areas] [t]he deviations in effects . . . are minor and do not require additional environmental analysis and mitigation." DOT_45624.  Further, the *Re-Evaluation* noted that "[t]he Final EA/FONSI anticipated there would be variations in the potential effects once the toll structure was adopted and since these variations are very minor, they continue to fall within the parameters of the Final EA/FONSI." *Id.*

The *Re-Evaluation* also expanded upon and made more concrete the mitigation measures that had been included in the Final EA and FONSI.  Specifically, the adopted toll structure increased the low-income toll discount and extended and deepened the overnight discount, resulting in an increased mitigation commitment of approximately $122.5 million.  DOT_45441. The MTA also committed to enhanced monitoring of the efficacy of its mitigation, providing that a "formal report on the effects of the Project will be issued one year after implementation and then every two years," that  "a reporting website will make data, analysis, and visualizations available in open data format to the greatest extent practicable," and that "[t]his data will also be used to support an adaptive management approach to monitoring the efficacy of mitigation, and adjustments as warranted."  DOT_45468.  Finally, the *Re-Evaluation* finalized the funding allocation for place-based mitigation.  DOT_45609.  The *Re-Evaluation* resultingly concluded that "[t]he mitigation measures identified in the Final EA/FONSI are still applicable and will ensure that the adopted toll structure does not result in significant effects. With the adopted toll structure, and an understanding of the effects, the place-based mitigation will be finalized in concert with stakeholder involvement."  DOT_ 45624.

The *Re-Evaluation* also included a summary of the public participation opportunities that had occurred and remained ongoing since publication of the Final EA and FONSI. A small business working group was established and started holding meetings in January 2024. DOT_45617. Numerous environmental justice outreach efforts were implemented. DOT_45618-19. And multiple public outreach events had been held weekly since April to inform the public about Congestion Pricing as well as the exemption and discount plans. DOT_45620.

On June 14, 2024, the FHWA concluded "that the analysis conducted in the *Re-Evaluation* confirms that the adopted toll structure and impacts associated with it was analyzed and mitigated accordingly." Accordingly, the agency found that "no additional environmental analysis is warranted" and that "[t]he conclusions in the Final Environmental Assessment and Finding of No Significant Impact remains valid. DOT_45625-26.

## IV.    The MTA's Adoption of a Phase-In Approach and the *Re-Evaluation 2*

On November 8, 2024, the MTA wrote to the FHWA to express interest in "add[ing] a phase-in feature to the tolling structure described in the Reevaluation approved in June 2024." DOT_47548. To ensure that feature's consistency with the Final EA and FONSI, the MTA and the FHWA undertook a re-evaluation of the feature's environmental effects via the *Re-Evaluation 2*. DOT_47523.[6] The phase-in approach did not modify the structure of the March 2024 adopted toll but instead established a schedule for three phases of implementation. DOT_47530. During Phase 1 (2025, 2026, and 2027), each of the relevant tolls and credits will be 60% of the tolls and credits in the March 2024 tolling structure. DOT_47531. During Phase 2 (2028, 2029, and 2030), the tolls and credits will be 80%. *Id.* And in Phase 3 (and going forward), the toll will be the structure adopted in March. *Id.*

---

[6] The MTA subsequently formally voted to adopt a phase-in approach on November 18, 2024, *see* MTA, Central Business District Tolling Program, *available at* https://new.mta.info/project/CBDTP.

FHWA approved *Re-Evaluation 2* on November 21, 2024. DOT_0047520.  The *Re-Evaluation* explained the procedural history of the environmental review of the Congestion Pricing Program to date, outlined the mechanism by which the March 2024 tolling structure would be phased in, and noted that "[n]otwithstanding the phasing in of tolls, the Project Sponsors would comply with all of the mitigation commitments set forth in the EA and FONSI within the same timeframes as contemplated in those documents and the reevaluation prepared for the March 2024 adopted tolling structure."  DOT_47530-31.

The *Re-Evaluation 2* further explained that, after adopting the phase-in, the Congestion Pricing Program would still meet the objectives set forth in the Final EA.  DOT_47537.  With respect to revenue generation, Phase 1, Phase 2, and Phase 3 would generate $500 million, $700 million, and $900 million in annual revenue, respectively.  DOT_47537.  Although these amounts do fall below the amounts considered in the Final EA as sufficient to fund $15 billion in capital projects, the MTA explained that "[t]he net revenues needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and terms."  *Id.*  "Following completion of the Final EA, based on current interest rates and expected timing of projects, MTA's Chief Financial Officer (CFO) determined that" $900 million in annual revenue would be sufficient.  *Id.*  And in the *Re-Evaluation 2*, "MTA's CFO [] determined that the expected revenues to be collected under the Phase-In Approach would in combination still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline as projected for the March 2024 Adopted Toll Structure."  *Id.*

