**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ELIZABETH CHAN, *et al.*,

                                        *Plaintiffs*,

            v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                                        *Defendants*.

Case No. 1:23-cv-10365 (LJL)
Case No. 1:24-cv-01644 (LJL)

MICHAEL MULGREW, *et al.*,

                                        *Plaintiffs*,

            v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, *et al.*,

                                        *Defendants*.

**MEMORANDUM OF LAW IN SUPPORT OF CROSS MOTIONS FOR SUMMARY
JUDGMENT BY DEFENDANTS THE METROPOLITAN TRANSPORTATION
AUTHORITY, THE TRAFFIC MOBILITY REVIEW BOARD, AND THE
TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, AND IN OPPOSITION TO
PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 3

LEGAL STANDARD............................................................................................ 7

ARGUMENT ....................................................................................................... 9

    I.  FHWA COMPLIED WITH NEPA.................................................................. 9

      A. The Reevaluation Procedure Complied With NEPA...................................... 9

      B. FHWA Took a Hard Look at the Adopted Toll Structure and Phase-In Approach...... 12

      1.  The Reevaluations Thoroughly Analyzed the Adopted Toll Structure's Impacts...... 12

      2.  Reevaluation 2 Built on the EA and Reevaluation 1 to Analyze the Phase-In Approach.................................................................................. 18

      C. Plaintiffs' Challenges to the Reevaluations Are Without Merit .................. 20

    II.  FHWA'S DECISION TO ISSUE THE REEVALUATIONS RATHER THAN A SUPPLEMENTAL EA WAS NEITHER ARBITRARY NOR CAPRICIOUS ................ 25

      A. Plaintiffs' Subjective Belief That Adjustments in the Adopted Tolling Structure Are Significant Does Not Support Their Claim .................................. 26

      B. The Alternatives Analysis Remains Valid ................................................ 28

    CONCLUSION.................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
67 F.3d 723 (9th Cir. 1995) ..................................................................................30

*Arkansas Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
431 F.3d 1096 (8th Cir. 2005) ..............................................................................27

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
462 U.S. 87 (1983) ...........................................................................................8, 24

*California v. Block*,
690 F.2d 753 (9th Cir. 1982) ................................................................................12

*Citizens' Comm. to Save our Canyons v. U.S. Forest Serv.*,
297 F.3d 1012 (10th Cir. 2002) ............................................................................30

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ...............................................................................................8

*City of N.Y. v. U.S. Dep't of Transp.*,
715 F.2d 732 (2d Cir. 1983) .................................................................................30

*City of Port Isabel v. FERC*,
111 F.4th 1198 (D.C. Cir. 2024) ..........................................................................27

*Coal. for Healthy Ports v. U.S. Coast Guard*,
No. 13 Civ. 5347, 2015 WL 7460018 (S.D.N.Y. Nov. 24, 2015) ...............................12

*Coliseum Square Ass'n, Inc. v. Jackson*,
465 F.3d 215 (5th Cir. 2006) ................................................................................15

*Communities Against Runway Expansion, Inc. v. F.A.A.*,
355 F.3d 678 (D.C. Cir. 2004) .............................................................................15

*Dubois v. U.S. Dep't of Agric.*,
102 F.3d 1273 (1st Cir. 1996) ..............................................................................28

*Friends of Animals v. Romero*,
948 F.3d 579 (2d Cir. 2020) ...................................................................................6

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
877 F.3d 1051 (D.C. Cir. 2017) ........................................................................9, 27

**CASES**                                                                     **PAGE(S)**

*Hughes River Watershed Conservancy v. Glickman*,
81 F.3d 437 (4th Cir. 1996) ........................................................................28

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976)........................................................................................8

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989).................................................................................. *passim*

*Metro. Edison Co. v. People Against Nuclear Energy*,
460 U.S. 766 (1983)......................................................................................22

*Missouri ex rel. Bailey v. U.S. Dep't of Interior*,
73 F.4th 570 (8th Cir. 2023) ..........................................................................9

*Mulgrew v. U.S. Dep't of Transp.*,
No. 24 Civ. 1644, 2024 WL 3251732 (S.D.N.Y. June 20, 2024).......................... *passim*

*NRDC v. Morton*,
458 F.2d 827 (D.C. Cir. 1972) ........................................................................8

*New State Ice Co. v. Liebmann*,
285 U.S. 262 (1932)........................................................................................1

*New Yorkers Against Congestion Pricing Tax v. U.S. Dep't of Transp.*,
No. 24 Civ. 367 (S.D.N.Y.) .........................................................................1, 6

*No Mid-Currituck Bridge-Concerned Citizens v. N. Carolina Dep't of Transp.*,
60 F.4th 794 (4th Cir. 2023) ....................................................................10, 11

*Norwalk Harbor Keeper v. U.S. Dep't of Transp.*,
No. 18 Civ. 0091, 2019 WL 2931641 (D. Conn. July 8, 2019)....................30

*Piedmont Env't Council v. U.S. Dep't of Transp.*,
159 F. Supp. 2d 260 (W.D. Va. 2001) ..........................................................11

*Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*,
113 F.3d 1505 (9th Cir. 1997) ...............................................................9, 10, 11

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).........................................................................................8

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017) .....................................................................15

**CASES**                                                    PAGE(S)

*S. Trenton Residents Against 29 v. FHWA,*
176 F.3d 658 (3d Cir. 1999)..............................................................10, 27

*New Jersey v. U.S. Dep't of Transp.,*
No. 23 Civ. 03885 (D.N.J.)..................................................................11

*Stewart Park & Reserve Coal., Inc. v. Slater,*
352 F.3d 545 (2d Cir. 2003)...................................................................7

*United States v. Quintieri,*
306 F.3d 1217 (2d Cir. 2002).............................................................10, 20

*Vill. of Grand View v. Skinner,*
947 F.2d 651 (2d Cir. 1991)..............................................................8, 27

**STATUTES**

42 U.S.C. § 4332(2)(C)...........................................................................9

42 U.S.C. § 7409(b)(1)..........................................................................14

N.Y. Veh. & Traf. Law § 1704-a(1)..........................................................29

**REGULATIONS**

23 C.F.R. § 771.107..............................................................................10

23 C.F.R. § 771.129.....................................................................9, 11, 18

23 C.F.R. § 771.130.........................................................................9, 26

40 C.F.R. § 1501.11.......................................................................10, 24

40 C.F.R. § 1508.1................................................................................24

## PRELIMINARY STATEMENT

In their motion for summary judgment, Plaintiffs[1] demonstrate tenacity—but little else—in yet another attempt to convince this Court to deploy the National Environmental Policy Act ("NEPA") to "stay experimentation" in the realm of transportation planning and prevent New York State and City from trying a "novel social and economic experiment[] without risk to the rest of the country," in the form of congestion pricing. *Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644, 2024 WL 3251732, at *25 n.21 (S.D.N.Y. June 20, 2024) (Liman, J.) (*citing New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)).  Plaintiffs' arguments boil down to: (1) relitigation of their prior unsuccessful challenges; (2) inchoate complaints about insignificant project changes bearing no relationship to environmental impacts; and (3) disavowal of the very approach they previously advocated for on their first bite at the apple, namely, a phase-in of tolling.  None of their arguments point to any reason this Court should require yet more environmental review of a program that has been subjected to five years of scrutiny.

At some point, iterative environmental review must end, lest "agency decisionmaking" become "intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989).  That point has been reached.  The Federal Highway Administration ("FHWA") conducted the "granular assessment[]" of the adopted tolling structure contemplated by the Finding of No Significant Impact ("FONSI"), *Mulgrew*, 2024 WL 3251732, at *29, and properly determined no further review was warranted.

---

[1] "Plaintiffs" refers to the plaintiffs in *Chan v. U.S. Department of Transportation*, No. 23 Civ. 10365 (S.D.N.Y.) ("*Chan*") and *Mulgrew v. U.S. Department of Transportation*, No. 24 Civ. 1644 (S.D.N.Y.) ("*Mulgrew*").  "Pl. Br." refers to Plaintiffs' identical memoranda of law in support of their motions for summary judgment filed in *Chan* at ECF 136 and *Mulgrew* at ECF 124.  This memorandum also refers to *New Yorkers Against Congestion Pricing Tax v. U.S. Department of Transportation*, No. 24 Civ. 367 (S.D.N.Y.) ("*New Yorkers*").

This Court recognized that FHWA conducted a comprehensive environmental assessment ("EA") of the Central Business District ("CBD") Tolling Program (the "Program") under NEPA, with assistance from the three Project Sponsors: the Triborough Bridge and Tunnel Authority ("TBTA"),[2] the New York State Department of Transportation, and the New York City Department of Transportation. Over five years, FHWA and the Project Sponsors consulted with federal, regional, state, and local agencies; held multiple public outreach meetings; and considered and responded to tens of thousands of comments before issuing the 958-page final EA with 32,543 pages of appendices. FHWA's FONSI determined that the Program, including mitigation, would not have a significant adverse impact on the environment and would not have a disproportionately high and adverse impact on environmental justice ("EJ") communities or populations.

