UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MICHAEL MULGREW, *et al.*,                    :
                                              :
                    Plaintiffs,               :
                                              :
          - against -                         :        1:24-cv-01644 (LJL)
                                              :        1:23-cv-10365 (LJL)
UNITED STATES DEPARTMENT OF                   :
TRANSPORTATION, *et al.*,                     :
                                              :
                    Defendants.               :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

ELIZABETH CHAN, *et al.*,                     :
                                              :
                    Plaintiffs,               :
                                              :
          - against -                         :
                                              :
UNITED STATES DEPARTMENT OF                   :
TRANSPORTATION, *et al.*,                     :
                                              :
                    Defendants.               :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................... 1

**ARGUMENT** ............................................................................................................... 5

I.    CHANGED CIRCUMSTANCES REQUIRE A SUPPLEMENTAL EA ......................... 5

II.   THE REEVALUATIONS WERE INSUFFICIENT ....................................... 13

**CONCLUSION** ............................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alaska Wilderness Recreation and Tourism v. Morrison*,
    67 F.3d 723 (9th Cir. 1995) ...................................................................7, 11, 12

*Citizens for a Better Henderson v. Hodel*,
    768 F.2d 1051 (9th Cir. 1985) .........................................................................5

*Headwaters, Inc. v. Bureau of Land Mgmt, Medford Dist.*,
    914 F.2d 1174 (9th Cir. 1990) .........................................................................5

*Hughes River Watershed Conservancy v. Glickman*,
    81 F.3d 437 (4th Cir. 1996) .......................................................................10, 11

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Srv.*,
    373 F. Supp. 2d 1069 (E.D. Cal. 2004)............................................................7

*Mayo v. Reynolds*,
    875 F.3d 11 (D.C. Cir. 2017)...........................................................................3

*Nat. Res. Def. Council v. Lujan*,
    768 F. Supp. 879 (D.D.C. 1991) .............................................................11, 12, 13

*Nat'l Audubon Society v. Dep't of Navy*,
    422 F.3d 174 (4th Cir. 2005) ..........................................................................15

*Nat'l Res. Def. Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) ................................................................10, 11, 13

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    235 F. Supp. 2d 1143 (W.D. Wash. 2002)......................................................11

*Robertson v. Methow Valley Citizens Counsel*,
    490 U.S. 332 (1989)..........................................................................................1

*Shenandoah Valley Network v. Capka*,
    No. 07-cv-00066, 2009 WL 2905564 (W.D. Va. Sept. 3, 2009)......................9

*Tongass Conservation Society v. Cole*,
    No. 09-cv-00003 JWS, 2009 WL 10704137 (D. Alaska Dec. 7, 2009) .................13

*U.S. Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004)..........................................................................................1

**Statutes**

National Environmental Policy Act (NEPA) ............................................................... *passim*

Traffic Mobility Act ................................................................................................... 18

**Other Authorities**

40 C.F.R. § 1502.14 ...................................................................................................... 5

Christina Baker, *MTA board approves updated congestion pricing plan*, The
    Bond Buyer (Nov. 20, 2024) ................................................................................... 7

Federal Reserve, "Summary of Economic Projections," September 18, 2024,
    https://new.mta.info/document/127701 ................................................................. 7

Michael Ostrovsky & Frank Youung, Working Paper No. 4228, "Effective and
    Equitable Congestion Pricing: New York City and Beyond", Stanford
    Graduate School of Business Faculty & Research,
    https://www.gsb.stanford.edu/faculty-research/working-papers/effective-
    equitable-congestion-pricing-new-york-city-beyond ............................................ 15

"MTA Final Proposed Budget: November Financial Plan 2024-2027,"
    https://new.mta.info/document/127701 ................................................................. 7

## PRELIMINARY STATEMENT

NEPA is a "democratic decision-making tool" intended to "provid[e] a springboard for public comment" and subsequent decision making. *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004). Its purpose is not only to ensure that agencies take a "hard look" at the environmental impact of a project, but that there also be a broader dissemination of analysis and that "relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 349 (1989). As this Court recognized, NEPA mandates a process, not a particular result.

In opposition to Plaintiffs' motion for summary judgment, Defendants narrowly focus on the particular results of their net environmental impact analysis, not on the integrity of the NEPA process. They stress that the June 14 Reevaluation and Revaluation 2 followed the same methodology of the Environmental Assessment ("EA") that this Court previously allowed and conclude that the reevaluations should similarly be permitted. Yet, the Court did not rubber-stamp or simply approve a re-running of the EA models. In deferring judgment on Plaintiffs' failure to supplement and reevaluation NEPA claims, the Court recognized that consideration would need to be given on the extent of the changes to the tolling construct and the completion of the NEPA process. Here, despite Defendants' claim to the contrary, there are significant changes that have been made, changes meriting public participation and engagement, visible interagency collaboration and broader dissemination. Instead, Defendants have pushed the process through a back door to satisfy political, not environmental, goals.

