UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELIZABETH CHAN, *et al.*,

        *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

        *Defendants*.

Case No. 1:23-cv-10365 (LJL)
Case No. 1:24-cv-01644 (LJL)

MICHAEL MULGREW, *et al.*,

        *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF TRANSPORTATION, *et al.*,

        *Defendants*.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CROSS MOTIONS FOR SUMMARY JUDGMENT BY DEFENDANTS THE METROPOLITAN TRANSPORTATION AUTHORITY, THE TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, AND THE NEW YORK CITY DEPARTMENT OF TRANSPORTATION**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1
ARGUMENT .................................................................................................................................. 2
   I.   A SUPPLEMENTAL EA WAS NOT REQUIRED ............................................................ 2
   II.  FHWA TOOK A HARD LOOK .......................................................................................... 6
CONCLUSION ............................................................................................................................. 10

# **TABLE OF AUTHORITIES**

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*,
67 F.3d 723 (9th Cir. 1995) ...............................................................................................4, 5

*Conn. Bar Ass'n v. United States*,
620 F.3d 81 (2d Cir. 2010)......................................................................................................7

*Friends of Cap. Crescent Trail v. Fed. Transit Admin.*,
877 F.3d 1051 (D.C. Cir. 2017)...............................................................................................5

*Hughes River Watershed Conservancy v. Glickman*,
81 F.3d 437 (4th Cir. 1996) .....................................................................................................4

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989).......................................................................................................*passim*

*Mulgrew v. U.S. Dep't of Transp.*,
No. 24 Civ. 1644, 2024 WL 3251732 (S.D.N.Y. June 20, 2024)......................................... *passim*

*Nat'l Audubon Soc'y v. Hoffman*,
132 F.3d 7 (2d Cir. 1997).........................................................................................................7

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
235 F. Supp. 2d 1143 (W.D. Wash. 2002)...............................................................................4

*Nat. Res. Def. Council v. Lujan*,
768 F. Supp. 879 (D.D.C. 1991) .............................................................................................5

*Nat. Res. Def. Council v. U.S. Forest Serv.*,
421 F.3d 797 (9th Cir. 2005) ...................................................................................................4

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989).................................................................................................................8

*Shenandoah Valley Network v. Capka*,
No. 07 Civ. 00066, 2009 WL 2905564 (W.D. Va. Sept. 3, 2009)...........................................6

*Sierra Club v. Froehlke*,
816 F.2d 205 (5th Cir. 1987) ...................................................................................................5

*Vill. of Grand View v. Skinner*,
947 F.2d 651 (2d Cir. 1991)................................................................................................2, 5

**STATUTES**

42 U.S.C. § 4332(2)(C) ...................................................................................................................5

N.Y. Veh. & Tr. Law § 1704-a(1) ..................................................................................................3

N.Y. Pub. Auth. Law § 553-k(3) ....................................................................................................3

**REGULATIONS**

23 C.F.R. § 771.130 .......................................................................................................................5

## PRELIMINARY STATEMENT

All along, Plaintiffs'[1] case has been a policy dispute masquerading as an environmental challenge. Their opposition and reply rips off the mask. Indeed, Plaintiffs now decry Defendants as being "singularly focused on . . . environment impact." Pl. Reply 4. Plaintiffs' attempt to transform NEPA from an environmental statute into a mechanism for endless public policy debate is fundamentally incorrect. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

Ironically, TBTA adopted a version of a policy Plaintiffs previously endorsed: a phase-in of the Program. The Court recognized that a phase-in would not require analysis as an alternative because it was simply a version of the Program (*Mulgrew v. U.S. Dep't of Transp.*, No. 24 Civ. 1644, 2024 WL 3251732, at *27 (S.D.N.Y. June 20, 2024)); nonetheless, Plaintiffs now illogically argue that the adoption of a phase-in requires a supplemental EA to reexamine alternatives. As FHWA found, the Program as adopted will still meet the objectives articulated in the EA, even if Plaintiffs baselessly question the financial analysis of the MTA's Chief Financial Officer.