In evaluating the continued validity of the Final EA and FONSI, the *Re-Evaluation 2* noted that Phase 3 presents the same scenario as the tolling structure already analyzed in the *Re-Evaluation*.  DOT_47539.  For Phase 1 and Phase 2, "peak tolling rates would fall within the

ranges studied in the Final EA." *Id.*  The *Re-Evaluation 2* recognized that "some effects of the interim phases would by definition be reduced as compared to Phase 3," but that "the mitigation set forth in the EA and the June 2024 reevaluation would be implemented as previously contemplated." *Id.*

On November 21, 2024, the FHWA issued a letter to the MTA stating: "FHWA concludes that the *Re-Evaluation 2* confirms that the phase-in of the adopted toll structure and impacts associated with it was analyzed and mitigated accordingly.  Thus, FHWA finds that no additional environmental analysis is warranted.  The conclusions in the Final Environmental Assessment and Finding of No Significant Impact remains valid." DOT_47520-21.

## ARGUMENT

Although Plaintiffs appear to separately challenge the FHWA's decision not to supplement the Final EA, Dkt. No. 136-1 ("Pls. Br.") at 15-23, and the FHWA's approval of the *Re-Evaluation* and the *Re-Evaluation 2, id.* at 23-29, their arguments reflect two sides of the same coin.  "NEPA does not specifically address how an agency should decide when changes require a more formal EA," but "the [FHWA] ha[s] specifically provided for reevaluations as a means to determine whether or not [an] approved environmental document remains valid."  *North Idaho Community Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1154 (9th Cir. 2008); *see also* 23 C.F.R. § 771.129(c) (setting forth the re-evaluation requirement).  Thus, where an agency takes "the requisite 'hard look' in a re-evaluation" and "determines that [] new impacts will not be significant (or not significantly different from those already considered), then the agency is in full compliance with NEPA and is not required to conduct a supplemental EA."  *North Idaho Community Action Network*, 545 F.3d at 1154-55.[7]

---

[7] In other words, a re-evaluation "is not a NEPA document," but "an initial significance determination that [can] result[] in a supplemental EA" if environmental impacts are "found to be significant."  *Little Rock Downtown*

Accordingly, the only question before the Court is whether the FHWA took a hard look at the tolling structure adopted by the MTA in March 2024, *see* DOT_45438, in the *Re-Evaluation* and at the phase-in approach adopted by the MTA in November 2024, *see* DOT_47533, in the *Re-Evaluation 2* before concluding that the analysis of the Final EA did not require supplementation, *see* DOT_45625, DOT_45720.  In both instances, the FHWA was required to assess only whether "new information" or "[c]hanges to the proposed action" would "result in significant environmental impacts" not previously addressed, such that the analysis in the Final EA was no longer sufficient.  23 C.F.R. § 771.130(a) (addressing supplementation of environmental impact statements); *see also Price Road Neighborhood Ass'n Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509-10 (9th Cir. 1997) (applying the same standard to supplementation of EAs).  Said differently, "[a]gencies need not supplement their NEPA analyses every time new information or circumstances emerge." *Earth Island Inst. v. U.S. Forest Serv.* 87 F. 4th 1054, 1069 (9th Cir. 2023). "Rather the new information or circumstances must show that the action will affect the quality of the human environment in a significant manner or to an extent not already considered."  *Id.*

The question whether to supplement an environmental review is "narrow," governed by the APA's "'arbitrary and capricious standard,'" and presents "a classic example of a factual dispute the resolution of which implicates substantial agency expertise."  *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 373, 376 (1989); *see also Wisconsin v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984) ("[A]n agency cannot have acted arbitrarily or capriciously in deciding not to file a [supplemental environmental impact statement] unless the new information provides a *seriously* different picture of the environmental landscape such that another hard look is

---

*Neighborhood Association, Inc. v. Federal Highway Administration*, No. 19 Civ. 362 (JM), 2022 WL 990341, at *9 (E.D. Ark. Mar. 31, 2022).  Accordingly, the only question present by Plaintiffs' motion is whether the FHWA's determinations that the Final EA need not be supplemented were arbitrary or capricious.

necessary." (emphasis in original)).   As explained below, the FHWA's analysis in the *Re-Evaluation* and *Re-Evaluation 2* that supplemental NEPA analyses was not required was neither arbitrary, nor capricious, and so summary judgment should be granted in Federal Defendants' favor on Plaintiffs' NEPA claims.

**I.    The FHWA's Determination That No Supplemental EA Was Required As A Result of the March 2024 Tolling Structure Was Neither Arbitrary Nor Capricious.**

As contemplated by the Court's prior decision,[8] in the *Re-Evaluation*, the FHWA engaged in a detailed analysis of the specifics of the tolling structure adopted by the MTA in March 2024 and examined "whether the EA 'remains valid' in light of the final tolling scenario."  Op. at 70 (citing 23 C.F.R. § 771.129(c)).  Based on the analysis contained in the *Re-Evaluation*, the FHWA reasonably concluded that the adopted tolling structure would not result in significant environmental impacts that were not analyzed in the Final EA or that would not be otherwise addressed by the mitigation measures in place, and that therefore no supplemental NEPA analysis was required.   Plaintiffs have not shown that the FHWA's conclusion was arbitrary or capricious.