In June 2024, this Court upheld the EA and FONSI, concluding that "[b]ased on the FHWA and Project Sponsors' painstaking examination of Congestion Pricing's environmental impacts…the FHWA 'has made the careful consideration and disclosure required by NEPA'…in a manner that was neither arbitrary nor capricious." *Mulgrew*, 2024 WL 3251732, at *19 (citation omitted). The Court specifically rejected Plaintiffs' "contrive[d]…portrait" of the Program's EJ mitigation measures as a "picture [that] bears little resemblance to the reality of the Project Sponsors' commitments," *id.* at *44, recognizing that the EA's EJ analysis "displayed both careful consideration and a deep commitment among the FHWA, EPA, and Project Sponsors alike not to repeat the dismal chapters of New York City's transportation history," *id.* at *38. These holdings preclude Plaintiffs from recycling their prior rejected arguments. Two subsequent reevaluations— in June 2024 ("Reevaluation 1") and November 2024 ("Reevaluation 2")—analyzed the toll

---

[2] TBTA is an affiliate agency of the Metropolitan Transportation Authority (the "MTA"), a public benefit corporation responsible for North America's largest transportation network, serving 15.3 million people across 5,000 square miles in New York City, Long Island, Southeastern New York, Northeastern New Jersey, and Southern Connecticut.

structure that had been adopted by the TBTA Board in March 2024 (the "March 2024 adopted toll structure") and a subsequent approach in November 2024 whereby those toll rates would be phased in gradually over the first several years of the Program (the "Phase-In Approach"). Each reevaluation reaffirmed that the Program's effects will be consistent with those discussed in the EA, and that the mitigation commitments set forth in the FONSI remain valid.

The only issues properly before the Court are whether the reevaluations complied with NEPA's hard look standard and if FHWA's determination that the FONSI remained valid was arbitrary and capricious. *See Mulgrew*, 2024 WL 3251732, at *12 (articulating standard). While Plaintiffs point to differences between the adopted toll structure and certain characteristics of the multiple scenarios evaluated in the EA, they fail to meet the fundamental requirement to show that a supplemental EA was required because of unstudied significant environmental impacts. Therefore, summary judgment should be granted to Defendants.

## STATEMENT OF FACTS

Supplementing this Court's discussion of the factual background as of *Mulgrew*, 2024 WL 3251732, at *1–7, below is a brief overview of FHWA's NEPA review and the two reevaluations.

On July 29, 2022, after more than a year of collaboration with federal, state and local agencies, an extensive public outreach campaign, and input from EJ groups, FHWA and the Project Sponsors published an 868-page draft EA, along with thousands of pages of appendices, for public comment. *See id.* at *5. The draft EA began by underscoring the severity of congestion in the CBD, describing the need for improvements to the region's public transportation network, and defining the Program's goals and objectives, including: reducing daily vehicle-miles traveled ("VMT") within the CBD; reducing the daily number of vehicles entering the CBD; and creating a funding source sufficient to raise $15 billion for the MTA's Capital Program. *Id.* After considering twelve potential alternatives to congestion pricing but determining that they would not

satisfy the Program's objectives, the draft EA evaluated a congestion pricing program compared to a "No Action" alternative, as required by NEPA.  *Id.*

Because the final tolling structure was not yet defined, and to assist the Traffic Mobility Review Board (the "TMRB") and the TBTA Board in evaluating the potential impacts of various tolling options, the EA analyzed seven tolling scenarios employing different variables, using the New York Metropolitan Transportation Council's Best Practice Model ("BPM") to predict changes in regional travel demand and patterns for all scenarios.  (DOT_0036328, DOT_0036343, DOT_0036340.)[3]  The draft EA analyzed the potential impacts of the Program—including on traffic, public transit, economic conditions, and air quality—considering "the 'worst-case tolling scenario' for the relevant impact as a conservative measure of potential harm."  *Mulgrew*, 2024 WL 3251732, at *6.  "Based on these analyses, the draft EA concluded that Congestion Pricing would result in 'beneficial or no adverse effects' for most of the factors considered and that any adverse effects as to the remaining factors could be effectively mitigated, such that Congestion Pricing would not have a significant environmental impact."  *Id.*  During the draft EA's 56-day public comment period, FHWA and the Project Sponsors held six virtual hearings and collected tens of thousands of comments.  *Id.* at *46.

In May 2023, FHWA approved the final EA (DOT_0036153), which included an expanded analysis of potential effects on EJ populations and communities, including the potential effect of traffic diversions (taken to avoid tolling) on local air quality.  (DOT_0036989–96, DOT_0006963–82, DOT_0007243–440.)

Based on the final EA, FHWA approved the issuance of a draft FONSI, which determined that the Program would not have a significant adverse impact on the human or natural environment.

---

[3] References to the administrative record cite to the Bates number of the relevant page(s).

(DOT_0000363.)  On June 23, 2023, after a period of public availability of the final EA and draft FONSI, FHWA's New York Division Administrator signed the FONSI.  (DOT_0000393.)  In accordance with FHWA's regulations, the FONSI committed to reevaluate the tolling structure ultimately adopted by TBTA, requiring that "TBTA demonstrate to FHWA that the effects of the final tolling rates and structure are consistent with the effects disclosed in the Final EA and that the mitigation is still valid."  (DOT_0000394.)

On March 27, 2024, based on the recommendations of the independent TMRB and informed by the EA, the TBTA Board adopted a toll rate schedule through a formal ratemaking process under the New York State Administrative Procedure Act ("SAPA").  Reevaluation 1 assessed the effects of the adopted toll structure; it was prepared in consultation with FHWA (via submission of interim drafts) and submitted for final review on May 23, 2024.  (*See* DOT_0047124–90, DOT_0047399.)  On June 5, 2024, several weeks before the Program's scheduled start, Governor Hochul announced a pause of its implementation, citing cost concerns.[4] The Project Sponsors asked FHWA to proceed with the reevaluation process, and on June 14, 2024, FHWA concluded that the adopted toll structure and associated impacts were analyzed and mitigated appropriately under NEPA, that no additional environmental analysis was warranted, and that the conclusions in the EA and FONSI remained valid.  (DOT_0047520–21, DOT_0047539.)[5]  Reevaluation 1 concluded that "[i]n every category, the effects are consistent with those predicted in the Final EA," and that, "importantly, some of the adverse effects no longer occur and many are on the lower end of those disclosed in the Final EA."  (DOT_0045437.)

---

[4] Press Release, Gov. Kathy Hochul, *Governor Hochul Announces Pause on Congestion Pricing to Address the Rising Cost of Living in New York* (June 5, 2024), https://www.governor.ny.gov/news/what-they-are-saying-governor-hochul-announces-pause-congestion-pricing-address-rising-cost.

[5] Reevaluation 1 was published on the MTA's website on June 21, 2024.  *See* MTA, Re-Evaluation (updated June 21, 2024), https://new.mta.info/project/CBDTP/reevaluation.

On June 20, 2024, this Court issued its opinion and order (1) dismissing certain claims in *New Yorkers* and *Mulgrew*, including dismissing their NEPA challenges as time-barred, (2) granting summary judgment in favor of Defendants on the challenge to the FONSI in *Chan*, and (3) deferring a decision on Plaintiffs' Count II (failure-to-supplement). *See Mulgrew*, 2024 WL 3251732, at *46–47. The Court held that "FHWA's thorough analysis and exhaustive review process" made it "'abundantly clear that [the agency] took a hard look at the environmental consequences'" of the Program and that "Plaintiffs' NEPA challenge to the EA and FONSI is at bottom a policy disagreement with the wisdom of Congestion Pricing." *Id.* at *46 (quoting *Friends of Animals v. Romero*, 948 F.3d 579, 588 (2d Cir. 2020)).