Perhaps most significant in changes is Defendants' decision to lower the annual toll revenue requirements for the program, a change to one of the three basic objectives undergirding the analysis in the EA. Defendants predictably downplay the significance of their dramatically

lowering the previously required $1 billion annual toll revenue, suggesting that it was always a more flexible criteria of securing $15 billion source of funds towards the MTA. The Administrative Record and Defendants' prior positions in this litigation show otherwise. Both the Final EA and the June 14 Reevaluation plainly state that "the modeling assumes the Project should provide at least $1 billion annual in total net revenue." DOT_0040645; DOT_0045449. Indeed, in the Final EA, Tolling Scenario B was rejected as not meeting the Project's criteria solely on the grounds that it provided only $830 million in annual revenue, rather than the $1 billion supposedly required. DOT_0036301. In briefing before this Court, alternatives to the tolling scenarios were similarly eschewed by Defendants because the scenarios studied in the EA were projected to only "narrowly meet the MTA's revenue generating objectives."[1] Defendants rejected a "phased-in implementation-such as gradually increasing tolls" because it "would delay achievement of revenue goals."[2]

Yet, the phase-in Congestion Pricing program will now begin earning 50% of the previous inviolable amount and is designed to increase gradually, earning $500 million for the first three years of its implementation, $700 million in revenue for the next three years, and seven years after inception, achieve $900 million at its peak— never actually hitting the supposedly required figure of $1 billion. While politics may have required this about-face, that is not a NEPA get-out-of-jail-free card. Congestion Pricing's construct has materially changed such that the public's prior engagement —a fundamental part of the NEPA process— bore on an analysis that no longer bears relevance to the current structure. Discarded alternatives earning less revenue but causing less or

---

[1] *Chan* ECF No. 81, at 15

[2] *Chan* ECF No. 82, at 14

no harm to environmental justice communities are now relevant. A robust alternative review –one not simply relegated to a footnote – is required to support the integrity of the process.

Defendants assert that Plaintiffs have not identified any viable alternatives that would raise the requisite funds. While that misstates our obligation – it is Defendants' to pursue – there are at least two project alternatives identified, both recognized in the Court's prior order, that were eliminated or discounted from review solely based on the toll revenue requirement. Indeed, the Court described as "notable' the EPA's comments that were critical of the Final EA's alternatives analysis, but suggested that EPA's suggested alternative was appropriately discounted by Defendants on account of inadequate revenue. As the Court explained, though the EPA proposed examining a combination of alternatives, it was sufficient that the "FHWA clarified that the alternatives combined would not generate adequate revenue." (Opinion and Order ("Order") at 65, (June 20, 2024) [*Chan* ECF No. 99]). That is no longer the case. By evaluating the purported economic benefits of only $1 billion revenue generating toll and discounting the economic benefits of any alternatives that would have earned less for the MTA, the EA skewed the public's evaluation of Congestion Pricing and therefore subverted NEPA's purposes. The change is particularly significant because the economic benefits – *i.e.,* cash for the improperly managed MTA budget – is inescapably the top priority for the program, despite causing adverse environmental harm to New York's most vulnerable communities. Defendants harp on the fact that re-evaluations are typically non-public. That may be so, and if the modifications to Congestion Pricing were insignificant or slight, a private process might be sufficient. But where, as here, the new criterion is fundamental enough to "undermine informed public comment and informed decision-making," a transparent supplemental EA process is needed. *See Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017).

Other changes to the tolling structure are significant. The new scheme essentially gives up on reducing Uber, Lyft and taxi vehicle miles traveled ("VMT") in the Manhattan's Central Business District ("CBD") – responsible for over half of all congestion. The reduction would be a meager *-0.3%*, a fact Defendants do not dispute, but cast aside as within the wide range of scenarios studied (scenarios which included an *increase* in FHV congestion). In new Phase 1 of Congestion Pricing, the (i) total daily reduction in VMT within the Manhattan CBD and the (ii) daily reduction in number of vehicles entering Manhattan, the first two objectives of the program, both fall below the entire the range of scenarios analyzed in the Final EA. DOT_0047537. Defendants are so singularly focused on their conclusions with respect to environmental impact, that they neglect to meaningfully analyze how much Congestion Pricing would actually reduce congestion and how the costs of the financial burden to many drivers who must drive to the CBD compare to any incremental reduction in traffic.