Plaintiffs cannot dispute that the Reevaluations analyze the adopted toll structure's environmental effects and ability to meet the Program's congestion-reduction and revenue objectives, including as part of the modeled structure charging taxis and FHVs on a per-ride basis equating to one full peak period passenger vehicle toll per day. But they now question whether this approach to taxi and FHV tolling is a good one for reducing congestion, having never before expressed this policy concern. The time has passed for such second-guessing.

Plaintiffs also challenge the Program's mitigation commitments as both too undefined and too inflexible. They are wrong on both counts. Reevaluation 1 identifies communities eligible for

---

[1] Unless otherwise noted, capitalized terms herein have the same meaning as set out in Defendants MTA and TBTA's moving papers, filed in *Chan* at ECF 148 and in *Mulgrew* at ECF 134, and referred to herein as "Def. Br." "Pl. Reply" refers to Plaintiffs' opposition and reply memorandum of law filed in *Chan* at ECF 154 and *Mulgrew* at ECF 140. "Tr." refers to the oral argument transcript filed in *Chan* at ECF 89.

place-based mitigation, proportionately allocates funding by population, and sets forth a process for siting mitigation measures in coordination with stakeholders. These commitments have not changed. The EA never contemplated an adjustment of the initial funding allocation based on monitoring of effects. Rather, monitoring and adaptive management are additional commitments of the Program that are limited neither to its first five years nor to any particular funding amount.

It is by now perfectly clear that Plaintiffs' sole agenda is to delay the Program by any means necessary, exploiting an environmental statute to forestall the environmental, quality of life, and economic benefits of this landmark effort. This agenda should not be countenanced.

## ARGUMENT

### I. A SUPPLEMENTAL EA WAS NOT REQUIRED

Plaintiffs do not dispute that whether to prepare a supplement "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise," that depends on whether changes to the Program "will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374, 376–77 (internal quotation marks and alterations omitted). Indeed, Plaintiffs studiously avoid reference to the "arbitrary and capricious" standard of review. *Id*. at 375–76; *Vill. of Grand View v. Skinner*, 947 F.2d 651, 657 (2d Cir. 1991). Nonetheless, Plaintiffs ask this Court to unwind more than five years of exhaustive environmental review, based on illusory "changed circumstances" related to economics, not environmental concerns. NEPA does not provide Plaintiffs such an avenue.

Plaintiffs claim that FHWA must conduct an entirely "new examination" of alternatives because the Phased-In Approach will generate less annual revenue in the early years of the Program. Pl. Reply 5. Plaintiffs' argument rests on a faulty premise: namely, that one of the three objectives used to screen alternatives, in addition to reducing daily VMT within the CBD by at least 5% and reducing the number of vehicles entering the CBD daily by at least 10%, was

2

*generating $1 billion annually*. *Id.* at 1–3, 5–12. With blatant falsity, Plaintiffs even claim that generating $1 billion annually was a "once fixed [sic] . . . *statutory objective*." *Id.* at 8.

Whether Plaintiffs are mistaken or hope to confuse the Court, they are wrong. The Traffic Mobility Act ("TMA") required that the Program generate sufficient revenue to fund $15 billion for the 2020-2024 MTA Capital Program. N.Y. Veh. & Tr. Law § 1704-a(1); Pub. Auth. Law § 553-k(3). The EA used this statutory mandate to screen alternatives (DOT_0036198, DOT_0036259, DOT_0036267–68), an approach this Court described as "pragmatically sensible . . . since it ensures federal agencies do not expend resources examining alternatives that the project sponsors are not legally authorized to implement." *Mulgrew*, 2024 WL 3251732, at *26 (internal quotation marks omitted). MTA's Chief Financial Officer ("CFO") determined that although the Phased-In Approach "would not raise as much annual revenue" in the early years, it "would *in combination* still achieve the objective of funding $15 billion in capital projects to allow their completion on the same timeline."[2] (DOT_0047537–38 (emphasis added).) Plaintiffs provide no basis to question the MTA CFO's conclusion. While Plaintiffs fixate on a $1 billion annual figure, the EA explained that this was an *estimate* of what would be needed to fund $15 billion, which "depends on a number of economic factors, including but not limited to interest rates and term." (DOT_0036301.) Indeed, Plaintiffs themselves previously argued that "there is no annual billion-dollar requirement in the statute." Pl. Reply 7–8 (quoting Tr. at 68:9–10).[3]

Plaintiffs concede that it "may be true" that the TMA set a $15 billion objective and not an

---

[2] Many of Plaintiffs' arguments appear to assume that the goalpost has moved from a $1 billion estimated annual need to $500 million. However, Reevaluation 2 was clear that the CFO's conclusion rests on the escalation of revenues over the first seven years of the Program.