**A.    The March 2024 Final Toll Structure Fell Within the Tolling Scenarios Analyzed in the Final EA.**

Plaintiffs' arguments that the tolling structure deviates "too much" from the seven tolling scenarios analyzed in the EA, Pls. Br. at 17-18, are simplistic and factually incorrect.  The question is not simply whether there were any changes in the tolling structure, but rather whether any changes to the tolling structure would *result in significant environmental impacts* that were not already considered in the EA and that would not be mitigated by the mitigation measures set forth

---

[8] Ignoring this Court's prior discussion of the Final EA, Plaintiffs claim that the *Re-Evaluation* was a "post hoc rationalization" for a failure to analyze the actual tolling plan in the Final EA.  Pls. Br. at 28-29.  But as the Court previously ruled, "[m]ulti-step NEPA reviews are not only lawful, but also salutary. By examining potential tolling scenarios prior to the finalization of the tolling structure, the FHWA enabled the TMRB and TBTA to benefit from the federal government's environmental expertise in crafting a suitable tolling schedule." Op. at 69.  The Court observed that the Final EA's use of the worst-case scenarios was "fundamentally conservative." *Id.* at 70.  Plaintiffs have pointed to nothing that would require the Court to reconsider its prior ruling.

in the EA (*i.e.*, whether the EA "remains valid"). Op. at 70; *see also Price Rd. Neighborhood Ass'n, Inc.*, 113 F.3d at 1510 ("Finding that there are no discernible differences in the level of environmental impacts when comparing the original configuration with the revised configuration, the FHWA concluded that supplemental documentation was not necessary. At that point, the FHWA was in full compliance with NEPA and was not required to conduct a supplemental EA." (internal quotation marks omitted)).  The *Re-Evaluation* makes clear that the FHWA undertook a reasoned and robust analysis of the specifics of the proposed tolling structure and reasonably concluded that they would not cause any significant environmental impacts not previously analyzed.

Indeed, the *only* environmental impact that Plaintiffs can point to where the adopted toll structure falls outside the range analyzed in the Final EA is with respect to specified air pollutant increases in the Bronx, Richmond, and Bergen Counties.  *See* Pls. Br. at 13.  But as the *Re-Evaluation* points out, the adopted tolling structure results in "fewer predicted increases" in air pollutants than the worst-case scenario analyzed in the Final EA, and "[a]ll of the changes between the adopted toll structure and [the worst-case scenario] by county are small," generally less than 1%.  DOT_45551.  Plaintiffs make no argument that these small, localized increases qualify as "significant environmental impacts that were not evaluated in the" Final EA, as would be required for them to prevail on their claims.  23 C.F.R. § 771.130(a)(1).

**$15 Peak Toll Amount for Passenger Vehicles**: Plaintiffs argue that the $15 toll is a "never before analyzed price," Pls. Br. at 17, but as the *Re-evaluation* explained it was "within the range of $9 to $23" analyzed in the seven scenarios.  DOT_45440.  To reach this conclusion, the FHWA did not simply rely on the obvious fact that the $15 was between $9 and $23, it went the extra mile and replicated the Final EA's modeling to ensure that the impacts under the adopted

tolling structure likewise fell within the range examined in the Final EA. *See* DOT_45476 ("To evaluate the adopted toll structure's effects in comparison to those described in the Final EA, the Project Sponsors used the same methodologies as used for the analyses in the Final EA. For each analysis topic, they considered the effects of the adopted toll structure in comparison to the effects for the seven tolling scenarios evaluated in the Final EA."). The modeling consistently reflected that the anticipated environmental impacts were within the range previously analyzed, and that no additional mitigation measures were required beyond those set forth in the Final EA. DOT_45452-68 (summarizing anticipated environmental effects under the adopted tolling structure as compared with the scenarios assessed in the Final EA).

**Off-Peak Toll Amounts**: Plaintiffs also point to the fact that the overnight toll was lowered to below the range for off-peak and overnight tolls considered in the Final EA to $2.25 to $3.75, Pls. Br. at 17. But Plaintiffs do not attempt to argue that this change results in different environmental impacts, particularly any new impacts that were not considered in the Final EA. Indeed, as the *Re-Evaluation* noted, while this is lower than the range in the Final EA, it "exceeds [the] commitment in the Final EA to include 'further reduced overnight tolls at or below 50 percent . . .' by reducing peak toll by 75 percent." DOT_45440.