On November 14, 2024, Governor Hochul announced a proposal to lift the pause and proceed with the Phase-In Approach.[6] Under this approach, the Program would be implemented in three steps, culminating with the March 2024 adopted toll structure. (DOT_0047532–38.) The interim steps would have tolls for each vehicle class and time of day, as well as tunnel crossing credits, proportionally reduced from the corresponding values in the March 2024 adopted toll structure. (*Id.*) The proportional reductions would result in values for Phase I (2025, 2026, and 2027) equaling 60% of the corresponding values for the March 2024 adopted toll structure (*e.g.*, a $9 peak EZPass automobile rate instead of $15). (*Id.*) For Phase 2 (2028, 2029, and 2030), the tolls and credits would equal 80% of the March 2024 adopted toll structure values (*e.g.*, a $12 peak EZPass automobile rate instead of $15). (*Id.*) The March 2024 adopted toll structure values would come into full effect in 2031 (*e.g.*, the $15 peak EZPass automobile rate). (*Id.*)

On November 13, 2024, the Project Sponsors sent FHWA a draft of Reevaluation 2,

---

[6] *See* Press Release, Gov. Kathy Hochul, *Putting Commuters First, Keeping Costs Down: Governor Hochul Unveils Plan for Future of Transit and Traffic in New York City, Including a 40 Percent Reduction in Congestion Pricing Tolls* (Nov. 14, 2024), https://www.governor.ny.gov/news/putting-commuters-first-keeping-costs-down-governor-hochul-unveils-plans-future-transit-and.

prepared consistent with FHWA's regulations, to assess the Phase-In Approach.  (DOT_0047540–48.)  Reevaluation 2 confirms that under the Phase-In Approach, the Project Sponsors will still implement all mitigation commitments, including for EJ communities, within the same timeframes as contemplated in the EA and FONSI.  (*Id.*)  On November 18, 2024, the TBTA Board formally adopted the Phase-In Approach to the toll rate schedule under SAPA.  Reevaluation 2 also confirmed that the Phase-In Approach would achieve the Program's objectives of reducing VMT by 5%, reducing entries to the CBD by 10%, and raising sufficient revenue to finance $15 billion for the MTA's Capital Program.  (Although revenues would be lower in the first two phases, in combination, the projected revenues from the Phase-In Approach would allow $15 billion in capital projects to be bonded on the same time frame as for the March 2024 adopted toll structure.)

On November 21, 2024, FHWA approved Reevaluation 2, concluding that the effects of the Program were consistent with those disclosed in the EA, that "the phase-in of the adopted toll structure and impacts associated with it was analyzed and mitigated accordingly," and "that no additional environmental analysis is warranted."  (DOT_0047520–39.)  That same day, FHWA and the Project Sponsors signed an agreement under the Value Pricing Pilot Program (the "VPPP") authorizing the Program's collection of tolls and requiring (among other things) implementation of the mitigation commitments made in the FONSI.[7]

## **LEGAL STANDARD**

In the instant motion, Plaintiffs argue that FHWA's decision not to prepare a supplemental EA must be annulled.  "NEPA is a procedural statute that mandates a process rather than a particular result."  *Stewart Park & Reserve Coal., Inc. v. Slater*, 352 F.3d 545, 557 (2d Cir. 2003); *see also Mulgrew*, 2024 WL 3251732, at *46 ("NEPA itself does not mandate particular results,

---

[7] VPPP Agreement (Nov. 21, 2024), https://new.mta.info/project/CBDTP/reevaluation2-and-vppp-agreement.

but simply prescribes the necessary process" (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989))).  "The only role for a court is to [ensure] that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'"  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (quoting *NRDC v. Morton*, 458 F.2d 827, 838 (D.C. Cir. 1972)).

Courts review an agency's compliance with NEPA, including an agency's decision as to whether supplemental environmental review is needed, under the Administrative Procedure Act's "arbitrary and capricious" standard.  *Marsh*, 490 U.S. at 375–76.  In the Second Circuit: "First, the court must ask whether the agency took a 'hard look' at the possible effects of the proposed action. Second, if such a 'hard look' has been taken, the court must ask 'whether the agency's decision was arbitrary or capricious.'"  *Vill. of Grand View v. Skinner,* 947 F.2d 651, 657 (2d Cir. 1991).

Whether to prepare a supplement "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise."  *Marsh*, 490 U.S. at 376–77.  "Because analysis of the relevant documents 'requires a high level of technical expertise,' [courts] must defer to 'the informed discretion of the responsible federal agencies.'"  *Id*. at 377 (quoting *Kleppe*, 427 U.S. at 412); *see also Baltimore Gas & Elec. Co. v. NRDC, Inc*., 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.").  A court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).  Although this inquiry must "be searching and careful," "the ultimate standard of review is a narrow one."  *Id*.  Consistent with NEPA's focus on *environmental* impacts, whether a supplement is required depends on whether project changes "will 'affec[t] the quality of the human environment' in a significant manner or to a significant

extent not already considered." *Marsh*, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)); *see also* 23 C.F.R. § 771.130.

In deciding whether to prepare a supplement, agencies must "apply a 'rule of reason.'" *Marsh*, 490 U.S. at 373. A supplement is not required "every time new information comes to light after the" initial environmental review is complete. *Id.* As the Ninth Circuit observed in upholding FHWA's reevaluation process, to require a more searching reevaluation or a supplement in every case "would task the agencies with a sisyphean feat of forever starting over in their environmental evaluations, regardless of the usefulness of such efforts." *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997). A supplement "must be prepared only where new information provides a *seriously* different picture of the environmental landscape." *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017) (emphasis in original). It is Plaintiffs' burden to "show the action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Missouri ex rel. Bailey v. U.S. Dep't of Interior*, 73 F.4th 570, 576 (8th Cir. 2023). They have not met that burden.

## ARGUMENT

### I.    FHWA COMPLIED WITH NEPA

#### A.    The Reevaluation Procedure Complied With NEPA

The reevaluations used to evaluate the continuing validity of the FONSI in light of the adopted toll structure and Phase-In Approach complied with FHWA's NEPA regulations. Those regulations require that the agency "determine, prior to granting any new approval related to an action or amending any previously approved aspect of an action, including mitigation commitments, whether an approved environmental document remains valid." 23 C.F.R. § 771.129. Only if the environmental documents—here, the EA and FONSI—are no longer valid, must the agency prepare a supplemental EA or EIS. *Id.* § 771.130.

This Court and others have uniformly upheld FHWA's reevaluation procedure as consistent with NEPA. *See Price Rd. Neighborhood Ass'n, Inc.*, 113 F.3d at 1509 ("[A]n environmental reevaluation is an appropriate procedure for the FHWA to determine the significance of the impacts produced by the modified design and whether a supplemental EA is required."); *see also No Mid-Currituck Bridge-Concerned Citizens v. N. Carolina Dep't of Transp.*, 60 F.4th 794, 805 (4th Cir. 2023); *S. Trenton Residents Against 29 v. FHWA*, 176 F.3d 658, 663 (3d Cir. 1999); *Mulgrew*, 2024 WL 3251732, at *29. Moreover, reevaluations need not replicate the same analyses conducted in the initial environmental review. *See* 40 C.F.R. § 1501.11(b) (explaining that an agency "may employ tiering" to "eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided"); 23 C.F.R. § 771.107; *cf.* 40 C.F.R. § 1501.11(c).

This Court has already affirmed FHWA's use of the tiering/reevaluation model, holding that "[m]ulti-step NEPA reviews" like this one "are not only lawful, but also salutary." *Mulgrew*, 2024 WL 3251732, at *29. The EA analyzed seven tolling scenarios varying by toll rates, exemptions, crossing credits, and discounts, with peak EZPass toll rates ranging from $9 to $23 for automobiles (and other ranges for small and large trucks (DOT_0036750)), and quantitatively analyzing representative worst-case scenarios for each analysis area. (DOT_0037262–66.) This process "enabled the TMRB and TBTA to benefit from the federal government's environmental expertise in crafting a suitable tolling schedule" while also providing "TBTA with flexibility going forward" to "adjust the final tolling structure within the bounds of the EA's tolling scenarios— including by *reducing* toll rates—without restarting the arduous NEPA review process." *Mulgrew*, 2024 WL 3251732, at *29 (emphasis in original). Plaintiffs cannot relitigate the propriety of this approach. *See United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002); *cf. Mulgrew*, 2024

WL 3251732, at *16 (holding reevaluation did not reopen prior NEPA review).[8]  Plaintiffs have

not even attempted satisfy the standard for setting aside the law of the case.

In effect, Plaintiffs challenge the legitimacy of FHWA's Court-sanctioned reevaluation

procedure by arguing that any project change or refinement requires supplementation to allow for

another round of public participation on the specific effects of the change.  (Pl. Br. 1–6.)  Plaintiffs

offer no legal support for that proposition, which is contrary to law.