The willingness to sacrifice revenue generation or an actual reduction in congestion in the current program is a direct product of politics and a desire to quickly implement any Congestion Pricing structure before the next administration takes office. Tellingly, Defendants do not dispute that the revised tolling structure was rushed to conclusion on account of the results of the November election. Instead, Defendants suggest that such motivation is "immaterial" absent a finding of bad faith. Putting aside whether Defendants acted in bad faith (or against the wishes of a majority of New Yorkers), the motivation is not "immaterial" because it explains why the Defendants avoided supplementation or public-reengagement, despite significant changes to the program, and why Reevaluation 2 contains a sum total of three short paragraphs of analysis. Even if the June 14 Reevaluation received the required "hard look," the actual implemented phased-in tolling structure in Reevaluation 2 was "hardly looked" at. It contains no analysis of the

cumulative impacts of a phase-in, no further review of the FHV/taxi passenger charge, no descriptions of how allocated mitigation measures should be timed to align with varying toll prices, and, again no alternatives analysis of how the supposedly new interest rate environment, capital project timeline or state funding changes the ability to bond to $15 billion.

When the parties were last before the Court at oral argument, counsel for the MTA argued that a phase-in would not be an appropriate alternative to study because "*if you only phase in part of a program, that doesn't tell you the impact of the next phase when you['ve] looked at the aggregate, as the EA did*." Transcript of Oral Argument at 128:11-13. Reevaluation 2 did not tell the impact or cumulative impact of the phases and the EA only looked at the toll structure in the aggregate. Yet in the race to implement Congestion Pricing before January 20th, Defendants could not afford to engage in the necessary analysis of a phase-in, no matter the NEPA requirements.

## ARGUMENT

## I.    CHANGED CIRCUMSTANCES REQUIRE A SUPPLEMENTAL EA

In support of summary judgment, Plaintiffs explained that circumstances have changed requiring a supplemental EA, or, at the very least, a new examination of the alternatives previously analyzed in the EA. The alternatives analysis lies "at the heart" of the NEPA process and the "existence of a viable but unexamined alternative renders an environmental statement inadequate." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985). The alternatives analysis is supposed to "sharply define the issues for the decision maker and the public and provide a clear basis for choice among options." 40 C.F.R. § 1502.14; *see also Headwaters, Inc. v. Bureau of Land Mgmt, Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir. 1990) ( [T]he "touchstone" of NEPAs' alternatives analysis "is whether the EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.").

5

There were only three criteria used to screen alternatives in the Final EA: (i) a daily VMT reduction in the CBD of at least five percent; (ii) a ten percent reduction in the number of vehicles entering the CBD per day; and (iii) as the Court put it, "*at least $1 billion in annual net revenu*e, as that amount could then be 'invested or bonded to generate sufficient funds' to meet the Traffic Mobility Act's $15 billion goal."  (Order at 58).  The last benchmark no longer applies.

Defendants argue that the circumstances have not changed requiring an EA because the MTA "did not change its funding objective," as Congestion Pricing still seeks a $15 billion funding source for capital projects. (Memorandum In Support Of The Federal Defendants' Cross-Motion For Summary Judgment And In Opposition To Plaintiffs' Motion For Summary Judgment ("Fed. Defs. Br.") (Dec. 9, 2024) [*Chan* ECF No. 146 at 22]).  That may be true, but the means or the spectrum of available alternatives to achieve that funding objective have significantly changed. Plainly, when the allowable estimated revenue will be significantly less than what was previously required, other options could and should be pursued.

Defendants assert that the "only difference" between the analysis of the Final EA and Reevaluation 2 is that the MTA Chief Financial Officer recently concluded "based on current interest rates and expected timing of projects" that lower annual net revenue could still meet that funding criteria.  (Fed. Defs. Br. at 23).  That *difference,* as Defendants put it, changes the analysis. Putting aside that the reevaluation contains no financial analysis from the Chief Financial Officer of the MTA explaining this shift, or how it is possible for $500 million in annual revenue to bond to the same $15 billion as $1 billion in revenue, the flexibility to lower the revenue requirement changes the parameters of review.[3]  Plaintiffs do not ignore the Court's deference to the Traffic

---

[3] While the Federal Defendants claim the "only difference" is the changed interest rate environment and expected timing of projects, in reality, the two driving "differences" are likely the change to the timeline on borrowing for MTA capital projects and additional committed state funding.  Municipal bond rates have changed little since June 2024, leaving a longer timeline and state aid as the likely determinative factors.  "Third Quarter 2024 Municipal

Mobility Act's legislative mandate to reach $15 billion in revenue, as Defendants suggest; rather, it simply recognizes that there is now an expanded universe of ways to achieve that legislative goal. *See Alaska Wilderness Recreation and Tourism v. Morrison*, 67 F.3d 723 (9th Cir. 1995) (finding a violation of NEPA to not reconsider alternatives available with public notice and further proceedings after a core criteria of the initial alternatives analysis had changed).