[3] Plaintiffs mischaracterize statements made by MTA and TBTA's counsel at oral argument, Pl. Reply 7–8, in which their counsel explained that the EA "indicates that the one billion is a rough surrogate for the 15 billion that's estimated based on bonding, future conditions, etc." Tr. at 125:17–126:1. There is no support for Plaintiffs' contention that FHWA applied "an inflexible objective" of generating $1 billion annually. Pl. Reply 7.

3

$1 billion annual figure, but nonetheless argue that "the spectrum of available alternatives . . . have significantly changed." Pl. Reply 6–7. They do not explain how. Apparently conceding that carpooling and license plate rationing would raise no revenue at all, *Mulgrew*, 2024 WL 3251732, at \*25–26, Plaintiffs posit that "increasing tolls at existing facilities" is now a viable alternative because it allegedly "only failed the revenue requirement." Pl. Reply 8–9. Plaintiffs are correct that increasing tolls would not raise sufficient revenue: FHWA determined that this "'would not be sufficient to fund $15 billion for capital projects for MTA's Capital Program,' because 'with some crossings remaining untolled, traffic would divert to untolled facilities, thereby reducing the revenue and not reducing traffic.'" *Mulgrew*, 2024 WL 3251732, at \*25 (quoting DOT_0036268). Moreover, this concept would not sufficiently reduce daily VMT or the number of vehicles entering the Manhattan CBD. (DOT_0036267–68.) While Plaintiffs speculate that a "combination" of alternatives may now be viable, Pl. Reply 9, they do not attempt to explain how a combination of one measure that would generate grossly insufficient revenue and others that would generate *none* is now a viable alternative to the Program.

Plaintiffs' contention that the EA contained "misleading" or "incomplete" information is therefore without merit. *Id.* at 9–12. Their attempt to draw an analogy to cases involving statutory amendments that eliminated a component of an agency's prior alternatives analysis, *see Alaska Wilderness Recreation & Tourism Ass'n v. Morrison*, 67 F.3d 723 (9th Cir. 1995), or in which agencies conceded that they had made mathematical errors that undermined the estimate of economic benefits, *see Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996); *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1157 (W.D. Wash. 2002) (deferring to the agency's calculation of net economic benefits), misses the mark. For example, *Alaska*

4

*Wilderness*, which Plaintiffs claim is "directly on point," Pl. Reply 11, involved a statutory amendment that *eliminated* a timber supply mandate that "significantly . . . alter[ed] the range of viable alternatives available to the Forest Service," 67 F.3d at 730–31. Here, the statutory requirement remains in effect. Plaintiffs also conflate the economic benefit of the Program with the TMA's revenue requirement, which would be met with the Phased-In Approach.

Plaintiffs persist in arguing that a supplement is required because of purported "changed economic conditions," ignoring the unbroken line of authority instructing that a supplement is required only when project changes "will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered." *Marsh*, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(2)(C)); 23 C.F.R. § 771.130; *see also Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1060 (D.C. Cir. 2017); *Skinner*, 947 F.2d at 657.[4] Even if economic circumstances changed since the issuance of the Final EA—which premise FHWA studied and rejected (DOT_0045523–32)—Plaintiffs do not make any serious effort to connect the supposed economic changes to environmental impacts.[5] And while Plaintiffs attempt to belatedly challenge the EA's assessment of the Program's economic impact, the Final EA studied the Program's potential impact on low- and middle-income drivers (DOT_0036974–75, DOT_0037001–03, DOT_0037015–33, DOT_0003657–67) and on small businesses

---

[4] Plaintiffs quote a stray remark in *Natural Resources Defense Council v. Lujan*, 768 F. Supp. 879, 886 (D.D.C. 1991), that was, at best, dicta, for the theory that any new information affecting an agency's decision-making process "is subject to the procedural requirements of NEPA." Pl. Reply 12–13. The only authority cited for this statement was *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987), which was itself abrogated by *Marsh*, albeit on other grounds. Indeed, the *Lujan* court's analysis begins with the principle that to prevail on a failure to supplement claim, "Plaintiffs must demonstrate, on a reviewable environmental record, that the new information raises a substantial environmental issue." 768 F. Supp. at 886. And the court found that the information at issue—a study finding a much greater probability of large oil reserves in the Arctic National Wildlife Refuge—had environmental implications. *Id*.