**Time Periods**: Plaintiffs also complain that the "peak" period was extended by two hours on weekdays (from 6AM-8PM to 5AM-9PM) and that the "off peak" and "overnight" periods were combined to provide two-time-period structure (*i.e.*, peak and overnight) on weekdays. *See* Pls. Br. at 17. But the *Re-Evaluation* specifically studied these longer time periods in the modeling conducted as part of its analysis. DOT_45440 n.2. And, again, those modeling results demonstrate that these two additional peak hours (along with the rest of the adopted toll structure) would not result in significant environmental impacts that were not analyzed in the Final EA. DOT_45452-

68.  In any event, as the *Re-Evaluation* explained, the simplified two-time-period structure was adopted for "ease of customer understanding" and "as there is no longer an off-peak period on weekdays, the weekday peak and overnight periods are longer than those studied in the Final EA." DOT_45439-40.

**Crossing Credits:** Plaintiffs separately complain that the crossing credits for passenger vehicles entering through the Lincoln, Holland, Hugh Carey and Queens-Midtown tunnels now range from $1.50 to $5.00 and argue that this is "significantly lower" than the $13.10 credit studied in the Final EA, Pls. Br. at 17. That is simply incorrect.  The Final EA studied a no credit scenario ($0), a low credit scenario (up to $6.55) and high credit scenarios (up to $13.10), DOT_4586. Thus, the crossing credits in the adopted tolling structure fell within the range analyzed in the Final EA.  Plaintiffs speculate that decreased credits must mean an increase in traffic on the crossings.[9] Pls. Br. at 19.  But that speculation is unsupported by the modeling conducted in the *Re-Evaluation*, which confirmed that the adopted tolling structure, including its crossing credit structures, would not result in significant environmental effects outside those analyzed in the Final EA. *See* DOT_45452-68.

**Taxis & FHVs:** Finally, Plaintiffs argue that the taxi and for-hire-vehicle ("FHV") per ride fee differs from what was an analyzed within the Final EA, which instead looked at a range of alternatives from exemptions, caps on the number of tolls, and full fares for all trips.  Pls. Br. at 17-18. However, the *Re-Evaluation* makes clear that the adopted per-ride fee is functionally "equivalent" to the toll rates analyzed in the Final EA: "the per-trip tolls for taxis and FHVs in the adopted toll structure would be equivalent to the auto peak rate of $15 (based on the NYC Taxi

---

[9] Plaintiffs' brief refers to "crossing credits on certain bridges" resulting in "more traffic over those bridges," Pls. Br. at 19.  However, the credits are only for tunnels into the CBP, as only tunnels that enter the CBP are tolled.

and Limousine Commission analysis of trips made by TLC-licensed vehicles in May 2023: for taxis the average number of trips with passengers to/from/within the CBD is 12, and for FHVs it is 6)." DOT_45474 n.5; *see also* DOT_45525-26.  The *Re-Evaluation* explains that the adopted toll structure was predicted to reduce vehicle miles traveled ("VMT") by taxis and FHVs within the CBD by 0.3%, which is within the range of the impacts of the seven tolling scenarios analyzed, which ranged from *increases* of VMT by taxis and FHVs in the Central Business District under scenarios B, F and modified G (all of which would have limited daily tolling for taxis and FHVs to no more than once per day) to decreases of VMT of up to 16.8% under scenario D, which would have charged $19 per entry into the Central Business District. DOT_45527.  Accordingly, this aspect of the schedule similarly fits within the range of scenarios analyzed within the Final EA.[10]

## B.    The *Re-Evaluation* Reasonably Utilized the Methodology from the Final EA to Determine that the Adopted Tolling Structure Would Not Result in Impacts that Were Not Analyzed in the Final EA.

The *Re-Evaluation* contains detailed assessments of impacts of the Project on the same 20 resource areas analyzed in the Final EA using the same modeling methodology as the Final EA, but applying it to the specifics of the adopted toll structure to compare them to the results from the original seven tolling scenarios analyzed in the Final EA.  *See* DOT_45452-68.  The FHWA reasonably concluded, based on this modeling, that the final toll structure would not result in any significant environmental impacts that were not analyzed and mitigated in the Final EA and FONSI.

---

[10] Plaintiffs also speculate that charging the per ride toll to passengers somehow may increase congestion.  Pls. Br. at 19.  However, they offer no support for this proposition, which is not borne out by the results of the modeling conducted in connection with the *Re-Evaluation*.  DOT_45527.

Plaintiffs challenge the *Re-Evaluation* methodology, arguing that the it used "outdated" models[11] and statistics that were not "updated," Pls. Br. at 11, 27.  As an initial matter, the Court has already rejected such challenges to the modeling used in evaluating impacts in the Final EA, noting that "'courts accord deference to agencies' choice of methodology as long as it is not arbitrary or without foundation'. . . . [a]nd the FHWA's choice of methodology here easily clears that low bar." Op. at 85 (quoting *Senville v. Peters*, 327 F. Supp. 2d 335, 354 n.16 (D. Vt. 2004)). The Court's reasoning is dispositive of that claim here, too.