Indeed, FHWA issues approximately 3,000 reevaluations per year.[9]  To date, not a single

court has held that a reevaluation was invalid due to a lack of public participation.  Rather, courts

have specifically rejected claims that FHWA's reevaluation process, which does not require a

public comment period, runs afoul of NEPA's public participation requirements.  *See Price Rd.*

*Neighborhood Ass'n, Inc.*, 113 F.3d at 1510 (rejecting argument that lack of public comment on

reevaluation conducted by FHWA "violated explicit statutory and regulatory public participation

requirements"); *see also No Mid-Currituck Bridge-Concerned Citizens*, 60 F.4th at 799 (affirming

reevaluation under § 771.129 that was done "[w]ithout soliciting further public input").  FHWA's

reevaluation guidance specifically does not require the agency to hold an additional public

comment period on a reevaluation.[10]

Plaintiffs decry the reevaluations as the product of a "back-room political pact" with "no

---

[8] Plaintiffs' reliance on *Piedmont Environment Council v. U.S. Department of Transportation*, 159 F. Supp. 2d 260, 265 (W.D. Va. 2001), *aff'd in part, remanded in part*, 58 F. App'x 20 (4th Cir. 2003), fails.  That case held that a reevaluation could not be used to analyze issues—there, a "bypass project's effects on [a water reservoir] and the mitigation efforts in place to address those impacts"—that "should have been included" in the original EIS and EA. *Id*. at 279.  *Piedmont* has no bearing on this case because this Court has already affirmed FHWA's decision to tier its environmental review of the Program and the sufficiency of the EA and FONSI.  *Mulgrew*, 2024 WL 3251732, at *29.

[9] *See* FHWA Report (ECF 152-1), *New Jersey v. U.S. Dep't of Transp.*, No. 23 Civ. 03885 (D.N.J.).

[10] *See* NEPA Re-Evaluation Joint Guidance for Federal Highway Administration (FHWA), Federal Railroad Administration (FRA), & Federal Transit Administration (FTA) 3 (Aug. 14, 2019), https://www.environment.fhwa.dot.gov/legislation/nepa/reevaluation_guidance_08142019.pdf (explaining that revaluations generally do not require public involvement" unless required by other legal provisions or where the agency, in consultation with the project sponsor, determines "that some form of public involvement is appropriate").

public input whatsoever." (Pl. Br. 5–6.) But again, further public comment was not necessary, and in any event, Plaintiffs fail to identify any methodological challenges they would have raised in a public comment period for either reevaluation. Indeed, in their prior briefing in this matter, Plaintiffs actually *supported* a phase-in approach to the Program. (*Chan*, ECF 54-1, at 43–44.)[11] The process here allowed parties to submit comments on the environmental analysis in the draft and final EA, and on toll rates under the SAPA process. *Mulgrew*, 2024 WL 3251732, at *29. The adopted toll rates, including their phase in, are generally within the range of scenarios already analyzed in the EA, which this Court noted were "subject to extensive public scrutiny and input." *Id.* at *46. Moreover, the differences between the EA scenarios and the adopted toll structure— discounted off peak hours, and per-ride taxi and FHV tolls—were the subject of and informed by public comment during the EA process. (*See* DOT_0009409, DOT_0003633–34.)[12]

### B. FHWA Took a Hard Look at the Adopted Toll Structure and Phase-In Approach

*1. The Reevaluations Thoroughly Analyzed the Adopted Toll Structure's Impacts*

First, as contemplated by the FONSI and in light of slight differences between the adopted tolling structure and the EA scenarios, FHWA reevaluated the adopted tolling structure. Contrary to Plaintiffs' assertions that these aspects of the adopted toll structure were not modeled (Pl. Br. 12, 27), Reevaluation 1 is crystal clear in describing the detailed modeling that was completed, as summarized further below. Reevaluation 1 applied the same methodologies this Court previously

---

[11] A plaintiff's participation claims are actionable only to the extent the lack of participation prevented the lead agency from taking a "hard look" at the relevant areas of environmental concern. *Coal. for Healthy Ports v. U.S. Coast Guard*, No. 13 Civ. 5347, 2015 WL 7460018, at *15 (S.D.N.Y. Nov. 24, 2015). Because Plaintiffs' claims of deficiencies in the Reevaluation must fail, Plaintiffs must lose on this claim as well.

[12] Contrary to Plaintiffs' suggestion, *California v. Block*, 690 F.2d 753, 772 (9th Cir. 1982), did not require a supplement where changes in the final iteration of a project "seriously dilute[]" the relevance of the prior comment period. Rather, the court there held, unremarkably, that the proposed project and its environmental impacts changed so substantially between the draft and final EIS that a supplement was needed. Even if this differed from the standard articulated here, the Ninth Circuit's decision in *Block* was based on a CEQ guidance document that is no longer in effect, and it predates the Supreme Court's articulation of the standard in *Marsh*, 490 U.S. at 374.

affirmed as a "painstaking examination of Congestion Pricing's environmental impacts." *Mulgrew*, 2024 WL 3251732, at *19, *28–44.  (Plaintiffs also acknowledge this, while continuing to litigate the already-decided rationality of the methodology.  (*See, e.g.*, Pl. Br. 11.))  Reevaluation 2 then assessed whether the Phase-In Approach would change the conclusion of Reevaluation 1 and determined it would not.  Although Plaintiffs continue to claim that the Program will adversely affect traffic, air quality, and EJ communities based on assertions the Court already rejected (*id.* at 17–19, 25–28), the reevaluations concluded that either no adverse effects would result, or they would be sufficiently mitigated as provided in the FONSI.  (DOT_0045624, DOT_0047539.)

### a.  Modeling Showed That Impacts on Traffic and Air Quality Were Within the Range of Impacts Studied in the EA

Reevaluation 1 "[m]odeled the adopted toll structure using the same version of the BPM as was used for the Final EA," the results of which were used to reevaluate "the full range of topics from the Final EA."  (DOT_0045477.)  The modeling demonstrated "that the adopted toll structure's effects on regional transportation patterns would be within the range of effects of the tolling structures studied in the EA," would reduce "the number of vehicles entering the [CBD] by approximately 17%," and would reduce VMT in the CBD by 8.9%, both of which met the objectives set forth in the EA.  (DOT_0045478–79.)

FHWA also used the same modeling techniques from the EA to evaluate the impacts of the adopted toll structure on highways and local intersections.  (DOT_0045480–86.)  Modeling showed that that the adopted toll structure would yield *lower traffic volumes* at the most impacted highway segments compared to the volumes predicted in the EA and would not have additional adverse effects on any new segments.  (DOT_0045480–83, DOT_0045486.)  Reevaluation 1 similarly found that the adopted toll structure would *reduce* local intersection traffic compared to the results in the EA at the 102 local intersections identified as the most likely to experience

increases in traffic under various scenarios. (DOT_0036478–79, DOT_0036494–96, DOT_0045481–86.) Thus, FHWA concluded that the effect on local intersections was "within the range evaluated in the Final EA and no new adverse effects would occur." (DOT_0045486.)

Reevaluation 1 took a similar approach to analyzing air quality. *See Mulgrew*, 2024 WL 3251732, at *32–38. It used EPA's latest emissions model—known as "MOVES3.1"—to analyze the adopted toll structure's impact on air emissions across the 12-county study area. (DOT_0045536–43.) The modeling showed that although certain counties could see small variations in county-wide emissions, the "adopted toll structure would benefit regional air quality by reducing criteria pollutants, [mobile source air toxins], and [greenhouse gases] overall in the 12-county study area." (DOT_0045538.) The modeling predicted that benefits from reductions in VMT and air emissions would be greater than those projected in the EA. (DOT_0045541.)

Reevaluation 1 used the EA methodology to evaluate potential effects from carbon monoxide and particulate matter at the 102 intersections described above. (DOT_0036859–60, DOT_0045536–37.) All 102 locations fell below the applicable screening thresholds, demonstrating that the Program "would not create any new or worsen any existing violation" "or delay timely attainment" of air quality standards. (DOT_0036859–63, DOT_0036868, DOT_0045544–48.) FHWA also updated its "highway link" analysis to evaluate the effect of traffic diversions on local air quality near highway segments. (DOT_0045549–54.) The modeling showed that either traffic volumes would be lower, or in one case where average daily traffic would be slightly greater, Program-related diversions would not result in exceedances of National Ambient Air Quality Standards, which are set by EPA with "an adequate margin of safety ... to protect public health." 42 U.S.C. § 7409(b)(1); (DOT_0045549–54). FHWA therefore concluded that the "analysis for the adopted toll structure demonstrates that there are no potential adverse

effects related to air quality and the conclusions of the Final EA remain valid."  (DOT_0045552.)

> *b.  The Reevaluation Refined the EA's EJ Assessment*

Reevaluation 1 "used the same methodology as the EA in considering local (neighborhood) and regional effects of the adopted toll structure" on EJ communities.  (DOT_0045568.)[13]  The EA evaluated potential impacts on EJ communities by first identifying a "10-county local study area…where the greatest change in traffic volumes and vehicle-miles traveled are predicted to occur."  (DOT_0036958–59.)  It then used conservative and inclusive metrics to identify low-income and minority communities at the census tract level.  (DOT_0006969–81.)