Defendants' position now also runs contrary to prior positions they have taken in this litigation, when the $1 billion was supposedly an inflexible objective. At oral argument on summary judgment for the first NEPA claim, Plaintiffs argued that Defendants' alternatives analysis violated NEPA because it had "narrowly defined" the project's purpose to achieve at least $1 billion so as to "winnow the alternatives until only one survives." Oral Argument Tr. at 67:13; *see also Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Srv.,* 373 F. Supp. 2d 1069, 1088 (E.D. Cal. 2004) (NEPA prohibits "narrowly defin[ing] [a project's] purpose and need so as to winnow down the alternatives until only the desired one survives."). Plaintiffs argued to the Court that the "idea that they have to raise a billion dollars in revenues is not right" and "there is no annual billion-dollar requirement in the statute." Transcript of Oral Argument at 68:9-16. The Court then inquired of the FHWA's counsel: "your adversary says…the $15 billion was – they didn't use

---

Securities Market Summary," Municipal Securities Rulemaking Board, October 2024, at 4-5. While not determinative, interest rate fluctuations will be fluid throughout the phase-in plan, and the MTA has been an outlier in forecasting interest costs as compared to prominent economic forecasters and financial policy makers. *Compare* "MTA Final Proposed Budget: November Financial Plan 2024-2027," available at https://new.mta.info/document/127701, *with* Federal Reserve, "Summary of Economic Projections," September 18, 2024, available at https://new.mta.info/document/127701

Importantly, Plaintiffs argued in support of their motion for summary judgment that changed economic circumstances to Congestion Pricing included the Governor's recent commitment to additional sources of funding. In opposition to Plaintiffs' motion, the MTA flippantly argued that there are no new circumstances because "no alternative funding sources have been identified, let alone secured." (MTA Br. 30). The assertion is demonstrably false, based on the MTA's own public statements. In recent comments to Bond Buyer, MTA CEO Janno Lieber explained that "[t]he only reason that we can absorb the timing impact of having the lower toll – which will mean that our full bonding that gets us to $15 billion is probably delayed a little bit – *is because we have a full and absolute commitment on the next MTA capital program.*" Christina Baker, *MTA board approves updated congestion pricing plan*, The Bond Buyer (Nov. 20, 2024) (emphasis added).

these words, but it's almost like it was hortatory…there's no annual revenue commitment…the number could be quite a bit lower in terms of what the legislative objective is." *Id*. at 91:20-25. In response, Defendants' counsel indicated that while he did not have a "detailed presentation" on how the $1 billion requirement was calculated, counsel assumed that "it was a process identified by the MTA as what would be sufficient to come up with the revenue that was required by the statute." *Id*. at 92:10-12. The MTA's counsel was blunter, explaining that the $1 billion mandate was clear in the EA, and that it was set out "not buried in some technical memo," but contained up front, within the Executive Summary. *Id*. at 125:17-126:1. The once fixed $1 billion statutory objective that Defendants' relied upon to justify the lack of any meaningful alternatives analysis cannot suddenly be unmoored without further review.

Defendants intimate that a supplemental analysis is unnecessary because Plaintiffs' proposed suggestion of a phase-in toll "is exactly what the MTA has adopted," misses the point. The "phase-in" should have been fully considered and analyzed, along with other alternatives, in a public EA (or EIS) process. Nor is it an answer to suggest that there has been public input into (or dissemination of information about) the reevaluation through various groups of interested persons. While a step in the right direction, that is not the transparent public process that NEPA mandates.

Moreover, Defendants take pains to assert that there are no alternatives that Plaintiffs proposed that could meet the new revenue goal because many did not even meet the non-revenue goals. But a closer look at this Court's decision shows that is simply false. First, the Court found that while "increasing tolls at existing facilities would generate some revenue, the FHWA determined it 'would not be sufficient to fund $15 billion for capital projects for MTA's capital program.'" (Order at 59). That was one alternative proposed that only failed the revenue

requirement.  Second, Plaintiffs argued that the FHWA failed to respond to critical comments in which the EPA "urged the FHWA to consider combinations of the preliminary alternatives." (Order at 64).  The FHWA responded to the EPA that "while multiple alternatives in combination might serve to reduce congestion sufficient to meet the Project objectives, they would still fail to meet the Project's revenue goal."  *Id.* at 65. The Court held that this response was sufficient because the FHWA rejected the alternative as "ineffective."  Yet it may no longer be "ineffective," given the MTA's changing fiscal flexibility and NEPA requires a second look.

Finally, Defendants suggest that the Court already recognized that a phase-in approach need not be analyzed because it "merely postpones the full operation of Congestion Pricing."  (Fed. Defs. Br. at 23).  Not so.  While a pilot program (testing the impact of tolling on certain vehicles, for example) might constitute a postponement of the program, Congestion Pricing is scheduled to be implemented on January 5.  A phase-in is not a postponement of the program, it *is* the program.

*Shenandoah Valley Network v. Capka,* No. 07-cv-00066, 2009 WL 2905564, at *11 (W.D. Va. Sept. 3, 2009), cited by the Court in its initial analysis of this pilot-type phase-in approach, is distinguishable in this regard.  In *Shenandoah,* the plaintiffs' suggested alternative was simply the postponement of an EIS regarding an assessment for the I-81 corridor until a state agency had completed its freight rail study.  The court there held that waiting for the state agency review was "not an alternative within the meaning of the NEPA regulations." *Id.*  That is decidedly different from the case here, where a phase-in approach is a type of qualitative Congestion Pricing structure that could have (and should have) been assessed.