[5] Plaintiffs point to extra-record (and irrelevant) comments of Governor Hochul, Pl. Reply 16, and MTA Chair Janno Lieber, *id.* at 7, relating to, respectively, concerns over the cost of the tolls, which the Phased-In Approach addressed, Def. Br. 6 n.6, and gubernatorial support for MTA's 2025-2029 Capital Program. The latter is contingent on legislative approval and not relevant to the $15 billion gap in the budget for the 2020-2024 Capital Program.

5

(DOT_0036695–96, DOT_0036749–52, DOT_0036766–67, DOT_0045527–28).  The Project Sponsors mitigated adverse effects on low-income drivers through the inclusion of a Low-Income Discount Plan, among other measures (DOT_0037020–25, DOT_0045466), and also established a small business working group to track concerns arising from the Program, although the EA found that small businesses would not suffer adverse effects (DOT_0045617–18, DOT_0036224).

Finally, Plaintiffs attempt to elide their prior support for a phase-in of the Program, suggesting that what they (and this Court) really meant was a "pilot program" to "test[] the impact of tolling." Pl. Reply 9–10.  Initially, the Program includes a robust monitoring program to do just that.  Point II, *infra*.  Moreover, neither Plaintiffs nor this Court ever referred to a phase-in of the Program as a "pilot."  *See Mulgrew*, 2024 WL 3251732, at *27; *Chan*, ECF 54-1; *Chan*, ECF 78.  To the extent that Plaintiffs are arguing that the Program should be further postponed to assess a phase-in, Pl. Reply 9, a feature of the tolling structure that was in fact adopted, the decision in *Shenandoah Valley Network v. Capka,* No. 07 Civ. 00066, 2009 WL 2905564, at *11 (W.D. Va. Sept. 3, 2009), is on point.  There, the court held that it would defeat the purpose of a highway widening project to wait for further ongoing study of railway improvements, which the plaintiffs had endorsed as an alternative.  Similarly here, this Court already held that a phase-in approach need not be studied as a separate alternative as it "was a potential feature of Congestion Pricing, rather than an alternative to it."  *Mulgrew*, 2024 WL 3251732, at *27.  Having achieved the adoption of a phase-in feature (not just the study of it), Plaintiffs seek yet another round of analysis, confirming that "Plaintiffs' NEPA challenge . . . is at bottom a policy disagreement with the wisdom of Congestion Pricing," *id.* at *46, with Plaintiffs' sole objective being further delay.

## II.   FHWA TOOK A HARD LOOK

Having abandoned many of their prior "hard look" arguments, Plaintiffs now make just two: (1) FWHA did not take a hard look at taxis and FHVs, and (2) the mitigation program the

6

Court previously affirmed, and which was bolstered and refined in the Reevaluations, is now insufficient. Neither argument holds water.

Plaintiffs continue to falsely claim that the Reevaluations did not "adequately appreciate[] or analyze[] the impact of the changed toll on taxis and [FHVs]." Pl. Reply 13–16. Plaintiffs ignore the fact that the adopted toll rates for taxis and FHVs were reflected in all of the Reevaluations' modeling results—including the projections of VMT and daily entry reductions. (DOT_0045439–40, DOT_0045571–72.)[6] FHWA thus took a "hard look" using the same modeling techniques this Court already affirmed. *Mulgrew*, 2024 WL 3251732, at *19, *28–44.