Moreover, the same modeling and methodology was reasonably used in the *Re-Evaluation* as the Final EA to permit a side-by-side comparison of the impacts of the seven tolling scenarios analyzed in the Final EA and the adopting tolling structure, DOT_45450, 45476.  This permits the *Re-Evaluation* to serve its purpose—to provide an effective analysis of whether the changes to the project would have environmental impacts that were not previously analyzed in the Final EA, and is entitled to deference.  *See Marsh*, 490 U.S. at  376 (question whether to supplement is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise"); *Massachusetts v. U.S. Nuclear Regul. Comm'n*, 708 F.3d 63, 76 (1st Cir. 2013) ("Agencies are entitled to select their own methodology as long as that methodology is reasonable, and we give deference to that decision here." (quotation marks and alterations omitted).[12]

---

[11] Plaintiffs also seem to take issue with the fact that the *Re-Evaluation* utilized an updated emissions model to test air quality, without updating data inputs, Pls. Br. at 27-28 (citing DOT_45538), but offer no explanation as to why the use of the version of EPA's emissions model that was current at the time the analysis was performed was arbitrary and capricious or not within the agency's reasoned discretion, particularly given that the model used in the Final EA was no longer being supported for use. DOT_45538. In any event, choices regarding modeling methodologies are afforded significant deference.  *See, e.g.*, *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004) (an agency's "choice among reasonable analytical methodologies is entitled to deference").

[12] Plaintiffs suggest, without ever seriously raising, that the *Re-Evaluations* escaped public scrutiny, *see* Pls. Br. at 2. As an initial matter, there is no requirement that re-evaluations be subject to public comment.  *Little Rock Downtown Neighborhood Association, Inc.*, 2022 WL 990341, at *9; *see also NEPA Re-Evaluation Joint Guidance for FHWA, FRA & FTA,* issued on August 14, 2019, at 3 ("[R]e-evaluations generally do not require public involvement.") (available at https://www.environment.fhwa.dot.gov/legislation/nepa/Reevaluation_guidance_08142019.aspx (last visited Dec. 5, 2024).  But even so, as detailed in the *Re-Evaluation*, following the Final EA and adoption of the final

II.    **FHWA's Determination in _Re-Evaluation 2_ That No Supplemental EA Was**
       **Required By the Phase-In Was Neither Arbitrary Nor Capricious.**

Months after concluding that the MTA's adopted tolling structure did not require

supplementation of the Final EA, the FHWA reasonably concluded that MTA's decision to use a

phase-in period for that tolling structure did not present significant new environmental impacts

and that the environmental analysis of the Final EA remained valid.  DOT_47520.  Plaintiffs

launch a scattershot attack on that conclusion, arguing that: (1) the phase-in differs materially from

the tolling structure adopted by the MTA in March, Pls. Br. at 18-19; (2) utilizing a phase-in

renders the MTA's adopted mitigation plan arbitrary, _id._ at 18-19; and (3) the FHWA's decision

was made too hastily and with too little documentation, _id._ at 24-25.  As set forth below, the MTA's

decision to implement the tolling structure adopted in March 2024 over the course of three

phases—a plan initially advocated for by Plaintiffs, _see_ Dkt. No. 54-1 at 43-44, and which the

Court has already recognized "merely postpones the full operation of Congestion Pricing," _see_ Op.

at 64—did not invalidate the years-long environmental review already approved by this Court.

A.    **The Phase-In Will Not Cause Additional Significant Environmental Impacts.**

Plaintiffs contend that "no evaluation has meaningfully addressed the effects of laddering

the toll price," as the MTA did in November, arguing that "varying toll prices will result in various

degrees of traffic diversion."  Pls. Br. at 18, 19; _see also_ DOT_47533-34 (showing tolling phase-

in progression).  But the _Re-Evaluation 2_ explained why phasing in the adopted tolling structure

would not "result in significant environmental impacts" outside those addressed in the Final EA.

In particular, "[b]y Phase 3, the effects would be those identified for the March 2024 adopted toll

structure in the June 2024 reevaluation," DOT_47539, which, as discussed above, did not require

---

tolling structure there has been extensive public input, including through small business working groups,
environmental justice community groups, and education and outreach efforts.  _See_ DOT_45617-21.

supplementation of the Final EA.  *See supra* Part I.  And "[d]uring Phases 1 and 2, the structure would be the same [as in Phase 3] but the tolls would be lower (but within the range of scenarios analyzed in the EA)."  DOT_47539.  Indeed, the toll rates of $9 and $12 utilized during Phase 1 and Phase 2—the factor that is the greatest driver of traffic diversions, *see, e.g.*, DOT_36372—are themselves within the range analyzed in the Final EA.  *Compare* DOT_36292 *with* DOT_47533-34.  A change to a project cannot be "significant" unless it "is *not* qualitatively within the spectrum of alternatives that were discussed in a prior" environmental document.  *In re Operation of Missouri River System Litigation*, 516 F.3d 688, 693 (8th Cir. 2008) (emphasis in original, quotation marks omitted).  Here, the phased-in approach falls well within the range already analyzed.