The EA analyzed traffic diversions in EJ communities by modeling the worst-case tolling scenarios for truck and non-truck traffic, respectively, to identify any EJ community facing high *preexisting* air quality or chronic health burdens that could experience *even the smallest increase in pollution*.  (DOT_0036981–96, DOT_0006963–82, DOT_0007243–440.)  The EA used this analysis to develop a robust, $155 million package of regional and place-based mitigation to avoid and mitigate adverse effects on overburdened EJ communities.  (DOT_0007283–312, DOT_007322–28.)  The EA identified so-called "90 or 90" census tracts—i.e., "tracts where individuals experience at least one pre-existing pollutant burden <u>or</u> at least one pre-existing chronic disease burden at or above the 90th percentile, nationally"—that were projected to see *any* increase in truck traffic proximity, and found that these areas would benefit from regional mitigation.

---

[13] "The principle of environmental justice encourages agencies to consider whether the projects they sanction will have a 'disproportionately high and adverse' impact on low-income and predominantly minority communities." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (quoting E.O. 12,898).  When reviewing an agency's analysis of EJ issues, an EA's methodology must be "reasonable and adequately explained," but the agency's "choice among reasonable analytical methodologies is entitled to deference."  *Communities Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004); *Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 233 (5th Cir. 2006).  "As always with NEPA, an agency is not required to select the course of action that best serves environmental justice, only to take a 'hard look' at environmental justice issues."  *Sierra Club*, 867 F.3d at 1368.

(DOT_0045575–76.)[14]  So-called "90 and 90" census tracts—i.e., "tracts where individuals experience at least one pre-existing pollutant burden and at least one pre-existing chronic disease burden at or above the 90th percentile, nationally"—that were projected to see *any* increase in truck traffic proximity were identified for place-based mitigation.  (*Id.*)

Using the "same methodology," Reevaluation 1 determined that the adopted toll structure would reduce diversionary impacts on EJ communities compared to the EA.  (DOT_0045574–81.) Modeling showed that "the number of census tracts affected by an increase in truck traffic proximity . . . would be more evenly distributed between non-[EJ]-designated tracts . . . and [EJ]-designated tracts."  (DOT_0045576–77.)  In addition, modeling showed that the total "number of affected [EJ]-designated tracts would be lower than in the Final EA," and that "[t]he adopted toll structure would have lower intensities of truck-traffic proximity increases" in communities facing high pre-existing pollutant and health burdens.  (DOT_0045577–81.)

Reevaluation 1 used the EA methodology to identify census tracts that warranted regional and place-based mitigation measures under the adopted tolling structure.  Although modeling showed slight variations in the census tracts that would warrant mitigation, the analysis "confirm[ed] that the same communities would be affected as predicted in the Final EA." (DOT_0045582–97.)  While Plaintiffs continue to claim that the mitigation program is "still not developed with any specificity" (Pl. Br. 11), FHWA and the Project Sponsors built on the analysis this Court affirmed by allocating funding for place-based mitigation based on each community's "share of population in all affected" census tracts.  (DOT_0045608–11.)  The use of population share ensures that each potentially impacted community receives an equitable share of place-based

---

[14] "Highway truck traffic proximity was a particular focus, because diesel emissions have a higher level of particulate matter, which is associated with adverse health outcomes, and because Program-related diversions would mainly occur on highways."  (DOT_0045575.)  Traffic proximity is a distance-weighted measure that provides a way to describe a census tract's exposure to highway traffic from all directions.  (DOT_0007266–71, DOT_0007292.)

mitigation funding, in addition to sharing in the benefits of regional mitigation.  (*Id*.)  This $100 million place-based mitigation program "will provide direct emissions reductions and air quality improvements, and will address some of the pre-existing health burdens."  (DOT_0007325.)

Regional measures include expanding the NYC Clean Trucks Program, which funds the replacement of diesel trucks with lower-emission electric, hybrid, or other clean vehicles, and expanding the NYC off-hours delivery program, which incentivizes the reduction in daytime truck traffic, reduces emissions, and increases safety.    (DOT_0007322–23,  DOT_0037016–19, DOT_0045606–08.)  In addition, the adopted toll structure deepened the overnight toll discount, to "benefit communities along diversion routes, including [EJ] communities, as drivers are less likely to divert due to the discounted rate."  (DOT_0045606–07.)  These measures will provide tangible emissions reductions and benefit air quality throughout the region.  (DOT_0045607.)[15]

Consistent with the EA, Reevaluation 1 also reiterates the Project Sponsors' commitment to implementing an adaptive management program that includes "monitoring the efficacy of mitigation, ongoing stakeholder consultation, and making adjustments as warranted." (DOT_0045575.)  TBTA has already "begun work with NYC . . . to expand New York City's existing air-quality monitoring network" and is gathering data from New Jersey counties; the Project Sponsors will use this data to evaluate changes in air quality throughout the region and adjust the tolls where appropriate.  (*Id*.)  This approach "provide[s] agencies with the flexibility to ensure their mitigation measures reflect the real effects of government action, rather than a rigid adherence to initial projections."  *Mulgrew*, 2024 WL 3251732, at *42 (collecting cases).

Accordingly, Reevaluation 1 concluded that, "with the implementation of the mitigation

---

[15] Reevaluation 1 also sets forth a site selection process for implementing the place-based mitigation program, including engagement with the Environmental Justice Community Group, "relevant communities that warrant place-based mitigation," and "local implementing agencies.  (DOT_0045610.)  This site selection process will include collection of data, a geospatial analysis, and multiple rounds of community engagement.  (DOT_0045610–11.)

commitments of the Final EA and FONSI, the adopted toll structure would not result in disproportionately high and adverse effects on environmental justice populations or communities and no new mitigation is needed." (DOT_0045613.) Because "[t]he conclusions of the Final EA with respect to environmental justice remain valid," FHWA determined that its regulations did not require it to prepare a supplemental EA. (*Id*.); *see also* 23 C.F.R. § 771.129.

> 2. *Reevaluation 2 Built on the EA and Reevaluation 1 to Analyze the Phase-In Approach*

Consistent with the tiering authorized by FHWA's regulations, and building on the exhaustive analysis in the EA and Reevaluation 1, Reevaluation 2 was narrowly focused on three questions regarding the Phase-In Approach: (1) whether the phased implementation of the adopted toll structure was consistent with the parameters of the tolling scenarios analyzed in the EA; (2) whether phasing would continue to meet the Program's purpose and need and objectives; and (3) whether the effects of phasing would be within the range of effects studied in the EA and Reevaluation 1, such that the mitigation measures previously adopted would continue to ensure that the Program would not result in significant adverse effects.

FHWA first compared the tolling rates and other parameters of each phase of the Phase-In Approach to those of the seven tolling scenarios evaluated in the EA, noting that the phase in "exceeds [the] commitment in the Final EA to include 'further reduced overnight tolls…from at least 12:00 a.m. to 4:00 a.m.' by charging overnight tolls from 9:00 p.m. to 5:00 a.m." (DOT_0047535.) FHWA found that the tunnel crossing credits were similar to those analyzed in tolling scenarios C, D, E, and F (applying to tolls paid for the tunnels entering the CBD directly but not to tolled bridges entering upper Manhattan). (*Id.*) FHWA also found that exemptions and limits for each class of vehicles were consistent with one or more of the tolling scenarios in the EA, and that the Phase-In Approach's per-trip tolls for taxis and FHVs would, on average, equal

the EA's commitment to a once-per-day charge for those vehicles.  (*Id.*)  Likewise, while the peak toll rates for each phase fell within the range analyzed in the EA for each vehicle class, the off-peak and/or overnight rates were lower, exceeding the EA's commitment to implement "reduced overnight tolls at or below 50 percent" by reducing the peak toll rate by 75 percent.  (*Id.*)

Next, FHWA determined that the Phase-In Approach would meet the Program's purpose and need of reducing traffic congestion in the CBD in a manner that will generate revenue for future transportation improvements.  (DOT_0047537.)  FHWA found that the toll rates in all phases of the Program would meet the objectives of reducing VMT by 5% and reducing the number of vehicles entering the CBD daily by 10%.  (*Id.*)  And while the Phase-In Approach would generate less net revenue in the early years of the Program than the range of scenarios analyzed in the EA, current interest rates and expected timing of projects meant that these lower annual net revenues in the early years, in combination with increased revenues in Phase 3, would be sufficient to meet the objective of funding $15 billion for capital projects and allow their completion on the same timeline as projected for the March 2024 adopted toll structure.  (*Id.* n.2.)  The Project Sponsors also determined that "an incremental start would have the benefit of helping drivers adapt more easily to the Program, while monitoring data regarding implementation and effects," and that "these benefits outweigh more immediate revenues."  (DOT_0047537–78.)