Revisiting the alternatives is necessary because the public, in light of the new revenue generation, could not have fully appreciated or weighed in on the benefits and environmental costs of Congestion Pricing with misleading, or at the very least, incomplete information.  A NEPA

document may be deficient if its assessment of the costs and benefits of a proposed action relies on misleading assumptions. Wrong information about economic benefits can prevent the agency from engaging in informed decision-making when balancing an action's benefits with its environmental effects and can preclude meaningful public participation by "skewing the public's evaluation of" the action. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir. 1996).

In *Hughes River Watershed Conservancy*, the Fourth Circuit considered an EIS prepared by National Resources Conservation Service ("NRCS") evaluating a proposed dam. *Id.* at 440. The court held that NRCS impaired fair consideration of the project's adverse effects by including an inflated estimate of benefits that accounted for a significant portion, approximately thirty-two percent, of the economic benefits for the project. The EIS overstated the economic data surrounding the construction of the dam and had the potential to mislead the public about the economic benefits that would result.

*Nat'l Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 801 (9th Cir. 2005), is also instructive. There, the United States Forest Service ("Forest Service") miscalculated the demand for timber and lower employment and earnings potential of the project in an EIS for a land management plan. The Ninth Circuit concluded that had the decision-makers and public known of the accurate demand for timber and the lower earnings potential, the Forest Service "may have selected an alternative with less adverse environmental impact, in less environmentally-sensitive areas." *Id*. at 803.

Here, just as in these cases, the public and decision-makers may have selected an alternative during the NEPA process, perhaps with less damage to environmental justice communities, or weighed the environmental harm differently, had they known that the required level of economic

benefit could be significantly lower. *See also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1157 (W.D. Wash. 2002) ("An EIS that relies upon misleading economic information may violate NEPA if the errors subvert NEPA's purpose of providing decisionmakers and the public an accurate assessment upon which to evaluate the proposed project.").

Defendants suggest that *Glickman* is "inapt" because there have been "no errors of analysis" and no "errors in revenue assessment" in evaluating whether Congestion Pricing will meet its revenue goals. (Fed. Defs. Br. at 25). The argument fails to appreciate the import of cases like *Glickman, Nat. Res. Def. Council,* and *Nat'l Wildlife Fed'n* and their application here. The reason NEPA was violated in those cases was not simply the fact of a mathematical error, but because the public lacked an accurate economic assessment with which to evaluate both the costs and benefits of the proposed project. The public could not properly weigh the environmental cost of the dam in *Glickman,* the land management plan in *Nat'l Res. Def.* Council or fisheries in *Nat'l Wildlife Fed'n* without knowing the economic benefit that would flow from the project. So too here. Throughout the EA process, including its publication, the public was led to believe that Congestion Pricing would generate $1 billion in annual economic benefit for the MTA and the transit system. The Court, too, was led to believe that the project "sought at least $1 billion in annual net revenue" for all tolling scenarios. (Order at 58). That was an inaccurate or misleading assessment upon which to weigh the environmental costs, requiring a supplemental EA.

The MTA belatedly attempts to distinguish *Alaska Wilderness,* 67 F.3d at 723, a case directly on point (in a footnote on the last page of its brief), on the grounds that the alternative criterion there was *eliminated* after the EIS (versus it purportedly only being *modified* here). The distinction is without meaning. (Memorandum Of Law In Support Of Cross Motions For Summary Judgment By Defendants The Metropolitan Transportation Authority, The Traffic

11

Mobility Review Board, And The Triborough Bridge And Tunnel Authority, And In Opposition To Plaintiffs' Motions For Summary Judgment ("MTA Br.") (Dec. 9, 2024) [*Chan* ECF No. 148] at 30, n. 25).  The NEPA violation in *Alaska Wilderness* turned on the agency's consideration of only alternatives that had met a certain contractual criterion, a volume requirement that was subsequently no longer required for the project.  *Id.* at 731.  That is precisely what has occurred here.

Two final points merit mentioning.  Defendants assert that there are no "changed economic circumstances" requiring the Final EA to be supplemented because Plaintiffs have not explained the new information and because changed economic conditions cannot necessitate supplementation. (Fed. Defs. Br. at 25-26). Both arguments fail.  First, Plaintiffs have explained the changed circumstances. Congestion Pricing was "paused" by the Governor on June 5, 2024, on account of changed economic conditions.  Defendants all agreed to that "pause" and the Reevaluation was issued to the public nine days later.  It is difficult to understand how Defendants deemed the "new information" sufficient to halt the entire implementation of the Congestion Pricing program, but not substantively discussing in the June 14 Reevaluation (or subsequent Reevaluation 2) the changes thereby necessitated.