Plaintiffs' arguments devolve into a policy dispute that the toll rates on taxis and FHVs should be greater or structured differently. Pl. Reply 13–16. Indeed, they make this plain by describing the tolls on taxis and FHVs as "a negligible fee" that is "unlikely to decrease congestion at all." *Id*. at 14. But as this Court recognized, such "policy disagreements" belong to the "political process," not NEPA. *Mulgrew*, 2024 WL 3251732, at *22 (internal quotation marks omitted). Plaintiffs make plain their focus on policy by referencing an extra-record working paper by two economists proposing ways to improve the Program. Plaintiffs have not sought to supplement the record, nor could they, since these policy ideas do not bear on whether "the information available to the decisionmaker included a complete discussion of environmental effects and alternatives." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 15 (2d Cir. 1997). Plaintiffs also cannot properly assert new policy proposals in a reply brief. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 91 n.13 (2d Cir. 2010).

---

[6] Plaintiffs' claim—that the equivalency between a once-per-day and a per-ride toll in the adopted toll rate schedule is a "back-of-the-envelope proxy for the money MTA wishes to collect"—grossly mischaracterizes the record. Pl. Reply 14. The EA included a commitment "to adopt a toll structure with a toll of no more than once per day for taxi and FHV drivers" to mitigate potential adverse effects on an EJ population, and the adopted toll structure does just that. (DOT_0045571–72.) Moreover, as Defendants explained, a per-trip toll was adopted partly in response to feedback from Uber and for greater consistency with NYC Taxi and Limousine Commission rules. Def. Br. 21.

7

In yet another policy argument, Plaintiffs assert that other tolling structures for taxis and FHVs might provide greater reductions in congestion. Pl. Reply 14–16. However, FHWA determined that the adopted toll structure, including during each phase of the Phased-In Approach, would meet the Program's congestion-reduction objectives. (DOT_0047537–38.) FHWA also determined that a once-per-day toll, or its equivalent in the form of per-ride tolls, was needed to avoid a disproportionately high and adverse effect on taxi/FHV drivers, who are overwhelmingly members of minority groups (DOT_0037025, DOT_0045571–72)—while recognizing this may limit or negate any reduction in VMT for such vehicles in the CBD (DOT_0037003–08). Whether Plaintiffs disagree with this balancing of congestion-reduction objectives and the need to mitigate impacts on taxi/FHV drivers, it is "well settled that NEPA . . . does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).[7] In effect, Plaintiffs seek to increase the adverse effects on an EJ population so that they themselves can pay lower tolls and/or drive even more freely in the CBD.

Next, raising a new argument for the first time on reply, Plaintiffs assail the mitigation program that this Court has already affirmed. Plaintiffs' objections cannot overcome FHWA's determination that "the mitigation measures identified in the EA and FONSI are still applicable and will ensure that the Phase-In Approach . . . does not result in significant effects." (DOT_0047539); *Marsh*, 490 U.S. at 376. Moreover, Plaintiffs misread the Project Sponsors' commitment to monitor the "potential effects of the Project" and issue a report "one year after implementation and then every two years" thereafter. (DOT_0000382.) The comprehensive monitoring program, "used to support an adaptive management approach to monitoring the

---

[7] Plaintiffs' passing objection that there is no "qualitative[] explan[ation]" of "how the changes [in peak periods and the overnight discount] will impact the environment or congestion or New Yorkers" falls flat. Pl. Reply 16. Reevaluation 1 *quantitatively* analyzed these issues by modeling the adopted toll structure. Def. Br. 12–20.

8

efficacy of mitigation" and make "adjustments as warranted," refutes Plaintiffs' arguments. (*Id*.)

On the one hand, Plaintiffs seek further up-front definition of the place-based EJ mitigation measures, complaining that the reevaluations "still" do not identify "what place based-mitigation [sic] will be implemented in any specific area." Pl. Reply 17. Reevaluation 1 outlines a detailed siting process based on additional data and community feedback. (DOT_0045610–11); *Mulgrew*, 2024 WL 3251732, at *43 (holding "the absence of sites for the place-based measures" does not "render their benefits impermissibly speculative"). On the other hand, Plaintiffs argue that the plan is too inflexible because the place-based mitigation will be implemented over five years, before the highest tolls are in effect, and thus not enable it to be shaped by monitoring of those tolls. Pl. Reply 17–18. But Plaintiffs' argument conflates the Program-wide monitoring program with the place-based EJ mitigation program. The latter was always intended to be implemented based on the predicted effects of the adopted toll structure and stakeholder consultation. Ongoing monitoring will then be used to assess "the efficacy of mitigation." (DOT_0045575.) The ongoing monitoring and adaptive management approach is *additive* and provides flexibility to reassess the efficacy of mitigation over time, not to site place-based mitigation measures. As FHWA found, the Phased-In Approach did not present any reason to change course. (DOT_0047539.)