Moreover, the *Re-Evaluation 2* also explains that, during Phase 1 and Phase 2, "some effects . . . would by definition be reduced as compared to Phase 3 (such as effects on low-income drivers)."  DOT_47539.  Again, *reduced* effects are definitionally not significant.  *See* 23 C.F.R. § 771.130(b)(1) ("[A] supplemental EIS will not be necessary where [t]he changes to the proposed action . . . result in a lessening of adverse environmental impacts evaluated in the EIS"); *S. Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 666 (3d Cir. 1999) (upholding conclusion that supplemental EIS "was not required under the regulations because the roadway design change would not result in significant new impact on the environment, and would have a lesser effect on the environment than the originally approved plan.").[13]  The *Re-Evaluation 2*'s

---

[13] *Dubois v. U.S. Dep't of Agriculture*, 102 F.3d 1273 (1st Cir. 1996), relied on by Plaintiffs, Pls. Br. at 20, is readily distinguishable.  In that case, the Court concluded that the changes to a project did not "fall within the spectrum of alternatives" that were previously considered, because while the footprint of changes to a ski resort was reduced, within that footprint, there would be additional physical development that had not been considered.  *Id.* at 1292.  As the court noted, these changes were "relevant to environmental concerns" and "could very well have environmental impacts that the Forest Service has not yet considered, simply based on their more compact physical location."  *Id.* There are no equivalent concerns here, given the FHWA has determined that the changes to the tolling structure will not result in any significant environmental impacts that were not previously considered, and Plaintiffs have pointed to nothing in the phase-in approach that would raise new environmental concerns similar to those at issue in *Dubois*.

discussion of the effect of a phase-in was not verbose, but that was neither inappropriate nor unsurprising given that, as this Court has already recognized, a phase-in "merely postpones the full operation of Congestion Pricing." Op. at 64.

**B.    The Mitigation Measures in the Final EA and FONSI Remain Valid.**

The FHWA correctly determined that the MTA's commitment to mitigation measures remained valid after the adoption of the March 2024 tolling structure and November 2024 phase-in approach.  The MTA retained (and even expanded) its mitigation commitments from the Final EA in the *Re-Evaluation* and *Re-Evaluation 2*, despite the Final EA being premised on worst-case scenario assumptions.  DOT_45441-42; DOT_37826.  The *Re-Evaluation* made more concrete the locations at which mitigation measures would be adopted and the funding that would be allocated. DOT_45609.  Plaintiffs' suggestion that the MTA's approach to monitoring the efficacy of mitigation (already approved of by this Court, *see* Op. at 99) has been rendered invalid by the phase-in approach because it "was based on a *two-year* monitoring period," while the phase-in will take longer to reach $15, Pls. Br. at 18, ignores the facts and is based on pure speculation. The *Re-Evaluation* commits to broad monitoring that extends well beyond two-years to ensure the efficacy of mitigation, including "[a] formal report on the effects of the Project . . . every two years," and a "reporting website that will make data, analysis, and visualizations available in open data format to the greatest extent practicable," all designed "to support an adaptive management approach to monitoring the efficacy of mitigation, and adjustments as warranted."  DOT_45616; *see also* DOT_45607-13 (discussing siting and monitoring of mitigation more thoroughly).

**C.    Arguments Regarding the Timing and Format of the *Re-Evaluation 2* Are Meritless.**

Finally, Plaintiffs contend that the *Re-Evaluation 2* was approved too quickly and was not lengthy enough.   Pls. Br. at 24-25.   Again, Plaintiffs' arguments are counterfactual and misapprehend the purposes of NEPA.

The *Re-Evaluation 2* was not approved of in "less than a day."  Pls. Br. at 25.  Instead, the MTA began engaging with the FHWA on November 8, 2024, and shared a draft of the *Re-Evaluation 2* with the FHWA on November 13, and so the process of re-evaluating the Final EA and FONSI in light of the phase-in approach took place over several weeks.  DOT_47540-48.  To the extent Plaintiffs argue that the *Re-Evaluation 2* was nevertheless evaluated too quickly due to a desire to move the Project forward, *see, e.g.*, Pls. Br. at 1, that claim misunderstands the purpose of NEPA review.  Administrative review of an agency decision is confined to considering whether the agency engaged in reasoned decisionmaking, not whether it met an arbitrary minimum time requirement.  *See, e.g.*, *Brodsky v. U.S. Nuclear Regulatory Commission*, 783 F. Supp.2d 448, 465 (S.D.N.Y. 2011) (dismissing argument that decision was made "too quickly" as having "no foundation . . . in fact or law"), *vacated in part on other grounds by* 704 F.3d 113 (2d Cir. 2013). And to the extent that Plaintiffs contend that the *Re-Evaluation 2* was rushed for political reasons, that, too, is immaterial, absent a showing of bad faith.  *Spiller v. White*, 352 F.3d 235, 242 (5th Cir. 2003) ("[A]gencies' actions are judged in accordance with their stated reasons" and the "subjective motivation of agency decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior" (quotation marks omitted)).