Finally, Reevaluation 2 referred to Reevaluation 1's comprehensive analysis of the effects of the adopted toll structure, which found that the mitigation commitments in the EA and FONSI would be sufficient to avoid significant effects.  (DOT_0047539; *see also* DOT_0045452–68; Point 1.B.)  Because the adopted Phase-In Approach's toll structure would mimic the March 2024 adopted toll structure, just with proportionally lower rates for the first six years (which rates are still within the range analyzed in the EA), FHWA concluded that "some of the effects of the interim

phases would by definition be reduced as compared to Phase 3 (such as effects on low-income drivers)[.]" (DOT_0047539.)  Moreover, the mitigation commitments set forth in the EA/FONSI and Reevaluation 1 would be implemented as previously contemplated and on the same timeline.[16] (*Id.*)  Therefore, FHWA determined that while the effects of the Program might have minor short-term variations in Phases 1 and 2, these effects would be within the range studied in the EA, FONSI, and Reevaluation 1.  FHWA also explained that "the traffic and air quality monitoring commitments set forth in the EA and FONSI would be implemented throughout this time period, as well as adaptive management if unexpected adverse effects are revealed through monitoring[.]" (*Id.*)  Accordingly, FHWA concluded that NEPA had been satisfied, and that "the mitigation measures identified in the EA and the FONSI are still applicable and will ensure that the Phase-In Approach, like the March 2024 adopted toll structure, does not result in significant effects."  (*Id.*)

### C.  Plaintiffs' Challenges to the Reevaluations Are Without Merit

In many places, Plaintiffs merely complain about the EA analyses that this Court already upheld, recognizing that the reevaluations used the same methodologies.  (*See, e.g.*, Pl. Br. 2–3, 11–12, 17, 27–29.)  These challenges, if not already decided, are time-barred and not reviewable by this Court.  *Quintieri*, 306 F.3d at 1225; *Mulgrew*, 2024 WL 3251732, at *17.

Plaintiffs also lodge several meritless objections to the reevaluations.  Plaintiffs repeatedly assert that the $15 base EZPass toll for automobiles in Reevaluation 1 was "never-before analyzed" because this specific toll rate was not one of the seven alternatives studied in the EA.  (Pl. Br. 3, 17.)  This Court already rejected this very argument, holding that the "EA's examination of tolling scenarios, prior to the TBTA's adoption of a final tolling structure, did not violate NEPA." *Mulgrew*, 2024 WL 3251732, at *29.  The $15 base EZPass toll for automobiles falls squarely

---

[16] Plaintiffs' assertion that Reevaluation 2 leaves this ambiguous (Pl. Br. 6) is simply wrong.

within the range studied in the EA (DOT_0045439–40), and as explained in Point I.B, FHWA reasonably determined that the effects of the adopted toll structure were within the range of impacts previously studied *based on modeling conducted for that structure in Reevaluation 1.*

With brazen disregard for the facts, Plaintiffs argue that Reevaluation 1 "did not fully appreciate the impact of the changed toll on taxis and [FHVs]." (Pl. Br. 3–4, 9, 12, 17–19.) For context, the EA and FONSI committed to mitigate potential adverse effects on taxi and FHV drivers—which are an EJ population—by committing "to adopt a toll structure with a toll of no more than once per day for taxi and FHV drivers." (DOT_0045571.) Partially in response to feedback from Uber advocating for per-ride tolls because they would be more practical and less likely to encourage intra-CBD cruising (*see* DOT_0009409), the adopted toll structure included toll charge rates, passed on to passengers, of $1.25 for taxis and $2.50 for FHVs "per trip with paying passengers for trips to, within, or from" the CBD. (DOT_0045571.) As the TMRB explained, this approach furthers the Program's objectives because "[u]ltimately, it is passengers—not drivers—who make the choice to add to vehicle congestion in the CBD, despite readily accessible public transportation to and within the CBD," and it is they "whose travel patterns must be influenced to fight congestion in the CBD."[17]

The charges to taxis and FHVs were included as an input to the BPM and are reflected in all the modeling results in Reevaluation 1, just like other aspects of the adopted toll structure. (DOT_0045439–40, DOT_0045571–72.)[18]  Moreover, Plaintiffs overstate the impact of this

---

[17] TMRB Report 22 (Nov. 2023), https://new.mta.info/document/127761.  Moreover, the New York City Taxi and Limousine Commission rules "require[] that passengers reimburse the taxi driver for any toll costs during the trip," (DOT_0036744), so a per-trip charge rather than a once-per-day charge is more workable.

[18] While Plaintiffs question how the different rates for taxis and FHVs were modeled using the BPM, which treats them as one vehicle class, the EA and Appendix 4A.1 explained that data on the proportions of taxis and FHVs entering the CBD were used to model differential treatment through weighted averaging. (DOT_0036344 (describing "blended" approach); DOT_0004594–95.) The EA also analyzed tolling scenarios with differential treatment of taxis and FHVs, yet Plaintiffs did not raise this issue until the instant motion.

refinement.  As Reevaluation 1 explained, "[b]ased on the average number of trips taxis and FHVs make each day, the toll amount for taxis and FHVs is equivalent to the once-daily auto peak rate in the adopted toll structure of $15."  (DOT_0045571.)  In other words, the adjustment will not alter the amount that taxis and FHVs are charged in the aggregate; it simply reallocates those charges to each trip to, from, within or through the CBD and facilitates passing such charges on to the passenger—the party whose behavior must be influenced.  (*Id*.)  Thus, Plaintiffs' unsupported assertion that "taxis and FHVs may drive as many miles as desired throughout the CBD . . . without being charged any toll" is simply false.  (Pl. Br. 12, 18.)  Indeed, the per ride toll eliminates this very possibility by charging for any passenger ride even if wholly within the CBD, whereas charging one toll upon entry to the CBD would allow such a possibility.  (DOT_0009409.)

Plaintiffs thus mainly express a policy objection that the adopted toll structure will not sufficiently deter taxis and FHVs from driving in the CBD.  (*Id.*)  However, policy disagreements of this kind cannot form the basis of a NEPA claim.  As this Court previously recognized, "[t]he political process, and not NEPA, provides the appropriate forum in which to air policy disagreements."  *Mulgrew*, 2024 WL 3251732, at *22 (quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983)).  Apart from the fact that this feature of the toll structure was adopted to mitigate potential adverse effects on an EJ population, (DOT_0045571), it is self-defeating that Plaintiffs are suing to block the Program *in toto* while simultaneously arguing that the tolls are *not high enough* to sufficiently reduce congestion.

Plaintiffs next argue that FHWA failed to properly analyze the deeply discounted overnight toll—which was adopted as a deepened mitigation commitment to reduce diversions of trucks driving through the CBD in overnight hours and reduce tolling burdens on late-shift workers—and the shift from three toll periods (peak, off-peak, and overnight) to two toll periods (peak and

overnight), which was adopted to simplify the toll structure so that the public can better understand and anticipate toll amounts. (DOT_0045439–40.) Plaintiffs attempt to minimize the analysis done by asserting that these changes were not analyzed "[b]eyond re-running the BPM," and that the "sole treatment" of these refinements "is a footnote." (Pl. Br. 12, 17, 27.) Contrary to Plaintiffs' mischaracterization, these aspects of the adopted toll structure were included as inputs into the same modeling techniques that this Court has already affirmed. *See Mulgrew*, 2024 WL 3251732, at *19, *28–44. Either Plaintiffs do not understand that the adopted toll structure was analyzed as a whole, not by individual characteristic, or they hope to confuse the Court. Plaintiffs also assert that the adjustment in peak hours "will necessarily divert more traffic," (Pl. Br. 17), but Reevaluation 1 contains a detailed description of the modeling results that showed that impacts on resource areas like traffic, air quality and EJ were consistent with the EA, and the adopted toll structure is predicted to largely yield fewer diversions than the EA predicted. *See* Point I.B.

Plaintiffs lodge several other objections to the deeply discounted overnight toll, but none withstand scrutiny. Plaintiffs claim (without providing any basis) that some truck drivers and named plaintiffs may not take advantage of the overnight toll discount. (Pl. Br. 13.) This anecdotal prediction is irrelevant. As Reevaluation 1 explained, modeling showed that the reduced overnight toll will "benefit communities along diversion routes, including environmental justice communities, as drivers are less likely to divert due to the discounted rate." (DOT_0045607.) In short, this feature was modeled as part of the overall toll structure and its effects were analyzed.