Second, despite Defendants' repeated insistence that the only relevant change requiring supplementation must be to pollution levels, which they say will not change, courts have been clear that new information requiring a supplemental EA "need not be strictly environmental." *Nat. Res. Def. Council v. Lujan*, 768 F. Supp. 879, 886 (D.D.C. 1991) (quoting *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987), *abrogated on other grounds by Marsh v. Oregon National Resources Council,* 490 U.S. 360 (1989).  Information that "does not seriously change the environmental picture, but that nevertheless affects, or could affect, the decision-making process,

is subject to the procedural requirements of NEPA." *Id.* at 887. In any event, there will be changes to pollution levels, despite Defendants' repeated insistence that there will be no environmental impact. The Federal Defendants admit that the Reevaluation finds that within the Bronx, Richmond and Bergan counties, new census tracts will see increased pollution under the adopted tolling structure. (Fed Defs. Br. at 13) – a change that the MTA fails even to acknowledge.

Moreover, while changed economic conditions may not typically require supplemental analysis, where, as here an agency chooses to address economic effects in an environmental assessment, that information must be accurate and up-to-date to allow for reasoned decision-making. *NRDC v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005); *see also Tongass Conservation Society v. Cole*, No. 09-cv-00003 JWS, 2009 WL 10704137 (D. Alaska Dec. 7, 2009). Both the Final EA and June 14 Reevaluation contained sections entitled "Economic Conditions" purporting to present an assessment of implementing Congestion Pricing on economic conditions at both the regional and neighborhood level. Yet, there is no analysis of affordability of the toll, no meaningful change to the analysis of the impact on small businesses in Manhattan, or any review of how economic circumstances have changed since the issuance of the Final EA.

## II.    THE REEVALUATIONS WERE INSUFFICIENT

In support of the motion for summary judgment, Plaintiffs pointed to the inadequacy of both the June 14 Reevaluation and Reevaluation 2. Two particular areas of the reevaluations – the (lack of) FHV/taxis analysis and mitigation – keenly illustrate the failure to take a "hard look" at the adopted tolling structure and Defendants have not sufficiently explained why further analysis was not conducted.

First, neither reevaluation adequately appreciated or analyzed the impact of the changed toll on taxis and for-hire vehicles ("FHV"). Under the adopted tolling structure, taxis and Ubers are charged per ride, not to be paid by the driver, but instead passed on to the passenger. Under

the new phase-in approach, the $1.25 and $2.50 charge to taxis and FHVs, respectively, will drop to $.75 and $1.50 to the passenger on a per ride basis, a negligible fee (particularly on longer rides) unlikely to decrease congestion at all.  The recommended toll is determined simply by dividing the toll rate by the average number of trips that taxis and FHVs make in the CBD today (12 and 6, respectively).  It was designed as a simple, back-of-the envelope proxy for the money the MTA wishes to collect, without real analysis of the impact on congestion or the environment.

Defendants do not dispute the significantly outsized proportion of congestion that FHVs and taxis make up in New York City.  As stated, the TMRB estimated that 52% of congestion is caused by FHVs and taxis only 32% of vehicles in midtown Manhattan are personal cars.  TMRB Recommendation at 11.  Thus, even if the toll is effective at reducing the number of private vehicles in Manhattan, it will barely affect the remaining two-thirds of the traffic and is therefore unlikely to meaningfully relieve traffic congestion (in fact, with less congestion from private vehicles, the number of miles driven by taxis, FHVs, and delivery vehicles are likely to increase).

Rather than dispute these figures, Defendants mischaracterize Plaintiffs' argument as a criticism of the treatment of FHV and taxi drivers within the reevaluations.  (MTA Br. at 22).  That is decidedly not so.  Plaintiffs' argument, not meaningfully treated by Defendants, is not that the FHV or taxi drivers should be charged more; it is that the negligible direct pass-through charge to a passenger is a qualitative and material change to the way that Congestion Pricing will be implemented, requiring a "hard look."  An appropriate analysis of how the new passenger charge might impact congestion should have focused, for example, on the elasticity of demand for FHVs and taxis, whether larger fees could be charged for longer trips, whether peak/off pricing could be implemented for passengers, and on the overall economic burden on private daily car drivers versus FHV and taxi pass.  None of this analysis of the adopted tolling scenario was done or even

considered.  Instead, Defendants simply re-ran the same BPM modeling and treated FHVs and taxis in the economic justice section of the reevaluation.