Plaintiffs' remaining objections, also improperly raised for the first time on reply, fare no better. Plaintiffs suggest that TBTA can only adjust the tolls by 10% in the first year of the Program, but that is found in TBTA's ratemaking document; nothing in the EA or FONSI precludes TBTA from adjusting toll rates in the future based on the monitoring and adaptive management principles. (DOT_0000382.) Plaintiffs claim that low-income drivers face a "cliff" because the discount for frequent low-income drivers ends after five years. Pl. Reply 19. But the EA and FONSI always contemplated that the discount was guaranteed for the first five years "to

9

allow time for frequent low-income drivers to try alternatives and/or adjust their travel habits as capital projects increase reliability and access." (DOT_0037023.) Moreover, the adopted toll structure contains a *50% discount* plan for frequent low-income drivers, double the 25% discount that FHWA determined was sufficient to avoid a disproportionately high and adverse impact on them. (DOT_0045569–70.) Even with the Phased-In Approach, the total value of the discount is greater than what FHWA found sufficient in the FONSI. (DOT_0000380–81.)

Finally, Plaintiffs claim that there is now a mismatch between the Phased-In Approach and certain mitigation measures, citing a commitment to monitor traffic near certain highway segments (including near the FDR Drive) for three months after the start of the Program. (DOT_0000384.) Even if this initial assessment will occur in the first three months of the Program to better assess what effects are Program-related rather than caused by factors, Plaintiffs concede that the larger monitoring program, including for traffic and air quality, will continue. (DOT_0000382.) Plaintiffs also complain that the 18-month parking study required by the TMA will be limited to Phase 1 of the Program, but the larger monitoring program will continue and allow the Project Sponsors to adjust over time. (DOT_0000382, DOT_0045616.) Indeed, the FONSI contemplates that adjustments may occur based on data gathered through monitoring. (DOT_0000382.)

FHWA determined that the exhaustive mitigation and monitoring programs set forth in the FONSI and reaffirmed in the Reevaluations will ensure that the Program will not result in adverse environmental impacts, or they will be sufficiently mitigated. (DOT_0045624, DOT_0047539.) Plaintiffs have offered no basis to overturn FHWA's expert judgment.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' Cross-Motion for Summary Judgment and dismiss Plaintiffs' NEPA claims with prejudice.

Dated: December 18, 2024
       New York, NY                                    Respectfully submitted,

MURIEL GOODE-TRUFANT                                  */s/ Mark A. Chertok*
Corporation Counsel of the City of New York           Mark A. Chertok
By:    */s/ Nathan Taylor*                            Elizabeth Knauer
       Nathan Taylor                                  John F. Nelson
       Senior Counsel                                 Amy Cassidy
       Environmental Law Division                     SIVE, PAGET & RIESEL, P.C.
       New York City Law Department                   560 Lexington Avenue, 15th Floor
       100 Church Street                              New York, NY 10022
       New York, NY 10007                             (212) 421-2150
       (212) 356-2315                                 mchertok@sprlaw.com
       ntaylor@law.nyc.gov                            eknauer@sprlaw.com
                                                      jnelson@sprlaw.com
       *Counsel for Defendant the New York City*      acassidy@sprlaw.com
       *Department of Transportation*

                                                      */s/ Roberta A. Kaplan*
                                                      Roberta A. Kaplan
                                                      D. Brandon Trice
                                                      Maximilian T. Crema
                                                      KAPLAN MARTIN LLP
                                                      1133 Avenue of the Americas
                                                      Suite 1500
                                                      New York, NY 10036
                                                      (212) 316-9500
                                                      rkaplan@kaplanmartin.com
                                                      btrice@kaplanmartin.com
                                                      mcrema@kaplanmartin.com

                                                      *Counsel for Defendants the Metropolitan*
                                                      *Transportation Authority and the*
                                                      *Triborough Bridge and Tunnel Authority*

11