Plaintiffs' separate contention that the *Re-Evaluation 2* was *too short* (while also making the contradictory argument that the *Re-Evaluation* was *too long*, *see* Pls. Br. at 16-17), is premised on dubious arguments that this Court has already rejected.  Op. at 55 (noting that "courts have

roundly rejected" the "facile argument" that the length of an environmental document has bearing on its validity); *see also TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 862 (D.C. Cir. 2006) ("[T]he length of an EA has no bearing on the necessity of an EIS."). As FHWA's Re-evaluation Guidance explains, "[t]here is no required format for written re-evaluations. Documentation may be simple, such as a checklist, and e-mail exchange between the Agency and project sponsor, or a memorandum to the project file. . . Regardless of the format, it should be concise and document whether the original environmental document or decision remain valid." *NEPA Re-Evaluation Joint Guidance*, at 3. NEPA requires agencies to take a hard look at the environmental effects of a proposed project, not produce paperwork for paperwork's sake. For all the reasons discussed above, the FHWA took the requisite hard look in the *Re-Evaluation* and the *Re-Evaluation 2*.

### III. There Have Been No Changed Circumstances That Would Require Supplementation of the EA.

Apart from their challenges to the analyses set forth in the two re-evaluations, Plaintiffs challenge two other allegedly changed circumstances that they believe require supplementation of the Final EA—an alleged change to the MTA's funding objectives and allegedly changed economic conditions in New York. Neither contention has merit.

#### A. The MTA Did Not Change Its Funding Objectives.

Plaintiffs' contention that the revenue goals used to assess alternatives in the Final EA has been "abandoned," Pls. Br. at 21-23, rests on a willful misreading of the record and a misunderstanding of what NEPA requires. The revenue criterion utilized in the Final EA was *not* to "achieve $1 billion in annual revenues," Pls. Br. at 21; instead, it was to "[c]reate a funding source for capital improvements and [to] generate sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program," DOT_36266. The *Re-Evaluation 2* uses

the same criterion. DOT_47537. The only difference between the analysis of the Final EA and the *Re-Evaluation 2* in this respect is that the MTA's Chief Financial Officer recently concluded "based on current interest rates and expected timing of projects," that lower annual net revenue could still meet that funding criterion. *Id.* That is because, as the *Re-Evaluation 2* explains, "[t]he net revenue needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and terms." *Id.* The MTA's expert financial analysis in this respect is entitled to deference. *See, e.g.*, *New Mexico Navajo Ranchers Ass'n v. ICC*, 850 F.2d 729, 738 (D.C. Cir. 1988) (deferring to financial projections under different regulatory regime). Even if it were not, the purpose of NEPA is to ensure consideration of *environmental* effects, not to police whether states have met their legislatively mandated financial goals. Op. at 62 ("NEPA does not empower the Court to second-guess the New York State Legislature's revenue objective under the guise of a purely procedural NEPA review.").

Plaintiffs nevertheless argue that the adoption of a phase-in approach and the MTA's assessment of the revenue necessary to meet its funding goals required the FHWA to undertake an alternatives analysis anew. Pls. Br. at 21-23. But this Court has already recognized that the phase-in approach "merely postpones the full operation of Congestion Pricing," Op. at 64, And "courts generally do not require supplementation and a new alternatives analysis where project changes simply reduce the scale of the previously approved project rather than changing the configuration and location of project features." *Florida Keys Citizens Coal., Inc. v. U.S. Army Corps of Engineers*, 374 F. Supp. 2d 1116, 1152 (S.D. Fla. 2005). Moreover, Plaintiffs have not (and cannot) identify *any* alternatives that were rejected in the Final EA that would now be viable in light of the MTA's analysis of the revenues necessary to fund $15 billion in MTA capital projects. Of the alternatives rejected in the Final EA, only three others—license plate rationing, mandatory

carpooling, and tolling the East and Harlem River bridges—even met the MTA's *non-revenue* congestion management goals. DOT_36267. But none of those alternatives would generate *any* revenue, let alone enough to meet MTA's statutorily-mandated goals.[14] Indeed, Plaintiffs point only to the phase-in approach as an alternative that was not discussed in the Final EA that could now be viable. Pls. Br. at 23. *But that is exactly what the MTA has adopted.* And, in any event, this Court has already ruled that a phase-in approach need not be separately analyzed as an alternative to the Congestion Pricing Project. Op. at 64.