Plaintiffs' objections to Reevaluation 2 fare no better. Describing Reevaluation 2 as the "operative reevaluation," Plaintiffs complain that it did not repeat the traffic and air quality modeling that was done in the EA and Reevaluation 1. (Pl. Br. 24–25.) But NEPA did not require FHWA to recreate the wheel at every stage of the tiered environmental review. NEPA regulations

"permit an iterative approach by allowing agencies to 'tier their environmental impact statements and environmental assessments,' through the preparation of 'broader environmental impact statements or environmental assessments' followed by 'subsequent narrower statements or environmental analyses . . . incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.'" *Mulgrew*, 2024 WL 3251732, at *29 (quoting 40 C.F.R. §§ 1501.11(a), 1508.1(ff)).  This approach "is 'appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.'" *Id*. (quoting 40 C.F.R. § 1501.11(c)(2)).

That is precisely what FHWA did.  As Reevaluation 2 explained, the structure under the Phase-In Approach "would be the same but the tolls would be lower (but within the range of scenarios analyzed in the EA) to enable drivers to adjust their budgets and travel modes in a more graduated fashion."  (DOT_0047539.)  Based on the exhaustive analysis in the EA and Reevaluation 1 of the potential effects of scenarios encompassing the characteristics of each phase, FHWA concluded "that as the implementation progresses through each phase, the effects of the [Program] may have minor variations but would be within the range of effects" previously studied. (*Id*.)  This is the essence of tiered review.  *Mulgrew*, 2024 WL 3251732, at *29.[19]

Plaintiffs' scattershot remaining "hard look" arguments provide no basis to override FHWA's expert judgment, which is entitled to deference.  *Marsh*, 490 U.S. at 376–77; *Baltimore Gas & Elec. Co.*, 462 U.S. at 103.  Plaintiffs argue that FHWA used "outdated" data in the EA and Reevaluation 1, but the Court has already rejected this argument, holding that FHWA "adequately explained" its data choices, which are "exactly the sort that courts afford agencies discretion to

---

[19] Plaintiffs also complain that the EJ mitigation program was not "re-evaluated," (Pl. Br. 18–29, 25), but there was no need. Reevaluation 2 explained that "mitigation set forth in the EA," which this Court already upheld, and reanalyzed in Reevaluation 1 and found sufficient, "would be implemented as previously contemplated—and would not be deferred until the March 2024 toll structure is fully implemented."  (DOT_0047539.)

make." *Mulgrew*, 2024 WL 3251732, at *36 (internal quotation marks and alternations omitted).[20]

Plaintiffs simultaneously argue that Reevaluation 1's length—175 pages excluding appendices—

"alone suggests that the altered tolling structure materially differs from the hypothetical tolls

analyzed in the EA," yet elsewhere ironically complain that Reevaluation 2 is too short.  (Pl. Br.

14, 16–17, 25.)  Like others before it, this Court "roundly rejected that facile argument."  *Mulgrew*,

2024 WL 3251732, at *23, *26 ("Given NEPA's goal of promoting informed decision making on

matters affecting the environment, it would be perverse to punish the FHWA for exhaustively

analyzing Congestion Pricing." (internal quotation marks omitted)).  Finally, Plaintiffs claim,

wrongly, that FHWA approved Reevaluation 2 "less than a day after MTA asked for a

reevaluation."  (Pl. Br. 25.)  The record shows that the Project Sponsors sent FHWA a letter

proposing the Phase-In Approach on November 8, 2024, and provided a draft reevaluation for

FHWA's review and comment on November 13; FHWA then approved Reevaluation 2 on

November 21.  (DOT_0047540–48, DOT_0045720.)

## II.    FHWA'S DECISION TO ISSUE THE REEVALUATIONS RATHER THAN A SUPPLEMENTAL EA WAS NEITHER ARBITRARY NOR CAPRICIOUS

As best we can decipher, Plaintiffs argue that a supplemental EA was required because of

(1) Plaintiffs' subjective belief that refinements in the adopted toll structure are significant, (2)

unspecified changes in the economy, (3) the adoption of the Phase-In Approach required a

wholesale reconsideration of alternatives, and (4) FHWA's decision not to prepare a supplement

deprived them of an opportunity for public comment—a claim refuted in Point I.A, *supra*.  None

---

[20] Plaintiffs alternatively complain that FHWA used an updated emissions model (known as MOVES3.1), though they do not explain why this is a flaw.  (Pl. Br. 27.)  Reevaluation 1 explained that the newer model was used because the prior version of the model (MOVES2014b) used for some analyses in the EA was "no longer being updated or supported for use."  (DOT_0045538.)  And while Plaintiffs offhandedly complain that EPA did not provide "public facing input … as was required in the EA," (Pl. Br. 27–28), FHWA air quality experts reviewed the analysis and choice of models.  (DOT_0047096–112, DOT_0047140–52.)

of these undermine the rational basis for FHWA's decisions.

### A.   Plaintiffs' Subjective Belief That Adjustments in the Adopted Tolling Structure Are Significant Does Not Support Their Claim

Plaintiffs first argue that FHWA was required to prepare a supplemental EA because of what Plaintiffs characterize as "material[]" differences between the tolling scenarios analyzed in the EA and the adopted toll structure analyzed in Reevaluation 1.  (Pl. Br. 16–20.)  Plaintiffs base this theory on the $15 base EZPass automobile toll, the adjustment to the peak tolling hours and elimination of the intermediate "off-peak" time period; the choice of crossing credits;[21] and the way tolls are levied on taxis and FHVs.  (*Id.*)  Plaintiffs claim that the "combination" of these changes mean that the adopted toll structure "deviates too much" from the scenarios analyzed in the EA.  (*Id.* at 17.)  In addition to overstating the differences between the adopted toll structure and the scenarios studied in the EA (DOT_0045439–40, DOT_0047535–36), this argument is premised on a fundamentally flawed notion that the magnitude of project changes, rather than impacts, determines the need for a supplement.  Plaintiffs have this backward.

Whether a supplement is required under NEPA turns not on whether a party subjectively believes that changes to a *project* are "significant."  Rather, as discussed in Point I.A, a supplement is required only if a major federal action remains to occur and "[c]hanges to the proposed action" or "new information or circumstances relevant to environmental concerns and bearing on the proposed action *would result in significant environmental impacts*" *not previously evaluated*.  23 C.F.R. § 771.130(a) (emphasis added).  Thus, a supplement "must be prepared only where new

---

[21] Plaintiffs claim that the crossing credits for passenger vehicles entering certain tunnels under the adopted toll structure and Phase-In Approach range from $1.50 to $5.00 and that the EA only studied a crossing credit of $13.10. (Pl. Br. 17.)  This is wrong: EA Scenarios A, B and G had $0 crossing credits and Scenario C analyzed a low crossing credit scenario that included credits below $6.55.  (DOT_0004586.)  But this is irrelevant in any event because Reevaluation 1 modeled the crossing credits included in the adopted toll structure and found that the environmental effects were within the range studied in the EA.  *See* Point I.B.

information provides a *seriously* different picture of the environmental landscape." *Friends of Cap. Crescent Trail*, 877 F.3d at 1060 (emphasis in original); *see also Marsh*, 490 U.S. at 374. Courts have squarely rejected Plaintiffs' "know-it-when-you-see-it" approach. *See, e.g.*, *S. Trenton Residents Against 29*, 176 F.3d at 663 ("[T]he key to whether a Supplemental [EIS] is necessary is not whether the area has undergone significant change, but whether the proposed roadwork will have a significant impact on the environment in a manner not previously evaluated and considered."); *Skinner*, 947 F.2d at 657; *Arkansas Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005).[22]

For the same reasons, Plaintiffs' other proxies for assessing whether the changes are significant also fail. Plaintiffs argue that FHWA should have prepared a supplemental EA to analyze asserted (but unspecified) changes in economic conditions, highlighting statements made by Governor Hochul in June 2024 concerning the cost of the toll on individual drivers. (Pl. Br. 11, 27–28.) They also posit that the short-term reduction in revenue generated in years 1–3 of the Phase-In Approach "evidenc[es] material differences from the final EA." (*Id.* at 26–27.)