This issue is real.  Recent academic scholarship argues that the adopted tolling scheme and its new treatment of FHV and taxi vehicles is a material modification that is "unlikely to be effective at solving the traffic congestion scheme," and that FHV/taxis should have been more closely reviewed.  In "Effective and Equitable Congestion Pricing: New York and Beyond," two Stanford and University of Chicago economists argue that the all-day pass-through charge to passengers is a major change to Congestion Pricing and a "major shortcoming" of the tolling scheme that should have been fixed during the Governor's "pause."[4]  Based on their analysis, the economists suggest a peak/non-peak structure (little need to charge a congestion fee to a passenger taking an Uber from a bar at 1:00 am), a per-mile rather than per-trip computation of the fee (the fee from the airport should not be the same as the fee for a few blocks), and a higher FHV/taxi peak charge (to actually disincentive their use).  The economists conclude that minor, feasible modifications to the FHV/taxi charge would reduce congestion and still meet the program's overall revenue generation goals.[5]

To be clear, Plaintiffs are not necessarily advocating these particular changes to the FHV/taxi toll or that it is for the Court to decide; the point is that these modifications were never even considered.  *Nat'l Audubon Society v. Dep't of Navy*, 422 F.3d 174, 194 (4th Cir. 2005) (courts should not permit researching in a "cursory manner" for an agency's 'hard look').  The lack of any deeper analysis on the congestion impact tracks with Defendants' seemingly changed

---

[4] Michael Ostrovsky & Frank Youung, Working Paper No. 4228, "Effective and Equitable Congestion Pricing: New York City and Beyond", Stanford Graduate School of Business Faculty & Research, available at https://www.gsb.stanford.edu/faculty-research/working-papers/effective-equitable-congestion-pricing-new-york-city-beyond

[5] *Id.*

program objective from the Final EA to the TBTA Recommendation and reevaluations.  In the Final EA, Defendants recognized that the volume of FHV registrations had tripled in New York City from 2010 to 2019 (DOT_0040637) and that by charging FHV and taxis on a per trip basis, "demand for their service would decline, particularly in New York City, reducing trips and *better meeting the Project objective*."  DOT_0040649.  Yet that "Project objective" changed in the June 14 Reevaluation, which touts as a positive result the "potential decrease in taxi/VMT across the region and within the Manhattan CB"" as smaller than the largest decreases found in the EA. DOT_0045447.  A "harder look" was required, particularly when the Defendants' desired goal with respect to how to treat over half of Manhattan's congestion had changed.

Aside from change to FHV/taxis, Defendants' response to many of the other structural changes described in Plaintiffs' moving papers – the two-hour increase in peak pricing and the change from a three-period to two-period toll – are met with quick reference to the BPM model (Fed. Defs. Br. at 14) and a cursory assertion that the changes were designed to facilitate an easier understanding of the toll.  (*Id.* at 15).  But that does not qualitatively explain how the changes will impact the environment or congestion or New Yorkers and does not constitute the requisite "hard look."[6]

With respect to mitigation, the Court's approval of the EA's proposed mitigation efforts was predicated, at least in part, on the existence of an "adaptive management approach" for certain place-based mitigation measures and because Defendants had committed to monitoring the mitigation program to ensure effectiveness.  (Order at 92, 99, 101) (quoting *National Audubon*

---

[6] While the MTA contends that Plaintiffs have not cited any authority for the limited effect of the so-called "mitigation" reflected in a discounted overnight toll for trucks (MTA Br. at 22), Plaintiffs cited to the submission and position of the Truckers' Association of New York – the very demographic that Defendants believe would benefit from the reduction – to refute the effectiveness of that reduced rate.  (Memorandum Of Law In Support Of Plaintiffs' Motions for Summary Judgment ("Mov. Br.") (Dec. 2, 2024) [*Chan* ECF No. 136-1] at 13, n.9).

*Soc. v. Hoffman*, 132 F.3d at 17 ("In practice mitigation measures have been found to be sufficiently supported…when they are likely to be adequately policed."). Defendants suggest that the Court has fully approved of its mitigation efforts. But the Court ruled on the validity of the EA and FONSI *prior* to the reevaluation and before Defendants' changed the toll to a lengthy phase-in. And Defendants have failed to adjust the mitigation plan to account for the new structure.

Defendants insist that they have now made the mitigation plan more precise. By that they mean they have roughly allocated the place-based funds across affected communities based upon population (DOT_0045605), while still not identifying what placed based-mitigation will be implemented in any specific area, nor how it is targeted to ameliorate that particular environmental impact. Despite knowing the toll amount and toll structure (and predicted pollutive impact), Defendants, for example, still do not specify what schools will receive air filtration units near highways, what parks will be renovated and where parks and greenspaces will be renovated. DOT_0045610. And places like Richmond County and lower Manhattan along the FDR Drive continue to lack air quality mitigation measures. Nonetheless, even assuming that continued uncertainty remains, the mitigation plan, such as it is, no longer matches the plan's construct.