Plaintiffs' arguments about alternatives also ignore a fundamental point that this Court addressed in its June decision. Although the Final EA excluded compliance with the MTA Reform and Traffic Mobility Act as a specific "objective," of the Project, *see* DOT_36266, under that Act, the MTA *is required* to "establish the central business district tolling program," DOT_38735. Following New York's legislative mandate "serves the separation of powers by respecting the democratic legitimacy of legislative judgments," Op. at 61; "promotes the balance of 'federalism' by ensuring federal agencies do not pass judgment on the policy wisdom of state and local enactments," *id.*; and "ensures federal agencies do not expend resources examining alternatives that the project sponsors are not 'legally authorized to implement," *id.* Given these considerations, the scope of alternatives considered—a no action alternative and implementation of the Project— was perfectly sensible, as this Court has already ruled.

Given this context, the analogy that Plaintiffs draw between this matter and *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996), is inapt. Pls. Br. at 27 n.15. In

---

[14] Tolling the East and Harlem River bridges would generate revenue for the City of New York, but there is no law or agreement in place that would direct that revenue to the MTA. DOT_36268. As this Court recognized in its June opinion, alternatives that are not "legally authorized" need not be examined. Op. at 61. Furthermore, this Court has already recognized that tolling these bridges would result in negative externalities to Environmental Justice communities and would poorly police "trips that start and end within Manhattan." *Id.* at 65-66.

*Glickman*, the Fourth Circuit held that the NEPA review of a dam project capriciously relied on an inaccurate economic analysis that impaired the Army Corps of Engineer's ability to balance the dam's benefits against its environmental costs.  *Id.* at 446.  But unlike in *Glickman*, there have been no errors of analysis in evaluating whether the Congestion Pricing Project will meet its revenue goals—the MTA's Chief Financial Officer simply provided an updated assessment about funding needs responding to current economic conditions.  Moreover, this is not a matter in which any errors in revenue assessment would "distort[] . . . fair consideration" of the Congestion Pricing Project's "adverse environmental effects." *Glickman*, 81 F.3d at 446.  To the contrary, with mitigation, the FHWA has already reasonably concluded that the Congestion Pricing Project *has no significant environmental effects*, as this Court has held.  Op. at 107 ("Based on the mitigation plan described in the EA and technical memorandum, the Court is convinced that the Sponsors' commitments provided adequate support for the FONSI.").  As such, it simply cannot be said that any alleged error "played a crucial part in the evaluation of whether to undertake the project." *North Carolina Alliance for Transp. Reform, Inc. v. U.S. Dep't of Transp.*, 151 F. Supp. 2d 661, 693 (M.D.N.C. 2001) (distinguishing *Glickman* on the same ground).

### B.    Allegedly Changed Economic Circumstances Do Not Require the Final EA To Be Supplemented.

Lastly, Plaintiffs brief alludes to (without ever raising) the argument that economic circumstances have changed in manner that requires the Final EA to be supplemented.  *See* Pls. Br. at 4 (citing "concerns over the affordability and financial burden on every day New Yorkers"). But Plaintiffs do not explain how economic circumstances have changed in a manner that would require supplemental NEPA analysis; instead, they simply parrot the Governor's statements in June that economic conditions differ from 2019 (which, notably, was four years before the Final EA was issued).  *See, e.g., Chemical Weapons Working Group v. U.S. Dep't of Defense*, 655 F.

Supp. 2d 18, 41 (D.D.C. 2009) (rejecting supplementation claim where "plaintiffs provide no evidence of 'new information'").

But even if Plaintiffs had met their burden to show that economic conditions had changed since the Court approved of the Final EA and FONSI, they could not show that those changed conditions would require a supplemental NEPA analysis. As set forth in the FHWA's regulations, a supplemental analysis must be prepared when "[n]ew information or circumstances relevant to environmental concerns . . . would result in significant environmental impacts not evaluated" in a prior NEPA document. 23 C.F.R. § 771.130(a)(2) (emphasis added). By contrast, because "[t]he zone of interests protected by the NEPA is, as its name implies, environmental; economic interests simply do not fall within that zone." *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015). Accordingly, the Court should reject these arguments.

## CONCLUSION

For the reasons stated herein, Plaintiffs' motion for summary judgment should be denied and Federal Defendants' cross-motion for summary judgment should be granted.

Dated: December 9, 2024
      New York, New York

                              DAMIAN WILLIAMS
                              United States Attorney
                              Southern District of New York

By:    /s/ *Dominika Tarczynska*
          ZACHARY BANNON
          DOMINIKA TARCZYNSKA
          Assistant United States Attorneys
          86 Chambers Street, Third Floor
          New York, New York 10007
          Tel.: (212) 637-2728