Plaintiffs fail to explain how unidentified "economic issues raised by the Governor in her June [press statements]" (*id.* at 28), which merely echoed comments submitted on the EA (*see, e.g.*, DOT_0003635–42, DOT_0003657), constitute new information implicating significant impacts—notwithstanding the EA's comprehensive evaluation of economic effects that Plaintiffs

---

[22] Plaintiffs attempt to elide NEPA's focus on environmental impacts by arguing that an agency is required to prepare a supplement when "a seriously different picture of the *overall landscape* is presented." (Pl. Br. 15 (emphasis added), citing *City of Port Isabel v. FERC*, 111 F.4th 1198 (D.C. Cir. 2024).) But *City of Port Isabel* sets forth the general rule that a supplement is required when there are "new circumstances or information that will affect the quality of the human *environment* in a significant manner or to a significant extent not already considered, or that provides a seriously different picture of the *environmental* landscape." 111 F.4th at 1207 (internal quotation marks and citations omitted) (emphasis added). That case is also distinguishable as it involved analyses conducted on remand from a prior court decision identifying deficiencies in an EIS. Reviewing the revised analysis following the remand, the D.C. Circuit held that it should have been published in a supplemental EIS because of material differences in the analysis and results. Here, by contrast, Plaintiffs challenge a reevaluation of project refinements following a FONSI that was upheld by this Court, and the agency found no material differences in effects.

never challenged in their initial attack on the Program. As the Court already held, the Governor's policy statements about cost to drivers are not relevant to the question the Court must answer. *Mulgrew*, 2024 WL 3251732, at *46. Moreover, Reevaluation 1 studied "the effects of the adopted toll structure" "on economic conditions at both the regional and neighborhood level," and found they were "within the range evaluated in the Final EA." (DOT_0045523–30.)[23] Nor do Plaintiffs explain how reduced Program revenues in the Phase-In Approach, a policy they sought to achieve in their first challenge, could lead to additional impacts. *Mulgrew*, 2024 WL 3251732, at *27.[24]

### B. The Alternatives Analysis Remains Valid

Contrary to Plaintiffs' argument, FHWA was not required to prepare a supplement to "revisit and redevelop" the alternatives analysis. (Pl. Br. 5, 7–8, 16, 21–23, 28.) Plaintiffs argue that the Phase-In Approach marks "a sea-change" by abandoning what they call the "$1 billion in toll revenue 'objective.'" (*Id.* at 16, 21–23.) But raising $1 billion annually has never been the single talismanic requirement of the Program. The EA included multiple objectives used to screen alternatives: (1) reducing daily VMT within the CBD by at least 5%; (2) reducing the number of

---

[23] Plaintiffs cite *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996), but that case is readily distinguishable. There, the court held that an EIS was invalid because it rested on what the agency *conceded* was a miscalculation of the economic benefits of a reservoir project (by stating gross rather than net benefits). *Id.* at 446–48. This case bears no resemblance to *Hughes River*. Reevaluation 2 concludes the revenue objective for the Program can still be achieved with the Phase-In Approach.

[24] Plaintiffs rely heavily on *Dubois v. U.S. Department of Agriculture*, 102 F.3d 1273 (1st Cir. 1996), but to no avail. In *Dubois*, the agency adopted a new alternative for a skiing facility that "appear[ed] for the first time in the Final EIS" and which included "widen[ing] existing trails so as to eliminate buffers," a new "28,500-square-foot base lodge facility," new "ski trails, access roads and lifts on land that the prior alternatives had left as a wooded buffer," and required that "four million gallons more water be withdrawn annually for snowmaking." *Id.* at 1292–93. The First Circuit held that the new alternative did "not fall within the spectrum of alternatives that were considered in previous drafts" and "could very well have environmental impacts that the Forest Service has not yet considered." *Id.* (internal quotation marks omitted). This case is poles apart from *Dubois*. First, that case involved a project that required an EIS because significant impacts were projected, and the new alternative could have additional significant impacts. Whereas the *Dubois* court found "substantial changes from the previous proposed actions that are relevant to environmental concerns," *id.*, here FHWA analyzed the adopted toll structure and found that it was "within the analysis conducted in" the EA, both in terms of the toll structure itself (DOT_0045439–40), and its environmental impacts, *see* Point I.B. Notably, the First Circuit specifically distinguished the case from one in which "the Forest Service had adopted a new alternative that was actually within the range of previously considered alternatives, e.g., simply reducing the scale of every relevant particular." *Dubois*, 102 F.3d at 1292–93. That is what FHWA concluded here.

vehicles entering the CBD daily by at least 10%; and (3) creating a funding source for capital improvements and generating sufficient annual net revenues to fund $15 billion for capital projects for the MTA Capital Program, as required by the Traffic Mobility Act (the "TMA"). (DOT_0036198, DOT_0036259, DOT_0036267–68, DOT_0004525–46); N.Y. Veh. & Tr. Law § 1704-a(1).  Plaintiffs' selective highlighting of Table 2-2 in their brief obscures the fact that the first two objectives screened out most of the preliminary alternatives.  (Pl. Br. 8; DOT_0036267–68.)  As the EA explained, the "net revenue needed to fund $15 billion depends on a number of economic factors, including but not limited to interest rates and term"; the $1 billion annual figure was not a criterion but an estimated amount that could "be invested or bonded to generate sufficient funds" to generate $15 billion.  (DOT_0036301.)

Reevaluation 2 confirmed that the Phase-In Approach will meet the $15 billion mandate. (DOT_0047537–38.)  The anticipated annual net revenue to support the MTA's Capital Program is $0.5 billion in Phase 1, $0.7 billion in Phase 2, and $0.9 billion in Phase 3.  (*Id.*)  Although Phases 1 and 2 would not raise as much *annual* revenue as the EA tolling scenarios, as part of the reevaluation process, the MTA's CFO determined that the revenues derived from the Phase-In Approach would, in combination and based on current interest rates, still achieve the objective of funding $15 billion in capital projects and allow their completion on the same timeline as projected for the March 2024 adopted toll structure.  (*Id.*)  This conclusion in no way undermines the EA's alternatives analysis, which did not screen out any alternative that would have raised between $500 million and $1 billion for the MTA Capital Program.

Plaintiffs demand that FHWA "revisit" alternatives such as mandatory carpooling and rationing license plates (Pl. Br. 7–8), but this Court has already held that "FHWA did not need to consult an empirical study" to reject these alternatives, because it is "self-evident" that "neither

measure would raise *any* revenue." *Mulgrew*, 2024 WL 3251732, at *25–26. As alternatives to the Program (as opposed to supplemental measures), they would not comply with the TMA's requirement that the Program provide sufficient revenues to fund $15 billion for capital projects; this alone is sufficient reason to reject an alternative. *See City of N.Y. v. U.S. Dep't of Transp.*, 715 F.2d 732, 743–44 (2d Cir. 1983). The Court has already affirmed the use of the TMA's statutory objectives as a "sensible compromise" that "serves the separation of powers by respecting the democratic legitimacy of legislative judgments" and "ensures federal agencies do not expend resources examining alternatives that the project sponsors are not legally authorized to implement." *Mulgrew*, 2024 WL 3251732, at *26 (internal quotation marks omitted).[25]

Plaintiffs claim that a supplement is required to evaluate the possibility that the Legislature could someday appropriate money to support the MTA without the Program. (Pl. Br. 5, 10–11, 16, 28.) No alternative funding sources have been identified, let alone secured. FHWA is not required to analyze hypothetical or speculative alternatives. *See Citizens' Comm. to Save our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1020 (10th Cir. 2002); *Norwalk Harbor Keeper v. U.S. Dep't of Transp.*, No. 18 Civ. 0091, 2019 WL 2931641, at *10 (D. Conn. July 8, 2019).

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

---

[25] Plaintiffs' reliance on *Alaska Wilderness Recreation & Tourism Association v. Morrison*, 67 F.3d 723 (9th Cir. 1995), is misplaced. The court there held that the Forest Service was required to prepare a supplemental EIS because a statutory amendment *eliminated* a previous statutory timber supply mandate that had been critical to the alternatives analysis. *Id.* at 730–31. Here, by contrast, the TMA has not been amended, and Reevaluation 2 explains that the adopted toll structure (with the Phase-In Approach) will meet the revenue mandate set in New York law.

Dated:  December 9, 2024
          New York, NY                                        Respectfully submitted,


MURIEL GOODE-TRUFANT                          /s/ Mark A. Chertok
Corporation counsel of the City of New York   Mark A. Chertok
By:  /s/ Nathan Taylor                         Elizabeth Knauer
     Nathan Taylor                             John F. Nelson
     Senior Counsel                            Amy Cassidy
     Environmental Law Division                SIVE, PAGET & RIESEL, P.C.
     New York City Law Department              560 Lexington Avenue, 15th Floor
     100 Church Street                         New York, NY 10022
     New York, NY 10007                        (212) 421-2150
     (212) 356-2315                            mchertok@sprlaw.com
     ntaylor@law.nyc.gov                       eknauer@sprlaw.com
                                               jnelson@sprlaw.com
*Counsel for Defendant the New York City*     acassidy@sprlaw.com
*Department of Transportation*

                                               /s/ Roberta A. Kaplan
                                               Roberta A. Kaplan
                                               D. Brandon Trice
                                               Maximilian T. Crema
                                               KAPLAN MARTIN LLP
                                               1133 Avenue of the Americas
                                               Suite 1500
                                               New York, NY 10036
                                               (212) 316-9500
                                               rkaplan@kaplanmartin.com
                                               btrice@kaplanmartin.com
                                               mcrema@kaplanmartin.com

                                               *Counsel for Defendants the Metropolitan*
                                               *Transportation Authority and the*
                                               *Triborough Bridge and Tunnel Authority*