The FHWA and the EPA initially criticized the MTA for having mitigation that "consists of a commitment to further study rather than a commitment to implementing measures." (Order at 100). In response, the MTA made a commitment of $155 million over five years, which the Court found acceptable under the initial EA. But that five-year commitment is not aligned with the phase-in of the plan. While the MTA has seemingly promised to monitor and study the program beyond the five-year mark, at that point, it amounts to the kind of "commitment to further study" and not to actually mitigate that the EPA and the FHWA warned against. Defendants' answer to this argument – that they have not delayed implementation of mitigation until the final

17

year of the phase-in (MTA Br. at 24) – misses the point.  The mitigation plan needed to be restructured to account for the fact that the biggest impact will only become evident well after the five-year commitment and after many of the tools to be used for adaptive management have expired.

While the Court recognized "[u]nder an adaptive management plan, an agency monitors the implementation of a project and then tailors its mitigation measures over time to fit effects as they unfold" (Order at 101), here, the toolbox for adaptive management largely expires after five years, before the real effects of the fully phased-in plan are felt.  By the time the likely worst traffic diversion and pollution from Congestion Pricing will occur, the $155 million in mitigation commitments that this Court approved will already have been spent, and the Defendants will be without any continuing obligation to remediate.

Everything about the unchanged mitigation plan presumes a tolling structure that is fully implemented at the beginning.  To start, the Court relied on the representation that after an initial two-year period, the Sponsors would "'assess the magnitude and variability of changes in air quality to determine whether more monitoring sites are necessary.'"  (*Id*. at 99).  The EA, too, commits to a study on the effects of Congestion Pricing on parking (pursuant to the Traffic Mobility Act), within 18-months after toll collection commences.  DOT_0036272.  While a preliminary assessment could be made in that two-year or 18-month period, it would now be limited to assessing the impact of only phase 1 of the toll and would need to be repeated as later phases are implemented.  Defendants do not discuss, let alone account for, the discrepancy in Reevaluation 2.

Another tool in the adaptive management program is the TBTA's ability to actually increase or decrease the price of tolls and credits up to 10% to respond to monitoring results, where

appropriate.  DOT_0045575.  The authority to make this type of adjustment (which itself has not

been clearly studied in terms of impact and could potentially create another tolling structure), can

only be exercised during the *first year* after implementation.  DOT_0047533.  While price certainty

as to the toll after year one is potentially positive, it is not clear how those potential changes would

impact the amount of the toll in later phases or how dynamic management would work after the

right to alter tolls and credits expires.  The same is true for the MTA's commitment to provide a

50% discount to low-income drivers for five years.  DOT_0045614.  This creates a cliff in 2031

when the discount will expire just in time for the toll to reach its maximum price.  The impact of

that cliff on low-income drivers has not been analyzed.

Lastly, at oral argument, Defendants explained that for one area that will be significantly

impacted by the program, the Lower FDR Drive, the MTA would implement a "monitoring period

of three months after implementation to see how effects come to pass that were discussed in the

environmental assessment" and adjust the mitigation accordingly. Transcript of Oral Argument at

84:16-85:4. That three-month evaluation will necessarily be limited to the phase 1 toll.  For all the

increased specificity that Defendants cite of the locations of the mitigation dollars, the three-month

air quality on the FDR Drive remains part of the mitigation program, along with the other

misaligned measures, to be implemented only during the $9 and $12 toll phase. There is no

mitigation plan specified moving forward and the VPPP has been signed, concluding the process.

Defendants promise that "[n]otwithstanding the phasing in of tolls, the Project Sponsors

would comply with all of the mitigation commitments set forth in the EA and FONSI within the

same timeframes as contemplated in those documents and the reevaluation prepared for the March

2024 adopted toll structure." DOT_0047531. That is precisely the problem, not the solution.

Plaintiffs are not advocating for delaying mitigation.  Mitigation should begin when the harm

19

begins. But that does not excuse the complete failure to adjust the mitigation plan and commitments to align to the final phased-in toll, or in any way analyze such changes.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion for Summary Judgment and deny Defendants' Cross-Motion for Summary Judgment.

Dated:  New York, New York
        December 13, 2024

**STEPTOE LLP**

By:    /s/ Alan M. Klinger
       Alan M. Klinger
       Dina Kolker
       David Kahne
       1114 Avenue of the Americas
       New York, New York 10036
       (212) 506-3900
       aklinger@steptoe.com

*Co-Counsel for the Mulgrew and Chan Plaintiffs*

Of Counsel:                    -and-

Carly Rolph                BETH A. NORTON, Esq.
Alexander Langer       United Federation of Teachers
                   52 Broadway
                   New York, NY 10004
                   (212) 701-9420

*Co-Counsel for the United Federation of Teachers and Individual Plaintiffs*

                   -and-

                   THE OFFICE OF LOUIS GELORMINO, Esq. & FONTE & GELORMINO LEGAL GROUP
                   2550 Victory Blvd.
                   Suite 304
                   Staten Island, NY 10314
                   (917) 968-1619
                   (718) 720-4949

*Co-Counsel for Vito J. Fossella*

20